**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN AIRLINES, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 04-1736<br>Judge Susan G. Braden |

**PLAINTIFF'S MOTION FOR PROTECTIVE ORDER**

Plaintiff American Airlines, Inc. ("AA") respectfully moves this Court for a protective order pursuant to Rule 26(b) and (c) of the Rules of the Court of Federal Claims ("RCFC"), and in support of such motion states as follows.

**BACKGROUND**

In its Opinion and Order dated November 30, 2005 (the "Opinion"), the Court found that the Government does not have authority to impose liability on AA for the payment of any APHIS and Immigration user fees that were not collected from passengers. Opinion at 11-14. The only issue remaining in this case is the measure of damages. AA asserts that the proper measure of damages is simply the amount of the assessments AA paid to the Government, because all of the assessments were based on so-called "confirmed errors" – that is, tickets that did not evidence the collection of the user fees, and for which AA could find no other evidence that the user fees had been collected. Specifically, during the audits, the Government auditors reviewed a sampling of AA's international tickets and identified as "potential errors" any tickets that did not show evidence of payment of the user fees. AA then thoroughly researched those tickets to see if it could provide any proof that the user fees were in fact collected or that the

passenger was exempt from the user fees. When AA found such proof, the Government removed that ticket from the error list. Any remaining tickets were deemed "confirmed errors" that were used to calculate an "error rate" that was extrapolated over the entire universe of international tickets during the relevant period to compute the amount of the assessment for uncollected fees. That is the amount that AA paid and the amount it seeks in this lawsuit. Because the "confirmed error" tickets do not evidence the collection of a user fee (as most tickets do), and because AA conducted exhaustive research at the time of the audits but could find no evidence that the user fees were in fact collected (as it could for other tickets), AA believes that all "confirmed errors" represent instances in which the user fees were not collected.

The Government, on the other hand, claims that the actual damages could theoretically be lower if some of the "confirmed error" tickets represent instances where AA collected, but failed to remit, the user fees. The Government argues that its "auditors have never assessed whether, for tickets bearing no evidence of user fee collection, fees might have been collected, but not remitted." Doc. No. 35 at 6. Thus, the Government claims it is "entitled to pursue that inquiry in discovery." *Id*. The Court has already stated that it will allow the Government to do so, and AA is willing to produce (and already has produced) materials relevant to that inquiry.

While most of the Government's discovery requests are potentially relevant to that inquiry, a handful are not. Those discovery requests have nothing to do with answering the question of whether the "confirmed errors" represent tickets where user fees were collected, but not remitted. Instead, they relate to a completely separate aspect of the audits – an aspect in which the Government auditors found no errors at all – in an attempt by the Government to now find new errors the auditors did not uncover before.

The discovery requests at issue relate to the method that airlines use to allocate to the

proper accounts a small portion of the taxes and user fees they collect. Airlines collect a variety of taxes, fees, and charges ("TFCs") on behalf of governments and airports. Each of these TFCs has been assigned a two-letter code by the International Air Transport Association ("IATA") – an airline industry association responsible for promulgating various industry standards. The APHIS and Immigration user fees at issue in this case are designated "XA" and "XY" respectively. Each collected TFC is recorded in one of three "TFC boxes" on the industry-standard ticket. The "XT" code is used when an airline collects more than three TFCs on one ticket. In such situations, two TFCs can be recorded in their own TFC boxes, and the IATA Ticketing Handbook instructs airlines and agents to accumulate the remaining TFCs into a third TFC box and to use the code "XT" in that box, while recording in the "fare calculation line" information for each TFC so that airlines (or other fee collectors) know which TFCs the collected money was for. Airlines (and other collectors) then use this information to assign the correct amount to each specific tax code (*e.g.*, XA or XY) so it can be paid to the government agency or airport to whom it its owed.

An issue arises, however, when there is not enough information in the fare calculation line to properly assign the money collected. Even though this happens on a very small percentage of tickets, there are too many tickets for an airline to be able to check each one by hand. Accordingly, AA takes a sample of these tickets, researches each one to figure out which TFCs should have been collected, and then uses this sample to allocate the otherwise unassigned TFCs with an "XT" code to the proper specific TFC codes (*e.g.*, XA and XY). AA does the same thing with respect to the "ZZ" code, which operates in exactly the same fashion as the

"XT" code.[1]

This XT and ZZ allocation methodology is old news to the Government. In addition to performing the exercise described above on pages 1-2 to identify "confirmed errors," the Government auditors also performed a variety of other tests of "the adequacy and reliability of [AA's] internal controls, collections, recording, reporting, and remittance systems for user fees." AA's Fact. App. at 41.[2] One such test was a specific review of AA's XT and ZZ allocation methodology, including a review of the workpapers documenting one of AA's actual monthly samples and allocations. If the Government auditors determined that AA's allocation methodology was improper, it presumably would have said so in the audit reports and would have made additional assessments against AA. However, it did not do so. More importantly for present purposes, the XT and ZZ allocations have absolutely nothing to do with the "confirmed error" tickets that served as the basis of the Government's audit assessments that AA paid.

