IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1736C |
| v. | ) | (Judge Braden) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER

Pursuant to the Court's Rules ("RCFC"), defendant, the United States respectfully responds to the motion for a protective order filed on October 27, 2006 by plaintiff, American Airlines, Inc. ("AA"). The Court should promptly deny the motion. AA misstates the issues in this case; relies upon unsupported and incorrect factual assertions by counsel; and attempts to resurrect discovery objections that the Court set aside when it rejected, in material part, AA's earlier arguments, during status conferences, regarding the appropriate scope of discovery and ruled in August 2006 that the Government had 90 days to conduct discovery along the lines we had proposed, but would pay AA's associated consulting fees.[1]

BACKGROUND

When the Court established the expedited discovery process, the Government determined that we could proceed most efficiently by requesting specific documentation, responsive to our document requests but not previously produced by AA, in phases, rather than in one omnibus request. If our review of an initial set of documents led us to believe we should further explore

---

[1] We respectfully maintain that AA should pay its own litigation costs in connection with proving its damages. Zubulake v. Warburg, 216 F.R.D. 280 (S.D.N.Y. 2003). Also, we anticipate a need to request additional time for discovery, given AA's inability to provide relevant ticket and accounting documentation promptly, a circumstance for which we are not responsible.

certain damages issues, we would request another phase of documentation targeted at those issues; and so on. AA agreed to this approach.

Accordingly, we developed our initial phase of specific requests and communicated them to AA by letter dated September 21, 2006. (AA had already made some documents available, to the extent it did not object to our discovery requests.) By e-mail dated October 6, 2006, undersigned counsel asked AA's counsel about the status of further production. AA's counsel responded that AA was "still working on a response. Some of your requests are incredibly broad and difficult to respond to. We aim to get you a formal response next week. Is that OK?" Undersigned counsel replied by e-mail that we appeared to have little choice but to await the response. (All cited correspondence is attached to this brief.) We believed, and continue to believe, that AA was addressing our September 21 letter diligently and in good faith. AA responded substantively, asserting the objections now raised in its motion, by letter dated October 20, 2006, four weeks and one day after the date of our letter.

One of the requests in our September 21 letter was for "[a]ll documents, to include written policies, procedures, analyses, audit plans, work papers, spreadsheets, memoranda, reports, etc., relating to any sample testing of the XT or ZZ accounts, and the allocation methodologies for those specific accounts." The attached affidavit of our damages expert, Bernard F. Woolfley of Navigant Consulting, explains in detail why we are interested in this information. Briefly stated, the primary internal accounts in which the user fees at issue in this case should be deposited by AA are known as the "XA" and "XY" accounts. (AA uses standard accounting codes published by the International Air Transport Association). However, documentation that has been made available to us and reviewed by Navigant indicates that some

portion of collected user fees are not credited to either of those accounts, but to accounts designated "XT" or "ZZ" – and, on some occasions, are accidentally "credited" to invalid or non-existent accounts. Woolfley Aff. ¶¶ 5-9.

As Mr. Woolfley further explains, "American Airlines allocates the monies recorded using [the XT and ZZ] codes [to its user fee remittance accounts] based upon a methodology that [AA] created." Id. ¶ 9. We need to investigate this allocation methodology, which is based upon sampling tickets, to determine whether the Government has been receiving the collected user fees in the correct amounts. Without going into detail here – since any particular arguments that the parties may make about the validity of these allocations are irrelevant, in the first instance, to the question of whether we need or are entitled to discovery into the allocation methodology – the documents available to us raise questions about the accuracy of the remittances from the XT and ZZ accounts, which we simply cannot resolve without obtaining additional documents relating to the means by which the allocation methodology has been tested by AA. Id. ¶¶ 10-14.

