**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN AIRLINES, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 04-1736<br>Judge Susan G. Braden |

# AMENDED COMPLAINT

This action is brought under the Tucker Act, 28 U.S.C. § 1491(a)(1), by plaintiff American Airlines, Inc. ("AA") against defendant the United States of America for the recovery of sums illegally exacted by defendant under the purported auspices of statutory and regulatory authority requiring airlines to collect Immigration User Fees and Animal and Plant Health Inspection Service User Fees from international passengers. These amounts were illegally exacted under defendant's mistaken assertion that the statutes and regulations in question also grant defendant the authority to force carriers themselves to pay any user fees that are not collected from passengers.

## JURISDICTION

1. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491(a)(1).

## PARTIES

2. Plaintiff is AA, a corporation formed under the laws of Delaware and having its principal place of business in Fort Worth, Texas.

3. Defendant is the United States of America, acting through the Department of

Justice, Immigration and Naturalization Service ("INS") during the years 2000-2002 and through the Department of Homeland Security, Immigration Office of Financial Management and Customs and Border Protection since the inclusion of INS within the Department of Homeland Security in 2002 until the present with respect to the Immigration User Fee; and through the United States Department of Agriculture, Animal and Plant Health Inspection Service ("APHIS") with respect to the APHIS User Fee.

**USER FEE COLLECTIONS AND AUDITS**

**Immigration User Fee Scheme**

4. Defendant is responsible for immigration services within the United States. Such immigration services include inspection of arriving commercial airline passengers and detention, transportation, hospitalization, and all other expenses relating to detained aliens.

5. To fund the expenses relating to such immigration services, Congress passed the 1986 Immigration User Fee Statute, codified at 8 U.S.C. § 1356 ("the INS User Fee Statute"). By enacting the INS User Fee Statute, Congress transferred the responsibility for all immigration service costs to defendant through the creation of the Immigration User Fee Account under defendant's exclusive control. In fact, the INS User Fee Statute specifically states that such services shall be provided by defendant through the Account at "no cost" to passengers and airline carriers, except for the imposition of an Immigration User Fee ("IUF").

6. The INS User Fee Statute established the IUF as a means to fund defendant's Immigration User Fee Account by assessing a fee on each passenger that is seeking transportation by a commercial aircraft into the United States.

7. The INS User Fee Statute places sole monetary responsibility on the passenger and requires entities issuing tickets to individuals for such transportation to collect from that

individual the IUF at the point-of-sale of such ticket.

8. If a ticket for transportation is issued in a foreign country and the IUF has not been collected by a travel agent or the ticketing carrier at the point-of-sale, the INS User Fee Statute provides for collection of the IUF by the enplaning commercial airline carrier providing return transportation to such passenger out of the United States at the time of such departure from the United States.

9. Once collected, the INS User Fee Statute, and its implementing regulations, require IUF collectors, either ticket issuers or carriers, to remit to defendant the balances of collected IUFs on a quarterly basis. Remitted IUFs are then deposited by defendant into the Immigration User Fee Account.

10. The amount of the IUF is set by defendant. For the relevant periods the IUF has been either six dollars ($6.00) per individual, per ticket or seven dollars ($7.00) per individual, per ticket. From 2001 through the present, the IUF was, and is, seven dollars ($7.00) per individual, per ticket. *See* 8 U.S.C. § 1356(d).

**APHIS User Fee Scheme**

11. Defendant is also responsible for agricultural quarantine and inspection services provided in connection with the arrival of international air passengers into the customs territory of the United States or the preclearance or preinspection of international air passengers at a site outside the customs territory of the United States.

12. To fund the expenses relating to such agricultural and quarantine inspection services, Congress passed Section 2509 of the Food Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990, codified at 21 U.S.C. § 136a (the "APHIS User Fee Statute"). By enacting the APHIS User Fee Statute, Congress

placed the responsibility for all agricultural and quarantine inspection service costs on defendant through the creation of the Agriculture Quarantine Inspection User Fee Account, which until September 30, 2002, contained all APHIS User Fees collected, including late payment penalties and interest charges. Throughout its existence, defendant remained in exclusive control of the Agriculture Quarantine Inspection User Fee Account. After September 30, 2002, the APHIS User Fee Statute provides that all APHIS User Fees collected shall be credited to the Department of Agriculture accounts that incur the costs associated with the provision of agricultural quarantine and inspection services, over which defendant also maintains exclusive control.

