**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN AIRLINES, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 04-1736<br>Judge Susan G. Braden |

**DIRECT TESTIMONY OF DAVID S. WILLIAMS**

Q1. Please state your name.

A1. David S. Williams.

Q2. Are you currently employed?

A2. Yes.

Q3. Where?

A3. I am a Principal in the Valuation Services Practice of Deloitte Financial Advisory Services LLP ("Deloitte FAS").

Q4. What type of work do you do at Deloitte FAS?

A4. I have over 24 years of consulting and litigation support experience with a broad range of clients, having been engaged to advise clients on a variety of issues. I am an expert in the development and analysis of financial management systems, including those used for accounting and financial reporting. I have been engaged on numerous occasions to assess the effectiveness of accounting and financial processes, business procedures and business systems. Such engagements have involved the design and/or critique of systems, procedures, and controls. I have designed, implemented and audited manufacturing and cost accounting systems at numerous organizations. Many of these engagements involved aerospace and defense companies, where one of the key business issues was compliance with

various accounting requirements, including the cost accounting requirements of the Federal Acquisition Regulation ("FAR") and related supplements and the Cost Accounting Standards ("CAS"). I am also an expert in the analysis and interpretation of financial data produced by accounting and other business systems. My work in this area has involved the application of financial, accounting, economic and statistical techniques to summarize, analyze and report salient characteristics of such data to management, courts of law and others seeking to understand such data and make decisions. My resume is marked as Exhibit 9.

Q5. Have you written any publications on these topics?

A5. Yes, I have written extensively on accounting, financial and government contracting subjects. My publications from the last 10 years are listed on my resume at Exhibit 9.

Q6. Have you lectured on these topics?

A6. Yes, I have lectured on both government contracting and other business topics in a variety of venues, including Federal Publications, Inc., Federal Publications Seminars, The George Washington University and the Fordham University School of Law.

Q7. Have you ever served as an expert witness before?

A7. Yes, I have served as both a consulting and a testifying expert in commercial litigation matters involving the calculation of damages. I have also been engaged in bankruptcy and related matters by creditors, debtors and other parties to the bankruptcy process. I have testified, or been designated to testify, in both bench and jury trials before the U.S. Court of Federal Claims, various Federal

Bankruptcy Courts, various District Courts, the Armed Services Board of Contract Appeals, and the American Arbitration Association, where I have also served as an arbitrator. I have listed the cases in which I have testified in the last the last 4 years on my resume at Exhibit 9.

Q8. Could you state your educational background?

A8. I hold a BA in Economics from the University of Pennsylvania and an MBA in Finance from the Wharton School of the University of Pennsylvania.

Q9. Do you have an understanding of the issues in this case?

A9. Yes.

Q10. Could you please explain them?

A10. At issue in this matter is approximately $2.63 million that American Airlines ("American") seeks to recover from the United States ("Government"). The amount at issue represents remittances of Immigration User Fees and Agricultural Quarantine Inspection User Fees ("User Fees") demanded from American as a result of various Government audits of American's compliance with the Immigration User Fee Statute and the Agricultural Quarantine Inspection (or "APHIS") User Fee Statute. By regulation, American and other commercial air carriers are required to collect and remit User Fees to the Government. The Government audited American's compliance with these regulatory requirements for the period July 1996 - June 2004 and claimed that a total of $2,627,974 in additional User Fees were due from American. I have prepared an exhibit marked Exhibit 1 that summarizes the User Fees Audits Performed by the Government that are at issue in this case. American paid the additional claimed amounts in these audits, but in October 2003 requested a refund of all such amounts paid.

American asserted that the additional User Fees had not been collected from the passengers and therefore there was no requirement to remit any of these amounts to the Government.

Q11. What is your involvement in this case?

A11. Miller and Chevalier, counsel to American, has engaged me as an expert witness to (a) analyze certain accounting processes that American employed to collect and remit User Fees during the audit periods in question, and (b) analyze those specific transactions cited by the Government in its audits as the basis for its demand for additional remittances of User Fees ("Audit Errors").

Q12. Did you work alone on this matter?

A12. No, I have sought assistance from several of my colleagues at Deloitte FAS and its affiliates. In connection with this project, these individuals worked at my direction at all times.

Q13. In general, what did you do on this engagement?

A13. My colleagues and I 1) reviewed all the documents produced by both the parties during discovery, 2) reviewed the relevant court filings, 3) conducted several conversations with American employees currently and previously responsible for collecting, recording, remitting and reporting the User Fees, 4) performed several visits to American to observe and understand its systems and processes relating to the User Fees, and 5) performed certain tests and reviews designed to determine whether the Audit Errors represented instances where American had collected a User Fee.

Q14. Did anyone on your team have prior experience in the airline industry?

A14. Yes. For example, in connection with item 4, I sought assistance from Glenn T. Harkabus, Director in the Audit and Enterprise Risk Services Practice of Deloitte & Touche to perform a walkthrough of American's accounting processes relating to the collection, recording, remitting and reporting of User Fees. Glenn has over 24 years of information technology audit and consulting experience with a broad range of clients in various industries. He has provided information technology audit and consulting services to companies in the transportation, public sector and manufacturing industries. He leads the information technology systems audit work related to two U.S. Airlines, and thus was previously familiar with accounting systems used by airlines.

Q15. You mentioned that your team performed a "walkthrough" – what is that?

A15. A "walkthrough" involves tracing a transaction through organizational records and procedures. The Public Company Accounting Oversight Board ("PCAOB") describes a walkthrough as follows: "In a walkthrough, the auditor traces a transaction from origination through the company's information systems until it is reflected in the company's financial reports." See PCAOB Auditing Standard No. 2: An Audit of Internal Control Over Financial Reporting Performed in Conjunction With an Audit of Financial Statements, pp. 79-82.

Q16. Were you able to form an opinion regarding the accounting systems and processes that American used to collect and remit User Fees from 1996 through 2004?

A16. Yes.

Q17. What is your opinion?

A17. With regard to collection and remittance of User Fees by American, it my opinion that American's accounting processes for User Fees are appropriately designed

and structured to assure that User Fees collected are remitted to the Government. This opinion is based upon my analysis of these processes, which has allowed me to understand their nature, the flow of information through the relevant aspects of American's accounting system, and the sequences of computerized procedures, manual operations and data interfaces. Based upon my analysis of American's accounting process for User Fees, it is also my opinion that the design and structure of American's accounting processes make it highly unlikely that collected User Fees are not remitted to the Government.

Q18. What role does American's accounting system and process play here?

A18. Generally, an accounting system is designed to systematically accumulate, classify and record relevant characteristics of business transactions and events. The American Institute of Certified Public Accountants ("AICPA") defines an Accounting System as "[T]he methods and records established to record, process, summarize, and report an entity's transactions (as well as events and conditions) and to maintain accountability for the related assets, liabilities and equity." In this case the relevant business transactions are those which accumulate, classify and record American's collection and remittance of User Fees.

Q19. How do these systems relate to the User Fees?

A19. In accordance with industry standards, American uses designated accounting codes to identify the User Fees at issue: "XA" for the APHIS User Fee and "XY" for the Immigration User Fee, and makes use of its revenue accounting process, specifically the tax collection and remittance elements, in its accounting for User Fees. The XA and XY codes are two of many coding protocols used by American as a part of its tax collection and remittance processes. American collects over 500 different types of taxes and user fees using the same general process. The

codes for the APHIS and Immigration User Fees, as well as the hundreds of other taxes, user fees, and passenger facilities charges imposed by various authorities around the world, are assigned by the International Air Transport Association ("IATA").

Q20. Are American's systems automated?

A20. Yes, as with most commercial airlines, American's systems are highly automated. Virtually all User Fee transactions are automated, and the normal processes of collection and remittance occur without manual intervention.

Q21. How does American account for the User Fees?

A21. American has two fundamental accounting processes for XA and XY, depending on when the User Fees are collected. The first process is applicable when the User Fees are collected at the time of original ticketing; the second is applicable when the collection occurs at some point after the initial ticketing.

Q22. Are any other processes relevant?

A22. No. American does use a third, less common process involving the examination and re-pricing of certain agency tickets based on the flight path and travel date, but it is not relevant here.

Q23. Could you explain?

A23. If the taxes collected on the ticket do not match the expected collection, American identifies the ticket for further review. On a daily basis, an employee reviews a sample of such tickets for under collection of any taxes/fees, including User Fees. American then attempts to collect these amounts from the agent by issuing a debit

memo; however, this is done for a very small number of tickets. For example, XA and XY fees collected through this process during twelve months between October 2004 and September 2005 were $3,391 and $3,026 respectively. Any amounts collected by this process are recorded in the related tax liability account through manual journal entries. Thus, in the unlikely event that User Fees associated with the Audit Errors were collected using this process, they would also have been remitted to the Government.

Q24. Regarding the two processes that are relevant, is collection of a User Fee documented in any way?

A24. Yes.

Q25. How?

A25. In both cases, the collection of XA and XY is reflected on a physical document. In the case of collection at original ticketing, the collection is reflected on the passenger ticket. In the case of collection of XA and XY after original ticketing, the collection is reflected on a document known as a miscellaneous sales receipt, or "MSR".

Q26. Is collection of funds after the time of ticketing common for airlines?

A26. In a sense, yes. In my experience, airlines often make additional "miscellaneous" collections for change fees and other items after original ticket issuance. However, while the amounts are significant in absolute terms, they are almost always small relative to the amounts collected at the time of ticketing. By way of example, American collects less than 2% of all its revenues after original ticketing, *i.e.*, through the MSR process. I have prepared an exhibit marked Exhibit 5 that summarizes how little American collects through the MSR process.

Q27. What portion of the User Fees does American collect through the MSR process?

A27. As shown in the lower left area on Exhibit 5, American collects about 0.008% of the User Fees through the MSR process – in other words, after the time of ticketing. The remaining 99.992% of the User Fees are collected at the time of ticketing.

Q28. You mentioned that collection of the User Fees at the time of ticketing is documented on the passenger ticket – could you explain how?

