IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------X

AMERICAN AIRLINES, INC., :

Plaintiff : Civil Action

v. : No. 04-1736

THE UNITED STATES OF AMERICA, :

Defendant :

--------------------------------X

Deposition of A. KEVIN SHEA

Washington, D.C.

Wednesday, May 16, 2007

9:10 a.m.

Job No.: 1-103576

Pages 1 - 73

Reported by: Nancy Bond Rowland

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------X

AMERICAN AIRLINES, INC., :
Plaintiff : Civil Action
v. : No. 04-1736
THE UNITED STATES OF AMERICA, :
Defendant :

------------------------------X

Deposition of A. KEVIN SHEA
Washington, D.C.
Wednesday, May 16, 2007
9:10 a.m.

Job No.: 1-103576
Pages 1 - 73
Reported by: Nancy Bond Rowland

2

Deposition of A. KEVIN SHEA, held at the offices of:

Miller & Chevalier, Chartered
655 15th Street, N.W.
Washington, D.C.

Pursuant to agreement, before Nancy Bond Rowland, Registered Professional Reporter and Notary Public in and for the District of Columbia.

3

APPEARANCES

ON BEHALF OF PLAINTIFF:
ADAM P. FEINBERG, ESQUIRE
JEFFREY M. HAHN, ESQUIRE
MILLER & CHEVALIER, CHARTERED
655 15th Street, N.W., Suite 900
Washington, D.C. 20005-5701
(202) 626-5800

ON BEHALF OF DEFENDANT:
KYLE CHADWICK, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Commercial Litigation Branch, Civil Division
1100 L Street, N.W., Room 7062
Washington, D.C. 20005
(202) 305-7562

4

CONTENTS

| EXAMINATION OF A. KEVIN SHEA | PAGE |
|---|---|
| By Mr. Feinberg | 6 |

EXHIBITS
(Attached to the Transcript)

| DEPOSITION EXHIBIT | PAGE |
|---|---|
| 1 - Letter datd February 4, 2005. Bates no. 034 - 050 | 13 |
| 2 - Letter dated July 26, 2004. Bates no. 52 - 55 | 29 |
| 3 - 31 USCS 3717. | 34 |
| 4A - Letter dated February (illegible). Bates no. 217 - 218 | 36 |
| 4B - Audit report. Bates no. 210 - 216 | 36 |
| 5 - Undated letter from Vollmerhausen to Parente. | 40 |
| 6A - Letter dated January 29, 2001. Bates no. 227 | 42 |
| 6B - Audit report. Bates no. 219 - 226 | 42 |

| DEPOSITION EXHIBIT | PAGE |
|---|---|
| 7A - Letter dated April 26, 2002. Bates no. 235 - 236 | 50 |
| 7B - Audit report. Bates no. 228 - 234 | 50 |
| 8A - Letter dated April 28, 2003. Bates no. 243 | 55 |
| 8B - Audit report. Bates no. 237 - 242 | 55 |
| 9 - Letter dated May 21, 2003. Bates no. 244 - 255 | 56 |
| 10 - Letter dated June 11, 2003. Bates no. 279 - 280 | 57 |
| 11 - Letter dated August 14, 2003. Bates no. 281 - 282 | 58 |
| 12 - Letter dated October 10, 2003. Bates no. 324 - 341 | 59 |
| 13 - Declaration of Kevin Shea. Bates no. 320 - 323 | 59 |



PROCEEDINGS

A. KEVIN SHEA

**having been duly sworn, testified as follows:**

**EXAMINATION BY COUNSEL FOR PLAINTIFF**

**BY MR. FEINBERG:**

Q Good morning, Mr. Shea?

A **Good morning.**

Q Could you please state your full name for the record?

A **Anthony Kevin Shea.**

Q And your address?

A **My home address or my office?**

Q Either one is fine.

A **My office address is 1400 Independence Avenue, S.W., Washington, D.C.**

Q Have you ever been deposed before?

A **I do not believe I have.**

Q I understand you're a lawyer, however.

A **I have deposed, but I have not been deposed.**

Q I figure it's safe to assume you know basically how the process works.

A **Yes.**



Q Did you do anything to prepare for this deposition?

A **I read a few materials and just refreshed my memory.**

Q Could you tell me what materials you reviewed?

A **I reviewed the statute itself, the implementing regulations, and my own declaration from I believe two years ago in this matter.**

Q Anything else?

A **I also looked at other materials that have been prepared in this case, arguments from each side.**

Q Are you speaking of briefs?

A **Briefs I guess, yes, and motions.**

Q And when you say the statute and regulations, I assume you're referring to the APHIS user fee statute and regulations?

A **Yes.**

Q Did you review anything else?

A **That is all that I remember reviewing in the last few weeks on this matter.**

Q Did you meet with anybody in preparation for the deposition?



A **Only with our attorneys from DOJ and from USDA, Mr. Chadwick and Miss Koch.**

Q And when was that?

A **About two weeks ago I believe I met with Mr. Chadwick, and I spoke with Miss Koch yesterday.**

Q Can you tell me roughly how long you spoke with Miss Koch?

A **Maybe 15 minutes.**

Q Did you review any documents together?

A **No, we didn't review documents. It was more logistical, where to meet and where to be at what time, that sort of thing.**

Q And how about your meeting with Mr. Chadwick, how long was that?

A **We met for I would say about 45 minutes to an hour a few weeks ago.**

Q Did you two review any documents together?

A **I don't know that we actually reviewed documents as much as just had a discussion.**

Q Can you tell me who your current employer is?

