# A. KEVIN SHEA DEPOSITION
# EXHIBIT 1

U.S. Department of Homeland Security
Washington, DC 20229

U.S. Customs and
Border Protection

FEB 4 2005

Mr. Monty Hobbs
Supervisor – Transportation Tax Control
American Airlines, Inc.
Revenue Accounting
4333 Amon Carter Boulevard
Fort Worth, Texas 76155-2664

Dear Mr. Hobbs:

Enclosed is the U.S. Customs and Border Protection (CBP), Regulatory Audit Division report on our review of American Airlines' compliance with Immigration User Fees (IUF), Customs Passenger Processing Fees (PPF), and APHIS Passenger and Landing Fee regulations for the review period of January 1, 2003 to June 30, 2004, and APHIS Landing Fee for the prior period. This report includes operational observations and an assessment of the liability due to DHS for the fees. Details of the findings and financial liability were discussed with you and Ms. Teresa Isakson at the exit conference.

**Immigration User Fee Liability:**

The total financial liability finding of $270,274 represents findings regarding unremitted fees and errors only and does not include interest or penalties.

**Customs PPF Liability:**

The financial liability finding of $136,202 represents findings regarding unremitted fees and errors only and does not include interest or penalties.

**APHIS Passenger and Landing Fee Liability:**

The financial liability finding of $101,224 passenger fees and $832,394.25 landing fees represents findings regarding unremitted fees and errors only and does not include interest or penalties.



PENGAD 800-631-6989 EXHIBIT 1 5/16/07 nbc

**Additional Charges:**

As notified in our initial letter to you, DHS and USDA are authorized by Federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to issue interest and any administrative charge assessments and/or penalties, as appropriate as a result of the findings in this audit. Any interest or charges will be issued directly from the U.S. Customs and Border Protection (CBP), National Finance Center (NFC) for the IUF and PPF and from the APHIS collection office for the APHIS fees in a separate mailing from this final audit report. Interest and penalties will be computed back to the period when the fees should have been remitted.

**Remittances:**

**Remittances of the IUF and PPF amounts due may be made by:**

**Checks:** Checks should be mailed to:

U.S. Customs and Border Protection
Attn: User Fee Team
6026 Lakeside Boulevard
Indianapolis, Indiana 46278

Please enclose the Exhibits with your check for clarity of payment intent.

**Wire Transfers:** ABA #021030004
Account #70 05 0096
U.S. Treasury – FRB New York
33 Liberty Street
New York, New York 10045
(212) 720-5000

The sender should make certain the following information is put on the payment:

1. Company Name
2. Company IRS Number
3. An indication of what the payment is for (include Exhibit(s) from Audit):
a. Passenger User Fees for quarter and year
b. Railroad User Fees for month and year
c. Promissory Note number, bill number or audit finding, if applicable.

Any questions concerning fed wire transfers can be addressed to Ms. Sue Warren at (202) 874-8896.

**ACH Credit:** Automated Clearinghouse (ACH) credit is an electronic process that allows companies to transmit their payment directly to the U.S. Customs and Border Protection, without disclosing their company's bank account information. If you have questions concerning the ACH credit process or would like to set up an account, please contact Ms. Dee Baskerville of the U.S. Customs and Border Protection at (317) 614-4466.

IUF and PPF billing and payment questions should be addressed to Kara Welty of the NFC, at (317) 614-4614.

**Remittances due for the APHIS Passenger and Landing Fees:**

Remit funds for APHIS fees to:

**Lockbox:**
USDA, APHIS, AQI
P.O. Box 952181
St. Louis, Missouri 63195-2181

Physical address for overnight deliveries:
US Bank
Attn: Government Lockbox – P.O. Box 952181
1005 Convention Plaza
St. Louis, Missouri 63101

**ACH Credit:** Automated Clearinghouse (ACH) credit is an electronic process that allows companies to transmit their payment directly to the APHIS account at US Bank in St. Louis, Missouri. Please process your electronic payment to the account listed below:

ABA Router Number - 081000210
Account Number - 1001104072
Refer to Lockbox Number: 952181

For ACH, please include your company name, company IRS taxpayer identification number and indicate that the payment is for an audit liability.

Any questions regarding payment of APHIS user fees should be addressed to the collection office via e-mail to abshelpline@aphis.usda.gov or by telephone to (612) 336-3400 or toll free in the US at (877) 777-2128.

**To aid in all payments, please include a copy of the Exhibits with the appropriate payments.**

The CBP team greatly appreciates the cooperation and assistance your staff provided us during this review.

Sincerely,

Daune I. Robinson
Director
Field Oversight Division I

Enclosures

# Inspection User Fee

# Report of Compliance

# On

# American Airlines, Inc.

**Review Period**
January 1, 2003 through June 30, 2004
IUF, Customs PPF, and APHIS

**Review Dates**
August 23-27, 2004

WARNING: CRIMINAL PENALTIES
This document contains trade secrets and commercial and financial information relating to the confidential business of private parties. The Trade Secrets Act, (18 U.S.C. 1905), provides penalties for disclosure of such information. Federal employees who violate this act by making wrongful disclosures of confidential commercial information may be subject to a personal fine not more than the greater of $100,000 or, if the person derives a financial gain from the offense, or the offense results in a financial loss to another person, a fine up to twice the gross gain or loss (18 U.S.C. 3571(b), (d)), imprisonment for not more than one year, or both; and shall be removed from employment. Also, improper disclosure of certain information contained in this document may constitute a violation of the Privacy Act (5 U.S.C. 552a) and violators could be subject to a fine of not more than $5,000.00.

Any disclosure, dissemination, or reproduction of this document or any of its contents is prohibited without the approval of the Regulatory Audit Field Director who signed the report.

# TABLE OF CONTENTS

Page

1. **Background** ........ 1
   a. Immigration User Fees
   b. Customs Passenger Processing Fees
   c. APHIS Passenger and Aircraft Landing Fees
   d. Data on American Airlines, Inc.

2. **Review Objectives** ........ 2

3. **Scope and Methodology** ........ 2

4. **Findings and Recommendations** ........ 4

5. **Liability** ........ 6

**EXHIBIT 1: IUF Liability Calculations**

**EXHIBIT 2: PPF Liability Calculations**

**EXHIBIT 3: APHIS Passenger Fee Liability Calculations**

**EXHIBIT 4: APHIS Aircraft Clearance Fee Liability Calculations**

**EXHIBIT 5: APHIS Aircraft Clearance Fee Liability Calculations Prior Periods**

# 1. Background

## a. Immigration User Fees (IUF)

In 1986, the U.S. Congress passed the Omnibus Appropriation Bill (PL 99-500 and PL 99-591). This legislation permits the U.S. Department of Homeland Security (DHS) to collect Immigration User Fees (IUF). These fees offset the cost of inspecting incoming passengers at U.S. Ports of Entry to ensure that they are admissible to the United States. On December 20, 1993, the user fee was established at $6 per passenger. Effective May 1, 2002, the fee was increased to $7. Effective February 28, 2003, a $3 fee was established for the previously exempt areas for cruise line travel.

## b. Customs Passenger Processing Fees (PPF)

Effective July 7, 1986, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Public Law 99-272, authorized Customs to collect user fees for certain services. On June 25, 1999 the Miscellaneous Trade and Technical Corrections Act of 1999 (Public Law 106-36) was signed into law. This law authorized: (1) continuation of the $5 fee for those passengers aboard commercial vessels or aircraft arriving in the United States territories, possessions, and adjacent islands, and (2) establishment of a new fee of $1.75 per passenger arriving aboard commercial vessels form Canada, Mexico, or the United States territories, possessions, and adjacent islands. Effective November 3, 2003, the authority provided Customs and Border Protection (CBP) to collect certain user fees under the Consolidated Omnibus Budget and Reconciliation Act was extended to March 1, 2005. The fees affected are those authorized by 19 U.S.C. 58c, subpart a.

## c. APHIS Passenger and Landing Fees

The Food, Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990 authorized the U.S. Department of Agriculture (USDA) through the Animal, Plant and Health Inspection Service (APHIS) to collect various user fees. These fees include agricultural quarantine and inspection services provided in connection with the arrival of commercial aircraft and international passenger arrivals at ports in the Customs territory of the U.S. The Farm Bill defines the U.S. Customs territory as the 50 States, the District of Columbia, and Puerto Rico.

APHIS published a final rule in the Federal Register on April 12, 1991, requiring airlines to collect a user fee from international air passengers arriving in the U.S. Customs territory from countries other than Canada. These fees became effective on May 13, 1991. On January 9, 1992, APHIS published a final rule requiring an inspection fee for commercial aircraft arriving in the U.S. from

countries other than Canada, effective February 9, 1992. Aircraft and passengers on flights originating in Canada are excluded from APHIS.

#### d. American Airlines

American Airlines, Inc. is the largest United States airline and a subsidiary of AMR Corporation. According to October 2004 Yahoo finance website, American Airlines has a fleet of 740 airplanes and has hubs in Dallas/Fort Worth, Miami, Chicago, and San Juan, Puerto Rico. American Airlines flies to over 150 destinations worldwide. AMR also owns a commuter airline, AMR Eagle Holding, which itself owns American Eagle Airlines (flies to/from Canada, Bahamas, and the Caribbean) and Executive Airlines (flies from/to Miami and San Juan, Puerto Rico). AMR purchased the assets of TWA about 3 years ago. AMR is part of the "Oneworld" airline alliance with major strategic partners such as: British Airways, Cathay Pacific, Finnair, Iberia, Qantas, Aer Lingus, and Lan Chile. American Airlines had approximately 96,000 airline employees at the end of 2003. American Airlines' website is "www.aa.com."

## 2. Review Objectives

The objectives were to: 1) evaluate the adequacy and reliability of internal controls, collections, recording, reporting, and remittance systems for user fees; 2) determine compliance with user fee regulations; and 3) partner with the company, providing information and advice to facilitate continued compliance with prevailing regulations.

## 3. Scope and Methodology

#### a. Scope

The review covered the period January 1, 2003 to June 30, 2004, for IUF, PPF, and APHIS and was performed at the company's office in Dallas, Texas, between August 23-27, 2004.