## ARGUMENT

The Government's attempt to make AA's XT and ZZ allocations part of this case must fail for at least three independent reasons. First, these allocations are entirely unrelated to this case. They have nothing to do with the "confirmed error" tickets around which this case centers, and have no bearing on the key question of whether those tickets represent instances where a user fee went uncollected or instances where a user fee was collected but not remitted. The

---

[1] "ZZ" is simply a default code that is used by the airline settlement plans if the agent places any TFCs in a TFC box but fails to enter a valid two-letter TFC code assigned by IATA or if the TFC data exceed the limitations for the settlement plan reporting format. As with the TFCs labeled with an "XT" code, TFCs labeled "ZZ" can be allocated to the proper TFC based on specific fare calculation data if provided by the settlement plans.

[2] AA's Factual Appendix was filed on April 14, 2005, along with its Motion for Partial Summary Judgment (Doc. No. 15).

Government did not issue any assessments related to the XT and ZZ allocations, nor did AA pay any such assessments. Accordingly, the XT and ZZ allocations are completely outside the scope of this lawsuit. The Government is plainly trying to find new assessments which it can use to offset its liability in this case. Such an attempt to offset, however, must be pled as an affirmative defense under RCFC 8(c) or a counterclaim under RCFC 13. *See* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1271 at 594-96 & n.46 (3d ed. 2004); *Regency Commc'ns, Inc. v. Cleartel Commc'ns, Inc.*, 304 F. Supp. 2d 1, 6-7 (D.D.C. 2004) (*citing* Wright & Miller). The Government has pled neither.[3] *See* Answer (Doc. No. 30) at 15. Accordingly, the Government has waived any right to seek an offset in this case. *See* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1278 at 644-45 (3d ed. 2004) ("It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule 8(c) results in the waiver of that defense and its exclusion from the case"); RCFC 8(a); RCFC 13.

Second, the Government has already reviewed the XT and ZZ allocations during its audits without finding anything improper. The Government should not now be given a second bite at the apple. In other words, the Government should be estopped from claiming an offset for AA's XT and ZZ allocations, after specifically reviewing those allocations and not finding anything improper about them or notifying AA that it should change its XT and ZZ allocation methodology.

Third, the Government's discovery requests will take approximately two months to comply with, and will require AA's regular, in-house information technology ("IT") consultant

---

[3] Perhaps the reason the Government has not pled an offset regarding AA's XT and ZZ allocations is that it is engaging on a "fishing expedition" and has no factual basis to make such an allegation. There was certainly nothing in the audits that suggests the basis for an offset.

to complete, thereby taking the consultant away from other important IT projects at AA.[4]

In short, the Government's discovery requests regarding the XT and ZZ allocations go well beyond the discovery regarding "whether, for tickets bearing no evidence of user fee collection, fees might have been collected, but not remitted" that the Government previously told this Court it needed. Doc. No. 35 at 6; *see also* Doc. No. 31 at 5-6. Indeed, discovery regarding the XT and ZZ allocations is unrelated to the assessments that the Government auditors made, that AA paid, and that are exclusively the subject of this case. The Government's attempt to pursue an unpled counterclaim or affirmative defense, to re-examine an issue it already covered in the audits, and to tax AA's IT resources should be denied.

## CONCLUSION

For these reasons, Plaintiff American Airlines, Inc. respectfully asks this Court to issue a protective order prohibiting the Government from taking discovery regarding the XT and ZZ allocations described in this motion.

## RULE 26(c) CERTIFICATION

I hereby certify that I have conferred in good faith with counsel for the United States in an effort to resolve this dispute without the Court's action.

[4] The process is also very expensive, but AA understands that the Government would have to pay those costs.

Respectfully submitted,

/s/ Adam P. Feinberg

Adam P. Feinberg
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 626-6087
(202) 628-0858 (Facsimile)

Counsel for Plaintiff

*Of Counsel*:

Robert K. Huffman
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 626-5877
(202) 628-0858 (Facsimile)

David R. Hamill
ARENT FOX
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 857-8940
(202) 857-6395 (Facsimile)

Dated: October 27, 2006