AA's conclusory assertion in its motion that Government auditors have "already reviewed the XT and ZZ allocations . . . without finding anything improper" is simply untrue. Pl. Br. 5. (The assertion is also legally irrelevant, as demonstrated below.) The report of an audit performed on AA's user fee records dating from October 2000 to December 2001 states: "AA performs a monthly sample of flight coupons as a means of determining a redistribution scheme for miscellaneous tax [XT] collections. The current sample selection is 65 tickets. In our opinion, this methodology is not statistically valid due to the small sample size. We believe that 279 sample items would provide a more representative sample of the population." In earlier

audit reports, the auditors simply noted the existence of AA's allocation methodology, without positive or negative comment. (The excerpts are attached to this brief.)

Even more significantly, in August 2004, approximately four months before this lawsuit was filed, AA expressly refused to explain or to document its XT allocation formula in response to direct requests by a Government auditor. This is described in the attached affidavit of auditor Yea Browning. Browning Aff. ¶¶ 3-5. The XT and ZZ allocations were not the focus of any of the user fee audits relevant to this case. At the same time, the auditors have not "blessed" AA's allocation methodology: They have expressly questioned it and have been denied access to information needed to review the methodology. AA's conclusory statements to the contrary carry no weight whatsoever.

We may identify, in the course of discovery, additional accounting issues that require our attention in assessing AA's damages. As one example, AA's tickets for international flights can be flagged with a "refuse" notation, the meaning of which AA has not yet explained to us.

We further note that, although it is not directly relevant to AA's motion, it is not strictly true that "[t]he only issue remaining in this case is the measure of damages." Pl. Mot. 1. The Court noted in its decision dated November 30, 2005 that we had argued the viability of affirmative defenses in connection with the summary judgment motions, but that we "ha[d] not filed an Answer asserting these defenses." American Airlines, Inc. v. United States, 68 Fed. Cl. 723, 725 n.12 (2005). Our answer, filed on December 22, 2005, asserts the affirmative defenses of accord and satisfaction, laches, equitable estoppel, and waiver. Def. Ans. ¶¶ 90-93. Accordingly, those defenses are at issue in this case.

ARGUMENT

1. Litigants in this Court are, in general, entitled to discovery concerning any non-privileged matters that are relevant, or could be relevant, to a claim or defense. RCFC 26(b)(1). A party seeking an order protecting it against discovery bears the burden of demonstrating "good cause." RCFC 26(c). "'Good cause' requires a showing that the discovery request is considered likely to oppress an adversary or might otherwise impose an undue burden." Sparton Corp. v. United States, 44 Fed. Cl. 557, 561 (1999) (citing cases). Mere conclusory statements do not suffice. E.g., Hussey v. State Farm, 216 F.R.D. 591, 595 (E.D. Tex. 2003).

AA fails to carry this burden principally because it fails to accurately describe the legal and factual issues in this case. First, notwithstanding the two briefs we filed in March and April 2006 addressing the scope of discovery, in connection with our request to seek interlocutory appeal, and our explanations during several telephonic status conferences, AA persists in mistakenly asserting that we hope to find in discovery that "some of the 'confirmed error' tickets represent instances where AA collected, but failed to remit, user fees." Pl. Mot. 2. We are not focusing on rechecking individual confirmed errors. That is but one possible issue in the case.

To the contrary, our consistent position has been that (i) AA bears the burden to substantiate that illegal exactions of specific amounts occurred – i.e., that AA, in fact, remitted to the United States Department of Agriculture or U.S. Customs and Border Protection specific amounts for agricultural quarantine inspection user fees or immigration inspection user fees that AA did not owe to the Government at that time, and (ii) we are entitled, as a consequence, to pursue those same questions in discovery. Whether the user fees deposited into the XT and ZZ accounts are eventually remitted to the Government in full is plainly relevant to those questions.