13. The APHIS User Fee Statute permits but does not require the Secretary of Agriculture to prescribe and collect fees sufficient to cover the cost of providing agricultural quarantine and inspection services in connection with the arrival of international air passengers into the customs territory of the United States from a foreign location by a commercial aircraft or the preclearance or preinspection of international air passengers at a site outside the customs territory of the United States. The APHIS User Fee Statute specifically places limits on the assessment of APHIS User Fees by providing that the amount of APHIS User Fees assessed shall be commensurate with the costs of agricultural inspection quarantine and inspection services with respect to the class of persons or entities paying the fees.

14. The APHIS User Fee Statute places sole monetary responsibility on the passenger for paying the APHIS User Fee. In fact, the APHIS User Fee Statute provides that an action may be brought against a person (*i.e.*, passenger) obligated to pay such fees in any United States district court (or other United States court for any territory or possession in any jurisdiction in which such person is found or resides or transacts business) for the recovery of APHIS User Fees, late payment penalties, and accrued interest which have not been paid.

15. Nothing in the APHIS User Fee Statute specifically requires that entities issuing tickets to individuals for such transportation are to collect from that individual the APHIS User Fees. The APHIS User Fee Statute provides, however, that APHIS User Fees collected by any person on behalf of the Secretary of the Agriculture are held in trust for the United States and shall be remitted to the Secretary in such manner and at such times as the Secretary may prescribe.

16. On or about April 12, 1991, the Secretary of Agriculture promulgated regulations, now codified at 7 C.F.R. § 354.3(f) (the "APHIS User Fee Regulations"), requiring that any person who issues tickets on or after May 13, 1991, is responsible for collecting the APHIS User Fee from all persons (subject to certain exceptions enumerated in the regulations) transported into the customs territory of the United States at the point-of-sale of such ticket.

17. If a ticket for transportation was issued but does not reflect the collection of the APHIS User Fee, the regulations provide for collection of the APHIS User Fee by the enplaning commercial airline carrier providing return transportation to such passenger out of the United States at the time of such departure from the United States. 7 C.F.R. § 354.3(f)(4). Nothing in the APHIS User Fee Statute authorizes the APHIS User Fees to be collected by these means.

18. Once collected, the APHIS User Fee Regulations require the collectors of APHIS User Fees, either ticket issuers or carriers, to remit to defendant the balances of collected APHIS User Fees on a quarterly basis.

19. The amount of the APHIS User Fee is set by defendant. For the relevant periods, the APHIS User Fee has ranged from one dollar and forty-five cents ($1.45) per individual, per ticket to three dollars and ten cents ($3.10) per individual, per ticket.

**Fee Collection Difficulties**

20. Despite the United States' collection requirements, collections of the IUF and the APHIS User Fees at point-of-sale in certain foreign countries is prohibited under these countries' version of the "revenue rule." Under the "revenue rule," certain countries consider collection of other countries' fees and/or taxes, including the IUF and the APHIS User Fee, to be injurious to their sovereignty and thus refuse to have a foreign sovereign or its agents employ their courts, institutions, and laws to enforce upon its citizens or residents the facilitation or collection of other countries' fees and/or taxes. As a corollary to this, airline carriers risk lawsuits and foreign administrative sanctions if they were to enforce collections of the IUF and the APHIS User Fee by denying to either issue a ticket or subsequently to board a passenger that has paid his or her airline fare but asserts his or her right to refuse payment of such fees under the foreign country's law. Such countries include but are not limited to the Dominican Republic, Colombia, Guatemala, Ecuador, Honduras, and Panama. Plaintiff provides services to and from each of these foreign countries.