A28. Sure. I have prepared an exhibit marked Exhibit 2 that is an example of this. I copied the ticket image on Exhibit 2 from a ticket in the Government's audit workpapers and produced by the Government in this case with Bates stamp CBP02663. Exhibit 2 is an example of an American passenger ticket. The highlighted area marked as "A" reflects the total revenue amounts collected and the various categories used by American to classify the amounts collected. The ticket reflects the collection of XA in the amount of $3.10 and XY in the amount of $7.00, as identified in the highlighted areas marked as "B" and "C" respectively. The applicable XA and XY fees are automatically priced and recorded in American's accounting records and on the ticket as a part of the ticketing process, and are determined based upon the route flown on the ticket.

Q29. You also mentioned that collection of the User Fees after the time of ticketing is documented on an MSR – could you explain how?

A29. Yes. I have prepared an exhibit marked Exhibit 3 that is an example of an MSR. I copied the MSR image on Exhibit 3 from an MSR in the Government's audit workpapers and produced by the Government in this case with Bates stamp CBP00683. Exhibit 3 is an example of an American MSR. American uses

MSRs for any and all non-ticket collections from passengers, including for example, change fees, taxes, fees, and other purchases made by passengers after original ticketing. In the example MSR, the highlighted area marked as "F" reflects the total amount of Guatemalan Quetzal GTQ 331.83 (equivalent to US$ 41.90) collected from the passenger. The MSR reflects the collection of XA in the amount of GTQ 24.55 (equivalent to US$ 3.10) and XY in the amount of GTQ 55.44 (equivalent to US$ 7.00), as identified in the highlighted areas marked as "G" and "H" respectively.

Q30. You mentioned before that you performed a review and "walkthrough" of American's User Fee systems – did you document your findings?

A30. Yes, as a part of my analysis, I have documented the two collection processes for User Fees in detail. I have also prepared an exhibit marked Exhibit 4 that summarizes how these systems operate.

Q31. Were you able to form an opinion regarding American's systems and processes regarding the collection and remittance of the User Fees?

A31. Yes.

Q32. What is your opinion?

A32. In my opinion, each of the processes is appropriately designed and structured to assure that User Fees are collected and remitted. Moreover, the systems and processes make it highly unlikely that a User Fee would ever be collected without evidence of such collection existing on either the ticket or an MSR. The systems also make it highly unlikely that a User Fee would be collected, but not remitted to the Government.

Q33. Other than your review of American's systems and processes, it there anything else that supports that conclusion?

A33. Yes. Consistent with my analysis and opinions regarding American's accounting processes for User Fees, I note that the Government in its audits also concluded that American's accounting system was appropriate for the recording, collection and remittance of User Fees. This finding is not surprising, given that the processes followed by the Government in conducting these audits were, in concept, no different than some of the work that I have done to develop my opinions. The auditors developed an understanding of the process and related procedures and collected documents and performed other tests in order to reach a conclusion on the appropriateness of the system with regard to the recording, collection and remittance of User Fees. I note that in each of the audits, the Government found American's systems and processes to be acceptable. In addition, American itself performed reviews of its User Fee collection and remittance systems and processes. For example, American did this in connection with its Sarbanes-Oxley 404 compliance obligations. I have studied these reviews and they similarly conclude that American's tax and User Fee systems and processes are appropriate.

Q34. You also mentioned that you performed certain tests and reviews to determine whether the Government's Audit Errors represented instances where American had collected a User Fee – could you explain what you did?

A34. Yes. In general, because the Government's audit liability assessments were based upon amounts derived from the Audit Errors, I designed and performed tests and searches of American's records in an attempt to find collections of User Fees related to any of the Audit Errors. I performed different reviews and tests to

check both for collection of the User Fees at the time of ticketing and for collection after the time of ticketing.

Q35. Could you explain in more detail what you mean by "Audit Errors?"

A35. The Government's User Fee audits each include an assessment of additional User Fees, calculated by projecting the Audit Errors noted in a sample of tickets examined during the audit to the total population of tickets for the audit period. An Audit Error in each instance is a ticket for which the Government expected User Fees to be collected and for which there is no evidence of User Fee collection and/or remittance. Based on my review of the documents (audit reports, working papers and other documents related to the audits), I have prepared an exhibit marked Exhibit 6, which lists the tickets that comprise the Audit Errors cited in the government's audit reports at issue in this case. Exhibit 6 lists 65 Audit Error incidents, which relate to 48 specific tickets. There are more Audit Errors than tickets because some of the tickets contained more than one Audit Error. In other words, the same ticket was an Audit Error in both an APHIS and an Immigration User Fee audit. (My previous expert report dated February 1, 2007 mentions 51 tickets, which I have reduced to 48 tickets after removing 3 duplicate tickets that were counted as Audit Errors in both the INS User Fee audit and the APHIS User Fee audit for the relevant period). Also, since two of the tickets evidence partial collection and remittance, the Government counted those tickets as partial errors, as noted on Exhibit 6.

Q36. In general, what did your searches and tests reveal about these Audit Errors?

A36. I have searched American's accounting records in order to determine whether any User Fees associated with these tickets had been collected. With one exception, I found no such evidence. In my opinion, the searches I performed were

reasonably designed to detect whether a User Fee had in fact been collected. Thus, I conclude that American did not collect the User Fees for any of the Audit Errors, except for one.

Q37. What specifically did you do to determine whether any User Fees were collected at the time of ticketing for the Audit Errors?

A37. As I mentioned, all of the Audit Errors cited by the Government relate to 48 original issue tickets. I noted that 43 of the 48 tickets were automated electronic tickets, 4 were handwritten tickets, and I could not locate a copy of 1 ticket.

First, I reviewed the 43 electronic tickets for evidence of collection and discovered that only one (Exhibit 6, Reference 59) showed evidence of collection of the User Fee or Fees in question. Since the User Fee collection process for these 43 original tickets was automated and 42 of the tickets do not reflect the collection of the User Fees, it is highly unlikely that any User Fees were collected at the time of original ticketing for those 42 tickets lacking evidence of collection of the User Fee. Next, I reviewed the 4 handwritten tickets (References 4, 5, 34, 35 and 41 (which is a duplicate of 35) on Exhibit 6). For these tickets, it is also unlikely that any User Fees were collected at the time of ticketing because they do not reflect the collection of the User Fees. This is particularly true for 3 of the 4 handwritten tickets that reflect the breakdown of the amounts collected. In sum, I reviewed all of the tickets (except the one that is unavailable) and determined that none reflected collection of a User Fee, with one exception.

Q38. You mentioned that one ticket was unavailable to you, but was it available to the Government auditors during the audit?

A38. I do not know. It is unclear from the Government's audit workpapers whether the one unavailable ticket (Reference 57 on Exhibit 6) was also unavailable to the Government auditors during the User Fee audit. If it was, this ticket was presumably deemed an error simply because it could not be located. However, based on the Government's own audit findings, there would be approximately a 99% chance that the User Fees were collected for this ticket and that the ticket reflected evidence of such collection. On the other hand, if the ticket was available to the Government auditors during the User Fee audit, it presumably did not reflect collection of the User Fee (as was the case with every other error in this audit). In either case, it is highly unlikely that a User Fee was collected, but not remitted.

Q39. You also mentioned that you found one ticket that did evidence collection of a User Fee – could you explain what you found?

A39. I noted one ticket in the Audit Errors (Exhibit 6, Reference 59 - Ticket No. 2125455171) that reflects the collection of two XY User Fees, but remittance of only one. As I noted on Exhibit 6, this Audit Error was from Flight 447 from Toronto to Chicago relating to the Immigration User Fee Audit for the period from 1/1/03 to 6/30/04. I consider this ticket to be an anomaly.

Q40. Why is that?

A40. As an additional test, I analyzed all available tickets for the applicable flight for similar evidence. I found 8 additional tickets with detailed tax records showing collection of two XY User Fees and noted on all of them that the two XY User Fees were both recorded and remitted properly. More importantly, I also noted that none of the remaining Audit Errors reflect collection of multiple User Fees on the same ticket; in fact except for this one ticket, none of the remaining Audit

Errors reflect the collection of any User Fees. Accordingly, this issue cannot apply to any of the other Audit Errors.

Q41. Did you do anything else to test whether any User Fees were collected at the time of ticketing?

A41. Yes, I also inspected the 47 available Audit Error tickets listed in Exhibit 6 to determine whether any User Fees could have been collected using American's "combined tax code" sampling process.

Q42. What is a combined tax code?

A42. Sometimes instead of using individual tax codes such as XA or XY, combined ticket tax codes – "XT" or "ZZ" – are used to record the multiple taxes collected on a ticket. The combined tax codes are typically used when collecting multiple taxes and fees as the tickets generally have only three input fields (or "boxes") to record the details of the taxes collected. The vast majority of the time, when combined tax codes are used, the precise breakdown of the taxes collected are recorded in a detailed tax record and printed in the "FARE CALC" line of the ticket. Exhibit 2 is an example of this. The highlighted box marked "D" shows that $50.50 was collected using the combined code "XT." The FARE CALC line in the area marked "E" shows that the $50.50 should be allocated as follows: $13.40 to code "US," $3.10 to code "XA," $7.00 to code "XY," $7.50 to code "AY," $6.00 to code "CS," and $13.50 to code "XF." During American's automated processing of tickets, a computer program reads the detailed tax record and allocates the taxes collected to the relevant tax codes, including XA and XY.

Q43. What is the sampling process you mentioned?

A43. American uses a sampling process to allocate taxes for tickets where taxes are collected using a combined tax code, but a detailed tax record is not available. But this only happens a very small percentage of the time. I wanted to review the tickets to see whether that process could have come into play for any of the Audit Errors.

Q44. What did you do?

A44. I reviewed each of the 47 available tickets deemed to be Audit Errors by the Government auditors to see whether any reflected the use of a combined tax code but did not contain a detailed tax record in the FARE CALC line.

Q45. What did you find?

A45. I found that there were no such tickets. In other words, each of the Audit Errors either shows that a combined tax code was not used at all, or if one was used that the precise breakdown of the taxes by individual tax code was shown in the FARE CALC line. Specifically, and as noted in Exhibit 6, I found that 36 of the tickets did not use an XT or ZZ combined tax code to collect any fees or taxes. I found 11 tickets that used the XT code to collect fees and/or taxes. However, the FARE CALC line on these 11 tickets presented detailed information to enable American's automated program to allocate the fees and taxes to the appropriate codes. That means that the sampling process cannot have been used with respect to any of these 47 tickets, and therefore that process is not relevant in this matter. Since it is not relevant to any of the Audit Errors, I express no opinion on the manner in which that sampling process was carried out for other tickets.