A **Yes. U.S. Department of Agriculture, Animal**

and Plant Health Inspection Service.
Q And that is what we refer to as APHIS, A-P-H-I-S?
A Yes, APHIS.
Q And what is your current position?
A I am the associate administrator/chief operating officer.
Q Of APHIS?
A Of APHIS, yes.
Q How long have you held that position?
A That position for almost three years.
Q When did you begin working for APHIS?
A I first began working for APHIS in November 1978. I left APHIS in 1991 and returned in 1992 and have been with APHIS since then.
Q And can you give me sort of a rough sketch of your progression in APHIS? Why don't we start when you came back in '92 until the present.
A When I returned to APHIS I was the associate director of the Policy, Planning, and Development Unit. And after that about a year later I became the director of the Budget and Accounting Division. I spent about



seven years in that position, and then became the deputy administrator of policy -- Program and Policy Development. I always get it backwards. Program and Policy Development. I was in that position until about August or September of 2004, and then I became the chief operating officer.
Q I see. So you became the chief operating officer in about 2004?
A Yes. About three years ago.
Q And then you were the deputy administrator of PPD?
A Yes, for about four years.
Q So that was about 2000 to 2004?
A Yes. About 2000, yes.
Q And then you were in the Budget --
A Budget and Accounting Division from about late 1992 until sometime in 2000.
Q Can you tell me which of those positions involved user fees, either user fee audits or the administration of user fees or anything related to user fees?
A Yes. Each had some relationship to it. As



the director of Budget and Accounting, I oversaw the unit that actually developed the fees, came up with the rates. When I was the deputy administrator for PPD, that unit actually drafts regulations for publication in the Federal Register. So I had that connection to it then. And since then as chief operating officer, I have sort of day-to-day operational responsibilities for the entire agency. So it's just one more thing that I have some responsibility over.
Q In any of your roles for APHIS were you ever involved in particular APHIS user fee audits?
A I was not involved directly in audits, no.
Q Did any of the auditors ever report to you?
A They did not report to me. They sent me a copy of their report in my capacity as the director of Budget and Accounting because they were auditing the implementation of the fees that we established.
Q And tell me what your involvement was in that sense. Was this something you literally just got on your desk and looked at and said, okay, one more audit to check off the list or were you actually involved substantively in what was going on in the audit?



A I would say not very substantively. I reviewed it just to see what kinds of numbers were being obtained.
Q And would you review anything other than the final audit report?
A No.
Q I assume you had no involvement in any immigration user fee audits?
A No.
Q By "no" you mean what I said was correct?
A What you said is correct. No, I had no involvement in immigration audits.
Q I apologize for wording that as a negative.
And I also assume that you saw audit reports from many airlines or for many airlines?
A Yes.
Q Can you tell me roughly how many audits of airlines a year APHIS performed?
A My best memory is I recall seeing maybe one or two a month crossed my desk. I don't know how many audits were actually being done.
Q So somewhere roughly 25 a year?

A Probably not that many. Maybe one month there might be one, one month there might be two, but I would say less than that; but again, I'm sort of guessing on that really. I mean, it's closer to that than 100.
Q Right.
A It was in that range.
(Deposition Exhibit 1 was marked for identification and was attached to the transcript.)
BY MR. FEINBERG:
Q Mr. Shea, let me show you what's been marked as Exhibit 1. Have you ever seen Exhibit 1 before?
A No, I have not.
Q This appears to be an audit report covering three different user fees: the immigration user fee, customs user fee, and APHIS, actually two different APHIS fees, the passenger and the aircraft landing fees. Is that what this appears to be to you?
A Yes.
Q And just help me understand. In your role when the audit reports were coming across your desk, was that when you were the deputy administrator from



2000 to 2004 or when you were the associate administrator and CEO?
A No. Actually that's when I was the director of the Budget and Accounting Division is when they came across my desk on a regular basis.
Q Oh, I see. So that's sort of '92 to 2000?
A Correct.
Q And in your subsequent roles did you even see the audit reports?
A No.
Q Not at all?
A No.
Q I understand you've never seen this report before, but could you help me understand at a general level how these audits operated with the three different agencies if you know?
A The best I can say is that at one time each agency was doing its own audits, and during the time I was the director of Budget and Accounting I recall that we started to do joint audits with one of the other two agencies, I don't remember which, and one did its own.
And then when DHS was created in 2003, the



function of auditing the user fees moved entirely to DHS, and so the people from APHIS who were doing these audits literally were transferred as employees of USDA to DHS, and now my understanding is that they audit for all three fees. When I say three, I'm counting agriculture as one although there are many gradations of the fee. So that's how it has worked.
Q I understand. So in your current role at APHIS, the people doing the audits are not even in your agency, is that correct?
A That's correct. They're not in APHIS.
Q And does APHIS at all have any role in how the audits are conducted?
A We consult with them. Our folks who set the fees consult with the reviewers or auditors, if you will, in the DHS. I don't know any detail of how that works, what discussions they have.
Q When you say the people who set the fee, those are the people who you're talking about literally setting the amount of the fee --
A Yes.
Q -- in the regulation?



A Yes. We set the fees in USDA, and also we still manage the account. The revenue comes into a USDA account. And so the people both who set the fees and the people who manage the revenues, if you will, would have some involvement in discussion with these folks I would think.
Q And do you know whether it's Customs and Border Protection, I assume that's the agency within the Department of Homeland Security that is doing these audits, is that correct?
A That's right.
Q Do you know if it's Customs and Border Protection or APHIS that administers the actual collection of an audit assessment once the audit assessment is made?
A I'm pausing because I don't know exactly, but I do believe that we would send the bill from USDA because it is a USDA-owed liability from the airline.
Q I ask, and we'll talk about this later, because the charging of interest, for example, is that in the hands of Customs and Border Protection who perform the audit or in APHIS's hands?

**A It should be in APHIS's hands because it is again an APHIS fee.**
Q In general do airlines have any choice about whether or not they're audited in connection with the APHIS user fees?
**A Choice? I guess I don't understand what you mean by choice. Can they decline to be audited?**
Q Exactly.
**A I don't think so.**
Q Have you ever heard of that happening?
**A No. I have heard of negotiated dates and negotiated methods and that sort of thing. I don't know that airlines can simply refuse to be audited.**
Q Do you know whether airlines have any choice in whether or not the government will assess a liability against them in connection with an audit?
**A I assume they do not.**
Q Do you have an understanding of the basic issue in this case, this American Airlines case?
**A I have some understanding.**
Q Can you tell me what your understanding is?
**A My basic understanding is that the airline**



**feels it cannot collect fees from certain passengers and, therefore, should not be liable for paying the fees for those passengers.**
Q When it does not collect?
**A When it does not collect. That's my understanding of the matter.**
Q And are you aware that the government has asserted certain affirmative defenses in this case?
**A Yes, I am.**
Q Do you know what those affirmative defenses are?
**A Yes.**
Q What are they?
**A I believe laches, accord and satisfaction were two of them. I forget what the other matters were.**
Q I don't mean for this to be a memory test. Is it waiver and equitable estoppel?
**A Yes. Waiver and equitable estoppel. Sending me back to 20 years at law school.**
Q Do you understand the factual basis for the affirmative defenses?