#### b. Methodology

We tested for collection, recording, reporting, and remittance compliance.

<u>Collection compliance</u>:

Collections based on Sales:


SENSITIVE – PROPRIETARY INFORMATION

To test collection compliance for the sales based remittance, passenger ticket-lifts for nine random sample flights were negotiated with American Airlines for flights from September 2003 through May 2004. This resulted in a net qualifying sample count of 1,444 for Immigration (XY), 1,335 for APHIS (XA), and 1,100 for Customs PPF (YC).

Random sample review:

We traced the collection of fees from a random sample of net qualifying ticket-lifts, manifests and passenger reports through the separate sales methods and to the general ledger (GL) liability account. Errors found during this process were:

| | |
|---|---|
| Immigration User Fee | 3.5 |
| Customs PPF | 4.0 |
| APHIS Passenger Fee | 3.0 |

| **Flight Arrival Date** | **Flight #** | **AIRPORTS** | **REMARKS** |
|---|---|---|---|
| November 30, 2003 | AA447 | Toronto-ORD | XY only |
| January 1, 2004 | AA5381 | British VI-San Juan | XA/XY |
| February 18, 2004 | AA2132 | Panama-MIA | All Fees |
| January 3, 2004 | AA954 | Honduras-MIA | All Fees |
| February 7, 2004 | AA49 | France-DFW | All Fees |
| September 9, 2003 | AA176 | Japan-DFW | All Fees |
| March 19, 2004 | AA1638 | Mexico-DFW | XY/XA |
| April 18, 2004 | AA970 | Nicaragua-MIA | All Fees |
| May 21, 2004 | AA906 | Brazil-MIA | All Fees |

**Recording activity:**

To test recording compliance, airline tickets from the Airport Ticket Offices (ATO), the City Ticket Office (CTO), the Airline Reporting Corporation (ARC), and the Bank Settlement Plan (BSP) for the APHIS, Immigration, and Customs Passenger User Fee liabilities were traced from recorded ticket user fees to month-end journal entries and/or the summary of the general ledger accrual accounts. Tickets processed in April 2004 were used for walk-through for the above sales channels.

The company does not have contracts with student consolidators.

Employee, frequent flyer, infant tickets, etc:



SENSITIVE – PROPRIETARY INFORMATION

We selected employee pleasure and business travel tickets/passes from the sample flights to supporting documentation for applicable user fee collections from the employee payroll-personnel system to the user fee general ledger liability accounts. The company is in compliance with user fee regulations for frequent flyer and infant tickets.

*Charter Flights:*

We reviewed the two categories of charter contracts and traced collections for the user fee accounts to the respective subsidiary general ledger accounts.

**Reporting activity:**

To test reporting compliance, each sales channel was traced to associated sales reports and to the general ledger liability accounts.

**Remitting activity:**

During the period reviewed, American Airlines remitted:

| | |
|---|---|
| $ 112,343,888.58 | Immigration User Fees |
| $ 37,697,927.34 | Customs Passenger Fees |
| $ 45,909,527.33 | APHIS Passenger Fees |
| $ 6,023,553.75 | APHIS Landing Fees |

To test remittance compliance, data from American Airlines was traced to remittances received for the report period.

Method of remitting:

During the period January 2003 through June 2004, remittance was based on sales. A summary of the sales reports was prepared and accumulated monthly. At end of the quarter the remittance was generated based on the GL balance(s).

## 4. Findings and Recommendations:

**User Fees:**

**FINDING 1: Error Rate on Qualifying Tickets for IUF, PPF, and APHIS**

Of the 1,444 passengers that qualified for Immigration User Fee (IUF) for the period January 2003 through June 2004, the company failed to collect or allocate collected user fees on 3.5 tickets, which translates to an error rate of 0.24

percent. Of the 1,100 passengers that qualified for Customs Passenger Processing Fees for the period January 2003 through June 2004, the company failed to collect or allocate collected user fees on 4 tickets, which translates to an error rate of 0.36 percent. Of the 1,335 passengers that qualified for APHIS Passenger Processing Fee for the period January 2003 through June 2004, the company failed to collect or allocate collected user fees on 3 tickets, which translates to an error rate of 0.22 percent.

The additional liability due as a result of the error rate applied to user fees collected for the review period is as follows:

| | |
|---|---|
| Immigration User Fees (IUF) | $270,274 (See Exhibit 1) |
| Customs Passenger Processing Fees | $136,202 (See Exhibit 2) |
| APHIS Passenger Fees | $101,224 (See Exhibit 3) |

**Recommendation:** The company should immediately remit the additional liability mentioned above. In addition, the company should implement procedures to improve remittance compliance.

**APHIS Aircraft Landing Fees:**

**Finding 2: Difference in APHIS Aircraft Landing Remittance Current Audit Period**

Our review of the APHIS aircraft landing fees determined that the company did not report and remit aircraft landing fees on 9,856 flights. This resulted in additional liability of $643,104. (See Exhibit 4).

During our audit, the company conducted an assessment of landing fees reported on the prior audit and discovered that 2,901 flights were not reported for review period October 2001 through December 2002. The additional landing liability for the prior period is $189,290.25. (See Exhibit 5).

**Recommendation:** The company should immediately remit the additional APHIS aircraft landing fees and is encouraged to implement complete internal reviews to lessen the impact of differences in remitting APHIS aircraft landing fees.

## 5. Liability

a. **Immigration User Fees (IUF) and Customs Passenger Processing Fees (PPF):**



SENSITIVE – PROPRIETARY INFORMATION

IUF - A total outstanding liability of $270,274 is assessed. (See Exhibit 1)
PPF – A total outstanding liability of $136,202 is assessed. (See Exhibit 2)

Note: The CBP, National Finance Center (NFC), will determine if interest and penalty amounts are due on Immigration User Fees and Customs Passenger Processing Fees collected by the carrier but not remitted. Interest and penalties will be computed back to the period when the fees should have been remitted and the carrier will be invoiced by the NFC for these amounts after the receipt of this final audit report. Audit liability amounts attributable to errors (such as those found by sampling during the audit process) will be subject to interest and penalties.

**b. APHIS Passenger and Aircraft Landing Fees:**

APHIS Passenger Fee - A total outstanding liability of $101,224 is assessed. (See Exhibit 3)

APHIS Aircraft Landing Fee

A total outstanding liability of $643,104 is assessed for the current review period. (See Exhibit 4)

A total additional outstanding liability of $189,290.25 is assessed for the prior review period as a result of the self-assessment conducted by the company during our audit. (See Exhibit 5)

Note: The USDA, APHIS Collections Office will determine if interest and penalty amounts are due on APHIS Passenger User Fees collected by the carrier but not remitted. Interest and penalties will be computed back to the period when the fees should have been remitted and the carrier will be invoiced for these amounts after the receipt of this final audit report. Audit liability amounts attributable to errors (such as those found by sampling during the audit process) will be subject to interest and penalty.

Daune I. Robinson


SENSITIVE – PROPRIETARY INFORMATION

AMERICAN AIRLINES — Exhibit [illegible]

# DHS - IUF Liability Calculations

| | |
|---|---|
| Sampled qualifying tickets: | 1444 |
| IUF not collected: | 3.5 |
| Error rate: | 0.24% |

| Year | Periods | Net Collections Posted to G/L | +Error Rate | Total IUF Due(1) | IUF Remitted | IUF Outstanding |
|---|---|---|---|---|---|---|
| | | | | | | |
| 2003 | Jan-Mar | $ 16,323,141 | $ 39,270 | $ 16,362,411 | $ 16,323,141 | $ 39,270 |
| | Apr-Jun | $ 18,363,738 | $ 44,179 | $ 18,407,917 | $ 18,363,738 | $ 44,179 |
| | Jul-Aug | $ 12,859,056 | $ 30,935 | $ 12,889,991 | $ 12,859,056 | $ 30,935 |
| | Sep | $ 6,032,797 | $ 14,515 | $ 6,047,312 | $ 6,032,797 | $ 14,515 |
| | Oct-Dec | $ 17,122,415 | $ 41,193 | $ 17,163,608 | $ 17,122,415 | $ 41,193 |
| | | | | | | |
| 2004 | Jan-Mar | $ 20,253,016 | $ 48,724 | $ 20,301,740 | $ 20,253,016 | $ 48,724 |
| | Apr-Jun | $ 21,389,726 | $ 51,458 | $ 21,441,184 | $ 21,389,726 | $ 51,458 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | TOTAL | $ 112,343,889 | $ 270,274 | $ 112,614,163 | $ 112,343,889 | $ 270,274 |

(1) (Recorded+Unrecorded)/(1-error rate)

AMERICAN AIRLINES

# DHS - PPF Liability Calculations

| | |
|---|---|
| Sampled qualifying tickets: | 1100 |
| PPF not collected: | 4 |
| Error rate: | 0.36% |

| Year | Periods | Net Collections Posted to G/L | +Error Rate | Total PPF Due(1) | PPF Remitted | PPF Outstanding |
|---|---|---|---|---|---|---|
| | | | | | | |
| 2003 | Jan-Mar | $ 5,378,093 | $ 19,430 | $ 5,397,523 | $ 5,378,093 | $ 19,430 |
| | Apr-Jun | $ 6,141,196 | $ 22,188 | $ 6,163,384 | $ 6,141,196 | $ 22,188 |
| | Jul-Sep | $ 7,263,203 | $ 26,242 | $ 7,289,445 | $ 7,263,203 | $ 26,242 |
| | Oct-Dec | $ 4,835,047 | $ 17,469 | $ 4,852,516 | $ 4,835,047 | $ 17,469 |
| | | | | | | |
| 2004 | Jan-Mar | $ 6,995,743 | $ 25,276 | $ 7,021,019 | $ 6,995,743 | $ 25,276 |
| | Apr-Jun | $ 7,084,645 | $ 25,597 | $ 7,110,242 | $ 7,084,645 | $ 25,597 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | TOTAL | $ 37,697,927 | $ 136,202 | $ 37,834,129 | $ 37,697,927 | $ 136,202 |

(1) (Recorded+Unrecorded)/(1-error rate)