AA disagrees. It argues, wholly without citation of authority, "that the proper measure of damages is simply the amount of the assessments AA paid to the Government, because all of the assessments were based on so-called 'confirmed errors' – that is, tickets that did not evidence the collection of the user fees, and for which AA could find no other evidence that the user fees had been collected." Id. at 1. AA's narrow and conclusory theory of damages, and the concomitant scope of discovery, is neither legally nor factually supportable.

2. As we noted in our prior briefs, AA's complaint asserts an illegal exaction claim, not a "confirmed error" claim, or a "faulty audit" claim. The law of illegal exaction is well defined in this Court. It is settled that, in order to recover, AA must demonstrate that "the Government has . . . in its pockets" a particular amount of money that it was not entitled to obtain from AA. Aerolineas Argentinas v. United States, 77 F.3d 1564, 1573 (Fed. Cir. 1996) (quoting Clapp v. United States, 127 Ct. Cl. 505, 512, 117 F. Supp. 576, 580 (1954)). Thus, for example, a plaintiff alleging an illegal exaction of income taxes must, "in addition to showing that the [tax demand] was arbitrary, capricious, or unreasonable . . . prove the correct amount of the tax, and any overpayment." Merck & Co. v. United States, 24 Cl. Ct. 73, 91 (1991) (emphasis added).[2] AA likewise bears the burden to establish a specific amount that was collected by the agencies, but not actually owed. Despite our repeated discussions of Merck in earlier briefs, AA has never cited the case, much less attempted to distinguish it or to address in any way the case law concerning the scope of evidence relevant to damages for illegal exaction.

---

[2] Although Merck does not use the term "illegal exaction," the court based its jurisdiction upon that theory. See 24 Cl. Ct. at 78 & nn. 5, 6 (citing illegal exaction dicta in Eastport S.S. Corp. v. United States, 372 F.2d 1002 (Ct. Cl. 1967), and illegal exaction precedents). The court determined the tax liability based upon stipulations. See id. at 91 ("Defendant has not demonstrated that . . . any other allocation[] would be appropriate.").

AA has established to this Court, at most, only that the legal theories pursuant to which the agencies sought remittance of "uncollected user fees" were erroneous. 68 Fed. Cl. at 731-32. It does not follow, as a matter of law, that AA is entitled to "reverse the charges" and recover the dollar amounts it paid following the user fee audits. See Pl. Br. 1. AA must prove, instead, that it paid specific amounts of money to the agencies that, at the time of the payments, AA did not owe. Merck, 24 Ct. Cl. at 91. By the same token, we are entitled under the Court's Rules to discovery calculated to uncover facts that may bear upon the amounts of these alleged overpayments. RCFC 26(b)(1). (Alternatively, even if it is determined that AA's payments are prima facie evidence of the amount of its damages, we should at least have the opportunity to look behind the audit papers and inquire into whether AA in fact collected the user fees it now claims not to have been collected.)

3. AA's argument that we are "trying to find new assessments" to assert as "offsets" against its illegal exaction claim has no legal or factual basis. Pl. Mot. 5. Properly quantifying AA's alleged overpayments of user fees has nothing to do with offsets or a counterclaim. As established above, AA bears the burden to establish that it paid the agencies a specific amount more than it owed in user fees. That is what we need to explore in discovery. Similarly, in tax refund lawsuits filed in this Court, in which the claim closely parallels illegal exaction, "given the de novo nature of the proceedings before this court," the Government may support a tax assessment with any admissible evidence whatsoever, including evidence newly obtained in discovery. Cook v. United States, 46 Fed. Cl. 110, 114 (2000). "Indeed . . ., courts have repeatedly held that the government . . . need not rely solely, or at all, on the evidence reviewed administratively by the [Internal Revenue] Service." Id. at 114-15 (emphasis added) (citing

Tucker v. United States, 8 Cl. Ct. 180, modified on other grounds, 8 Cl. Ct. 575 (1985)). We are similarly unconstrained here by the methodologies and conclusions of the agency auditors.