21. However, the enplaning carrier's ability to collect the IUF and the APHIS User Fee in these instances is further restricted by United States law. For instance, neither of the Statutes, nor their respective regulations, direct or require a carrier to deny boarding to a passenger who has not paid his or her IUF or APHIS User Fee. In addition, the carrier is not provided any legal immunity for such a denial. In fact, there is only one federally-mandated and protected instance in which a carrier can deny boarding to a passenger; a carrier can deny boarding to a passenger if the carrier has a well-founded belief that the passenger is "inimical to safety." No construction of a passenger's failure to pay an IUF or APHIS User Fee could be classified as "inimical to safety."

22. Furthermore, federal immigration law and regulation does not assist a carrier in collection of such fees. Federal immigration law does not make payment of the fees a condition for an otherwise "admissible" alien (8 U.S.C. § 1181) to be allowed entry to the United States (8 C.F.R. § 235.1(d)), nor are immigration officials legally empowered to block a nonpaying passenger departure from the United States as prejudicial to the interests of the United States (8 C.F.R. § 215.3), nor does it allow the United States to deport a previously lawfully admitted alien (8 U.S.C. § 1227) for failure to pay such fees.

**AA's User Fee Collection**

23. AA is a major United States airline carrier and, with its affiliates, provides scheduled air transportation to more than 250 destinations throughout North America, the Caribbean, Latin America, Europe, and the Pacific. In addition, AA provides ticketing services to individuals for travel on AA flights. As such, AA is responsible for collecting IUF and APHIS User Fees from international passengers pursuant to the two statutory schemes, as well as a myriad of additional fees and assessments imposed by the United States, other governments, and airports.

24. AA has taken its commitment toward collection of such fees seriously. Within the domestic and foreign legal framework discussed above, AA has instituted policies and procedures to achieve the highest possible fee collection rate.

25. Notwithstanding the statutory and practical difficulties carriers experience at home and abroad, defendant's own auditors have found that AA has achieved a high degree of success with approximately a 99 percent collection rate for both IUF and APHIS User Fee for the periods at issue.

26. Despite AA's near-perfect collection rate, defendant asserts that it can require AA

to meet a *100 percent* IUF and APHIS User Fee collection rate. Such a requirement makes AA secondarily liable for all uncollected IUF and APHIS User Fees and the guarantor of defendant's Immigration User Fee Account and the Department of Agriculture's respective APHIS accounts. Defendant has no statutory or regulatory authority to require remittance of uncollected IUF or APHIS User Fees.

**Immigration User Fee Audits**

27. Pursuant to regulations authorized by the INS User Fee Statute, defendant is authorized to conduct its own IUF audits of collectors, including carriers such as plaintiff, to "assure the accuracy of the remittance of fees collected and remitted and compliance with the applicable statutes and regulations." 8 C.F.R. § 286.5(f).

28. On or about September 18-22, 2000, defendant audited plaintiff's IUF remittances for the period July 1, 1998 through June 30, 2000.

29. The auditors found that plaintiff remitted $116,668,942 in collected IUF during the audit period.

30. Using a sampling methodology, defendant's audit personnel audited plaintiff's passenger tickets for the review period. The auditors concluded that plaintiff failed to show collection of IUF on 4 of 1,177 qualified sampled tickets, or 0.34 percent of the qualified sampled tickets.

31. The auditors applied this uncollected IUF rate to the amount of collected IUF remitted by plaintiff during the period and assessed an additional IUF liability of $397,844 for uncollected IUF.

32. On or about December 19, 2000, plaintiff paid $397,844 to defendant for the uncollected IUF in response to the 2000 audit demand.

33. By assessing the additional IUF liability for uncollected IUF, defendant required plaintiff to pay a 100 percent collection of IUF to defendant on all applicable tickets for the audit period. In essence, such a charge made plaintiff secondarily liable for the uncollected IUF or the guarantor of defendant's Immigration User Fee Account. Defendant has neither statutory nor regulatory authority to demand such a payment for remittance of *uncollected* IUF.