Q46. What is your opinion about whether American collected any User Fees in connection with the Audit Errors at the time of ticketing?

A46. For the reasons I've stated, it is my opinion that no User Fees were collected at the time of ticketing for any of the Audit Errors, except for Reference 59 on Exhibit 6.

Q47. So far you have testified about what you did to determine whether any User Fees were collected for any of the Audit Errors at the time of ticketing. What specifically did you do to determine whether any User Fees were collected after the time of ticketing for the Audit Errors?

A47. As I mentioned, I also searched for potential User Fees collections on MSRs related to the applicable tickets. As I discussed previously, this is the only other method by which there could have been any collection of User Fees related to these tickets. If the MSR process worked as designed, all collected User Fees would be remitted through the mechanisms outlined in Exhibit 4, and therefore I would not expect to find any MSRs where User Fees were collected but not remitted. In any event, for each ticket listed in Exhibit 6, I performed electronic queries of tens of millions of American's historical accounting records, which included every single MSR issued during the relevant audit periods, in an attempt to locate MSRs possibly related to the ticket. Specifically, I searched archived accounting and other data for MSRs containing either the ticket number or passenger name (or similar name) identified on the ticket for a period of one year before and after the flight date. My objective was to look for evidence to confirm whether or not the collection could have potentially been for User Fees in connection with any of the Audit Errors. I prepared an exhibit marked as Exhibit 7 that summarizes my findings.

Q48. How did you obtain the relevant data?

A48. The search for MSRs that could possibly be related to the Audit Errors began with extracting the relevant ticketing, MSR and passenger related information from data stored on hundreds of American's data storage tapes located at its headquarters in Dallas, Texas. After extracting the relevant information, my team and I converted it into a searchable database and used an electronic search tool for large electronic databases in order to search for the potentially relevant MSRs.

Q49. What search criteria did you use to find potentially relevant MSRs?

A49. I searched for MSRs having (1) passenger names matching or similar to those names identified in Exhibit 6 or ticket numbers matching those identified in Exhibit 6, and (2) a date within 365 days before or after the date of flight. Such a match would potentially indicate that the MSR in question pertained directly to a ticket identified as an Audit Error.

Q50. What did your search reveal?

A50. I found 94 MSRs that met my search criteria, and I collected relevant data relating to each MSR for further analysis.

Q51. What data did you collect?

A51. The data I collected for each MSR included the customer name, MSR number, associated ticket number (if available), transaction date, the MSR type or types, the amounts paid in total and by MSR type, and the location of the payment.

Q52. What is an MSR type?

A52. American uses three digit codes to designate the purpose of each MSR. These codes are known as the MSR type. I have prepared an exhibit marked as Exhibit

8 that lists all of American's MSR types. American has specific MSR types for the collection of APHIS and Immigration User Fees, which are types 047 and 116, respectively.

Q53. You mentioned that you analyzed the data for each MSR – what did you do?

A53. First, I checked to see if any of the MSRs matched a ticket number for an Audit Error listed on Exhibit 6. I found that of the 94 MSR identified, only 2 MSRs contained ticket numbers matching a ticket number of an Audit Error (the other 92 matched only the name on an Audit Error ticket). However, neither of these MSRs reflected MSR types for APHIS or Immigration User Fees, *i.e.*, types 047 and 116. Accordingly, assuming American's ticketing agents followed procedure – which requires using the proper MSR type and entering the applicable ticket number when collecting User Fees on an MSR – no User Fees for any Audit Errors could have been collected using an MSR.

Q54. What if American's ticketing agents did not follow those procedures?

A54. In the unlikely event that proper procedure was not followed, I performed three additional tests on each of the 94 MSRs to eliminate the possibility that it represented the collection of User Fees for any of the Audit Errors. The first test was to determine whether the city in which the MSR was issued corresponded to a city in the flight path of the applicable Audit Error. If the MSR was issued in a city that did not correspond to the flight path, it is extremely unlikely that the MSR represented the collection of a User Fee for that flight. The second test was to determine and document whether any portion of the MSR amount could potentially represent a charge for User Fees. For this test I treated certain miscellaneous MSR types (specifically types 098, 099, and 114) as if they could potentially be collections for User Fees, however unlikely. In addition, for any

MSR reflecting the collection of a tax or user fee other than XA or XY, I validated that American should in fact have collected that type of tax or user fee, in order to ensure that they did not represent mistakenly-coded XA or XY fees. The third test was to compare the date of collection noted on the MSR in order to determine whether it matched (or was near) the date of flight for the applicable Audit Error.

Q55. What were the results of this testing?

A55. As I mentioned, the results are documented in Exhibit 7. In summary, I found that 93 of the 94 MSRs failed one or more of these tests, allowing me to eliminate the already remote possibility that the MSR was used to collect User Fees associated with the Audit Errors. Further, although the remaining MSR (Exhibit 7, Reference 1; MSR No. 616586581) could potentially represent collection of a User Fee in connection with one of the Audit Errors (Exhibit 6, Reference 4; Ticket No. 8496032891), it is my opinion that this outcome is very unlikely given American's systems and processes.

Q56. Do you have an opinion of what American's damages are in this case?

A56. Yes. For the reasons I have described, it is highly unlikely that American collected the User Fees for any of the Audit Errors, except for the one at Reference 59 on Exhibit 6. Accordingly, it is my opinion that the Government improperly exacted from American a total of $2,589,363 for uncollected user fees, exclusive of interest. This amount equals the total of all Audit Errors on Exhibit 6, except for the one at Reference 59.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 25th day of May 2007

David S. Williams

Exhibits

1. Summary of User Fees Audits Performed by the Government
2. Example of User Fee Collected on a Ticket
3. Example of a Miscellaneous Sales Receipt
4. User Fees Collection Processes
5. MSR Statistics
6. Listing of Audit Errors
7. Results of MSR Testing
8. Listing of MSR Types
9. Resume of David S. Williams

# EXHIBIT 1

# TO

# DIRECT TESTIMONY OF DAVID S. WILLIAMS

American Airlines v. United States
Direct Testimony of David S. Williams
Exhibit 1 – Summary of User Fee Audits Performed by the Government

Immigration User Fee (Code XY)

| Period Covered by Government Review | Sample Size | Audit Errors | Error Rate (%) | Original Amount Paid ($ US) | Additional Liability* Assessed ($ US) |
|---|---|---|---|---|---|
| 7/1/98-6/30/00 | 1,177 | 4 | 0.34% | $ 116,668,942 | $ 397,844 |
| 7/1/00-12/31/01 | 545 | 1 | 0.18% | 87,520,875 | 160,878 |
| 1/1/02-12/31/02 | 416 | 17.1 | 4.12% | 3,131,053 | 134,577 |
| 1/1/02-12/31/02 | 400 | 3 | 0.75% | 62,099,220 | 469,263 |
| 1/1/03-6/30/04 | 1,444 | 3.5 | 0.24% | 112,343,889 | 270,274 |
| Totals | | | 0.37% | 381,763,979 | 1,432,836 |

APHIS User Fee (Code XA)

| Period Covered by Government Review | Sample Size | Audit Errors | Error Rate (%) | Original Amount Paid ($ US) | Additional Liability* Assessed ($ US) |
|---|---|---|---|---|---|
| 7/1/96-6/30/98 | 878 | 5 | 0.57% | $ 26,289,955 | $ 150,572 |
| 7/1/98-6/30/00 | 1,130 | 8 | 0.71% | 42,806,248 | 299,107 |
| 10/1/00-12/31/01 | 685 | 7 | 1.02% | 33,982,490 | 345,937 |
| 1/1/02-12/31/02 | 450 | 12 | 1.05% | 28,218,485 | 298,298 |
| 1/1/03-6/30/04 | 1,335 | 3 | 0.22% | 45,909,527 | 101,224 |
| Total | | | 0.67% | 177,206,705 | 1,195,138 |

Total Additional Assessment (Immigration User Fee +APHIS Fee) $ 2,627,974

* Exclusive of any interest and/or penalties

# EXHIBIT 2

# TO

# DIRECT TESTIMONY
# OF DAVID S. WILLIAMS

American Airlines v. US
Direct Testimony of David S. Williams
Exhibit 2 – Example of a passenger ticket showing XA and XY collections



```
05/06/03 14:45:22  TKT 0017415253156  TCN 7906034532796
A410407                                                          RAP107
 AMERICAN AIRLINES        AUDITORS COUPON FACSIMILE ETKT         PRSOAF
 NONREF/CHG FEE APPLIES NO VALU                              CNJ 56-57
 E AFTER FLT DA                                          *TADS ISSUE INFO TEMP
 RUTLEDGE/RALPH A                 03 FEB 03  SMF/SMF     NOT AVAILABLE *
                                      ZUIZQN/1A          11 54822

   SACRAMENTO          AA 1842 N  28MAR 0812A OK NW7L5A
 X DALLAS-FT WORTH     AA 2195 N  28MAR 0524P OK NW7L5A              31MAR
   GUATEMALA CITY                                VOID                31MAR
 O SAN JOSE            AA 2166 N  15APR 0855A OK NX7L5A
   DALLAS-FT WORTH                                               30MAR 15APR
 USD           503.00
 USD YC          5.00                                        SITI
     US         13.40   SMF AA X/E/DFW Q5.00AA GUA M254.00NW7L5A //SJO Q5.00AA X/
     XT         50.50   E/DFW AA SMF M239.00NX7L5A NUC503.00END ROE1.000000XT13.4
                        0US3.10XA7.00XY7.50AY6.00CS13.50XF SMF4.5DFW4.5DFW4.5
              TOTAL
 USD           571.90
 790 /
 FOP                 CASH
RAPP MSG: INQUIRY DONE - PFK4 TO VIEW CONJUNCTION
```