**A My understanding is that the airlines say that some foreign countries preclude the agent I guess who sells the ticket from collecting fees from foreign nationals in those countries. That's my understanding of the basic concept.**
Q I'm talking about the government's affirmative defenses.
**A Oh, I'm sorry. Yes, I understand the basic concept of that. Any particular one or how would you like me to proceed with that?**
Q Tell you what, have you reviewed previously the government's discovery response regarding its affirmative defenses?
**A I have not.**
Q You have not?
**A No.**
Q Well, why don't we go through them one by one. You can just tell me what you do know.
**A All right.**
Q Why don't we start with waiver. Solely in connection with the APHIS user fee obviously, what's your understanding of the factual basis of the



government's waiver affirmative defense?
**A That on any number of occasions I know, for example, I believe American Airlines have been audited probably half a dozen times over the course of time since these fees were implemented and has indeed agreed to pay upon each audit until I guess the last one. And so that is the basis I understand of the waiver defense is that the airlines, not only American but all airlines, have paid the results of the audit in every case.**
Q Is it simply the fact that they actually paid?
**A Well, they paid voluntarily in each case in that they had the opportunity in each time to dispute any ticket that should have been assessed a fee and was not. I don't know if you want me to get into that at this point or not. If you want me to, I can. But as I understand it, that the way the system works in the audit is that we see which tickets were issued, and we determine where fees were not collected, and we do that for a selected number of flights, and determine a rate of noncompliance.**

And during that operation of that audit or the operation of that audit, the airline has the opportunity to dispute why a fee was not collected or whether or not something should be counted as a noncollected fee on a particular ticket. So over time in each case the airlines had the opportunity to dispute unpaid fees on any particular ticket in determining that rate.

Q Is the basis of the defense simply that they didn't object at the time?

A Both that they did not object and that they indeed paid.

Q Is there anything else that constitutes a waiver in your view?

A Not in my view.

Q And what about the affirmative defense of laches, what's the basis of that?

A Again, I think the time that has elapsed. I believe the first audit of American Airlines must have been in the early to mid '90s, and I believe an airline like American is probably audited every other year or so. I think that was at one time the practice to audit



every other year.

And so there have been audits going back ten or more years during which time the airline did not raise this reasoning of why they should not pay. So I think all the time that has expired between the initial fee collection, the initial audit, and the paying by the airline on the audit represents quite a bit of time, elapsed time.

Q Anything else other than the time elapsed?

A And I think that's been to the detriment of the government because if we did have some idea that this was improper or that such fees could not be collected, we would have taken steps to remedy that.

Q Can you tell me what steps the government would have taken?

A Probably a number of things. One thing, we probably would have sought to clarify in the regulations our position that the airlines are responsible to not only collect but to actually pay the fee for each ticket upon which a fee is appropriately assessed.

Q Including uncollected fees?



A Yes.

Q So the idea here is that you would have clarified the regulations to say that airlines have to pay a user fee even if they don't actually collect the user fee from the passenger?

A Yes.

Q Anything else?

A We also could very well have sought legislation, clarifying legislation. So either regulation changes clarification or a statutory clarification. And also we could have conducted the audit somewhat differently in that we would have had this on the plate, if you will, on the part of the audit where there was the -- I don't know if dispute resolution is the right term, but during the time where we first identified tickets for which a fee was not paid and the airline had the opportunity to say why a fee was not appropriate for that particular ticket, this could have been an affirmative part of the audit all along but, of course, it was not since we were not aware.

Q I'm sorry. What specifically would have been



an affirmative part of the audit?

A This issue of fees that could not be collected because of whatever reason the airline was asserting. In this case, as I understand it, it's asserting that foreign countries prevent the ticket agent from collecting that fee in other countries.

Q So is the idea you would have conducted the audit to determine whether or not a particular user fee actually went uncollected?

A That could have been part of the audit, yes.

Q Is there anything else, any other audit procedures that the government would have done?

A I think that's -- To my knowledge, again I'm not an auditor, but that is something I would have looked at.

Q Is there anything else that supports the government's laches defense?

A I think that's all I would say on that.

Q How about equitable estoppel?

A I think very similar to the laches defense in that we have relied on our interpretation of this regulation of the statute for 16 years since the fee

was implemented in 1991, and we have built the fees based on the theory that we are indeed collecting for every passenger. We do not factor in a percentage of uncollected fees from passengers.

We did factor in the possibility that an airline or a shipline, whatever it happened to be, could go out of business and not pay after having collected fees. We did contemplate that. We did not set the fees with a rate of X percent of fees not being collected from the individual passenger.

Q And are you saying that the government would have done something different?

A If we had been aware and adhered to the position that the airlines were not responsible for paying fees that they could not collect, we could have factored that into the fee schedule. So instead of the fee being, for example, now it's $5 per passenger, it might have been $5.20 a passenger because we would have had to factor in fees that were uncollectible. That is something we could have done differently over time if we had been aware and if we had adhered to that position.



Q Do the amounts that you collect from airline audits materially affect the total amount of APHIS passenger user fees that you collect annually?

A I believe that they do. I do know especially when I had more direct knowledge of the numbers when I was director of the Budget and Accounting Division, there were very significant amounts being discovered in these audits, literally millions of dollars in a year, at a time when the annual revenue from those fees was probably less than $100 million. So they amounted to a significant percentage.

Q Can you express the amount as a percentage?

A I don't know. I'd have to find the numbers. I don't remember the numbers.

Q Can you give me an estimate? Is it less than 1 percent?

A Oh, no. More than 1 percent certainly.

Q More than 10 percent?

A I don't know if it was more than 10, but certain it was more than 1 percent. Again, the revenue at that time was more in the neighborhood of $100 million, and I know that there were some audits



discovering $1 million alone in a single audit. Obviously airlines were different. Some have a lot more than others, but it was not an insignificant amount.

Q When you say $100 million, are you talking for the entire program?

A Yes. In the 1990s.

Q Take a look at Exhibit 1.

A Which page?

Q Page 4 of the audit report. It says 043 at the bottom.

A Okay.

Q It shows the remitting activity, and this period looks like it covers a year and half from January '03 to June '04, is that correct?

A Yes.

Q And for that year and a half period American Airlines alone submitted almost $46 million in APHIS passenger fees?

A Yes. The revenue today is, again I don't know the exact numbers, is probably $400 million, but in the early to mid 1990s, the time period I was



referring to, the revenue was more in the neighborhood of $100 million in total.