American Airlines, Inc. Exhibit 3

# APHIS Passenger Liability Calculations

| | |
|---|---|
| Sampled qualifying tickets: | 1335 |
| APHIS not collected: | 3 |
| Error rate: | 0.22% |

| Year | Periods | Net Collections Posted to G/L | +Error Rate | Total APHIS Due(1) | APHIS Remitted | APHIS Outstanding |
|---|---|---|---|---|---|---|
| 2003 | Jan-Mar | $ 6,683,029 | $ 14,745 | $ 6,697,774 | $ 6,683,028 | $ 14,745 |
| | Apr-Jun | $ 7,482,548 | $ 16,516 | $ 7,499,064 | $ 7,482,548 | $ 16,516 |
| | Jul-Sep | $ 7,662,823 | $ 16,916 | $ 7,679,739 | $ 7,662,823 | $ 16,916 |
| | Oct-Dec | $ 7,068,782 | $ 15,599 | $ 7,084,381 | $ 7,068,782 | $ 15,599 |
| | | | | | | |
| 2004 | Jan-Mar | $ 8,403,886 | $ 18,499 | $ 8,422,385 | $ 8,403,886 | $ 18,499 |
| | Apr-Jun | $ 8,608,459 | $ 18,949 | $ 8,627,408 | $ 8,608,459 | $ 18,949 |
| | Jul-Sep | | $ - | | | $ - |
| | Oct-Dec | | $ - | | $ - | $ - |
| | | | | | | |
| | TOTAL | $45,909,527 | $ 101,224 | $ 46,010,751 | $45,909,527 | $ 101,224 |

(1) (Recorded+Unrecorded)/(1-error rate)

American Airlines, Inc.

## Aircraft Clearance Fee Liability Calculations

| Year | Periods | Calculated from Record | APHIS Aircraft Clearance Remitted | APHIS Aircraft Clearance Outstanding (2) |
|---|---|---|---|---|
| 2003 | Jan-Mar | $ 1,086,543 | $ 985,210 | $ 101,333 |
| | Apr-Jun | $ 1,044,131 | $ 934,837 | $ 109,294 |
| | Jul-Sep | $ 1,127,324 | $ 1,026,317 | $ 101,007 |
| | Oct-Dec | $ 1,099,071 | $ 997,477 | $ 101,594 |
| | | | | |
| 2004 | Jan-Mar | $ 1,150,749 | $ 1,042,695 | $ 108,054 |
| | Apr-Jun | $ 1,158,840 | $ 1,037,018 | $ 121,822 |
| | Jul-Sep | | | |
| | Oct-Dec | | | |
| | | | | |
| | TOTAL | $ 6,666,658 | $ 6,023,554 | $ 643,104 |

(2) Based on 61 American and 9,795 American Eagle/Executive @ $65.25 equals $643,104.00
The 61 flights unpaid were allocated straight line; the 9,795 were allocated as reported

# Aircraft Clearance Fee Liability Calculations

Prior Periods: Self Assessment Conducted by the Carrier During the Review

| Year | Prior Periods | Calculated from Record | APHIS Aircraft Clearance Remitted | APHIS Aircraft Clearance Outstanding (1) |
|---|---|---|---|---|
| 2001 | Jan-Mar | $ 991,323 | $ 991,323 | $ - |
| | Apr-Jun | $ 1,051,346 | $ 1,051,346 | $ - |
| | Jul-Sep | $ 991,128 | $ 991,128 | $ - |
| | Oct-Dec | $ 943,189 | $ 913,174 | $ 30,015.00 |
| | | | | |
| 2002 | Jan-Mar | $ 1,020,706 | $ 948,148 | $ 72,558.00 |
| | Apr-Jun | $ 999,891 | $ 992,714 | $ 7,177.50 |
| | Jul-Sep | $ 1,078,517 | $ 1,078,517 | $ - |
| | Oct-Dec | $ 1,081,845 | $ 1,002,305 | $ 79,539.75 |
| | | | | |
| | **TOTAL** | **$ 8,157,944.25** | **$ 7,968,654.00** | **$ 189,290.25** |

**(1) Based on 2,901 American Eagle/Executive @ $65.25 equals $189,290.25**

# A. KEVIN SHEA DEPOSITION
# EXHIBIT 2

U.S. Department of Homeland Security
Washington, DC 20229

U.S. Customs and Border Protection

JUL 26 2004

American Airlines
Attn: Mr. Monty Hobbs
4333 Amon Carter Blvd.
Fort Worth, TX 76155

EXHIBIT
2
5/16/11

Dear Mr. Hobbs:

This letter confirms arrangements made on July 2, 2004, by Mr. Eugene Schulman, Auditor, Regulatory Audit Division (RAD) to conduct a compliance review of the Immigration User Fee (IUF), the Customs Passenger Processing Fee (PPF), and APHIS passenger and landing fees collections by American Airlines for the inspection of passengers and aircraft arriving into the United States. The review will cover the period from January 1, 2003 to June 30, 2004 for the IUF, PPF, and APHIS. It will be performed at your office in Dallas, TX from August 23 through August 27, 2004 by Eugene Schulman, auditor. In addition, Ms. Betty Bridgewater, auditor and Ms. Gwen Stapleton, auditor, and Ms. Yea Browning, Supervisory Auditor will be assisting Eugene Schulman to perform the audit during the week.

The objective of this review is to: 1) evaluate internal control adequacy and reliability of user fee collections, recording, reporting and remitting systems; 2) determine the company's compliance with regulations implementing user fee collections from international passengers arriving into the United States; and, 3) partner with the company, providing information and advice to facilitate continued compliance with prevailing regulations.

This review will verify:

- the quarterly reports submitted by the company to the financial records;
- the quarterly reports and records to the manifest reporting process;
- the reports provided to DOT and remittances to each agency;
- the number passengers for interline, code share, charter, etc. passengers; and.
- tail numbers and records for reconciliation of landings.

Failure to provide the requested data may contribute to additional error findings, resulting in greater liability for the company. Thus, it is imperative that you compile the necessary data before the audit date.

1. All tickets lifted from passengers, electronic ticket facsimiles, the flight manifests, the general declaration, and the airport agent post ticketing collection reports for the first flights arriving at the following airports, on the following dates. (Sales Base)

Browning Exh. A

| FLIGHT ARRIVAL DATE | FLIGHT # | AIRPORTS | FEE: YC/XA/XY |
|---|---|---|---|
| March 28, 2003 | AA0131 | LHR-JFK | All User Fees Apply |
| February 18, 2004 | AA2132 | PTY-MIA | All User Fees Apply |
| January 3, 2004 | AA954 | TGU-MIA | All User Fees Apply |
| February 7, 2004 | AA49 | CDG-DFW | All User Fees Apply |
| February 29, 2004 | AA 176 | NRT-DFW | All User Fees Apply |
| March 19, 2004 | AA1638 | CUN-DFW | XY and XA |
| April 18, 2004 | AA970 | MGA-MIA | All User Fees Apply |
| May 21, 2004 | AA906 | GRU-MIA | All User Fees Apply |

2. A report of international charter flights/block ticket sales on scheduled/charter flights into the United States and territories for the review period. Include dates, passenger counts, and full itineraries. Please provide documentation of charter flight contracts that will indicate which entity is responsible for remitting user fees.

3. Flight statistics reports by airport (airport landing counts, including charter flights), date and total passenger count for the review period for flights arriving to U.S. and territories only.

4. Copies of the T-100 data filings to U.S. Department of Transportation (DOT) for the review period.

5. Copies of code- share agreements/alliances for the review period. A listing of all subsidiaries and what methods are utilized for remittance of User Fees.

6. Copies of tail numbers used for international flights to the U.S. from January 1, 2003 through June 30, 2004.

7. Full fee remittance history for each agency fees for the review period and the supporting documents used for determining the amount remitted, including summary sales or passenger reports, by month, that were used to support the remittances submitted. If applicable, copies of internal procedures for compiling and remitting the fees should be available.

8. Procedures and processes used to record, collect, and report user fees for frequent flyers, employee business and pleasure travel, internet sales, E-tickets and any other sales method.

9. Company annual reports covering the review period.

10. Copies of internal audits performed on the subject of ticket sales and various governmental user fees and taxes collected.

11. Copies of the general ledger showing where and how user fee liability is posted. Include any necessary documentation needed to trace the total user fee dollars from all sales sources to the general ledger accounts.

12. A report of all infants transported where tickets were not issued. This should include the process and policies regarding non-revenue lap children with a demonstration of how the carrier reports, collects and remits fees for the review period.

We will review airport ticket office (ATO), city ticket office (CTO) and Billing and Settlement Plan (BSP) sales channel sample tickets taken from flights reviewed on Monday, August 23, 2004. These tickets will function as walk through to trace the tickets to the appropriate sales reports and detailed General Ledger Accounts for the respective user fee liability accounts.

As mentioned, the review will cover the period from January 1, 2003 through June 30, 2004. However, CBP retains the right to review and assess liability on areas of partial, sporadic or non-remittance of the inspection user fees for a period of the past six years. In reviewing your data, if you find such a situation, alert the review team so that they can work with your staff in resolution of the issues. For the air passenger user fee, the lifted tickets from the sample selected will be audited. Any noncompliance rate resulting from auditing the sample of tickets will be extrapolated over the 18-month review period. The remittance history will be used as the basis for any additional liability assessment.

You will be given a copy of audit exceptions and liability at the exit conference. A final report will be issued after completion of the audit.

U.S. Customs and Border Protection (CBP) and U.S. Department of Agriculture (USDA), Animal and Plant Health Inspection Service (APHIS) are authorized by Federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to assess and collect interest and penalty amounts, in addition to principal on debts owed. DHS and APHIS retain the right to issue interest and any administrative charge assessments and/or penalties as considered appropriate as a result of the findings in this audit. Any interest or charges will be issued directly from CBP National Finance Center (NFC) for the IUF and PPF, or from the APHIS Collection Office for the APHIS related fees, in a separate mailing after the issuance of the final audit report. Interest and penalties will be computed back to the period when the fees should have been remitted.

If you have any additional questions or need additional information please call Eugene Schulman, auditor at 202-344-2963 by July 28, 2004 to discuss the status of the compilation of the above information.