Furthermore, consistent with Merck and other case law, tax refund claimants retain the burden of proof with respect to the amount of tax actually owed, even if this Court rejects the grounds upon which the Government relied in making its original tax assessment.

> [U]nder the common law rationale [for refund suits], the loss of the presumption of correctness [of the assessment] does not alter the fundamental nature of a refund suit as an assumpsit action for money had and received, in which the burden is borne by the party seeking to recover the funds. And, under the modern rationale for allocating the burden . . ., the taxpayer remains the party seeking to press a claim and best positioned to preserve and bring forward evidence bearing on the facts of that claim.

Id. at 117. Just as the Government is not asserting an "offset" when it holds a taxpayer to its factual proof of the correct amount of tax owed in a refund case, we are not seeking "offsets" here. AA, like a taxpayer, bears the burden to prove its damages – not simply to defeat the legal theories under which the Government demanded payment– and we are entitled to discovery into the amount of user fees, if any, that AA owed to the agencies when it made the disputed payments of "uncollected user fees." We know of no authority to the contrary.[3]

4. AA's argument that we are improperly seeking "a second bite at the apple" in discovery, because, allegedly, the Government auditors have "already reviewed the XT and ZZ allocations . . . without finding anything improper," is equally groundless. Pl. Mot. 5. First, as a matter of law, we are under no obligation to rely in this litigation upon the same financial evidence, or even the same theories, upon which the agencies relied when making the

[3] At the same time, we do not waive the right to assert an offset or counterclaim, should the Court determine it is necessary or appropriate.

assessments. Cf. Cook, 46 Fed. Cl. at 117-18. The Court's review of AA's illegal exaction claim is de novo and is not a review of the user fee audits themselves.

Moreover, AA's argument concerning a prior "review" of its allocation methodology should be rejected simply because AA offers only assertions of counsel and cites no sworn statements or other evidence of this supposed review. RCFC 43(e). This absence of evidentiary support is explained, in any event, by the fact that AA's allegation that the auditors conducted a "specific review" of the allocations is false. Pl. Br. 4. As we demonstrated above, the auditors did not perform even a "general review," since AA did not blame any specific user fee non-collection errors on its XT or ZZ allocation methodology, during the audits. And, to the extent the auditors have attempted to review the methodology, AA has blocked those efforts.

5. Finally, AA simply should not be heard to argue that retrieving its relevant accounting information for the years relevant to this case imposes an undue burden. See id. at 5-6. It was AA, not the Government, that controlled when this lawsuit was filed. Moreover, it should be borne in mind that, when the user fee audits were conducted, both AA and the Government believed AA was liable for user fees even when AA claimed not to have collected the user fees from covered passengers. AA never argued otherwise at that time. Had AA timely asserted it was not liable, under the user fee regulations, for "uncollected user fees," documentation to substantiate AA's claims of non-collection could have been provided to the Government for review contemporaneously. AA has been at all times "best positioned to preserve and bring forward evidence bearing on the facts of [its] claim." Cook, 46 Fed. Cl. at 117 (emphasis added). It would be fundamentally unfair to deny us discovery relevant to our defense, as the result of circumstances solely within AA's control. Hussey, 216 F.R.D. at 595.

CONCLUSION

Accordingly, the Court should deny AA's request to bar us from conducting discovery concerning the XT and ZZ allocations, or any other user fee-related accounting issues that may arise.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

s/Kyle Chadwick
KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 305-7644

Attorneys for Defendant

OF COUNSEL:

ANDREW S. KOSEGI
Attorney
U.S. Customs and Border Protection
Indianapolis, IN

CYNTHIA A. KOCH
Senior Counsel
United States Department of Agriculture
Washington, DC

November 13, 2006

CERTIFICATE OF FILING

I certify under penalty of perjury that the attached document was electronically filed on November 13, 2006. I understand that service is complete upon filing and that parties and others may access the filing through the Court's electronic system.

s/Kyle Chadwick