34. On or about January 14-18, 2002, defendant audited plaintiff's IUF remittances for the period July 1, 2000 through December 31, 2001.

35. The auditors found that plaintiff remitted/accrued $89,599,828 in collected IUF during the audit period. The IUF for September 1 through December 31, 2001, was included in this figure although the quarterly IUF remittance had not been made at the time of audit.

36. Using a sampling methodology, defendant's audit personnel audited plaintiff's passenger tickets for the review period. The auditors concluded that plaintiff failed to show collection of IUF on 1 of 545 qualified sampled tickets, or 0.18 percent of the qualified sampled tickets.

37. The auditors applied this uncollected IUF rate to the amount of IUF remitted (or accrued) by plaintiff during the period and assessed an additional IUF liability of $160,878 for uncollected IUF.

38. On or about May 22, 2002, plaintiff paid $160,878 to defendant for uncollected IUF in response to the 2002 audit demand.

39. By assessing the additional IUF liability for uncollected IUF, defendant required plaintiff to pay a 100 percent collection of IUF to defendant on all applicable tickets for the audit period. In essence, such a charge made plaintiff secondarily liable for the uncollected IUF or the guarantor of defendant's Immigration User Fee Account. Defendant has neither statutory nor

regulatory authority to demand such a payment for remittance of *uncollected* IUF.

40. On or about March 10-14, 2003, defendant audited plaintiff's IUF remittances for the period January 1, 2002 through December 31, 2002.

41. The auditors found that plaintiff remitted $66,281,357 in collected IUF during the audit period. Furthermore, the auditors stated that "[a]ll [such IUF] payments were made in an accurate and timely manner."

42. Using a sampling methodology, defendant's audit personnel audited plaintiff's passenger tickets for the review period. However, both the auditors and plaintiff's personnel determined that the flights selected for sampling did not fairly represent plaintiff's flights. The auditors split the South and Central American region from the general population when calculating liability. In that region, the auditors concluded that plaintiff failed to show collection on approximately 17 of 416 qualified sampled tickets, or 4.12 percent of the qualified sampled tickets. For the general population, the auditors concluded that plaintiff failed to show collection on 3 of 400 qualified sampled tickets, or 0.75 percent of the qualified sampled tickets.

43. The auditors applied the regional uncollected IUF rate to the regional percentage of the IUF remitted by plaintiff during the period and assessed an additional $134,577 of IUF liability for uncollected IUF for the region. In addition, the auditors applied the general population uncollected IUF rate to the general population IUF remitted by plaintiff during the period and assessed another $469,263 in uncollected IUF. Thus, the total assessed additional IUF liability was $603,840 for uncollected IUF.

44. Less than sixty (60) days after the assessment was conveyed to plaintiff, defendant issued a "First Delinquent Notice" for non-payment of the 2003 audit demand. Defendant's notice assessed interest in the amount of $12,010 and penalties in the amount of

$36,031. The total amount then due became $651,881.

45. On or about September 26, 2003, plaintiff paid $651,881 to defendant for uncollected IUF and intesest and penalties.

46. By assessing the additional IUF liability for uncollected IUF, defendant required plaintiff to pay a 100 percent collection of IUF to defendant on all applicable tickets for the audit period. In essence, such a charge made plaintiff secondarily liable for the uncollected IUF or the guarantor of defendant's Immigration User Fee Account. Defendant has neither statutory nor regulatory authority to demand such a payment for remittance of *uncollected* IUF.

47. On or about August 23-27, 2004, defendant audited plaintiff's IUF remittances for the period January 1, 2003 through June 30, 2004.

48. The auditors found that plaintiff remitted $112,343,888.58 in collected IUF during the audit period.

49. Using a sampling methodology, defendant's audit personnel audited plaintiff's passenger tickets for the review period. The auditors concluded that plaintiff failed to show collection of IUF on 3.5 of 1,444 qualified sampled tickets, or 0.24 percent of the qualified sampled tickets.