The ticket image is copied from
Bates # CBP02663

# EXHIBIT 3

# TO

# DIRECT TESTIMONY OF DAVID S. WILLIAMS

American Airlines v. United States
Direct Testimony of David S. Williams
Exhibit 3 – Example of a Miscellaneous Sales Receipt

```
05/01/03 16:33:32   TKT 0010612608312   TCN 0018081593992              PRS120
A578271                                                                 RAPOAG
 AMERICAN AIRLINES          MISCELLANEOUS SALES RECEIPT
                             AUDITOR COUPON FACSIMILE
                           GUATAGT    14 APR 03          GUATEMAULA          GT
 TOLEDO/CLAUDIA                       EYINSP             82 10120      001/42L L

   02     U.S.-INTL TRANSPORATION    212.24   ** NOT VALID FOR TRANSPORTATION **
   01     YC CUSTOMS FEE              39.60
   01     XY-U.S. IMMIGRATION FEE     55.44
   01     XA-US APHIS FEE             24.55

 GTQ           331.83                          PSGR TKT 0013611911636 04/14/03

                                           *************************
                 TOTAL                      ALL MISCELLANEOUS CHARGES
 GTQ             331.83                        ARE NONREFUNDABLE
                                           *************************

 001 8081593992     001  0612608312 5 FOP CC BA4966540580701117         014271
RAPP MSG: INQUIRY DONE              PF9 - HELP MENU                    EXP 01/05
```

H

G

F

The ticket image is copied from
Bates # CBP00683

# EXHIBIT 4

# TO

# DIRECT TESTIMONY OF DAVID S. WILLIAMS

American has two fundamental accounting processes for XA and XY, depending on when the User Fees are collected. The first process is applicable when the User Fees are collected at the time of original ticketing; the second is applicable when the collection occurs at some point after the initial ticketing. The following paragraphs describe the two processes:

***XY and XA Collected at Time of Ticketing***

1. American tickets are sold through three primary sales channels; (a) company ticket sales, including ticket stations at airports, American's internet site (AA.com), and American ticket offices (including sales made with an AA ticket agent via phone), (b) domestic travel agency ticket sales and (c) international travel agency ticket sales. Because travel agent sales constitute a significant portion of carrier sales, the industry has established protocols to facilitate sales reporting by travel agents to the carriers. The protocols essentially permit a travel agent to submit a single sales report to a centralized entity that then reports the agent's sales and other relevant transactions to the respective airlines.[1]

2. When a standard revenue passenger ticket is sold through any of these sales channels, the applicable XA and XY fees collected are automatically priced and recorded as a part of the ticketing process, based on the route flown.[2] User Fee collections are recorded in a ticket control number record ("TCN") and on sales reports generated by the channel that sold the ticket. A TCN record contains ticket information generated from the applicable reservation system used to book the travel itinerary details. It includes information such as itinerary purchased, fare calculation, taxes and fees, and is received electronically by American on a real time basis. Sales reports are generated primarily to support the cash settlement between the ticketing agents and AA. The frequency of agency sales reports from numerous sales channels range from daily to monthly.

3. TCN records are received electronically by American and stored in a system known as the "Passenger Revenue Accounting System", or "PRAS" where all XA and XY fee collection information is stored and processed. The detailed information relating to XA and XY fees for each ticket is stored in the Passenger Accounting Transaction History ("PATH") database of PRAS. PRAS then executes various processes using the information, ultimately resulting in accounting entries recorded in American's general ledger.

---

1 Examples include the Area Settlement Plan administered by the Airline Reporting Corporation ("ARC") and the Billing and Settlement Plan ("BSP") for international ticketing.

2 See Exhibit 2, Example of User Fee Collection on a Ticket.

4. For company sales, the Revenue Accounting & Pricing Proration ("RAPP") module within PRAS loads the XA and XY collected amounts into PATH from the corresponding TCN record.

5. For agency sales, all relevant TCN records are matched to information in the sales reports using another system known as the Agency & Company Sales Input System ("ACSIS"). The collected XA and XY amounts as reflected in the matched records are then loaded into PATH.

6. PATH converts any XA or XY collections made in foreign currencies to US dollars. It also adjusts any over- or under-collection of XA or XY fee to the appropriate amounts.[3]

7. At the end of each month, American's Company Audit & Distribution ("CAAD") System uses PRAS data to record a lump-sum accounting entry, recognizing all taxes and fees collected as a single amount in the tax clearing account in its general ledger.

8. Subsequently, the Tax System (another module within PRAS) processes all XA and XY collections and executes another accounting entry; this entry identifies the specific XA and XY amounts due to the Government and records them into separate liability accounts by moving the appropriate amounts from the tax clearing account. The entire amounts in these liability accounts (including those for XA and XY) are paid to the appropriate government authority periodically. In the case of XA and XY, they are paid on a quarterly basis as described below.

9. American has several processes designed to ensure that combined ticket tax codes are analyzed for potential collection of User Fees.[4]

---

[3] If, for example, American collected a User Fee amount from a passenger that was less than the required amount, American would make up the difference using its own money and remit the correct amount to the Government. This adjustment ensures that the appropriate User Fee is reflected in remittances to the Government, a key process control.

[4] Sometimes instead of using individual tax codes such as XA or XY, combined ticket tax codes (XT or ZZ) are used to record multiple taxes collected on a ticket. The combined tax codes are typically used when collecting multiple taxes and fees as the tickets often have limited number (usually three) of input fields (or "boxes") to record the details of the taxes collected. The vast majority of the time, when combined tax codes are used, the precise breakdown of the taxes collected are recorded in a detailed tax record and printed in the "FARE CALC" line of the ticket. Exhibit 2 is an example of this. The highlighted box marked "D" shows that $50.50 was collected using the combined code "XT." The FARE CALC line in the area marked "E" shows that the $50.50 should be allocated as follows: $13.40 to code "US," $3.10 to code "XA," $7.00 to code "XY," $7.50 to code "AY," $6.00 to code "CS," and $13.50 to code "XF." During the automated processing of tickets, a program in the PATH database reads the detailed tax record in the FARE CALC line and allocates the taxes collected to the relevant tax codes, including XA and XY. American uses a sampling process to allocate taxes for the small percentage of tickets where taxes are collected using a combine tax code, but a detailed tax record is not included in the FARE CALC line. I reviewed each of the tickets deemed to be Audit Errors by the government auditors to see whether any reflected the use of a combined tax code without a detailed tax record, and there were no such tickets. In other words, each of

10. With minor caveats, the process described above applicable to revenue passengers is also applicable to the other types of American passengers as described below:

11. AAdvantage Award Passenger[5] - The applicable XA and XY amounts collected are processed in the same manner as described for revenue passengers.

12. Refunds - Refund transactions are processed in the same manner as regular revenue ticket except that the fare and taxes are negative amounts.

13. Charter Flights - All taxes and fees records for charter flights are maintained manually. Applicable XA and XY collected are recorded by American using manual accounting entries, as opposed to the system-driven entries described above.

14. Employee Travel - When employee travels, the fare and taxes due are priced through a system for "Non Revenue Space Available" or NRSA travel. For American employees based in the United States, the amounts due are deducted from payroll and the applicable XA and/or XY fees are recorded in the corresponding tax liability accounts. Non-US employees are required to pay the total amount of fare and taxes prior to traveling. Therefore their fares and taxes are typically recorded as part of the company ticket sales stream. XA and XY fees collected are processed in the same manner as a revenue passenger.

***XY and XA Collected After Ticketing***

15. If XA and/or XY fees are not collected at the time of the ticketing, such collections might occur subsequently. If they do, they are recorded by airport agents by issuing Miscellaneous Sales Receipts ("MSRs"). American uses MSRs for any and all non-ticket collections from passengers, including for example, change fees, taxes, fees, and other purchases made by passengers after original ticketing.[6] American identifies MSRs used to collect XA and XY fees as MSR types 047 and 116 respectively. If the designated MSR types are used to collect XA or XY, the MSR record is pre-populated on the ticketing screen with the current amount of the Use Fee and cannot be changed manually. As a

---

the Audit Errors either shows that a combined tax code was not used, or if one was used that the precise breakdown of the taxes by individual tax code was shown in the FARE CALC line. For this reason, the sampling process is not relevant in this matter, and I express no opinion on the manner in which that process was carried out.

[5] AAdvantage is American's frequent flyer program. The AAdvantage passenger pays all applicable taxes and fees associated with award travel.

[6] See Exhibit 3 for an example of a Miscellaneous Sales Receipt.

practical matter, American collects very few User Fees after the time of original ticketing.[7]

16. All MSR records are processed by PRAS and stored in PATH. Each MSR record in PATH typically includes the ticket number as well as the passenger name. All MSR amounts collected are recorded in the company sales reports. Similar to the ticketing process described for revenue passengers, the CAAD system records daily the fees that are collected via MSRs using a lump-sum accounting entry reflecting all MSR collections, and at month end, the Tax System records the amount collected under the specific MSR types 047 and 116 respectively to the distinct XA and XY tax liability accounts.

17. It is possible that agents might use a miscellaneous MSR type (i.e., the 098 or 099 MSR types) to collect XA or XY fees. In this instance there is no pre-population of amounts on the ticketing screen. Periodically, American attempts to reclassify the collected User Fees by executing various keyword searches on MSR 098 and 099 records in PATH to identify any potential XA or XY fee collection. Any XA or XY amount identified is reallocated from revenue to the proper tax liability account using manual accounting entries, and is therefore remitted to the Government along with other collected User Fees.

***Fee Remittance***

18. AA remits the XA and XY fees to the Government on a quarterly basis. As a process control, American performs a monthly reconciliation of the XA and XY liability ending balances in the general ledger. Before the quarterly remittance is made by remitting the entire balance in the account, American's Tax Accounting personnel review the three monthly XA & XY reconciliations to check the reasonableness of the tax liability ending balance in the general ledger. Once the review is complete, payment vouchers are prepared, reviewed and approved by American's Transportation Tax and Revenue Accounting and Control organizations. After approvals, Tax Accounting remits the amount to the appropriate Government agencies.

---

[7] See Exhibit 5 for certain statistics related to User Fee collections using the MSR process. On average, revenue collected via MSR collections represent less than 2% of total revenue, and collections of User Fees via the MSR process represent an insignificant percentage of total User Fee collections.