Q I see.

A The fee at that time was $1.45. Now the fee is $5. The number of passengers arriving is dramatically higher. I don't know the exact number, but it's very significantly higher.

Q And if you'd look towards the bottom of that page there's the finding, and it shows the error rate, and it looks like -- this is now on the next page -- the error rate for the APHIS passenger fee is 0.22 percent?

A Right. I see that.

Q In your view is that a typical error rate?

A I just am not familiar enough today with what the error rates are. This would be a low error rate from the time I was more directly interested in it 12 years ago, but I think that is explainable by I think everyone does better with the fees than they did when they were first implemented.

Q Anything else supporting the government's equitable estoppel defense that you know of?

A **No.**
Q And the last one is accord and satisfaction. What's the basis of the government's accord and satisfaction?
A **I think this is related to the waiver defense in that indeed the airlines accepted the audit findings after the negotiation and indeed paid the amounts.**
Q Anything else?
A **No, I don't think I have anything to add to that.**
**(Deposition Exhibit 2 was marked for identification and was attached to the transcript.)**
**BY MR. FEINBERG:**
Q Mr. Shea, let me show you what has been marked as Exhibit 2. Have you ever seen Exhibit 2 before?
A **I do not think I have seen this.**
Q Generically do you know what this is?
A **I do not generically, again since this function moved to CBP, I'm not as familiar with what these things look like.**
Q When you say "these things," what do you mean



by that?
A **This looks like sort of the introduction letter of the audit perhaps, that they're coming to audit and be ready on a certain day, that sort of thing.**
Q This is the letter the agency sends to the airline saying we're coming to audit?
A **Right. It looks like they're confirming arrangements that have been made in advance.**
Q I realize you haven't seen this particular letter. Have you seen other sort of pre-audit confirmation letters that APHIS sent to airlines in the past?
A **If I did, it was 10, 12 years ago when I was the director of Budget and Accounting.**
Q Take a look at page 3 of this letter. In about the middle of the page there's a paragraph that starts "As mentioned." Do you see that?
A **Yes.**
Q That paragraph starts "As mentioned, the review will cover the period from January 1, 2003 through June 30, 2004. However, CBP retains the right



to review and assess liability on areas of partial, sporadic or nonremittance of the inspection user fees for a period of the past six years."
First of all, if you know, can you tell me what's referred to by the inspection user fees?
A **I don't know what they intended here, whether they intended the inspection fees of all three agencies or just CBP. I don't know.**
Q Do you know what those two sentences mean?
A **No. It's not something we've dealt with, that I've dealt with.**
Q Not something you've dealt with in the sense that you don't do the audits?
A **Right. Particularly since CBP has taken the entire function, I am just not familiar with the lingo they use and how they go about this.**
Q Do you know whether or not APHIS had a policy or believed that it had the right to audit backwards in time for any six-year period?
A **I don't know whether we had a specific policy or not. I think it was probably moot in most cases because we were doing audits on a two-year rotation.**



Q I guess the question is was APHIS able to audit a prior period even though it was previously audited as long as that period fell within the last six years?
A **I don't recall whether we did or not.**
Q Does APHIS have any regulations or other guidance regarding the time periods that it is able to audit an airline?
A **I don't know of any regulations. Again, I would not know that specific kind of information about that.**
Q Does APHIS have any regulations or any other written guidance on when an airline can challenge an audit assessment?
A **I am not aware if we do or do not.**
Q Does APHIS have any regulations or other written guidance on how an airline can challenge an APHIS user fee audit assessment?
A **I don't know whether we did or did not. I know now, of course, we do not do those audits, so we probably would not have such regulations.**
Q Take a look at that same page 3 of Exhibit 2

and look at the last paragraph. The last paragraph starts "U.S. Customs and Border Protection (CBP) and U.S. Department of Agriculture (USDA), Animal and Plant Health Inspection Service (APHIS), are authorized by federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to assess and collect interest and penalty amounts, in addition to principal on debts owed." Do you know what that's referring to?
**A I think it's simply a reference to the government-wide Debt Collection Act that applies to virtually any kind of debt that the government collects that allows for interest and penalty, and I believe the APHIS user fee statute or AQI makes specific reference to interest as well.**
Q When you say the -- You said the APHIS statute or regulations?
**A Well, the statute authorizing the user fees I think refers to penalties or refers to interest.**
Q Does the Debt Collection Improvement Act of 1996 apply to debts owed in connection with APHIS user fee audit assessments?



**A I think it applies to any debt that the federal government assesses.**
Q Including APHIS user fee audit assessments?
**A Yes.**
**(Deposition Exhibit 3 was marked for identification and was attached to the transcript.)**
**BY MR. FEINBERG:**
Q Mr. Shea, let me show you what's been marked as Exhibit 3. Have you ever seen this document before?
MR. CHADWICK: Has he seen the statute. You don't mean if he's seen the Lexis printout before.
MR. FEINBERG: That's correct.
BY MR. FEINBERG:
Q What I've handed you is a Lexis printout of 31 USC section 3717. My question to you, as Mr. Chadwick correctly points out, is simply have you seen the statute before?
**A I have. I'm not intimately familiar with it, but I have in the course of time occasion to see it.**
Q Is this the Debt Collection Improvement Act that's referred to in the letter we just looked at?
**A I believe that it is.**



Q Did APHIS have a policy or practice regarding charging airlines interest in connection with APHIS user fee audit assessments?
**A As I recall our general practice was that we would not charge interest if payment was made within 30 days.**
Q And can you tell me what time period that policy was in effect?
**A I can talk to the policy from the time I was again back in the Budget and Accounting days.**
Q So this is '92 to 2000?
**A In that period, general period, yes. I'm not saying that it's not still policy. I don't know for sure, but I do know back then that that was the general policy, and I know that more specifically from the audit reports would always say that.**
Q You said there's no interest charged if paid within 30 days. Paid within 30 days of what?
**A Those letters -- I believe letters went to the airline confirming the final findings of the audit.**
Q So it's 30 days of that?
**A Yes.**