Sincerely,

Yea Browning
Supervisory Auditor
Regulatory Audit Division

# A. KEVIN SHEA DEPOSITION
# EXHIBIT 3

LEXSTAT 31 USC 3717

UNITED STATES CODE SERVICE
Copyright (c) 2007 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) Companies
All rights reserved

*** CURRENT THROUGH P.L. 110-24, APPROVED 5/3/2007 ***

TITLE 31. MONEY AND FINANCE
SUBTITLE III. FINANCIAL MANAGEMENT
CHAPTER 37. CLAIMS
SUBCHAPTER II. CLAIMS OF THE UNITED STATES GOVERNMENT

**Go to Code Archive Directory for this Jurisdiction**

*31 USCS § 3717*

§ 3717. Interest and penalty on claims

(a) (1) The head of an executive, judicial, or legislative agency shall charge a minimum annual rate of interest on an outstanding debt on a United States Government claim owed by a person that is equal to the average investment rate for the Treasury tax and loan accounts for the 12-month period ending on September 30 of each year, rounded to the nearest whole percentage point. The Secretary of the Treasury shall publish the rate before November 1 of that year. The rate is effective on the first day of the next calendar quarter.

(2) The Secretary may change the rate of interest for a calendar quarter if the average investment rate for the 12-month period ending at the close of the prior calendar quarter, rounded to the nearest whole percentage point, is more or less than the existing published rate by 2 percentage points.

(b) Interest under subsection (a) of this section accrues from the date--

(1) on which notice is mailed after October 25, 1982, if notice was first mailed before October 25, 1982; or

(2) notice of the amount due is first mailed to the debtor at the most current address of the debtor available to the head of the executive [, judicial,] or legislative agency, if notice is first mailed after October 24, 1982.

(c) The rate of interest charged under subsection (a) of this section--

(1) is the rate in effect on the date from which interest begins to accrue under subsection (b) of this section; and

(2) remains fixed at that rate for the duration of the indebtedness.

(d) Interest under subsection (a) of this section may not be charged if the amount due on the claim is paid within 30 days after the date from which interest accrues under subsection (b) of this section. The head of an executive, judicial, or legislative agency may extend the 30-day period.

(e) The head of an executive, judicial, or legislative agency shall assess on a claim owed by a person--

(1) a charge to cover the cost of processing and handling a delinquent claim; and

(2) a penalty charge of not more than 6 percent a year for failure to pay a part of a debt more than 90 days past due.

(f) Interest under subsection (a) of this section does not accrue on a charge assessed under subsection (e) of this section.

(g) This section does not apply--

(1) if a statute, regulation required by statute, loan agreement, or contract prohibits charging interest or assessing charges or explicitly fixes the interest or charges; and

(2) to a claim under a contract executed before October 25, 1982, that is in effect on October 25, 1982.

EXHIBIT
3
5/16/07 nbr
PENGAD 800-631-6989

Case 1:04-cv-01736-SGB Document 64-2 Filed 05/29/2007 Page 26 of 58



(h) In conformity with standards prescribed jointly by the Attorney General, the Secretary of the Treasury, and the Comptroller General, the head of an executive, judicial, or legislative agency may prescribe regulations identifying circumstances appropriate to waiving collection of interest and charges under subsections (a) and (e) of this section. A waiver under the regulations is deemed to be compliance with this section.

(i) (1) The head of an executive, judicial, or legislative agency may increase an administrative claim by the cost of living adjustment in lieu of charging interest and penalties under this section. Adjustments under this subsection will be computed annually.

(2) For the purpose of this subsection--

(A) the term "cost of living adjustment" means the percentage by which the Consumer Price Index for the month of June of the calendar year preceding the adjustment exceeds the Consumer Price Index for the month of June of the calendar year in which the claim was determined or last adjusted; and

(B) the term "administrative claim" includes all debt that is not based on an extension of Government credit through direct loans, loan guarantees, or insurance, including fines, penalties, and overpayments.

**HISTORY:**

(Added Jan. 12, 1983, P.L. 97-452, § 1(16)(A), 96 Stat. 2471; April 26, 1996, P.L. 104-134, Title III, Ch 10, § 31001(c)(1), (g)(1)(C), (q), 110 Stat. 1321-359, 1321-363, 1321-372.)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

Prior law and revision:

| Revised section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 3717(a) .... | 31 App.: 952(e)(1) (1st-3d sentences). ........ | July 19, 1966, Pub. L. 89-508, 80 Stat. 308, Sec. 3(e)(1)(1st-3d sentences), (2)-(7); added Oct. 25, 1982, Pub. L. 97-365, Sec. 11, 96 Stat. 1755. |
| 3717(b), (c) . | 31 App.: 952(e)(5) .. | |
| 3717(d) ..... | 31 App.: 952(e)(6) .. | |
| 3717(e) ..... | 31 App.: 952(e)(2) .. | |
| 3717(f) ..... | 31 App.: 952(e)(7) .. | |
| 3717(g)(1) ... | 31 App.: 952(e)(3)(1st sentence). | |
| 3717(g)(2) ... | 31 App.: 952(e)(4) .. | |
| 3717(h) ..... | 31 App.: 952(e)(3) (2d, last sentences). | |

In subsection (a), the words "percentage point" and "percentage points" are substituted for "per centum" for clarity.

In subsections (a)(1) and (e), the words "Except as provided in paragraph (3)" are omitted as surplus.

In subsection (a)(2), the words "for a calendar quarter" are substituted for "quarterly", and the words "prior calendar quarter" are substituted for "that quarter", for clarity.

In subsection (b), before clause (1), the words "Subject to paragraph (6)" and "except as provided in subparagraph (B)" are omitted as surplus. In clause (2), the words "on the claim" are omitted as surplus. The words "if notice is first mailed after October 24, 1982" are added for clarity.

In subsection (c), the words "on a claim" are omitted as surplus.

In subsection (g)(1), the words "applicable" and "either" are omitted as surplus. The word "assessing" is added for clarity. The words "that apply to claims involved" are omitted as surplus.

In subsection (h), the words "under this section" are added for clarity.

Explanatory notes:

The bracketed matter ", judicial," has been inserted in subsec. (b)(2) to indicate wording probably intended by Congress.

Amendments:

1996. Act April 26, 1996 (effective on enactment, as provided by § 31001(a)(2)(A) of such Act, which appears as *31 USCS § 3322* note) purported to amend this section by striking "the head of an executive or legislative agency" each place it appeared and inserting "the head of an executive, judicial, or legislative agency". That substitution was made in subsec. (h), but in subsecs. (a)(1), (d), and (e), the amendment was executed by striking "The head of an executive or legislative agency" each place it appeared and inserting "The head of an executive, judicial, or legislative agency" in order to effectuate the probable intent of Congress.

Such Act further (effective as above), in subsec. (h), inserted ", the Secretary of the Treasury,"; and added subsec. (i).

**NOTES:**

Code of Federal Regulations:

Office of the Secretary of Agriculture--Debt management, 7 CFR Part 3.

Farm Service Agency, Department of Agriculture--Debt settlement policies and procedures, 7 CFR Part 792.

Animal and Plant Health Inspection Service, Department of Agriculture--User fees, 9 CFR Part 130.

Nuclear Regulatory Commission--Salary offset procedures for collecting debts owed by Federal employees to the Federal government, 10 CFR Part 16.

National Credit Union Administration--Requirements for insurance, 12 CFR Part 741.

Office of the Secretary of Commerce--Disclosure of government information, 15 CFR Part 4.

Bureau of the Census, Department of Commerce--Public information, 15 CFR Part 60.

Office of Workers' Compensation Programs, Department of Labor--Claims for compensation under the Federal Employees' Compensation Act, as amended, 20 CFR Part 10.

Office of Workers' Compensation Programs, Department of Labor--Claims for compensation under the Energy Employees Occupational Illness Compensation Program Act of 2000, as amended, 20 CFR Part 30.

Office of the Secretary, Department of Housing and Urban Development--Administrative claims, 24 CFR Part 17.

National Indian Gaming Commission, Department of the Interior--Debt collection, 25 CFR Part 513.

Department of Justice--Production or disclosure of material or information, 28 CFR Part 16.

Bureau of Prisons, Department of Justice--Cost of incarceration fee, 28 CFR Part 505.

Fiscal Service, Department of the Treasury--Indorsement and payment of checks drawn on the United States Treasury, 31 CFR Part 240.

Fiscal Service, Department of the Treasury--Waiver of interest, administrative costs, and penalties, 31 CFR Part 391.

Federal Claims Collection Standards (Department of the Treasury-Department of Justice)--Standards for the administrative collection of claims, 31 CFR Part 901.

Office of the Secretary, Department of Education--Debt collection, 34 CFR Part 30.

United States Patent and Trademark Office, Department of Commerce--Disclosure of government information, 37 CFR Part 102.

Department of Veterans Affairs--General provisions, 38 CFR Part 1.

National Foundation on the Arts and the Humanities--Collection of claims, 45 CFR Part 1150.

National Foundation on the Arts and the Humanities--Claims collection, 45 CFR Part 1177.

Related Statutes & Rules:

This section is referred to in *5 USCS § 5514*; *7 USCS §§ 2371, 7753, 7759, 8311*; *10 USCS § 2739*; *15 USCS § 80a-24*; *21 USCS § 136a*; *22 USCS § 2671*; *26 USCS § 6103*; *31 USCS §§ 3701, 3711*; *42 USCS §§ 404, 1383.*

Research Guide:

Federal Procedure:

21A Fed Proc L Ed, Judgments and Orders § 51:82.

29 Fed Proc L Ed, Railroads § 67:384.

Am Jur:

*70B Am Jur 2d, Social Security and Medicare § 1795.*

Interpretive Notes and Decisions:

1. Generally 2. Applicability 3. Relationship to other laws 4. --Common law 5. Rate of interest 6. Prejudgment interest 7. Attorney's fees and costs 8. Particular cases

**1. Generally**

Agencies are without discretion to waive interest charges required by *31 USCS § 3717* absent express exception; the exception for "contracts" in *31 USCS § 3717(g)(1)* refers to those contracts which specifically concern payment of money pursuant to particular government program involving loans administered by agencies, and not to contracts in general sense; agencies are not authorized to enter into collective bargaining agreement containing provision waiving application of required interest in penalty charges. *NFFE & US Army Engineer Dist., Kansas City, Mo., (1986) 21 FLRA 101*, 21 FLRA No. 20.