50. The auditors applied this uncollected IUF rate to the amount of collected IUF remitted by plaintiff during the period and assessed an additional IUF liability of $270,274 for uncollected IUF.

51. On or about February 8, 2005, plaintiff paid $270,274 to defendant for the uncollected IUF in response to this audit demand.

52. By assessing the additional IUF liability for uncollected IUF, defendant required plaintiff to pay a 100 percent collection of IUF to defendant on all applicable tickets for the audit

period. In essence, such a charge made plaintiff secondarily liable for the uncollected IUF or the guarantor of defendant's Immigration User Fee Account. Defendant has neither statutory nor regulatory authority to demand such a payment for remittance of *uncollected* IUF.

**APHIS User Fee Audits**

53. Pursuant to the APHIS User Fee Regulations, defendant is authorized to conduct its own verification of collectors of APHIS User Fees, including carriers such as plaintiff, to "verify the accuracy of the APHIS user fees collected and remitted and to otherwise determine compliance" with the applicable statutes and regulations. 7 C.F.R. § 354.3(f)(7).

54. On or about October 19-23, 1998, defendant audited plaintiff's APHIS User Fee remittances for the period July 1996 through June 1998.

55. The auditors found that plaintiff remitted $26,289,954.77 in collected APHIS User Fees during the audit period.

56. Using a sampling methodology, defendant's audit personnel audited plaintiff's passenger tickets for the review period. The auditors concluded that plaintiff failed to show collection of APHIS User Fees on 5 of 878 qualified sampled tickets, or 0.57 percent of the qualified sampled tickets.

57. The auditors applied this uncollected APHIS User Fee rate to the amount of collected APHIS User Fees remitted by plaintiff during the period and assessed an additional APHIS User Fee liability of $150,572.48 for uncollected APHIS User Fees.

58. On or about December 7, 1998, plaintiff paid $150,572.48 to defendant for the uncollected APHIS User Fees in response to the 1998 audit demand.

59. By assessing the additional APHIS User Fee liability for uncollected APHIS User Fees, defendant required plaintiff to pay a 100 percent collection of APHIS User Fees to

defendant on all applicable tickets for the audit period. In essence, such a charge made plaintiff secondarily liable for the uncollected APHIS User Fees or the guarantor of funds held by the defendant used for agricultural and quarantine inspection services. Defendant has neither statutory nor regulatory authority to demand such a payment for remittance of *uncollected* APHIS User Fees.

60. On or about September 18-22, 2000, defendant audited plaintiff's APHIS User Fee remittances for the period July 1998 through June 2000.

61. The auditors found that plaintiff remitted $42,806,248.32 in collected APHIS User Fees during the audit period.

62. Using a sampling methodology, defendant's audit personnel audited plaintiff's passenger tickets for the review period. The auditors concluded that plaintiff failed to show collection of APHIS User Fees on 8 of 1,130 qualified sampled tickets, or 0.71 percent of the qualified sampled tickets.

63. The auditors applied this uncollected APHIS User Fees percentage to the amount of APHIS User Fees remitted by plaintiff during the period and assessed an additional APHIS User Fee liability of $299,106.51 for uncollected APHIS User Fees.

64. On or about November 15, 2000, plaintiff paid $299,106.51 to defendant for uncollected APHIS User Fees in response to the 2000 audit demand.

65. By assessing the additional APHIS User Fee liability for uncollected APHIS User Fees, defendant required plaintiff to pay a 100 percent collection of APHIS User Fees to defendant on all applicable tickets for the audit period. In essence, such a charge made plaintiff secondarily liable for the uncollected APHIS User Fees or the guarantor of funds held by the defendant used for agricultural and quarantine inspection services. Defendant has neither

statutory nor regulatory authority to demand such a payment for remittance of *uncollected* APHIS User Fees.

66. On or about January 28, 2002 through February 1, 2002, defendant audited plaintiff's APHIS User Fee remittances for the period October 1, 2000 through December 31, 2001.