# EXHIBIT 5

# TO

# DIRECT TESTIMONY
# OF DAVID S. WILLIAMS

American Airlines v. United States
Direct Testimony of David S. Williams
Exhibit 5 – MSR Statistics

**Miscellaneous Sales Receipt (MSR) Collections as a Percentage of Passenger Revenue**

| | Total Collections[1] through the MSR process | Passenger Revenue[2] |
|---|---|---|
| Twelve months ended December 31, 2006 | $376,716,182 | $20,612,036,566 |
| Percentage of Passenger Revenue | 1.83% | |

Notes:
1. Composed of fares, fees, taxes, etc
2. Composed of Earned and Unearned Revenue collected during 2006

**APHIS & INS User Fee Collections via MSRs 047 & 116 respectively as a Percentage of Total APHIS & INS User Fee Collections**

| | User Fee Collections For Twelve months ended 12/31/06 |
|---|---|
| APHIS (XA) User Fee | |
| Collected using MSR-047 | $4,681 |
| Total Collections (through Ticketing, MSRs, etc.) | $60,194,082 |
| Collections using MSR-047 as a Percentage of Total Collections | 0.008% |
| INS (XY) User Fee | |
| Collected using MSR-116 | $6,771 |
| Total Collections (through Ticketing, MSRs, etc.) | $89,999,278 |
| Collections using MSR-116 as a Percentage of Total Collections | 0.008% |

**APHIS & INS User Fee Collections as a Percentage of Total Collections (fares, fees, taxes, etc.) through the MSR process**

| | APHIS (XA) User Fee Collections using MSR-047 | INS (XY) User Fee Collections using MSR-116 | Total Collections through the MSR process |
|---|---|---|---|
| In US Dollars | | | |
| Twelve months ended December 31, 2006 | $4,681 | $6,771 | $376,716,182 |
| Percentage of Total Collections using the MSR process (US$) | 0.001% | 0.002% | |
| Number of MSRs | | | |
| Twelve months ended December 31, 2006 | 864 | 898 | 7,082,824 |
| Percentage of Total Collections using the MSR process | 0.01% | 0.01% | |

Note – although the MSR statistics presented are based on Calendar Year 2006 data, it is my opinion that they are reflective of the period at issue in this matter.

# EXHIBIT 6

# TO

# DIRECT TESTIMONY OF DAVID S. WILLIAMS

American Airlines v. US
Direct Testimony of David S. Williams
Exhibit 6 - List of Errors- INS and APHIS Audits From 7/1/1996 - 6/30/2004

| Type of Audit | Period of Audit | # of Errors | Reference Number | Flight # | Flight Date | Ticket # | No XT or ZZ code used | XT or ZZ code used & detailed tax line data is available | Missing ticket | Passenger Name (Last Name/First Name) | Amount assessed for Audit Error (US$) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| APHIS | 7/1/1996 - 6/30/1998 | 5 | 1 | 912 | 6/26/1998 | 3868117494 | X | | | SOTO/ELENA MRS | 30,114 |
| | | | 2 | 912 | 6/26/1998 | 9404243787 | X | | | LUI/SHA | 30,114 |
| | | | 3 | 956 | 2/20/1998 | 6881249059 | X | | | INI/MATIAS | 30,114 |
| | | | 4 | 956 | 2/20/1998 | 8496032891 | X | | | COLINA/LUIS (not clearly legible) | 30,114 |
| | | | 5 | 1276 | 4/14/1998 | 8495477976 | X | | | /JOSE A (not clearly legible) | 30,114 |
| | | | | | | | | | | | 150,572 |
| APHIS | 7/1/1998 - 6/30/2000 | 8 | 6 | 1700 | 2/5/2000 | 3122868381 | X | | | MATAMOROS/PEDRO | 37,388 |
| | | | 7 | 1700 | 2/5/2000 | 3124295218 | X | | | QUIROS/SANDRAMRS | 37,388 |
| | | | 8 | 1700 | 2/5/2000 | 6868689401 | X | | | CURTIS/DES | 37,388 |
| | | | 9 | 5322 | 3/15/2000 | 3173349216 | X | | | LAUDE/CARLITO | 37,388 |
| | | | 10 | 2134 | 4/25/2000 | 2168405835 | X | | | DOMINGUEZ/MARIA MISS | 37,388 |
| | | | 11 | 588 | 5/2/2000 | 7004357872 | X | | | GUERRERO/LUIS (INF) | 37,388 |
| | | | 12 | 900 | 6/22/2000 | 2169775638 | X | | | DEL SOLAR/JOSE | 37,388 |
| | | | 13 | 1646 | 8/3/2000 | 6882688091 | X | | | DIEUDONNE/NATHAN | 37,388 |
| | | | | | | | | | | | 299,107 |
| INS | 7/1/1998 - 6/30/2000 | 4 | 14 | 5322 | 3/15/2000 | 3173349216 | * | | | LAUDE/CARLITO | 99,461 |
| | | | 15 | 2134 | 4/25/2000 | 2168405835 | * | | | DOMINGUEZ/MARIA MISS | 99,461 |
| | | | 16 | 588 | 5/2/2000 | 7004357872 | * | | | GUERRERO/LUIS (INF) | 99,461 |
| | | | 17 | 900 | 6/22/2000 | 2169775638 | * | | | DEL SOLAR/JOSE | 99,461 |
| | | | | | | | | | | | 397,844 |
| APHIS | 10/1/2000 - 12/31/2001 | 7 | 18 | 71 | 12/15/2000 | 2173260892 | X | | | BERES/IVELISSE | 49,420 |
| | | | 19 | 2110 | 7/2/2001 | 3312470243 | X | | | MATTOS/JORGE MR | 49,420 |
| | | | 20 | 2110 | 7/2/2001 | 3312470245 | X | | | PORTALES/ALONSO MR | 49,420 |
| | | | 21 | 958 | 8/20/2001 | 3129585153 | X | | | MAN/SUK WING MRS | 49,420 |
| | | | 22 | 958 | 8/20/2001 | 3129585154 | X | | | LEUNG/KWOK YAN | 49,420 |
| | | | 23 | 958 | 8/20/2001 | 3129568500 | X | | | BACKWELL/PATRICIA MRS | 49,420 |
| | | | 24 | 958 | 8/20/2001 | 3129568502 | X | | | ENNIONS/MICHAEL MR (not clearly legible) | 49,420 |
| | | | | | | | | | | | 345,937 |
| INS | 7/1/2000 - 12/31/2001 | 1 | 25 | 71 | 12/15/2000 | 2173260892 | * | | | BERES/IVELISSE | 160,878 |
| APHIS | 1/1/2002 - 12/31/2002 | 12 | 26 | 780 | 10/25/2002 | 1621966885 | | X | | CASTRO/ALFREDO | 24,858 |
| | | | 27 | 780 | 10/25/2002 | 1621966886 | | X | | ESQUEA/JOSE | 24,858 |
| | | | 28 | 780 | 10/25/2002 | 1621972198 | | X | | CURIEL/CRISTINA | 24,858 |
| | | | 29 | 780 | 10/25/2002 | 1621972004 | | X | | MELO/DELVIALIES | 24,858 |
| | | | 30 | 780 | 10/25/2002 | 1621972231 | | X | | MELO/DOMINGO | 24,858 |
| | | | 31 | 780 | 10/25/2002 | 3612741581 | | X | | MEDINA/MANUELA | 24,858 |
| | | | 32 | 780 | 10/25/2002 | 3612767149 | | X | | HERRERA/WALDYS | 24,858 |
| | | | 33 | 780 | 10/25/2002 | 3612767150 | | X | | RODRIGUEZ/DANITZA | 24,858 |
| | | | 34 | 780 | 10/25/2002 | 4265644115 | X | | | GUTIERREZ/ANTONIA (not clearly legible) | 24,858 |
| | | | 35 | 780 | 10/25/2002 | 4265644252 | X | | | SOTO/BOLIVAR | 24,858 |

* indicates a duplicate ticket because the same ticket was counted as an Audit Error in both the INS User Fee audit and the APHIS User Fee audit

American Airlines v. US
Direct Testimony of David S. Williams
Exhibit 6 - List of Errors- INS and APHIS Audits From 7/1/1996 - 6/30/2004