Q Do you know anything about the origins of this policy?
**A Not specifically, no.**
Q Do you know if that statute that we just looked at at Exhibit 3 had anything to do with it?
**A I don't know whether it did or not.**
**(Deposition Exhibits 4A and 4B were marked for identification and were attached to the transcript.)**
**BY MR. FEINBERG:**
Q Mr. Shea, please take a look at the two exhibits I've handed you that are marked 4A and 4B. Have you ever seen these documents before?
**A Well, I've certainly seen 4A because I was a cc on it in 1998 or '99. I can't quite make the date out there. '98 I guess it is. Well, it's February '99 referring to a '98 audit, so I assume it's February '99.**
Q How about the report that's at Exhibit 4B?
**A I most likely did see this. Again, it was in the course of normal business for me to have seen this at that time in 1998 or 1999.**

Q And just to clarify, is Exhibit 4A one of these letters that you just spoke of that went to the airline telling them the final findings of the audit?
**A This is somewhat typical. This looks a little different in that it looks like the money has already been received, and often the letter would have said here is what we think you owe. This looks a little different, but generally speaking it's very similar.**
Q And is Exhibit 4B the actual audit report?
**A Yes.**
Q Take a look at Exhibit 4A, the letter. Towards the bottom of the first paragraph there's reference to an audit notification letter dated October 16th, 1998. Do you know what an audit notification letter is?
**A I don't recall what that specifically meant. Again, this looks a little dissimilar from the typical because this is something after fees have been remitted. I would have said I thought the audit notification letter was something like that letter we looked at in one of the earlier exhibits that said that**



**the audit is getting ready to happen.**
Q Like Exhibit 2?
**A Yes. As I read this, this sounds more like notification of the results of the audit, but again I'm just speculating when I say that.**
Q In the second paragraph of Exhibit 4A there is reference or the second sentence says "These amounts were received before the due date"?
**A Yes.**
Q What's the due date?
**A I think that is where the letter would usually say within 30 days if you submit the amount, there's no interest. So I think that is most likely what this meant by the due date.**
Q I see. So the due date is simply 30 days after whenever the airline was first notified of the liability?
**A Well, I would say not notified as much as the final liability amount was determined because the liability existed all along. The liability existed from the day the passenger actually flew. But in terms of the notification of the determination of the final**



**amount is how I think I would characterize it.**
Q I see. That's what I meant to ask you. The due date is 30 days after the airline was notified that the government had determined a final liability amount, is that accurate?
**A I think that was the due date to resolve the audit findings.**
Q By paying the audit liability finding?
**A Yes.**
Q And was Exhibit 4A the first such written notification that American Airlines received in connection with this audit?
**A I don't know.**
Q Do you know if American Airlines -- Well, in this case we already know that they paid by the due date, correct?
**A Right.**
Q Do you know if the government and American Airlines reached any agreement in connection with the payment of interest on this user fee audit assessment?
**A I can't tell from just this.**
Q What else would you need to be able to



determine that?
**A A letter which I'm assuming exists that initially determined that the liability to APHIS was $150,572.48 because American Airlines had to know what the amount was to send. So I'm assuming there was another piece of correspondence here. I need to see that to deduce much more out of this.**
**(Deposition Exhibit 5 was marked for identification and was attached to the transcript.)**
**BY MR. FEINBERG:**
Q Let's take a look at another example. I think this is one where perhaps the airline hadn't already paid. Maybe this will be easier. Let me show you what's been marked as Exhibit 5. Have you ever seen Exhibit 5 before?
**A I don't think I have. This doesn't look like the kind of thing I would have seen directly back in those days.**
Q I notice this letter is marked Draft.
**A Right.**
Q Do you have any idea whether this letter was actually sent to American Airlines?

A I don't know.
Q Can you tell me what the purpose of this letter is if you know?
A This is the more typical letter that I may have seen. So I may have seen this one. Because this has the date, for example, that says by November 15th if you pay the amounts in the audit, there will be no interest. So this is the more typical letter than the one of the previous exhibit. And this would have been attached I think to something like 4B, the audit report, that would have had the amount in it.
Q The first line docs say "Enclosed is the report."
A Right, which would have had the amount.
Q So what's the significance of the November 15th, 2000 date?
A I think the significance is that interest would not be assessed, that APHIS was using its discretion not to assess any interest if payment was made by then.
Q And is that November 15th date the 30 days from the time APHIS notified American Airlines of the



final audit determination?
A Not knowing the date of this, since there is no date on this, I can't tell, but most likely. 30 days was the general time frame.
(Deposition Exhibits 6A and 6B were marked for identification and were attached to the transcript.)
BY MR. FEINBERG:
Q Mr. Shea, let me show you what's been marked as Exhibits 6A and 6B. Have you ever seen these exhibits before?
A I don't believe that I have, and I can see I'm not cc'd because by this time I had left the Budget and Accounting job and was in the next position, so I would not have seen this then.
Q Does Exhibit 6A appear to be referring to the same audit that Exhibit 5 is referring to?
A Yes, it does.
Q And is Exhibit 6B that actual audit report?
A Yes, it appears to be.
Q Take a look at page 6 of the audit report of Exhibit 6B. Is the final APHIS audit liability for



this audit $299,106.51?
A Yes.
Q And that's what's shown on page 6 of the audit report?
A Yes.
Q Did American Airlines pay the entire $299,000 owed for this APHIS user fee audit assessment?
A Looking at page 6, it says Remitted. So I'm assuming that they did.
Q And do you know whether they paid it within the 30 days?
A I can't tell for sure, but I would assume that they did or else it should have been a higher number because the interest would apply. So I'm assuming they did.
Q Do you know if the government and American Airlines reached any agreement with respect to paying interest in connection with this APHIS user fee audit?
A By paying, that constituted an agreement I would say.
Q What was the substance of the agreement?
A As the initial letter says, if you pay by a



certain date, we will not assess interest, "we" being APHIS. So by the amount being remitted by American Airlines, I think that amount is acceptance of that offer and, therefore, an agreement on interest.
Q That offer not to be charged interest if you paid within 30 days?
A Yes.
Q So the airline was getting relief from interest in the deal?
A Yes.
Q And what was the government getting?
A Prompt payment.
Q And who made this agreement on the government's behalf?
A I guess the offer was made by Mr. Vollmerhausen in his role as director of Resource Management Systems and Evaluation Staff who oversaw the auditors.
Q Were you involved in any way with this agreement?
A No.
Q Who accepted the agreement on American