Purpose of Debt Collection Act was to ensure that government did not lose benefit of use of monies owed to it by contractors. *Capital Dev. Co. v United States (2001) 49 Fed Cl 178*, affd (2002, CA FC) *308 F3d 1283.*

**2. Applicability**

For purposes of *31 USCS §§ 3701, 3717*, Nuclear Regulatory Commission, although independent agency, is executive or legislative agency to which interest and penalty provisions of § 3717 apply; pursuant to § 3717, Commission is required to charge both interest and late penalty fee to overdue and unpaid portions of company's bill for license application review fees imposed pursuant to *31 USCS § 9701. Commonwealth Edison Co. v United States Nuclear Regulatory Com. (1987, CA7) 830 F2d 610.*

Food and Nutrition Service of Department of Agriculture is precluded from assessing interest against state Department of Social Services on debts owed to federal agency. *Perales v United States (1984, SD NY) 598 F Supp 19*, affd (1984, CA2 NY) *751 F2d 95.*

**3. Relationship to other laws**

Mine operator, who successfully sued government for reimbursement of mining reclamation fees under Surface Mining Control and Reclamation Act (*30 USCS §§ 1201* et seq.), was not entitled under *30 USCS § 1268(c)* to interest on that portion of refund representing civil penalties, because penalties at issue were assessed pursuant to *31 USCS § 3717*, rather than *30 USCS § 1268(c). Horizon Coal Corp. v United States (1994, CA6 Ohio) 43 F3d 234, 40 Envt Rep Cas 2035, 25 ELR 20843, 1994 FED App 400P.*

Since *31 USCS § 3717(g)(1)* refers disjunctively to interest or charges, statute does not apply to actions brought under Oil Pollution Act (*33 USCS §§ 2701* et seq.), which provides for interest (*33 USCS § 2705*) but not penalties. *United States v Hyundai Merchant Marine Co. (1999, CA9 Alaska) 172 F3d 1187, 99 CDOS 2843, 99 Daily Journal DAR*

*3685, 48 Envt Rep Cas 1385, 1999 AMC 1521, 29 ELR 21131,* cert den *(1999) 528 US 963, 145 L Ed 2d 310, 120 S Ct 397, 49 Envt Rep Cas 1768.*

With respect to Nuclear Regulatory Commission fees for nuclear power reactor licenses, pursuant to *42 USCS § 2213*, it was reasonable for Commission not to include interest and late fees collected under *31 USCS § 3717* as deductible "other amounts collected," because (1) since purpose of § 2213 was to recover costs incurred by Commission, phrase "other amounts collected" can reasonably be interpreted to mean other cost-recovery measures, and penalties, fines, and interest charges are not cost-recovery measures; while (2) contrary interpretation would allow utilities that violate law and pay consequent penalties or fines, to benefit by recovering portion of penalty or fine as reduced user fee. *Florida Power & Light Co. v United States (1988, App DC) 269 US App DC 377, 846 F2d 765,* cert den *(1989) 490 US 1045, 104 L Ed 2d 422, 109 S Ct 1952.*

Generally, government contracts include clause which mandates that contractor pay interest on amounts due to government at rates established under Contract Disputes Act (*41 USCS §§ 601* et seq.), and where this clause is included in contract, it, and not Debt Collection Act (*31 USCS § 3717*), is authority for government to assess and collect interest due. Advanced Injection Molding, Inc. v General Services Administration (2005, GSBCA) 2005-2 BCA P 33097.

**4. --Common law**

In determining whether, under federal common law, state owes prejudgment interest to United States due to contractual obligation arising prior to 1982, United States Supreme Court will not attribute any significance to 1983 federal statute, which in *31 USCS § 3717* prescribes interest payable by persons to Federal Government, but in *31 USCS § 3701* excludes from definition of "person" any agency of state government, where, as stated in § 3717, 1983 statute does not apply to contracts entered into before October 25, 1982 and Supreme Court can draw no inference of Congresses' comprehension of federal common law of interest from Congress' enactment, without any discernible legislative history, of definitional exclusion. *West Virginia v United States (1987) 479 US 305, 93 L Ed 2d 639, 107 S Ct 702.*

Federal government's federal common law right to collect prejudgment interest on debt owed by state for lost food stamps is not abrogated by Debt Collection Act (*31 USCS §§ 3701* et seq.), since underlying claim is contractual obligation to pay money, and only obligation from which *31 USCS § 3701(c)* (which provides that states are not persons) exempts states is obligation to pay prejudgment interest in accordance with mandatory provisions of Act. *United States v Texas (1993) 507 US 529, 123 L Ed 2d 245, 113 S Ct 1631, 93 CDOS 2520, 93 Daily Journal DAR 4287, 7 FLW Fed S 145.*

Provisions of Debt Collection Act of 1982 (*31 USCS §§ 3701, 3717*) did not abrogate federal common-law right of Food and Nutrition Service of Department of Agriculture to assess interest on outstanding debts of states incurred pursuant to Food Stamp Act (*7 USCS §§ 2011-2030*) and specifically Service's mail loss regulation. *Gallegos v Lyng (1989, CA10 NM) 891 F2d 788.*

**5. Rate of interest**

Where United States obtained judgment against surety which had posted bond guaranteeing payment of overdue tax obligations owed by third party, interest owed to government from date of third party's default should be calculated at rate established by Internal Revenue Code (*26 USCS § 6621*), rather than under terms of *31 USCS § 3717(a). United States v American Ins. Co. (1994, CA3 Pa) 18 F3d 1104, 94-1 USTC P 50131, 73 AFTR 2d 1469,* 94 TNT 55-22.

When statutory cause of action sets it own rate of interest, *31 USCS § 3717* does not apply. *United States v Hyundai Merchant Marine Co. (1999, CA9 Alaska) 172 F3d 1187, 99 CDOS 2843, 99 Daily Journal DAR 3685, 48 Envt Rep Cas 1385, 1999 AMC 1521, 29 ELR 21131,* cert den *(1999) 528 US 963, 145 L Ed 2d 310, 120 S Ct 397, 49 Envt Rep Cas 1768.*

*31 USCS § 3717*(a)(1) plainly provides authority for agency to decide what interest rate is compensatory or even to impose greater than compensatory rate. *Amax Land Co. v Quarterman (1999, App DC) 337 US App DC 64, 181 F3d 1356.*

**6. Prejudgment interest**

In determining whether, under federal common law, state owes prejudgment interest to United States due to contractual obligation arising prior to 1982, United States Supreme Court will not attribute any significance to 1983 federal statute, which in *31 USCS § 3717* prescribes interest payable by persons to Federal Government, but in *31 USCS § 3701*

excludes from definition of "person" any agency of state government, where, as stated in § 3717, 1983 statute does not apply to contracts entered into before October 25, 1982 and Supreme Court can draw no inference of Congresses' comprehension of federal common law of interest from Congress' enactment, without any discernible legislative history, of definitional exclusion. *West Virginia v United States (1987) 479 US 305, 93 L Ed 2d 639, 107 S Ct 702.*

Federal government's federal common law right to collect prejudgment interest on debt owed by state for lost food stamps is not abrogated by Debt Collection Act (*31 USCS §§ 3701* et seq.), since underlying claim is contractual obligation to pay money, and only obligation from which *31 USCS § 3701(c)* (which provides that states are not persons) exempts states is obligation to pay prejudgment interest in accordance with mandatory provisions of Act. *United States v Texas (1993) 507 US 529, 123 L Ed 2d 245, 113 S Ct 1631, 93 CDOS 2520, 93 Daily Journal DAR 4287, 7 FLW Fed S 145.*

As to state agency's argument that Labor Secretary was precluded by Debt Collection Act of 1982 from requiring agency to pay prejudgment interest on repayments of certain costs in connection with CETA grants, Act is inapplicable, since it does not apply to claim under contract executed before 10/25/82 that is in effect on that date, agency does not contest that CETA grants may be considered contracts, grant period extended from 10/1/80-6/30/82, and agency, as part of its monitoring obligation, engaged in such activities into 1984. *Florida Dep't of Labor & Employment Sec. v United States Dep't of Labor (1990, CA11) 893 F2d 1319,* cert den *(1990) 498 US 812, 112 L Ed 2d 25, 111 S Ct 49.*

Mere fact that government has secured judgment on contract does not entitle it to prejudgment interest absent underlying contractual obligation by contractor to pay money. *Thermalon Indus. v United States (2002) 51 Fed Cl 464.*

**7. Attorney's fees and costs**

U.S. is awarded default final judgment on unpaid national direct student loan but is granted only part of costs and fees requested, where U.S. sought recovery on 1974 3 percent fixed rate loan in principal sum of $ 600 plus $ 1,492.40 in costs and attorney's fees, because U.S. does not pay $ 120 filing fee under *28 USCS § 1914(a)* and "administrative/collection costs" of $ 158.15 are not collectible on this loan under *31 USCS §§ 3717(g)(1)* and (2). *United States v Spann (1992, SD Fla) 797 F Supp 980, 6 FLW Fed D 380.*

To extent U.S. could prove that power company lacked good faith basis for denying payment on any "claims," clear language of statute seemed to indicate that U.S. was not only permitted, but was required to assess costs of attorneys fees under *31 USCS § 3717* in its collection efforts; however, assuming attorneys' fees were recoverable as "costs" under § 3717(e), § 3717(g)(2) prohibited U.S. from seeking such "costs" associated with any of their claims arising out of power company's two subject project licenses, memorandum of understanding, or special use permit, as "costs" provision of § 3717(e) did not apply to claim under contract executed before October 25, 1982, that was in effect on October 25, 1982. *United States v S. Cal. Edison Co. (2004, ED Cal) 300 F Supp 2d 964,* motion to strike gr, in part, motion den (2005, ED Cal) *2005 US Dist LEXIS 24748,* motion to strike den, motion den (2005, ED Cal) *2005 US Dist LEXIS 24597,* different results reached on reconsideration (2005, ED Cal) *2005 US Dist LEXIS 24592.*