67. The auditors found that plaintiff remitted $33,982,489.97 in collected APHIS User Fees during the audit period.

68. Using a sampling methodology, defendant's audit personnel audited plaintiff's passenger tickets for the review period. The auditors concluded that plaintiff failed to show collection of APHIS User Fees for 7 of 685 qualified sampled tickets, or 1.02 percent of the qualified sampled tickets.

69. The auditors applied this uncollected APHIS User Fees rate to the amount of APHIS User Fees remitted by plaintiff during the period and assessed an additional APHIS User Fee liability of $345,936.76 for uncollected APHIS User Fees.

70. On or about March 28, 2002, plaintiff paid $345,936.76 to defendant for uncollected APHIS User Fees in response to the 2002 audit demand.

71. By assessing the additional APHIS User Fee liability for uncollected APHIS User Fees, defendant required plaintiff to pay a 100 percent collection of APHIS User Fees to defendant on all applicable tickets for the audit period. In essence, such a charge made plaintiff secondarily liable for the uncollected APHIS User Fees or the guarantor of funds held by the defendant used for agricultural and quarantine inspection services. Defendant has neither statutory nor regulatory authority to demand such a payment for remittance of *uncollected* APHIS User Fees.

72. On or about February 24-28, 2003, defendant audited plaintiff's APHIS User Fee remittances for the period January 1, 2002 through December 31, 2002.

73. The auditors found that plaintiff remitted $28,218,485.10 in collected APHIS User Fees during the audit period.

74. Using a sampling methodology, defendant's audit personnel audited plaintiff's passenger tickets for the review period. After discussions with AA personnel and follow-up audit work on or about June 16, 2003, the auditors concluded that plaintiff failed to show collection of APHIS User Fees on 1.05 percent of the qualified sampled tickets.

75. The auditors applied this uncollected APHIS User Fees rate to the amount of APHIS User Fees remitted by plaintiff during the period and assessed an additional APHIS User Fee liability of $298,298.37 for uncollected APHIS User Fees.

76. On or about September 26, 2003, plaintiff paid $298,298.37 to defendant for uncollected APHIS User Fees in response to the 2003 audit demand.

77. By assessing the additional APHIS User Fee liability for uncollected APHIS User Fees, defendant required plaintiff to pay a 100 percent collection of APHIS User Fees to defendant on all applicable tickets for the audit period. In essence, such a charge made plaintiff secondarily liable for the uncollected APHIS User Fees or the guarantor of funds held by the defendant used for agricultural and quarantine inspection services. Defendant has neither statutory nor regulatory authority to demand such a payment for remittance of *uncollected* APHIS User Fees.

78. On or about August 23-27, 2004, defendant audited plaintiff's APHIS User Fee remittances for the period January 1, 2003 through June 30, 2004.

79. The auditors found that plaintiff remitted $45,909,527.33 in collected APHIS

User Fees during the audit period.

80. Using a sampling methodology, defendant's audit personnel audited plaintiff's passenger tickets for the review period. The auditors concluded that plaintiff failed to show collection of APHIS User Fees on 3 of 1,335 qualified sampled tickets, or 0.22 percent of the qualified sampled tickets.

81. The auditors applied this uncollected APHIS User Fee rate to the amount of collected APHIS User Fees remitted by plaintiff during the period and assessed an additional APHIS User Fee liability of $101,224.00 for uncollected APHIS User Fees.

82. On or about February 8, 2005, plaintiff paid $101,224.00 to defendant for uncollected APHIS User Fees in response to this audit demand.

83. By assessing the additional APHIS User Fee liability for uncollected APHIS User Fees, defendant required plaintiff to pay a 100 percent collection of APHIS User Fees to defendant on all applicable tickets for the audit period. In essence, such a charge made plaintiff secondarily liable for the uncollected APHIS User Fees or the guarantor of funds held by the defendant used for agricultural and quarantine inspection services. Defendant has neither statutory nor regulatory authority to demand such a payment for remittance of *uncollected* APHIS User Fees.