| Type of Audit | Period of Audit | # of Errors | Reference Number | Flight # | Flight Date | Ticket # | No XT or ZZ code used | XT or ZZ code used & detailed tax line data is available | Missing ticket | Passenger Name (Last Name/First Name) | Amount assessed for Audit Error (US$) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 36 | 63 | 2/27/2002 | 3581134350 | X | | | ROJAS/ANAMILENAMRS | 24,858 |
| | | | 37 | 63 | 2/27/2002 | 3581134349 | X | | | CALDERON, HERNANDOMR | 24,858 |
| | | | | | | | | | | | 298,298 |
| INS | 1/1/2002 - 12/31/2002 | 20.142 | 38 | 63 | 2/27/2002 | 3581134350 | * | | | ROJAS/ANAMILENAMRS | 156,421 |
| | | | 39 | 1542 | 7/5/2002 | 9612739983 | | X | | ANAN/KAYOKOMS | 156,421 |
| | | | 40 | 4308 | 12/23/2002 | 3574942344 | X | | | DE LA BARRERA/ANDREA MS | 156,421 |
| | | | | | | | | | | | 469,263 |
| | | | 41 | 780 | 10/25/2002 | 4265644252 | * | | | SOTO/BOLIVAR | 7,851 |
| | | | 42 | 780 | 10/25/2002 | 3612741581 | | * | | MEDINA/MANUELA | 7,851 |
| | | | 43 | 780 | 10/25/2002 | 3612767149 | | * | | HERRERA/WALDYS | 7,851 |
| | | | 44 | 780 | 10/25/2002 | 3612767150 | | * | | RODRIGUEZ/DANITZA | 7,851 |
| | | | 45 | 780 | 10/25/2002 | 1621972004 | | * | | MELO/DELVIALIES | 7,851 |
| | | | 46 | 780 | 10/25/2002 | 1621972198 | | * | | CURIEL/CRISTINA | 7,851 |
| | | | 47 | 780 | 10/25/2002 | 1621966886 | | * | | ESQUEA/JOSE | 7,851 |
| | | | 48 | 780 | 10/25/2002 | 1621972231 | | * | | MELO/DOMINGO | 7,851 |
| | | | 49 | 780 | 10/25/2002 | 7068166927 | | X | | MARTINEZ/DIONISIO (0.142 Audit Error) | 1,115 |
| | | | 50 | 914 | 4/15/2003 | EM-D3/612609287 | X | | | STEWART/MATTHEW | 7,851 |
| | | | 51 | 914 | 4/15/2003 | EM-D2P/612609529 | X | | | GOMEZ/ALEXANDER | 7,851 |
| | | | 52 | 914 | 4/15/2003 | 9145485754 | X | | | PEREIRA/BERNARDO MR | 7,851 |
| | | | 53 | 914 | 4/15/2003 | 3638082552 | X | | | RAMIREZ/ARMANDO | 7,851 |
| | | | 54 | 2196 | 4/15/2003 | 9166355659 | X | | | GIRON/SALVADOR | 7,851 |
| | | | 55 | 2196 | 4/15/2003 | 3612034839 | X | | | ORELLANA/MAYNOR | 7,851 |
| | | | 56 | 2196 | 4/15/2003 | 9166339150 | X | | | TURRIS/VICTOR | 7,851 |
| | | | 57 | 2196 | 4/15/2003 | 9166331856 | | | X | LORENZO/JAMIE | 7,851 |
| | | | 58 | 2196 | 4/15/2003 | 9166331858 | X | | | MAYEN/YADIRA | 7,851 |
| | | | | | | | | | | | 134,577 |
| | | | | | | | | | | | 603,840 |
| INS | 1/1/2003 - 6/30/2004 | 3.5 | 59 | 447 | 11/30/2003 | 2125455171 | | X | | CHENG/MICHAEL MR (0.5 Audit Error) | 38,611 |
| | | | 60 | 2132 | 2/18/2004 | 9184203014 | X | | | YAU/JORGE MR | 77,221 |
| | | | 61 | 2132 | 2/18/2004 | 9184203016 | X | | | CHEN/JULIO MR | 77,221 |
| | | | 62 | 2132 | 2/18/2004 | 9184203018 | X | | | CHEUNG/TAK CHUEN MR | 77,221 |
| | | | | | | | | | | | 270,274 |
| APHIS | 1/1/2003 - 6/30/2004 | 3 | 63 | 2132 | 2/18/2004 | 9184203014 | * | | | YAU/JORGE MR | 33,741 |
| | | | 64 | 2132 | 2/18/2004 | 9184203016 | * | | | CHEN/JULIO MR | 33,741 |
| | | | 65 | 2132 | 2/18/2004 | 9184203018 | * | | | CHEUNG/TAK CHUEN MR | 33,741 |
| | | | | | | | | | | | 101,224 |
| | | 63.642 | | | | | 36 | 11 | 1 | Total Additional Liability Assessed | 2,627,974 |

* indicates a duplicate ticket because the same ticket was counted as an Audit Error in both the INS User Fee audit and the APHIS User Fee audit

# EXHIBIT 7

# TO

# DIRECT TESTIMONY OF DAVID S. WILLIAMS

American Airlines v. United States
Direct Testimony of David S. Williams
Exhibit 7 - Results of MSR Testing

| No. | MSR Sale Date | MSR Number | Associated Ticket | Name | MSR sold in a City that does not match the flight path | Valid identifiable charge other than User Fees | Difference between MSR Sale Date & Flight Date: MSR Sale Date Equals Flight Date | Within 1 month | Within 1 to 2 months | Within 2 to 6 months | More than 6 months |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2/20/1998 | 616586581 | 8496032891 | DELACOLINA/LUIS | | | X | | | | |
| 2 | 2/20/2000 | 612253626 | 6868689401 | CURTIS/DES | | X | | X | | | |
| 3 | 10/9/1997 | 615565015 | 1393010080 | COLINA/LUIS | X | X | | | | X | |
| 4 | 10/9/1997 | 615565082 | 1393010080 | COLINA/LUIS | X | X | | | | X | |
| 5 | 1/27/1999 | 619050867 | 99 | PELLEGRINI/MATIAS | | X | | | | | X |
| 6 | 1/27/1999 | 619047770 | 4472688305 | FOLCINI/MATIAS | X | X | | | | | X |
| 7 | 8/10/1999 | 610573305 | 4781688771 | DIEUDONNE/NATHAN | X | | | | | | X |
| 8 | 12/9/2000 | 615034577 | 3379811923 | MATAMOROS/PEDRO | | X | | | | | X |
| 9 | 11/13/2001 | 618159564 | (NF) | MARTINEZ/DIONISIO | | | | | | | X |
| 10 | 11/28/2001 | 618284477 | (NF) | CURIEL/CRISTINA | X | X | | | | | X |
| 11 | 1/3/2002 | 618611146 | 2136683409 | CASTRO/ALFREDO | X | X | | | | | X |
| 12 | 1/15/2002 | 618728147 | 2151058078 | MARTINEZ/DIONISIO | X | X | | | | | X |
| 13 | 3/24/2002 | 619398414 | 99 | DE CASTRO/ALFREDO | X | | | | | | X |
| 14 | 3/25/2002 | 619405318 | 2151678540 | CURIEL/CRISTINA | X | X | | | | | X |
| 15 | 4/28/2002 | (NF) | 2136522640 | MEDINA/MANUELAL | X | | | | | X | |
| 16 | 5/11/2002 | 619869306 | 3567242758 | MELO/DOMINGO | | | | | | X | |
| 17 | 5/19/2002 | 619936442 | (NF) | CASTRO/ALFREDO | X | | | | | X | |
| 18 | 5/31/2002 | 610030755 | 7272533333 | RAMIREZ/ARMANDO | X | | | | | | X |
| 19 | 6/3/2002 | 610052032 | 7254607269 | SOTO/BOLIVAR | X | X | | | | X | |
| 20 | 6/7/2002 | 610094083 | 2152315832 | GOMEZ/ALEXANDER | X | X | | | | | X |
| 21 | 6/20/2002 | 610206304 | 2153642750 | CURIEL/CRISTINA | X | X | | | | X | |
| 22 | 7/3/2002 | 610328286 | 2113227079 | GOMEZ/ALEXANDER | X | | | | | | X |
| 23 | 7/11/2002 | 610392214 | 99 | CASTRO/ALFREDO | X | X | | | | X | |
| 24 | 7/11/2002 | 610394861 | 910000000 | RAMIREZ/ARMANDO | | X | | | | | X |
| 25 | 7/14/2002 | 610421249 | 7286767106 | RAMIREZ/ARMANDO | X | | | | | | X |
| 26 | 7/15/2002 | 610435465 | 2139874258 | RAMIREZ/ARMANDO | | X | | | | | X |
| 27 | 7/22/2002 | 610497507 | 7273762547 | RAMIREZ/ARMANDO | | X | | | | | X |
| 28 | 7/25/2002 | 610525514 | 3574475769 | RAMIREZ/ARMANDO MR | X | X | | | | | X |
| 29 | 8/29/2002 | 610840587 | 2154904486 | GOMEZ/ALEXANDER | X | | | | | | X |
| 30 | 9/24/2002 | 611039948 | 99 | STEWART/MATTHEW | X | X | | | | | X |
| 31 | 10/7/2002 | 611148401 | 2154740333 | MARTINEZ/DIONISIO | | X | | X | | | |
| 32 | 10/9/2002 | 611173166 | 2155537931 | RAMIREZ/ARMANDO | X | | | | | | X |
| 33 | 10/21/2002 | 611268269 | 2114842834 | RAMIREZ/ARMANDO | | X | | | | X | |
| 34 | 10/31/2002 | 611349376 | 99 | RAMIREZ/ARMANDO | | | | | | X | |
| 35 | 11/4/2002 | 611375229 | 2115835811 | RAMIREZ/ARMANDO | | | | | | X | |