Airlines' behalf?
**A I think by writing the check constitutes an agreement, and I don't know who wrote the check obviously.**
Q In your view is there anything that documents this agreement other than the letter we looked at at Exhibit 5 and the check?
**A I don't think there's anything other than that, no.**
Q That's the entire substance of the agreement?
**A I think that's the substance of this particular one, yes. I think it was a pattern of business as well because it had been done several times by then.**
Q Right. This was the normal routine that happened with respect to most or all of these audits?
**A Yes.**
Q But there are no other documents that evidence this agreement other than the letter at Exhibit 5 and the check?
**A I'm not aware of any.**
Q For example, there isn't a contract somewhere



that says We, American Airlines, hereby waive our rights to ever come after you government in exchange for your waiving the payment of interest?
**A I'm not aware of any such document.**
Q Was there any conversation along those lines that you're aware of?
**A I am not aware of it.**
Q Take a look at Exhibit 3.
**A Okay.**
Q This is the Debt Collection Act that we talked about before?
**A Yes.**
Q Take a look at subsection (d). That says "Interest under subsection (a) of this section may not be charged if the amount due on the claim is paid within 30 days after the date from which interest accrues under subsection (b) of this section." Do you see that?
**A Yes.**
Q Do you understand that to mean that the government is not entitled to charge interest if the amount is paid within 30 days?



**A Of the date that the claim accrues, yes.**
Q Is that your understanding?
**A Yes.**
Q So now we need to figure out when the claim accrues?
**A Yes.**
Q Take a look at subsection (b). That says "Interest under subsection (a) of this section accrues from the date," and then because we're after 1982, subsection (2) would apply, correct?
**A Right.**
Q Subsection (2) says "Notice of the amount due is first mailed to the debtor at the most current address of the debtor available to the head of the executive, judicial or legislative agency, if notice is first mailed after October 24, 1982."
When was the notice of the amount due first mailed to American Airlines in connection with this user fee audit assessment?
**A In terms of determining the final amount owed, whatever the date said on those letters. Which exhibit was it again?**



Q Well, there's an undated letter Exhibit 5 and then the subsequent one that looks like it was sent after payment on January 29th, 2001 at Exhibit 6A.
**A Right. Since this is an undated letter, it's difficult to say what that is. But again, I am presuming it was most likely October 15th because the general practice was a 30-day notice.**
Q Okay. Well, then isn't it true that the government was not entitled by law to charge any interest so long as American paid by November 15th, 2000?
**A I think that the liability from American to USDA accrued the day the passenger flew or, more specifically, 30 days after the quarter in which the passenger flew.**
Q Well, did the government give notice of the amount due by mail to American Airlines at that time or sometime after the audit was completed?
**A In terms of the findings of the audit, after the audit was completed, but the fee is due by statute when the passenger flies. So in our view that is when the liability accrued, then. The audit merely**

**discovered unpaid fees from a liability that accrued in this particular audit as I recall as far back as almost two years.**

Q I don't disagree with you, but the question isn't when the liability accrued. The question is when does interest start to run, correct?

**A Correct.**

Q And interest starts to run 30 days after notice of the amount due is first mailed to the debtor, correct?

**A Correct. According to this statute, yes.**

Q When was notice of the amount due first mailed to American Airlines? After the audit, correct?

**A Well, I would say that that was the first time that we determined the final amount --**

Q Due?

**A -- due from that audit of fees that were due for the previous two years.**

Q Did the government previously send American Airlines any other notices saying an amount is due?

**A We did not send any mailed notices, no.**

Q Did you provide any other notices, mailed or



not, to American Airlines?

**A I think that the statute and the implementing regulations indicate clearly that the fee is to be collected when the passengers fly and, therefore, it accrues then. That's the notice.**

Q That's not my question. The question is did you send a specific notice to American Airlines saying you owe X dollars prior to the letters we looked at at Exhibits 5 and 6A?

**A No, we did not.**

**(Mr. Hahn leaves the deposition.)**

**(Deposition Exhibits 7A and 7B were marked for identification and were attached to the transcript.)**

**BY MR. FEINBERG:**

Q Mr. Shea, let me show you what has been marked as Exhibits 7A and 7B. Can you identify these documents?

**A Not from personal knowledge. I think it's the first time I've seen this particular one. Again, it's a series of similar documents.**

Q Is that true for both 7A and 7B?



**A Yes.**

Q When you say these are similar documents, you mean these are similar documents to the documents we've been looking at, Exhibits 5 and 6A and 6B and even 4A and B?

**A Yes. They're similar audit finding documents, transmitting audit findings to the airline.**

Q I assume since you've never seen these before, you had no role in creating either 7A or 7B?

**A No, I did not play any role.**

Q And if you'd look at 7A, this says in the second paragraph "The financial liability outlined in the enclosed report does not include interest or penalties. Your company will not be charged interest for any amounts received by April 1, 2002." Correct?

**A Correct.**

Q And I notice this letter is dated April 26th, 2002, correct?

**A Yes, it is.**

Q After April 1st?

**A Yes.**

Q And can you tell me the significance of the



April 1st, 2002 date if you know?

**A I do not know.**

Q Is it your presumption that April 1st, 2002 is 30 days after American Airlines was first notified of the final audit liability amount?

**A That normally would be my presumption, but given the conflicting dates here, I don't know what to make of it.**

Q The conflicting date being the fact that the letter is dated after April 1st?

**A Yes.**

Q We saw in the last set of exhibits, Exhibit 5, for example, a draft letter existed at least.

**A Yes.**

Q And could it be that a draft of the same letter was previously sent to American, and through that mechanism it was notified prior to April 1st of what the liability amount was?

**A I don't know that, but it's possible.**

Q Does that sound like something that might have happened?