**8. Particular cases**

For purposes of *31 USCS §§ 3701, 3717*, Nuclear Regulatory Commission, although independent agency, is executive or legislative agency to which interest and penalty provisions of § 3717 apply; pursuant to § 3717, Commission is required to charge both interest and late penalty fee to overdue and unpaid portions of company's bill for license application review fees imposed pursuant to *31 USCS § 9701*. *Commonwealth Edison Co. v United States Nuclear Regulatory Com. (1987, CA7) 830 F2d 610.*

Unless Congress prescribes different policies or specific requirements for particular grant or grants, interest earned by grantee on funds advanced by US belongs to US rather than grantee and must be paid to US; thus, Syracuse University must pay Department of Navy interest earned on congressionally mandated grant (Urgent Supplemental Appropriations Act, July 2, 1986, P.L. 99-349, 100 Stat. 710) to University, and six-month Treasury rate is proper rate to compute amount of interest due. *Syracuse University (1990) 69 Comp Gen 660.*

With respect to computation of debts owed HUD on defaulted, FHA-guaranteed manufactured home loans, and assessment of interest on those loans and property improvement loans, FHA properly subtracts from outstanding loan balance greater of sale proceeds or appraised value of manufactured home, and properly assesses interest on debts at lesser of note rate or Treasury rate. *Calculation of Debt, and Interest on Debt, Owed to Department of Housing and Urban Development (1992) 71 Comp Gen 449.*

During pendency of appeal under Contract Disputes Act (*41 USCS §§ 601* et seq.), Forest Service is not required, pursuant to *31 USCS § 3717*, to discontinue assessment of interest, late payment penalties or administrative costs on delinquent debts arising from national forest timber sales contracts. *Interest Under Federal Claims Collection Act, as Amended, on Debts Appealed Under Contract Disputes Act of 1978 (1991) 70 Comp Gen 517.*

Under both Surface Mining Control and Reclamation Act (*30 USCS §§ 1201* et seq.) and Debt Collection Act (*31 USCS § 3717(e)(2)*), Secretary of Interior is empowered to promulgate regulations which provide six percent annual penalty on all reclamation fees more than 91 days overdue, and nowhere in language of either statute is there provision limiting applicability of such penalty; thus, mining company's contention that penalty should not be based upon mere innocent failure to pay reclamation fee is without merit. *Addington Mining v United States (1996) 35 Fed Cl 754.*

# A. KEVIN SHEA DEPOSITION
# EXHIBIT 4A

USDA

United States
Department of
Agriculture

Marketing and
Regulatory
Programs

Animal and
Plant Health
Inspection
Service

4700 River Road
Riverdale, MD 20737

FEB 1999

Ms. Maureen Blair, Acting Revenue Accounting Manager
American Airlines
MD 5519 HDQ
DFW Airport, Texas
75261-9616

Dear Ms. Blair:

Enclosed is the report of the U.S. Department of Agriculture, Animal and Plant Health Inspection Service (APHIS), user fee audit of American Airlines (AA), which was conducted by Mr. Michael Campbell and Mr. Pierre Arsenec. As you know, this report includes operational findings and recommendations for APHIS and Customs, as noted in our audit notification letter dated October 16, 1998. I understand that the auditors discussed details of the findings and financial liability with you.

I understand that you remitted the liability amounts of $150,572.48 and $128,244.27 to APHIS and Customs, respectively. These amounts were received before the due date.

The financial liability in this report resulting from statistical sampling relates only to specific Federal Agencies listed on the last pages of this report. Since each Federal Agency has a different collections error rate, the error rate for no two Agencies is identical.

If you have any questions, please contact Mr. Campbell at (301) 734-4796. The cooperation and assistance of your staff during this audit was greatly appreciated.

Sincerely,

Frank C. Vollmerhausen
Director, Resource Management
Systems and Evaluation Staff

Vir BLCD 711718184 Rcd 12/7/98

Enclosure

Exhibit B

EXHIBIT
4A
5/16/07

cc:
C. Reed, OA. Washington, DC
P. York. ABA. Riverdale. MD
K. Shea. BA. Riverdale. MD
D. Ford, BA. Riverdale, MD
D. Gradick. FSO, Minneapolis. MN
G. Muller, INS, Washington. DC
R. Hamilton. Customs. Indianapolis, IN

# A. KEVIN SHEA DEPOSITION
# EXHIBIT 4B

TABLE OF CONTENTS


I. Background .......... 1

II. Audit Objectives .......... 2

III. Audit Scope and Methods .......... 2

IV. Fieldwork Audit Team and Dates .......... 3

V. Findings and Recommendations .......... 3

VI. Financial Liability - APHIS .......... 5

VII. Financial Liability - Customs .......... 6


Exhibit A

EXHIBIT
4B
5/16/07 nbr
PENGAD 800-631-6989

## I. Background

In 1990, Congress established new user fee legislation. The Food, Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990, authorized the U.S. Department of Agriculture (USDA) through the Animal and Plant Health Inspection Service (APHIS) to collect various user fees. These fees include agricultural quarantine and inspection services provided in connection with the arrival of commercial aircraft and international passenger arrivals at ports in the Customs territory of the U.S. The Farm Bill defines the U.S. Customs territory as the 50 States, the District of Columbia, and Puerto Rico.

APHIS published a final rule in the Federal Register on April 12, 1991, requiring airlines to collect a user fee from international air passengers arriving in the U.S. Customs territory from other countries, except Canada. These fees became effective on May 13, 1991. On January 9, 1992, APHIS published a final rule requiring an inspection fee for commercial aircraft arriving in the U.S. from other countries except Canada, effective February 9, 1992. Aircraft and passengers on flights originating in Canada are excluded from APHIS fees because of a negligible agricultural health threat to U.S. agriculture.

Effective July 7, 1986, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Public Law 99-272, authorized Customs to collect user fees for certain services. All of the legislative bills creating or modifying Customs user fee programs are codified in one statute: 19 U.S. Code (U.S.C.) 58c. Interim regulations were published in the Federal Register on June 11, 1986.

Specifically, the law above established a requirement for operators of commercial aircraft to collect and remit a passenger processing fee for each passenger entering the U.S. from a non-exempt foreign country. From July 7, 1986, through December 31, 1993, passengers traveling from Canada, Mexico, a territory or possession of the U.S. or any adjacent island were exempt from this fee. See 19 CFR 24.22 (g) (2) for a complete list of exemptions. These exemptions were lifted from January 1, 1994 through September 30, 1997.

User fees must be remitted for receipt no later than 31 days after the close of each calendar quarter in which they are collected.

AA headquarters is in the Dallas-Fort Worth, TX area. AA had qualifying passenger and cargo flights operating during the audit period of July 1996 through June 1998. The major scheduled flight ports of entry into the U.S. are Boston, Chicago, Dallas-Ft Worth, Los Angeles, Miami, New York (JFK), Orlando, and San Juan (SJU).

AA is a publicly traded company and has approximately 100.000 world-wide employees. AA has operating jet aircraft which includes the following: 35 A300s, 79 B727s. 90 B757s, 71 B767. 75 Fokker 100s. 18 DC10s, 13 MD11s. and 260 MD80s.

The Airline Group consists primarily of American's Passenger and Cargo divisions. and AMR Eagle Holding Corporation.

For the above mentioned audit period, AA's user fee remittances for APHIS passengers and aircraft were $26,289,954.77 and $4,770,237.25, respectively. Remittances for the Customs user fee total $16.030,534.34.

## II. Audit Objectives

1. Evaluate internal control adequacy and reliability of user fee collections. recording. reporting, and remittance systems.

2. Determine compliance with regulations (mentioned above).

3. Develop a rapport with the payer. Provide information and advice to the payer to facilitate continued compliance.

## III. Audit Scope and Methods

The audit coverage period for the APHIS user fees is July 1996 through June 1998. For the Customs user fee the audit period is October 1997 through June 1998. AA and Customs settled AA's audit liability to Customs. The audit was conducted in accordance with the Government Auditing Standards issued by the Comptroller General of the United States and included such tests that were deemed necessary. We tested internal controls associated with the collection. recording, reporting, and remittance systems.

To test collection compliance. we audited tickets lifted from passengers for flights arriving into the following airports. on the following dates. At the request of the auditee, we limited our sample selection of flights to the last five months of our audit period. This was done to facilitate the research process for any potential findings.

| DATES | AIRPORTS |
|---|---|
| 1. Feb 20. 1998 | New York (JFK) |
| 2. Mar 02. 1998 | Dallas-Fort Worth (DFW) |
| 3. Mar 27. 1998 | Miami (MIA) |
| 4. Apr 14, 1998 | Los Angeles (LAX) |

5. May 06. 1998 Chicago (ORD)
6. May 25. 1998 Boston (BOS)
7. Jun 10. 1998 San Juan (SJU)
8. Jun 26. 1998 Miami (MIA)

To audit recording compliance, we traced an auditor coupon from each sales channel to the associated sales report. The sales reports selected were from: a) the city ticket office (CTO) in St. Croix for April 6, 1998 and the airport ticket office (ATO) at Miami (MIA) for February 19, 1998.

To test reporting compliance, we traced tickets sold from the sales reports listed above to the Passenger Revenue Accounting System (PRAS). Data from PRAS is downloaded into the AA general ledger.

Remittance compliance was tested by comparing remittance data to general ledger entries in the respective liability accounts.

Instances of noncompliance were used to determine an additional liability, using user fee dollars collected as the calculation basis.

The aircraft clearance fee was audited by comparing an auditee prepared schedule of landing counts by month by airport, to statistics provided by the U.S. Department of Transportation (DOT), and to APHIS remittances data.

## IV. Fieldwork Audit Team and Dates

The audit fieldwork was performed during October 19-23, 1998, by Mr. Michael Campbell and Mr. Pierre Arsenec.

## V. Findings and Recommendations

1. Finding: Of the 878 qualifying tickets audited for the APHIS air passenger user fee collections compliance, the number of tickets with no evidence of fee collection or remittance was 5. The associated error rate is .57 percent. The resulting amounts due to APHIS is $150,572.48.