**<u>Post-Audit Actions</u>**

84. By letter dated October 13, 2003, plaintiff requested from defendant a refund of the uncollected IUF amounts paid to defendant in response to all but the last of the IUF audits described above. Plaintiff's thorough request detailed the lack of statutory and regulatory authority behind defendant's audit demands.

85. On or about August 5, 2004, defendant responded to plaintiff's request for refund.

Defendant denied the request. Defendant's denial was not based on a statutory or regulatory right to the payment of the uncollected IUF. Not surprisingly, defendant cited no statutory or regulatory authority for such demands in its response.

86. By letters dated October 10, 2003, and January 30, 2004, plaintiff requested from defendant a refund of the uncollected APHIS User Fee amounts paid to defendant in response to all but the last of the APHIS User Fee audits described above. Plaintiff's thorough request detailed the lack of statutory and regulatory authority behind defendant's audit demands.

87. On or about August 13, 2004, defendant responded to plaintiff's request for refund. Defendant denied the request. Defendant's denial was not based on a valid statutory or regulatory right to the payment of the uncollected APHIS User Fees.

**COUNT I**
**(Illegal Exaction of IUF)**

88. Plaintiff incorporates paragraphs 1 through 52 and 84 through 87 above.

89. Defendant has misinterpreted or misapplied its statutory and regulatory authority relating to the collection and remittance of IUF by compelling plaintiff to indirectly incur financial responsibility that by statute and regulation is defendant's responsibility. Defendant has imposed such financial liability on plaintiff without either statutory or regulatory authority to do so.

90. There is neither statutory nor regulatory authority that imposes secondary liability on AA for uncollected IUF nor that requires AA to be the guarantor of defendant's Immigration User Fee Account. Furthermore, there is neither statutory nor regulatory authority for defendant to require the remittance of uncollected IUF by carriers, including plaintiff.

91. By demanding remittance of uncollected IUF from plaintiff, which was not based on any statutory or regulatory authority, defendant illegally exacted the sums plaintiff paid to

defendant for uncollected IUF.

**COUNT II**
**(Illegal Exaction of APHIS User Fees)**

92. Plaintiff incorporates paragraphs 1 through 26 and 53 though 87 above.

93. Defendant has misinterpreted or misapplied its statutory and regulatory authority relating to the collection and remittance of APHIS User Fees by compelling plaintiff to indirectly incur financial responsibility that by statute and regulation is defendant's responsibility. Defendant has imposed such financial liability on plaintiff without either statutory or regulatory authority to do so.

94. There is neither statutory nor regulatory authority that imposes secondary liability on AA for uncollected APHIS User Fees nor that requires AA to be the guarantor of defendant's funds used for agricultural and quarantine inspection services. Furthermore, there is neither statutory nor regulatory authority for defendant to require the remittance of uncollected APHIS User Fees by carriers, including plaintiff.

95. By demanding remittance of uncollected APHIS User Fees from plaintiff, which was not based on any statutory or regulatory authority, defendant illegally exacted the sums plaintiff paid to defendant for uncollected APHIS User Fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in its favor against the United States as follows:

a. for judgment awarding plaintiff damages caused by defendant's illegal exactions of uncollected Immigration User Fees, including, but not limited to, reimbursement of all the funds illegally exacted by defendant;

b. for judgment awarding plaintiff damages caused by defendant's illegal

exactions of uncollected APHIS User Fees, including, but not limited to, reimbursement of all the funds illegally exacted by defendant;

c. for judgment awarding plaintiff any and all other damages to which it is entitled by law;

d. for judgment awarding plaintiff costs and interest as allowed by law; and

e. for judgment awarding such other and further relief as this Court deems just.

Respectfully submitted,

/s/ Adam P. Feinberg

Adam P. Feinberg
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 626-6087
(202) 628-0858 (Facsimile)

Counsel for Plaintiff

*Of Counsel*:
Robert K. Huffman
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 626-5877
(202) 628-0858 (Facsimile)

David R. Hamill
ARENT FOX
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 857-8940
(202) 857-6395 (Facsimile)

Dated: February 28, 2007