Exhibit 7 - Results of MSR Testing

| No. | MSR Sale Date | MSR Number | Associated Ticket | Name | MSR sold in a City that does not match the flight path | Valid identifiable charge other than User Fees | Difference between MSR Sale Date & Flight Date: MSR Sale Date Equals Flight Date | Within 1 month | Within 1 to 2 months | Within 2 to 6 months | More than 6 months |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 36 | 11/8/2002 | 611405008 | 2156004352 | RAMIREZ/ARMANDO | X | | | | | X | |
| 37 | 11/19/2002 | 611482774 | 0 | STEWART/MATTHEW | | X | | | | X | |
| 38 | 11/21/2002 | 611501879 | 1621966885 | CASTRO/ALFREDO | | X | | X | | | |
| 39 | 11/24/2002 | 611519290 | 2115670402 | CASTRO/ALFREDO | X | X | | X | | | |
| 40 | 12/5/2002 | 611598635 | 2156401461 | CASTRO/ALFREDO | X | | | | X | | |
| 41 | 12/20/2002 | 611709066 | 0 | CASTRO/ALFREDO | X | X | | | X | | |
| 42 | 12/21/2002 | 611719664 | 2156384929 | MARTINEZ/DIONISIO MR | X | X | | | X | | |
| 43 | 12/30/2002 | 611776667 | 2156004352 | RAMIREZ/ARMANDO | X | | | | | X | |
| 44 | 1/19/2003 | 611941686 | 99 | STEWART/MATTHEW | | | | | | X | |
| 45 | 1/23/2003 | 611977267 | 2155703554 | MARTINEZ/DIONISIO | X | | | | | X | |
| 46 | 3/24/2003 | 612455120 | 2145884481 | RAMIREZ/ARMANDO | | | | X | | | |
| 47 | 3/26/2003 | 612470465 | 916000000 | CASTRO/ALFREDO | X | X | | | | X | |
| 48 | 4/28/2003 | 612706629 | 3638082553 | RAMIREZ/ARMANDO | X | X | | X | | | |
| 49 | 5/3/2003 | 612755329 | 2158458443 | GUTIERREZ/ANTONIA | | | | | | | X |
| 50 | 5/5/2003 | 612768800 | 99 | STEWART/MATTHEW | | X | | X | | | |
| 51 | 5/6/2003 | 612783903 | 2119231292 | STEWART/MATTHEW | | | | X | | | |
| 52 | 5/15/2003 | 612857790 | 9163391501 | TURRIS/VICTOR | | | | X | | | |
| 53 | 5/22/2003 | 612924902 | 3143821378 | YAU/JORGE MR | | X | | | | | X |
| 54 | 5/28/2003 | 612968029 | 9176703032 | CASTRO/ALFREDO | X | | | | | | X |
| 55 | 6/5/2003 | 613045991 | 4260000000 | SOTO/BOLIVAR | | X | | | | | X |
| 56 | 6/12/2003 | 613107725 | 2159017122 | MARTINEZ/DIONISIO | X | | | | | | X |
| 57 | 6/15/2003 | 613133413 | 2119302505 | CASTRO/ALFREDO MR | | | | | | | X |
| 58 | 6/23/2003 | 613207142 | 2120304512 | STEWART/MATTHEW | | X | | | | X | |
| 59 | 6/24/2003 | 613220810 | 99 | YAU/JORGE MR | | | | | | | X |
| 60 | 6/30/2003 | 613279715 | 2159343025 | MARTINEZ/DIONISIO | | | | | | | X |
| 61 | 7/23/2003 | 613533762 | 99 | CASTRO/ALFREDO | X | X | | | | | X |
| 62 | 7/24/2003 | 613548173 | 2117309252 | MELO/DOMINGO | | X | | | | | X |
| 63 | 7/27/2003 | 613573728 | 7355591628 | CASTRO/ALFREDO | | X | | | | | X |
| 64 | 7/28/2003 | 613581879 | 2157255954 | MARTINEZ/DIONISIO | X | | | | | | X |
| 65 | 8/19/2003 | (NF) | 99 | CASTRO/ALFREDO | X | | | | | | X |
| 66 | 8/26/2003 | (NF) | 7418165931 | GUTIERREZ/ANTONIA | | X | | | | | X |
| 67 | 9/6/2003 | 613955146 | 0 | SOTO/BOLIVAR | | X | | | | | X |
| 68 | 11/20/2003 | 614503375 | 2126426368 | GOMEZ/ALEXANDER | X | X | | | | | X |
| 69 | 11/30/2003 | 614559790 | 0 | RAMIREZ/ARMANDO | X | X | | | | | X |
| 70 | 12/10/2003 | 614638807 | 7000896324 | STEWART/MATTHEW | | X | | | | | X |
| 71 | 12/14/2003 | 614662324 | 3205022522 | RAMIREZ/ARMANDO | X | X | | | | | X |
| 72 | 12/14/2003 | 614662163 | 99 | YAU/JORGE MR | | | | | | X | |

Exhibit 7 - Results of MSR Testing

| No. | MSR Sale Date | MSR Number | Associated Ticket | Name | MSR sold in a City that does not match the flight path | Valid identifiable charge other than User Fees | Difference between MSR Sale Date & Flight Date: MSR Sale Date Equals Flight Date | Within 1 month | Within 1 to 2 months | Within 2 to 6 months | More than 6 months |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 73 | 12/23/2003 | 614721129 | 2161486326 | RAMIREZ/ARMANDO | X | | | | | | X |
| 74 | 1/27/2004 | 614984924 | 7478579208 | STEWART/MATTHEW | X | X | | | | | X |
| 75 | 2/29/2004 | 615239430 | 2128630733 | RAMIREZ/ARMANDO | | X | | | | | X |
| 76 | 2/29/2004 | 615239453 | 99 | RAMIREZ/ARMANDO | | | | | | | X |
| 77 | 3/6/2004 | 615290281 | 2127936712 | STEWART/MATTHEW | | X | | | | | X |
| 78 | 3/14/2004 | 615346632 | 9184203196 | YAU/JORGE MR | | X | | X | | | |
| 79 | 3/18/2004 | 615379543 | 2127703297 | STEWART/MATTHEW | | X | | | | | X |
| 80 | 4/9/2004 | 615540362 | 9184220221 | YAU/JORGE MR | | X | | | X | | |
| 81 | 5/5/2004 | 615730063 | 9184220301 | YAU/JORGE MR | | X | | | | X | |
| 82 | 5/7/2004 | 615750145 | 9184220301 | YAU/JORGE MR | | X | | | | X | |
| 83 | 5/7/2004 | 615750166 | 9184220301 | YAU/JORGE MR | | | | | | X | |
| 84 | 5/30/2004 | 615913508 | 3231981401 | YAU/JORGE MR | | X | | | | X | |
| 85 | 6/28/2004 | 616144147 | 3231981484 | YAU/JORGE MR | | X | | | | X | |
| 86 | 7/29/2004 | 616411991 | 3231990924 | YAU/JORGE MR | | X | | | | X | |
| 87 | 9/16/2004 | 616853815 | 3232013380 | YAU/JORGE MR | | X | | | | | X |
| 88 | 12/18/2004 | 618279174 | 2220167115 | YAU/JORGE MR | | X | | | | | X |
| 89 | 9/18/2004 | 616892627 | 3232013380 | YAU/JORGE MR | | | | | | | X |
| 90 | 11/27/2004 | 617962610 | 2220167141 | YAU/JORGE MR | | | | | | | X |
| 91 | 1/26/2003 | 611995945 | 2157060535 | CASTRO/ALFREDO | X | | | | | X | |
| 92 | 2/2/2003 | 612052813 | 99 | STEWART/MATTHEW | | X | | | | X | |
| 93 | 2/16/2003 | 612158858 | 2117477679 | STEWART/MATTHEW | | X | | | X | | |
| 94 | 3/1/2003 | 612259270 | 4265412415 | SOTO/BOLIVAR | | X | | | | X | |
| | | | | | 42 | 57 | | | | | |

# EXHIBIT 8

# TO

# DIRECT TESTIMONY
# OF DAVID S. WILLIAMS

American Airlines v. United States
Direct Testimony of David S. Williams
Exhibit 8 - List of MSR Types and Descriptions

| MSR Type | MSR Description |
|---|---|
| 1 | PET KENNEL-CABIN SIZE |
| 2 | PET KENNEL-SMALL 100 |
| 3 | PET KENNEL-MEDIUM 200 |
| 4 | PET KENNEL-LARGE 400 |
| 5 | PET KENNEL-XTR LG 500 |
| 6 | BICYCLE BAG |
| 7 | BICYCLE BOX |
| 8 | ADMIN SERVICE CHARGE |
| 9 | ADMIN SERVICE CHARGE-CAD |
| 10 | GIFT CARD $100.00 |
| 11 | GIFT CARD $50.00 |
| 12 | GUN CASE-PISTOL |
| 13 | GUN CASE-RIFLE |
| 14 | SVC BOX COMPLIMENTARY |
| 16 | CHARGE FOR REISSUE OAL |
| 17 | ASC ADV PURCHASE COUPON |
| 18 | ASC ADV PURCHASE COUPON CANADIAN |
| 19 | AAIR BORN |
| 20 | U.S. TRANSPORTATION TAX |
| 21 | CANADIAN AIR SECURITY CHARGE |
| 22 | LOST TICKET APPLICATIONS |
| 23 | TRANSIT WITHOUT VISA |
| 24 | CHANGE CANCELLATION PENALTY |
| 25 | PTA SERVICE CHARGE |
| 26 | UM-NONSTOP/THROUGH-OW |
| 27 | OXYGEN IN FLIGHT |
| 28 | DRY ICE CHECKED |
| 29 | GATE DISPATCH DELIVERY |
| 30 | INBOND PROCESSING FEE |
| 31 | HAIR SALON |
| 32 | LCR FRONT DESK |
| 33 | TOURIST CARDS |
| 34 | TOURIST CARDS |
| 35 | TOURIST CARDS |
| 36 | UM-NONSTOP/THROUGH-RT |
| 40 | XU-FED INSPECTION FEE |
| 41 | INTERNATIONAL SECURITY CHARGE-Q |
| 42 | EXCESS EVALUATION |
| 43 | PHOTO ID |

| MSR Type | MSR Description |
|---|---|
| 44 | YC CUSTOMS FEE |
| 45 | BRIT RAIL |
| 47 | XA-US APHIS FEE |
| 48 | U.S.-INTL TRANSPORATION TAX |
| 49 | XF-PASSENGER FACILITY CHG |
| 50 | ADM-RENEWAL ANNUAL |
| 51 | ADM-NEW ANNUAL |
| 52 | ADM-ANNUAL RENEWAL |
| 53 | ADM-TWA ANNUAL RENEWAL W/ SPOUSE |
| 54 | ADM-ADD SPOUSE TO ANNUAL RENEWAL |
| 55 | ADM-TWA 3 YEAR RENEWAL |
| 56 | ADM-TWA 3 YEAR RENEWAL W/ SPOUSE |
| 57 | ADM-NEW ANN W-SPOUSE |
| 58 | ADM-TWA LIFETIME RENEWAL |
| 59 | ADM-TWA LIFETIME RENEW W/ SPOUSE |
| 60 | ADM-EXPIRED ANNUAL |
| 61 | ADM-CONVERT ANNUAL TO LIFETIME |
| 62 | ADM-RENEW ANNUAL W-SPOUSE |
| 63 | ADM-EXP ANNUAL W-SPOUSE |
| 64 | ADM-SPOUSE REPL CARD |
| 65 | ADM-MEMBER REPL CARD |
| 66 | ADM-CONFERENCE ROOM |
| 67 | ADM BAR SERVICE |
| 68 | ADV-PLT GLD UPG PKG-L |
| 69 | ADV-UPG STKR PKD-LS |
| 70 | ADM-MISC ADM CLUB REV |
| 71 | ADV-EXPEDITE FEE-US |
| 72 | ADV-EXPEDITE FEE-INTL |
| 73 | ADV-UPG STKR PKD-SS |
| 74 | ADV-PLT GLD UPG PKG-S |
| 75 | ADV-QUICK CLAIM |
| 76 | ADV-REINSTATEMENT FEE |
| 77 | ADV-OTHER TXBL-10PCT |
| 78 | ADV-OTHER NONTAXABLE |
| 79 | TUITION FEES |
| 80 | ADM-DISCOUNT OPTION |
| 81 | ADM-DISCOUNT CODE |
| 82 | ADM-DISCOUNT AMOUNT |
| 83 | ADM-AUDIO VISUAL EQP |