**A I just can't tell. I wasn't in touch with**

53

**this, and again the date makes it unusual.**
Q I realize this will be difficult given your lack of involvement and the oddness of the dates here, but other than Exhibits 7A and B and perhaps any earlier drafts that were sent to American Airlines, did the government previously notify American of the APHIS user fee audit liabilities in any way?
**A In this particular case?**
Q Correct.
**A I don't know.**
Q Do you know if the government and American Airlines reached any agreement regarding interest charges in connection with this APHIS user fee audit?
**A I do not know.**
MR. FEINBERG: By the way, if you want to take a break at any point, just let me know.
THE WITNESS: Can we take a quick break?
MR. FEINBERG: Sure.
(Recess)
BY MR. FEINBERG:
Q Mr. Shea, I just want to go back and talk about one thing that we were talking about before. You

54

had mentioned that the APHIS user fee statute requires the payment of interest?
**A Right. I believe it refers to interest. I could by mistaken.**
Q We can get a copy if you'd like. My recollection is that it incorporates the Debt Collection Act statute that we looked at at Exhibit 3. Is that your recollection?
**A I have a copy of it here if we could refer to it.**
Q That would be great. Absolutely.
**A Do you want to have this entered?**
Q If you'd like. Just tell me what section you're referring to here.
**A Section 4. As I read it, you're correct. It says as required by section 3717 of Title 31. But it does refer to, it has a late payment penalties heading.**
Q Right. That's the provision you were recalling before?
**A That, and there's something else here. Yes. I guess the only other thing I was referring to that relates not directly but the Section A(6) refers to**

55

**amounts collected, and it merely refers to fees and other amounts, and the other amounts meaning I think the penalty or interest payments, it's under (6), are available to be spent by the agency as opposed to going into the general treasury.**
Q I see.
**A I think that was the distinction I was probably thinking of most directly.**
Q But that subsection A(6) has nothing to do with the conditions under which you charge interest or penalties?
**A No. No, it does not.**
Q "No" in that I was correct?
**A Yes, you're correct.**
Q I've got to stop doing that.
(Deposition Exhibits 8A and 8B were marked for identification and were attached to the transcript.)
BY MR. FEINBERG:
Q Mr. Shea, can you identify Exhibits 8A and 8B?
**A These appear to be another of the**

56

**notification letters to the airline of an amount due transmitting an audit.**
Q And Exhibit 8B is the actual audit report that it was transmitting?
**A Yes.**
Q Have you ever seen these documents before?
**A Not these specific ones to my knowledge.**
Q Were you involved in this particular audit?
**A No, I was not.**
Q And this was after the time when you had been receiving copies of audit reports, correct?
**A Correct.**
**(Deposition Exhibit 9 was marked for identification and was attached to the transcript.)**
**BY MR. FEINBERG:**
Q Mr. Shea, can you identify Exhibit 9?
**A Again, I've never seen this before. It looks like American Airlines' appeal of the user fee liability is the title line here.**
Q You've never seen this document before?
**A No.**
Q Turn the page twice to sort of an attached

document.
A Yes.
Q Have you ever seen that document before?
A I have not.
Q Before today were you aware that American Airlines had filed an appeal in connection with an APHIS user fee liability?
A I was not aware of it, no.
(Deposition Exhibit 10 was marked for identification and was attached to the transcript.)
BY MR. FEINBERG:
Q Have you ever seen Exhibit 10 before?
A I have not.
Q This appears to be APHIS's response to that appeal?
A Correct.
Q You've never seen it before?
A I've never seen it before.
Q Did you have any role in reviewing or responding to American Airlines' so-called appeal, Exhibit 9?
A I did not.



(Deposition Exhibit 11 was marked for identification and was attached to the transcript.)
BY MR. FEINBERG:
Q Have you ever seen this document, Exhibit 11, before?
A I have not.
MR. FEINBERG: By the way, Exhibit 10 and Exhibit 11 are letters that are from APHIS to American Airlines, and I believe there are other copies of these exact same letters that are signed and are on APHIS letterhead. These, however, are the copies that were in the government's appendix already submitted in this case which are where the Exhibit L and K came from as well as the exhibit labels on a lot of the prior exhibits we looked at, just for the record.
BY MR. FEINBERG:
Q You've never seen this letter before?
A I have not.
Q And by "this letter" I mean the substance of this letter, whether it looks exactly like this piece of paper or on APHIS letterhead?
A I have not seen this.



Q And the same thing goes for Exhibit 10 I assume?
A That's correct.
(Deposition Exhibit 12 was marked for identification and was attached to the transcript.)
BY MR. FEINBERG:
Q Mr. Shea, let me show you what's been marked as Exhibit 12. Have you ever seen Exhibit 12 before?
A I'm only hesitating because I know I did not see this at the time it was done, but it does ring a bell to me as maybe something that was attached to some of the pleadings in this case and I glanced through some of them, and this does look vaguely familiar as one of those maybe, but I don't have any knowledge of it. Again, it would just be something that I saw in a stack of documents.
Q Let me show you something else that might help you.
MR. FEINBERG: Can we mark this 13.
(Deposition Exhibit 13 was marked for identification and was attached to the transcript.)
THE WITNESS: I've certainly seen that.



BY MR. FEINBERG:
Q You've certainly seen Exhibit 13?
A Yes.
Q What is Exhibit 13?
A This is my declaration.
Q In this case?
A In this case, yes.
Q That you signed on May 25th, 2005?
A Yes.
Q Take a look at paragraph 7.
A Yes.
Q You seem to be referring to, this is on the top line or two of the last page, a letter that American sent to APHIS, a true and correct copy of which is enclosed.
A Yes. That was Exhibit 12 it looks like.
Q Our Exhibit 12?
A Your Exhibit 12, yes.
Q And later on in that same paragraph 7 you refer to an Exhibit S as being that letter, is that correct?
A That's where I must have seen it. It's two

**years ago. Yes. But I was not familiar with it in October 2003.**

Q That was going to be my next question. You did not see Exhibit 12 in October of 2003?

**A I did not see it in 2003, no.**

Q When was the first time you saw Exhibit 12?

**A I don't know exactly. Probably when this case began to evolve and I became involved to give this declaration I think was the first time I probably saw this.**

Q You say in your declaration that the sending of this letter or the receipt by the government of the letter of Exhibit 12 was the first time the government learned of American Airlines' claim in this case?

**A Yes.**

Q How do you know that?

**A Because it had not been made aware -- I had not been made aware of it in any fashion.**

Q In your position would you have been made aware of it?

**A I may have been. I certainly would have been made aware of it in my position as the Budget and**



**Accounting director, and I would have been made aware of it generally speaking because I was again during the 2003 time period in oversight of regulation writing which included setting these user fees.**

**And also at that time it was during the transition from APHIS to CBP where the agriculture inspectors themselves literally were transferred from APHIS to CBP, and I was heavily involved in managing that transfer of employees.**

**So I did have a little more involvement then than I had for the previous few years in the AQI matters.**

Q I see. I guess if you think you would have heard of American Airlines expressing this argument, how come you didn't learn of the letter at Exhibit 12 when it was sent to the government?