Of the 504 tickets qualifying tickets audited for the Customs air passenger user fee collections compliance. the number of tickets with no evidence of fee collection or remittance was 4. The associated error rate is .79 percent. The resulting amounts due to APHIS is $128,244.27.

5. May 06, 1998 Chicago (ORD)
6. May 25, 1998 Boston (BOS)
7. Jun 10, 1998 San Juan (SJU)
8. Jun 26, 1998 Miami (MIA)

To audit recording compliance, we traced an auditor coupon from each sales channel to the associated sales report. The sales reports selected were from: a) the city ticket office (CTO) in St. Croix for April 6, 1998 and the airport ticket office (ATO) at Miami (MIA) for February 19, 1998.

To test reporting compliance, we traced tickets sold from the sales reports listed above to the Passenger Revenue Accounting System (PRAS). Data from PRAS is downloaded into the AA general ledger.

Remittance compliance was tested by comparing remittance data to general ledger entries in the respective liability accounts.

Instances of noncompliance were used to determine an additional liability, using user fee dollars collected as the calculation basis.

The aircraft clearance fee was audited by comparing an auditee prepared schedule of landing counts by month by airport, to statistics provided by the U.S. Department of Transportation (DOT), and to APHIS remittances data.

## IV. Fieldwork Audit Team and Dates

The audit fieldwork was performed during October 19-23, 1998, by Mr. Michael Campbell and Mr. Pierre Arsenec.

## V. Findings and Recommendations

1. Finding: Of the 878 qualifying tickets audited for the APHIS air passenger user fee collections compliance, the number of tickets with no evidence of fee collection or remittance was 5. The associated error rate is .57 percent. The resulting amounts due to APHIS is $150,572.48.

Of the 504 tickets qualifying tickets audited for the Customs air passenger user fee collections compliance, the number of tickets with no evidence of fee collection or remittance was 4. The associated error rate is .79 percent. The resulting amounts due to APHIS is $128,244.27.

## VI. Financial Liability - APHIS

AA's Financial Liability Due to APHIS Resulting from a User-Fee Audit

| QUARTER ENDED | PASSENGER LIABILITY |
|---|---|
| Sep-96 | $ 18,821.56 |
| Dec-96 | $ 18,821.56 |
| Mar 97 | $ 18,821.56 |
| Jun 97 | $ 18,821.56 |
| Sep 97 | $ 18,821.56 |
| Dec 97 | $ 18,821.56 |
| Mar-98 | $ 18,821.56 |
| Jun-98 | $ 18,821.56 |
| TOTALS | $ 150,572.48 |

## VII. Financial Liability - Customs:

AA's Financial Liability Due to Customs Resulting from a User Fee Audit

| QUARTER ENDED | PASSENGER LIABILITY |
|---|---|
| Dec 97 | $ 42,748.09 |
| Mar-98 | $ 42,748.09 |
| Jun-98 | $ 42,748.09 |
| TOTALS | $ 128,244.27 |

# A. KEVIN SHEA DEPOSITION
# EXHIBIT 5

Mr. John Parente,
Director, State and Local Taxes
American Airlines
P.O. Box 619616
MD 5697
DFW Airport
Fort Worth, Texas 75261-9616

Dear Mr. Parente:

Enclosed is the report of the U.S. Department of Agriculture, Animal and Plant Health Inspection Service (APHIS), user fee audit of American Airlines, which was conducted by Mr. Michael Campbell. As you know, this report includes operational findings and recommendations for APHIS and Customs, as noted in our audit notification letter dated August 21, 2000. I understand that the auditor, Mr. Campbell, discussed details of the findings and financial liability with you.

The financial liability outlined in the enclosed report does not include interest or penalties. Your company will not be charged interest for any amounts received by November 15, 2000. For any amounts received after that date, you will be subsequently billed interest effective from the end of the quarter in which the fee was supposed to have been collected.

The APHIS audit findings on behalf of Customs represent unremitted passenger user fees only. Customs retains the right to assess interest, administrative charges, and/or penalties, as deemed appropriate as a result of this report.

The liability amounts on the last two pages of this report should be mailed to the same address to which the quarterly payments are mailed. **Please send a copy of the Financial liability pages of this report with your checks.**

If you have any questions or comments, please contact Mr. Campbell at (301) 734-4796, fax (301) 734-7439 or e-mail at MichaelK.Campbell@usda.gov. The cooperation and assistance of your staff during this audit is greatly appreciated.

Sincerely,

Frank C. Vollmerhausen
Director, Resource Management
Systems and Evaluation Staff

Enclosure

DRAFT

EXHIBIT
5
5/16/07

PENGAD 800-631-6989

C 1 2 -01

# A. KEVIN SHEA DEPOSITION
# EXHIBIT 6A

USDA

ited States
partment of
riculture

rketing and
gulatory
ograms

imal and
nt Health
pection
rvice

)0 River Road
erdale, MD 20737

January 29, 2001

Mr. John Parente
Director, State and Local Taxes
American Airlines
P.O. Box 619616
MD 5697
DFW Airport
Fort Worth, Texas 75261-9616

Dear Mr. Parente:

Enclosed is the report of the U.S. Department of Agriculture, Animal and Plant Health Inspection Service (APHIS), user fee audit of American Airlines, which was conducted by Mr. Michael Campbell. As you know, this report includes operational findings and recommendations for APHIS and Customs, as noted in our audit notification letter dated August 21, 2000. I understand that the auditor, Mr. Campbell, discussed details of the findings and financial liability with you.

I understand that you have remitted checks covering the audit liability of $299,106.51 to APHIS and $1,030,362.06 to Customs.

The APHIS audit findings on behalf of Customs represent unremitted passenger user fees only. Customs retains the right to assess interest, administrative charges, and/or penalties, as deemed appropriate as a result of this report.

If you have any questions or comments, please contact Mr. Campbell at (301) 734-4796, fax (301) 734-7439 or e-mail at Michael.K.Campbell@usda.gov. The cooperation and assistance of your staff during this audit is greatly appreciated.

Sincerely,

Frank C. Vollmerhausen
Director, Resource Management
Systems and Evaluation Staff

Enclosure

cc:
C. A. Reed, OA, Washington, DC
W. J. Hudnall, MRPBS, Washington, DC
D. Ford, BASE, Riverdale, MD
D. Gradick, MRPBS-MNPLS, Minneapolis, MN
E. Barnett, U.S. Customs, Indianapolis, IN
File

# A. KEVIN SHEA DEPOSITION
# EXHIBIT 6B

# TABLE OF CONTENTS


I. Background .................................................. 1

II. Audit Objectives .................................................. 2

III. Audit Scope and Methods .................................................. 2

IV. Findings and Recommendations .................................................. 4

V. Financial Liability - APHIS .................................................. 6

VI. Financial Liability - Customs .................................................. 7


Exhibit C
[redacted]

PENGAD 800-631-6989
EXHIBIT
6B
5/16/07

I. Background

In 1990, Congress established new user fee legislation. The Food, Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990, authorized the U.S. Department of Agriculture (USDA) through the Animal and Plant Health Inspection Service (APHIS) to collect various user fees. These fees include agricultural quarantine and inspection services provided in connection with the arrival of commercial aircraft and international passenger arrivals at ports in the Customs territory of the U.S. The Farm Bill defines the U.S. Customs territory as the 50 States, the District of Columbia, and Puerto Rico.

APHIS published a final rule in the Federal Register on April 12, 1991, requiring airlines to collect a user fee from international air passengers arriving in the U.S. Customs territory from other countries, except Canada. These fees became effective on May 13, 1991. On January 9, 1992, APHIS published a final rule requiring an inspection fee for commercial aircraft arriving in the United States from other countries except Canada, effective February 9, 1992. Aircraft and passengers on flights originating in Canada are excluded from APHIS fees because of a negligible agricultural health threat to U.S. agriculture.

Effective July 7, 1986, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Public Law 99-272, authorized Customs to collect user fees for certain services. All of the legislative bills creating or modifying Customs user fee programs are codified in one statute: 19 U.S. Code (U.S.C.) 58c. Interim regulations were published in the Federal Register on June 11, 1986.

Specifically, the law above established a requirement for operators of commercial aircraft to collect and remit a passenger processing fee for each passenger entering the United States from a nonexempt foreign country. From July 7, 1986, through December 31, 1993, passengers traveling from Canada, Mexico, a territory or possession of the United States or any adjacent island were exempt from this fee. See 19 CFR 24.22 (g) (2) for a complete list of exemptions. These exemptions were lifted from January 1, 1994 through September 30, 1997.

User fees must be remitted for receipt no later than 31 days after the close of each calendar quarter in which they are collected.

American Airlines (AA) headquarters is in the Dallas-Fort Worth, TX area. AA had qualifying passenger and cargo flights operating during the audit period of July 1998 through June 2000. The scheduled flight ports of entry into the United States are Boston, Chicago (ORD), Dallas Fort-Worth, Los Angeles, Miami, New York (JFK), Orlando, and San Juan.

AA is a publicly traded company and has approximately 112,000 employees worldwide. As of December 31, 1999, AA had the following aircraft in service: 11 B-777s, 11 MD-11s, 8 DC-10s, 35 A300-600s, 30 767-200s, 49 767-300ERs, 102 757-200s, 24 737-800s, 68 727-200s, 279 MD-80s, 5 MD-90s, 75 F-100s, 45 ERJ-145s, 9 ERJ-135s, 43 Super ATRs, 32 ATR-42s, and 114 Saab 340s.

The Airline Group consists of American's Passenger and Cargo divisions, and AMR Eagle Holding Corporation, a division of AMR Corporation.

For the above mentioned audit period, AA's user fee remittances for APHIS passengers and aircraft were $42,806,248.32 and $7,536,014.00, respectively. Remittances for the Customs user fee total $46,143,127.13.

## II. Audit Objectives

1. Evaluate internal control adequacy and reliability of user fee collections, recording, reporting, and remittance systems.