American Airlines v. United States
Direct Testimony of David S. Williams
Exhibit 8 - List of MSR Types and Descriptions

| MSR Type | MSR Description |
|---|---|
| 84 | ADM-EXECUTIVE CENTER |
| 85 | ADM-FOOD SERVICE/CATERING |
| 86 | ADM-LUGGAGE TAGS |
| 87 | SAME DAY SERVICE |
| 98 | MSR-OTHER TAXABLE |
| 99 | MSR-OTHER NON TAXABLE |
| 100 | ADM-CONV ANNUAL TO LIFE W-SPOUSE |
| 101 | CHANGE FEE |
| 102 | ADM - ONE DAY PASS |
| 103 | ADM - PROCESSING FEES |
| 104 | ADM - SERVICE FEES |
| 105 | ADM - MERCHANDISE |
| 106 | ADM - RESERVED FOR FUTURE USE |
| 109 | ZP - US SEGMENT FEE |
| 110 | HAWAII TRAVEL TAX |
| 111 | CANADIAN AIF FEE |
| 112 | RC CANADA HARMONIZED SALES TAX |
| 113 | XQ QUEBEC TAX |
| 114 | XT COMB TAXES AND FEES |
| 115 | XG-CANADIAN GST |
| 116 | XY-U.S. IMMIGRATION FEE |
| 117 | TRANSPORTATION TAX |
| 118 | COUNTRY TAX |
| 140 | STIN CONFERENCE |
| 141 | SIT ON-SITE |
| 142 | SIT PHONE CONSULT |
| 143 | SIT LAB |
| 150 | CL - GIFT CERT |
| 151 | CLI - INCENT CERT |
| 152 | SENIOR SAAVERS |
| 153 | AIRPORT SERVICE FEE |
| 193 | UM-CONNECTION-OW |
| 194 | UM-CONNECTION-RT |
| 195 | UM-ATLANTIC/PACIFIC-OW |
| 196 | UM-ATLANTIC/PACIFIC-RT |
| 200 | EXCESS WITHIN SIZE AND WEIGHT |
| 201 | EXCESS OVERSIZE |
| 202 | EXCESS OVERWEIGHT |
| 203 | EXCESS OVER SIZE & WEIGHT |

American Airlines v. United States
Direct Testimony of David S. Williams
Exhibit 8 - List of MSR Types and Descriptions

| MSR Type | MSR Description |
| --- | --- |
| 204 | EXCESS 0-35 POUNDS |
| 205 | EXCESS 36-70 POUNDS |
| 206 | EXCESS 71-100 POUNDS |
| 207 | EXCESS PIECES 1-3 |
| 208 | EXCESS PIECES 4-6 |
| 209 | EXCESS PIECES 7 PLUS |
| 210 | OVERSIZE |
| 211 | OVERWEIGHT 51-70 LBS |
| 212 | OVERSIZE AND OVERWEIGHT |
| 213 | PET CHECKED |
| 214 | PET CARRY ON |
| 215 | PHOTO/SOUND EQUIPMENT |
| 216 | HIGH VALUE/EXCESS VALUATION |
| 217 | EXCESS BAGGAGE |
| 218 | OVERWEIGHT 71-100 LBS |
| 220 | ANTLERS |
| 221 | ARCHERY EQUIP |
| 222 | BACKPACK |
| 223 | BICYCLE |
| 224 | BOOGIE BOARDS |
| 225 | BOWLING |
| 226 | FISHING |
| 227 | GOLF |
| 228 | SCUBA |
| 229 | SHOOTING |
| 230 | SKI EQUIPMENT |
| 231 | SNOWBOARD |
| 232 | SURFBOARD |
| 233 | WINDSURFING |
| 235 | CONFIRMED FLIGHT CHANGE |
| 236 | CONFIRMED FLIGHT CHANGE |
| 237 | REDUCED MILEAGE AWARDS |
| 238 | TAC BOOKING FEE REVENUE |
| 242 | CHECKED BAG 1 |
| 243 | CHECKED BAG 2 |
| 299 | OTHER/SPORTS ITEMS |
| 598 | CLUSTER REVENUE TAX |
| 599 | CLUSTER REV NON TAX |

# EXHIBIT 9

# TO

# DIRECT TESTIMONY
# OF DAVID S. WILLIAMS

Exhibit 9

**Resume of David S. Williams**

**POSITION**

Principal, Deloitte Financial Advisory Services (FAS) LLP, New York, New York Office

**EDUCATION**

B.A. Economics, and MBA, Finance, Wharton School, University of Pennsylvania, Philadelphia, Pennsylvania

**BACKGROUND**

Mr. Williams has over 24 years of general consulting experience, primarily focused in three areas:

- Litigation support, including alternate dispute resolution and related consulting services to clients in a variety of industries.
- Information technology (IT) consulting services to clients in the aerospace and defense industry, including the implementation of large-scale Enterprise Resource Planning (ERP) systems.
- General business consulting services related to issues faced by clients in the aerospace, defense and government contracting industries.

Litigation Support - Mr. Williams has been engaged by clients as both a consulting and testifying expert in litigation, arbitration and bankruptcy matters. He has also been engaged as an arbitrator in alternative dispute resolution (ADR) matters. These matters have focused upon:

- the calculation of damages in commercial disputes involving breach of contract, financial and securities fraud, wrongful termination, adjustment of purchase price, regulatory noncompliance and other causes of action. These calculations required the application of techniques from accounting, finance, economics statistics and other disciplines.
- bankruptcy-related services, including the preparation of bankruptcy schedules and operating reports, consulting services related to the formulation and development of plans of reorganization, and serving as consulting and testifying expert in bankruptcy litigation matters.

Information Technology – Mr. Williams has extensive experience with the planning, design and implementation of information systems solutions for clients. He has led major technology

integration projects, including large-scale implementations of financial, manufacturing, accounting and enterprise-wide information systems. He has also conducted post-implementation reviews of failing/problem IT solutions and assisted clients in the redesign and re-implementation of such systems.

General Business Consulting - Mr. Williams has been engaged as a management consultant by organizations in the aerospace, defense and government contracting industries. These engagements have focused upon the unique pricing, costing and management issues associated with contractual arrangements in these industries, including planning and analysis, proposal development and pricing, manufacturing and service delivery, cost measurement and control, performance measurement, financial accounting and reporting and the associated compliance requirements.

**PROFESSIONAL AND BUSINESS HISTORY**

Deloitte FAS LLP and predecessor firm, Principal 2002 to date

PricewaterhouseCoopers LLP and predecessor firm, Principal, 1994 to 2002, Senior Manager, 1990 to 1994; Manager, 1987 to 1990; Senior Consultant, 1985 to 1987.

Baltimore Economic Development Corporation (BEDCO), Project Director, 1983 to 1985.

## Information on Prior Testimony

| | Matter | Venue | Date |
|---|---|---|---|
| 1) | United States of America, ex rel. Albert D. Campbell v. Lockheed Martin Corporation and Martin Marietta Corporation | United Sates District Court – Middle District of Florida Orlando Division | March 2003 |
| 2) | DAG Enterprises, Inc. and Eyob Mamo v. Exxon Mobil Corporation, Exxon Corporation And Mobil Corporation, | United States District Court For The District Of Columbia | April 2003 |
| 3) | In re. Berner and Postnieks | American Arbitration Association | June 2003 |
| 4) | Lucky Charms, et. al. v. Gruner & Jahr USA | State Supreme Court – New York County, New York. | November 2003 |
| 5) | United States vs. United Technologies Corporation | District Court – Southern District of Ohio | May 2004 |
| 6) | Pell vs. DuPont, et.al | US District Court – District of Delaware | March 2006 |
| 7) | Pekala vs. DuPont, et al. | US District Court – District of Delaware | May 2006 |
| 8) | Mofet Etzion Ltd. vs. General Dynamics Land Systems, Inc. | American Arbitration Association - International Center for Dispute Resolution | October 2006 |

## Publications

---

1. Business Concepts for the Commercial Lawyer. Internally Published, Spring 2001.

2. Commercial Pricing - Course Manual. Internally Published, May 1999.

3. Case Studies in Government Contracting - Course Manual. Internally Published, May 1999.

4. Accounting Issues in Credit Agreements. Internally Published, May 1999.

5. Government Contract Litigation - Course Manual. Federal Publications, Inc., April 1999.

6. Accounting for Lawyers, 1999 - Using Financial Data in Legal Practice. Practising Law Institute, February 1999.

7. The Government Contract Accounting Institute. Federal Publications, Inc., July 1998.

8. Cost Accounting Standards. Federal Publications, Inc., June 1998.

9. Proposal Preparation - Course Manual. Internally Published, May 1998.

10. Government Contract Research. Internally Published, May 1998.

11. Construction Engineering Management. Internally Published, March 1998.

12. Contract Fraud. Internally Published, February 1998.

13. The Nuts and Bolts of Working with Experts. Internally Published, February 1998.

14. Contract Cost Accounting. Internally Published, November 1997.

15. Recent Contracting Developments. Internally Published, May 1997.

16. Alternate Dispute Resolution in International Forums. Internally Published, May 1997.

17. "Cost Accounting Standard 405, an Analysis," with G. Smith, Government Cost, Pricing and Accounting Report, July 1996.

18. Government Contract Fundamentals. Internally Published, April 1996.

19. Accounting for Lawyers, 1995 - Using Financial Data in Your Legal Practice. Internally Published, October 1995.

20. Government Contract Pension Accounting. Internally Published, September 1994.

21. Commercial Pricing. Internally Published, August 1994.

22. "Analysis of Contract Cost Principles," with F.M. Alston, Government Cost, Pricing and Accounting Report, July 1994.

23. Special Contracting Methods. Internally Published, May 1994.

24. Proposal Preparation Workshop - Course Manual. Internally Published, September 1993.

25. Current Events in Government Contracting. Internally Published, May 1993.

26. Material Management and Accounting Systems. Internally Published, May 1993.