**A It probably just would not have risen to my level at the time it was sent. Looking at it, it's the kind of thing that would still be within the folks who were managing the fees most directly.**

Q If a similar letter were sent in say 2001, do you think you would have seen it in 2001?



**A Probably not. I would have seen it in 1999 in my role. In 2001 I probably would not have seen it. I think the other reason that I would have been more familiar with it then is that in my role as the deputy administrator for PPD, part of my venue was managing the agency budget, and at that time we were trying to figure out how much money transferred to the CBP, how much stayed in APHIS, how we had to adjust the appropriation, and that sort of thing. So I think that as this matter became more specific, then it was raised to my level as a revenue issue.**

Q Did you have any role in preparing the government's response to American Airlines' letter at Exhibit 12?

**A No, I did not.**

Q You mentioned before some agreements. We talked about, for example, your claim that there was an agreement regarding interest where the government sent a letter and American accepted the agreement by sending a check?

**A Yes.**

Q Other than what we've talked about, are there



any other agreements between American Airlines and the government that you're aware of in connection with the APHIS user fee audits?

**A No, other than as I recall they would agree on the logistics of when they would meet, agree on which flights to sample, that sort of thing.**

Q Anything else?

**A No, not that I'm aware of.**

Q You mentioned before that you thought at least that October 2003 was the first time that American Airlines notified the government of its claims in this case?

**A To my knowledge.**

Q Do you know whether American Airlines realized it might have a claim before October 2003?

**A No.**

Q I take it does that mean you don't know one way or another?

**A Could you rephrase or repeat the question?**

Q Yes. Let me try to explain a little better what I'm getting at.

Obviously American Airlines sent this letter

in October 2003.
A **Right.**
Q My question is do you think they knew about this potential argument five years before and just didn't do anything or that they just came to the realization that they might have an argument in or around October of 2003 when they sent the letter or you have no way of knowing?
A **I have no way of knowing.**
Q Before October of 2003 did American Airlines ever threaten to take any legal action against the government based on the argument that the government did not have the right to assess liability for uncollected user fees?
A **I am not aware of that.**
Q And did any other airline do that before October of 2003?
A **I don't know the dates. I know of other airlines involved in similar litigation. I don't know the dates. I don't know which filed first.**
Q You're referring to, for example, the Continental and United cases?



A **Yes.**
Q Do you have any reason to believe that American Airlines intentionally misled the government by not raising its claims earlier?
A **I have no knowledge of that at all.**
Q From October 2003 until the present has the government taken any actions to revise the user fee regulations to clarify that airlines are liable when they do not collect the fee?
A **We have begun the process of doing that, yes.**
Q And when did that process begin?
A **The process began within this calendar year. I don't know the exact date.**
Q By that you mean in 2007?
A **Yes.**
Q And where are you in the process?
A **We are drafting proposed rule making.**
Q Has anything been released to the public?
A **No.**
Q And does this affect the APHIS user fee?
A **Yes, only the APHIS. It's the only one we can affect.**



Q And why, if you know, is APHIS drafting this proposed rule making?
A **To clarify what our position is on the issue.**
Q Why did you wait until 2007 to do that?
A **We were trying to see just how the courts would interpret it and how it would work out. It's been our position that we felt the statute and the regulations were clear. Obviously that has not been universally shared. And so we feel the time has come to make that very clear.**
Q From October 2003 until the present has the government taken any action to revise the APHIS user fee statute to clarify that airlines are liable for user fees when they don't collect?
A **We have not, but we are also internally drafting potential legislation for that. I don't mean to be evasive of that, but the government legislative drafting process is a slow confidential process within the administration before something actually makes its way to Congress, and it's still at that kind of stage.**
Q Can you tell me when that process began?
A **A similar time.**



Q In 2007?
A **Yes, as the regulations.**
Q From October of 2003 until the present has the government taken any actions to adjust the amount of the user fee to factor in expected shortfalls due to uncollected user fees?
A **We have not. We did adjust the fees during that period, but we did not do it to account for this.**
Q From October of 2003 until the present has the government performed any additional reviews of American Airlines' internal controls to identify potential problem areas regarding inability or failure to collect user fees?
A **I don't know.**
Q Do you know whether from October of 2003 until the present the government has done anything different in connection with auditing American Airlines with respect to the APHIS user fee?
A **I do not know that we have.**
Q Who would know that?
A **I think the people who worked with the CBP auditors who were conducting the audits.**

69

Q Has anybody at APHIS suggested to the CBP auditors that they change their auditing procedures?
**A I don't know.**
Q Have you reviewed the analysis prepared by American Airlines' experts in this case?
**A Could you tell me what it is? I've seen, for example, an argument perhaps in a pleading, but I don't know what you're referring to exactly.**
Q It's an expert witness report essentially from Deloitte.
**A I don't think I've seen that.**
MR. FEINBERG: Can we go off the record for a second.
(Recess)
BY MR. FEINBERG:
Q I just have one more question for you which is simply if you have anything else you'd like to add or clarify about the topics you've testified to today?
**A I do not.**
MR. FEINBERG: I have no more questions.
MR. CHADWICK: I don't have any questions. We want him to sign.

70

(Signature having not been waived, the deposition of A. Kevin Shea was concluded at 10:45 a.m.)

ACKNOWLEDGMENT OF DEPONENT

I, A. Kevin Shea, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata Sheet signed by me.

________________ ____________________
(DATE) (SIGNATURE)

71

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Nancy Bond Rowland, Registered Professional Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of May 2007.

My commission expires:
October 31, 2009

____________________
NOTARY PUBLIC IN AND FOR THE
DISTRICT OF COLUMBIA

72

ERRATA SHEET

IN RE: American Airlines v. USA

RETURN BY: ____________________

PAGE LINE CORRECTION AND REASON

____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________

____________ ____________________
(DATE) (SIGNATURE)

73

ERRATA SHEET CONTINUED

IN RE: American Airlines v. USA

RETURN BY: ______________________

PAGE LINE CORRECTION AND REASON

____ ____ ______________________

____ ____ ______________________

____ ____ ______________________

____ ____ ______________________

____ ____ ______________________

____ ____ ______________________

____ ____ ______________________

____ ____ ______________________

____ ____ ______________________

____ ____ ______________________

____ ____ ______________________

____ ____ ______________________

____ ____ ______________________

____ ____ ______________________

____ ____ ______________________

____ ____ ______________________

______________ ______________________

(DATE) (SIGNATURE)