2. Determine compliance with regulations (mentioned above).

3. Develop a rapport with the payer. Provide information and advice to the payer to facilitate continued compliance.

## III. Audit Scope and Methods

The audit coverage period for each user fee is July 1998 through June 2000. The audit was conducted in accordance with the Government Auditing Standards issued by the Comptroller General of the United States and included such tests that were deemed necessary. We tested internal controls associated with the collection, recording, reporting, and remittance systems.

To test collection compliance, we audited tickets lifted from passengers for flights arriving into the following airports, on the following dates. We understand that you have agreed that the sample below is representative of the markets in which you sold applicable tickets during the audit period. At the request of the auditee, we limited our sample selection of flights to the last five months of our audit period. This was done to facilitate the research process for any potential findings.

**The following are core flights used for the APHIS sample:**

| DATES | CITY PAIRS |
|---|---|
| 1/26/00 | London (LHR) - New York (JFK) |
| 2/05/00 | San Jose (SJO) - Miami (MIA) |
| 3/15/00 | Nassau (NAS) - Miami (MIA) |

| | |
|---|---|
| 4/25/00 | Caracas (CCS) - Miami (MIA) |
| 5/02/00 | Santo Domingo (SDQ) - New York (JFK) |
| 6/22/00 | Buenos Aires (EZE) - Miami (MIA) |
| 7/18/00 | Mexico (MEX) - Dallas-Fort Worth (DFW) |
| 8/03/00 | Port au Prince (PAP) - Miami (MIA) |

**These following flights were included in the Customs sample in addition to LHR-JFK, SJO-MIA, CCS-MIA, EZE-MIA from above:**

| | |
|---|---|
| 3/01/00 | London (LHR) - Chicago (ORD) |
| 5/10/00 | Bogota (BOG) - Miami (MIA) |

To audit recording compliance, we traced a ticket from sales channel listed below to the Passenger Revenue Accounting System (PRAS). The tickets selected were as follows:

a. ARC ticket number 001-7778103157 issued by Omega Travel (Agent #A09545130) on March 30, 2000.

b. Ticket number 001-2102038310 issued at the Dallas city ticket office (CTO) February 25, 2000 .

c. Ticket number 001-2168418521 issued at the Milan, Italy airport ticket office (ATO) April 13, 2000.

d. BSP ticket number 001-3379976905 by BTM Internacional (Agent # 82500272) in Guatemala City on July 20, 2000.

We also traced an AA generated report of employee pleasure travel during June 2000 to the NRSA journal entry for the same time period.

To test reporting compliance, we traced monthly activity from PRAS to the general ledger.

Remittance compliance was tested by comparing remittance data to general ledger entries in the respective liability accounts.

Instances of noncompliance were used to determine an additional liability, using user fee dollars collected as the calculation basis.

The aircraft clearance fee was audited by comparing an auditee prepared schedule of landing counts by month by airport, to statistics provided by the U.S. Department of Transportation (DOT), Customs data and APHIS' remittance data.

The audit fieldwork was performed September 18-22, 2000, by Michael Campbell, Auditor-In-Charge, and Pierre Arsenec, Supervisor.

IV. Findings and Recommendations

1. Finding: Of the 1,130 qualifying tickets audited for the APHIS air passenger user fee collections compliance, the number of tickets with no evidence of fee collection or remittance was 8. The associated error rate is .71 %. The resulting amount due to APHIS is $299,106.51.

Of the 766 qualifying tickets audited for the Customs air passenger user fee collections compliance, the number of tickets with no evidence of fee collection or remittance was 17. The associated error rate is 2.22%. The resulting amount due to Customs is $1,030,362.06

Recommendation: The additional liability amounts mentioned above were remitted subsequent to audit fieldwork completion. Copies of the noncompliance tickets were given to the AA's Revenue Accounting Staff so that measures can be implemented to improve collections compliance.

2. Finding: After several conference calls, the draft audit notification letter was faxed to AA five weeks before the start of audit fieldwork. At the audit entrance conference, AA personnel informed us that the sample lifts for several flights, as well as additional requested information, would not available until later in the week. We received the sample lifts for the final two flights Thursday and Friday afternoon. While we appreciate the steps taken by Revenue Accounting personnel to prepare for the audit, the lack of data at the start of fieldwork decreased the potential effectiveness of the audit.

The data availability problem was influenced by the following factors: 1) This was the first joint audit performed at AA by APHIS and INS; 2) Newer AA personnel was assigned to the audit; 3) The audit requirement that manifests be provided for all flights which required extensive research to obtain all of the lifted flight coupons.

Recommendation: AA has recommended that there be an annual audit of Federal user fees with a quarterly selection of sample flights. We concur with this recommendation, since it will alleviate the auditee burden of trying to obtain historical documentation with short records retention periods. Currently, ticket histories are stored for 9 months, then purged. In past APHIS audits, the AA sample selected did not correlate with the time period over which it was extrapolated. The proposed methodology will provide for selection of one flight per quarter by APHIS and INS. AA, once notified of the selected flight, will direct the station manager to send the flight envelope, which contains the flight coupons and manifests, to an appointed site where the contents will be photocopied. The originals will then be sent for processing and the copies will be forwarded to APHIS and INS.

AA, along with INS, Customs and APHIS, will implement the annual audit recommendation with quarterly selection of sample flights. APHIS and INS will conduct annual on-site reviews to discuss exceptions from the sample flights and perform standard audit procedures.

3. Finding We compared a AA prepared report of employee pleasure travel activity during June 2000 with the amount recorded in AA financial records for the corresponding period. We determined there to be discrepancy amount of $29,591.25 for APHIS and $4,092.50 for Customs. We were unable to determine the source of the discrepancy and are working with AA personnel to resolve this issue.

Recommendation: APHIS and AA will determine the source on the discrepancy and report on this finding during the annual APHIS audit.

4. Finding Prior to the start of audit fieldwork, AA determined that they improperly remitted APHIS aircraft landing fees for flights which had been canceled. This occurred due to personnel changes, and due to the extracting of information from the AA scheduled flight database instead of the database that contained flights flown.

Recommendation: This issue has since been rectified. AA currently bases APHIS aircraft fee remittances on actual flights flown. In addition, AA subtracted the improperly remitted flights from their third quarter 2000 aircraft fee remittance.

V. Financial Liability - APHIS

American Airline's Financial Liability Due to Customs Resulting from a User Fee Audit.

| QUARTER ENDED | PASSENGER LIABILITY |
|---|---|
| | |
| Dec-98 | $37,388.32 |
| Mar-99 | $37,388.32 |
| Jun-99 | $37,388.32 |
| Sep-99 | $37,388.32 |
| Dec-99 | $37,388.32 |
| Mar-00 | $37,388.31 |
| Jun-00 | $37,388.30 |
| Sep-00 | $37,388.30 |
| TOTALS | $299,106.51 |

DATE DUE: Remitted

VI. Financial Liability - CUSTOMS

American Airline's Financial Liability Due to Customs Resulting from a User Fee Audit.

| QUARTER ENDED | PASSENGER LIABILITY |
|---|---|
| Sep-98 | $128,795.26 |
| Dec-98 | $128,795.26 |
| Mar-99 | $128,795.26 |
| Jun-99 | $128,795.26 |
| Sep-99 | $128,795.26 |
| Dec-99 | $128,795.26 |
| Mar-00 | $128,795.25 |
| Jun-00 | $128,795.25 |
| TOTALS | $1,030,362.06 |

The APHIS audit findings on behalf of Customs represent unremitted passenger user fees only. Customs retains the right to assess interest, administrative charges, and/or penalties, as deemed appropriate as a result of this report.

# A. KEVIN SHEA DEPOSITION
# EXHIBIT 7A

4/30/02

United States
Department of
Agriculture

Marketing and
Regulatory
Programs

Animal and
Plant Health
Inspection
Service

4700 River Road
Riverdale, MD 20737

Mr. John Parente
Director, State and Local Taxes
American Airlines
P.O. Box 619616
MD 5657
Fort Worth, Texas 75261-9616

APR 26 2002

Dear Mr. Parente:

Enclosed is the report of the U.S. Department of Agriculture, Animal and Plant Health Inspection Service (APHIS), user fee audit of American Airlines, which was conducted by Mr. Michael Campbell. As you know, this report includes operational findings and recommendations for APHIS and Customs, as noted in our audit notification letter dated January 12, 2002. I understand that the auditor discussed details of the findings and financial liability with you.

The financial liability outlined in the enclosed report does not include interest or penalties. Your company will not be charged interest for any amounts received by April 1, 2002. For any amounts received after that date, you will be subsequently billed interest effective from the end of the quarter in which the fee was supposed to have been collected.

The APHIS audit findings on behalf of Customs represent unremitted passenger user fees only. Customs will assess interest, administrative charges, and/or penalties, as deemed appropriate as a result of this report.

Separate checks payable to each agency in payment of the liability amounts shown on the last pages of this report should be mailed to the following addresses:

The current lockbox addresses are as follows:

USDA, APHIS, AQI
P.O. Box 952181
St. Louis, MO 63195-2181

Physical address for overnight deliveries:
Firstar Bank
Attn: Government Lockbox - P.O. Box 952181
1005 Convention Plaza
St. Louis, MO 63101

U.S. Customs Service
Attention: Collections Team/User Fee Unit
6026 Lakeside Blvd.
Indianapolis, IN 46278

APHIS - Protecting American Agriculture

Exhibit F
[redacted]

EXHIBIT
7A
5/16/07
PENGAD 800-631-6989

An Equal Opportunity Employer

**Please send a copy of the Financial Liability pages of this report with your checks.**

If you have any questions or comments, please contact Mr. Campbell at (301) 734-4796, fax (301) 734-7439 or e-mail at Michael.K.Campbell@aphis.usda.gov. The cooperation and assistance of your staff during this audit is greatly appreciated.

Sincerely,

for
Pierre M. Arsenec
Chief
User Fee Auditing Branch

Enclosure

cc:
W. J. Hudnall, MRPBS, Washington, DC (w/ copy of enclosure)
D. Ford, BASE, Riverdale, MD (w/ copy of enclosure)
D. Crews, MRPBS-MNPLS, Minneapolis, MN (w/ copy of enclosure)
E. Barnett, US Customs, Indianapolis, IN (w/ copy of enclosure)