# A. KEVIN SHEA DEPOSITION
# EXHIBIT 7B

TABLE OF CONTENTS


I. Background ........ 1

II. Audit Objectives ........ 2

III. Audit Scope and Methods ........ 2

V. Findings and Recommendations ........ 3

V. Financial Liability - APHIS ........ 5

VI. Financial Liability - Customs ........ 6


Exhibit E [redacted]

EXHIBIT
7B
5/16/07
PENGAD 800-631-6989

I. Background

In 1990, Congress established new user fee legislation. The Food, Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990, authorized the U.S. Department of Agriculture (USDA) through the Animal and Plant Health Inspection Service (APHIS) to collect various user fees. These fees include agricultural quarantine and inspection services provided in connection with the arrival of commercial aircraft and international passenger arrivals at ports in the Customs territory of the U.S. The Farm Bill defines the U.S. Customs territory as the 50 States, the District of Columbia, and Puerto Rico.

APHIS published a final rule in the Federal Register on April 12, 1991, requiring airlines to collect a user fee from international air passengers arriving in the U.S. Customs territory from other countries, except Canada. These fees became effective on May 13, 1991. On January 9, 1992, APHIS published a final rule requiring an inspection fee for commercial aircraft arriving in the U.S. from other countries except Canada; effective February 9, 1992. Aircraft and passengers on flights originating in Canada are excluded from APHIS fees because of a negligible agricultural health threat to U.S. agriculture.

Effective July 7, 1986, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Public Law 99-272, authorized Customs to collect user fees for certain services. All of the legislative bills creating or modifying Customs user fee programs are codified in one statute: 19 U.S. Code (U.S.C.) 58c. Interim regulations were published in the Federal Register on June 11, 1986.

Specifically, the law above established a requirement for operators of commercial aircraft to collect and remit a passenger processing fee for each passenger entering the U.S. from a nonexempt foreign country. From July 7, 1986, through December 31, 1993, passengers traveling from Canada, Mexico, a territory or possession of the U.S. or any adjacent island were exempt from this fee. See 19 CFR 24.22 (g) (2) for a complete list of exemptions. These exemptions were lifted from January 1, 1994 through September 30, 1997.

User fees must be remitted for receipt no later than 31 days after the close of each calendar quarter in which they are collected.

AA headquarters is in Dallas, Texas. AA had qualifying passenger and cargo flights operating during the audit period of 10/00-12/01. The primary scheduled flight ports of entry into the US are Boston, Chicago (ORD), Dallas-Fort Worth (DFW), Los Angeles, Miami, New York (JFK), Orlando, and San Juan.

AA is a wholly owned subsidiary of AMR Corporation and has approximately 100,000 employees worldwide. AA has the following aircraft in service: 34 A300-600Rs, 33 B727-200s, 77 B737-800s, 117 B757-200s, 8 B767-200, 21 B767-200ERs, 49 B767-300ERs, 40 B777-200IGWs, 74 Fokker F100s, and 259 MDC MD-80s.

For the above mentioned audit period, AA's user fee remittances for APHIS passengers and aircraft were $33,982,489.97 and $ 4,952,630.25, respectively.

II. Audit Objectives

1. Evaluate internal control adequacy and reliability of user fee collections, recording, reporting, and remittance systems.

2. Determine compliance with regulations (mentioned above).

3. Develop a rapport with the payer. Provide information and advice to the payer to facilitate continued compliance.

III. Audit Scope and Methods

The audit coverage period for each user fee is October 1, 2000 through December 31, 2001. The audit was conducted in accordance with the Government Auditing Standards issued by the Comptroller General of the United States and included such tests that were deemed necessary. We tested internal controls associated with the collection, recording, reporting, and remittance systems.

To test collection compliance, we audited tickets lifted from passengers for flights involving the following city pairs, on the following dates. We understand that you have agreed that the sample below is representative of the markets in which you sold applicable tickets during the audit period.

| DATES | AIRPORTS |
|---|---|
| 1. Dec15, 2000 | Frankfurt (FRA) – Dallas (DFW) |
| 2. Mar 23, 2001 | Mexico City (MEX) – Dallas (DFW) |
| 3. Jul 02, 2001 | Lima (LIM) – Miami (MIA) |
| 4. Aug 20, 2001 | Panama City (PTY) – Miami (MIA) |
| 5. Dec 28, 2001 | Puerto Plata (POP) - New York (JFK) |

To audit recording compliance, we traced the following tickets from the sales channels listed below to the Passenger Revenue Accounting System (PRAS).

| Issue Date | Reporting Entity | Ticket Number |
|---|---|---|
| 6/06/01 | ARC | 7190769513 |
| 6/26/01 | ARC | 7029763262 |
| 6/16/01 | BSP-Peru | 3301952385 |
| 6/23/01 | BSP-Peru | 3312741382 |
| 6/28/01 | CTO-Lima | 2177641497 |
| 6/21/01 | ATO-IAD | 2177475981 |
| 6/27/01 | ATO-DFW | 2177615035 |
| 6/21/01 | Non-Revenue | 4265726613 |
| 6/28/01 | Non-Revenue | 4265050429 |

We traced employee flight coupons from the five sample flights listed above to the Non-Revenue Space Available (NRSA) database. In addition, we traced an AA generated report to the APHIS and Customs general ledger account.

To test reporting compliance, we traced monthly activity from PRAS to the general ledger.

Remittance compliance was tested by comparing remittance data to general ledger entries in the respective liability accounts.

Instances of noncompliance were used to determine an additional liability, using user fee dollars collected as the calculation basis.

The aircraft clearance fee was audited by comparing an auditee prepared schedule of landing counts by month by airport, to statistics provided by the U.S. Department of Transportation (DOT), Customs data and APHIS' remittance data.

The audit fieldwork was performed January 28 through February 1, 2002, by Mr. Campbell, with a supervisory visit performed by Mr. Pierre Arsenec.

IV. Findings and Recommendations

1. Finding: Of the 685 qualifying tickets audited for the APHIS air passenger user fee collections compliance, the number of tickets with no evidence of fee collection or remittance was 7. The associated error rate is 1.02%. The resulting amount due to APHIS is $ 345,936.76.

Of the 586 qualifying tickets audited for the Customs air passenger user fee collections compliance, the number of tickets with no evidence of fee collection or remittance was 7. The associated error rate is 1.19%. The resulting amount due to Customs is $ 350,248.31.

Recommendation: The additional liability amounts mentioned above should be remitted. Copies of the noncompliance tickets were given to the AA Senior Financial Analyst so that measures can be implemented to improve collections compliance.

2. Finding: During our review we noted that APHIS passenger user fees were not recorded for travel segment destinations in the US that originate in the Caribbean. The auditee mentioned that the programmed geographical matrix did not include the Caribbean as a qualifying origin for user fees.

In many cases, user fee amounts recorded for APHIS included old rates. The auditee mentioned that these trips involved geographical matrices with the old rate tables (used when American Airlines serviced those city pairs) were accessed by the computer.

No monthly detailed report of employee pleasure travel is produced to substantiate the total amount booked to the APHIS liability account. The auditors requested that a detailed report (for July 2001 payroll deductions) be produced to verify the accuracy of the general ledger entry. We reviewed this report and determined that AA should have remitted APHIS passenger user fees totaling $68,384.16. The NRSA journal entry for this period was $42,563.80. The liability amount related to this month was $25,820.36. We applied this error rate of 62.24% to the NRSA journal entries covering November 2000 through December 2001. The additional liability amount due is $246,455.09.

Recommendation: The additional liability amounts mentioned above should be remitted.

AA should ensure that all qualifying origin points are included in the NRSA grid and computation tables so that APHIS user fees are properly collected and remitted from employee pleasure travelers. **Note: AA informed us that the tax table amounts were corrected for travel effective February 1, 2002.**

AA should prepare a monthly summary of payroll deduction activity to NRSA to provide for an audit trail to the APHIS general ledger account.

3. Finding: AA performs a monthly sample of flight coupons as a means of determining a redistribution scheme for miscellaneous tax collections. The current sample selection is 65 tickets. In our opinion, this methodology is not statistically valid due to the small sample size. We believe that 279 sample items would provide a more representative sample of the population.

Recommendation: AA should raise the current sample size for their XT and ZZ analysis to a minimum of 279 sample items.

V. Financial Liability - APHIS

American Airlines' Financial Liability Due to APHIS Resulting from a User Fee Audit

| QUARTER ENDED | PASSENGER LIABILITY |
|---|---|
| | |
| Dec-00 | $104,373.88 |
| Mar-01 | 122,630.62 |
| Jun-01 | 135,253.08 |
| Sep-01 | 125,923.46 |
| Dec-01 | 104,210.81 |
| TOTALS | $592,391.85 |

DATE DUE: April 1, 2002

**Note: AA informed us they sent a check of $597,306.76 to cover the audit liability. AA should take a credit of $4,914.91 on their next APHIS passenger user fee remittance.**

V. Financial Liability - Customs

American Airlines' Financial Liability Due to Customs Resulting from a User Fee Audit

| QUARTER ENDED | PASSENGER LIABILITY |
|---|---|
| | |
| Dec-00 | $ 70,049.66 |
| Mar-01 | 70,049.66 |
| Jun-01 | 70,049.66 |
| Sep-01 | 70,049.66 |
| Dec-01 | 70,049.67 |
| TOTALS | $350,248.31 |

The APHIS audit findings on behalf of Customs represent unremitted passenger user fees only. Customs will assess interest, administrative charges, and/or penalties, as deemed appropriate as a result of this report.

# A. KEVIN SHEA DEPOSITION
# EXHIBIT 8A

April 28, 2003

nited States
epartment of
griculture

arketing and
egulatory
rograms

nimal and
ant Health
spection
ervice

700 River Road
iverdale, MD 20737

American Airlines
Attn: Teresa Isakson
4333 Amon Carter Blvd., Mail Drop 5657
Fort Worth, TX 76155

Dear Ms. Isakson:

Enclosed is the report of the U.S. Department of Agriculture (USDA), Animal and Plant Health Inspection Service (APHIS), user fee audit of American Airlines, which was conducted by Mr. Michael Campbell. As you know, this report includes operational findings and recommendations. I understand that Mr. Campbell discussed details of the findings and financial liability with you.

The financial liability outlined in the enclosed report does not include interest or penalties. Your company will not be charged interest for any amounts received within 30 days after the date of this audit report. For any amounts received after that date, you will be subsequently billed interest effective from the end of the quarter in which the fee was supposed to have been collected.

The liability amount on the last one page of this report should be mailed to the same address to which the quarterly payments are mailed. **Please send a copy of the last page of this report with your check.**

If you have any questions or comments, please contact Mr. Campbell at (301) 734-4796; fax (301) 734-5403 or e-mail at Michael.K.Campbell@aphis.usda.gov. The cooperation and assistance of your staff during this audit is greatly appreciated.

Sincerely,

Pierre M. Arsenec
Chief, User Fee Auditing Branch
Resource Management Systems
and Evaluation Staff

Enclosure

cc:
W.J. Hudnall, MRPBS, Washington, DC (w/copy of enclosure)
D. Ford, BASE, Riverdale, MD (w/copy of enclosure)
D. Crews, MRPBS-MNPLS, Minneapolis, MN (w/copy of enclosure)

EXHIBIT
8A
5/16/07 abr
PENGAD 800-631-6989



Exhibit H

# A. KEVIN SHEA DEPOSITION
# EXHIBIT 8B

TABLE OF CONTENTS


I. Background .......... 1

II. Audit Objectives .......... 1

III. Audit Scope and Methods .......... 2

IV. Findings and Recommendations .......... 3

V. Financial Liability - APHIS .......... 4


Exhibit G
[redacted]

EXHIBIT
8B
5/16/07
PENGAD 800-631-6989

I. Background

In 1990, Congress established new user fee legislation. The Food, Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990, authorized the U.S. Department of Agriculture (USDA) through the Animal and Plant Health Inspection Service (APHIS) to collect various user fees. These fees include agricultural quarantine and inspection services provided in connection with the arrival of commercial aircraft and international passenger arrivals at ports in the Customs territory of the U.S. The Farm Bill defines the U.S. Customs territory as the 50 States, the District of Columbia, and Puerto Rico.

APHIS published a final rule in the Federal Register on April 12, 1991, requiring airlines to collect a user fee from international air passengers arriving in the U.S. Customs territory from other countries, except Canada. These fees became effective on May 13, 1991. On January 9, 1992, APHIS published a final rule requiring an inspection fee for commercial aircraft arriving in the U.S. from other countries except Canada, effective February 9, 1992. Aircraft and passengers on flights originating in Canada are excluded from APHIS fees because of a negligible agricultural health threat to U.S. agriculture.

User fees must be remitted for receipt no later than 31 days after the close of each calendar quarter in which they are collected.

American Airlines (AA) headquarters is in Dallas, TX. AA had qualifying passenger and cargo flights operating during the audit period of January 2002 through December 2002. The scheduled flight ports of entry into the U.S. are Boston (BOS), Chicago (ORD), Dallas-Fort Worth (DFW), Los Angeles (LAX), Miami (MIA), New York (JFK), Orlando (MCO), and San Juan (SJU).

AA is a wholly owned subsidiary of AMR Corporation.

For the above mentioned audit period, AA's user fee remittances for APHIS passengers and aircraft were $28,218,485.10 and $4,021,683.75, respectively.

II. Audit Objectives

1. Evaluate internal control adequacy and reliability of user fee collections, recording, reporting, and remittance systems.

2. Determine compliance with regulations (mentioned above).

3. Develop a rapport with the payer. Provide information and advice to the payer to facilitate continued compliance.

III. Audit Scope and Methods

The audit coverage period is January 1, 2002 through December 31, 2002. The audit was conducted in accordance with the Government Auditing Standards issued by the Comptroller General of the United States and included such tests that were deemed necessary. We tested internal controls associated with the collection, recording, reporting, and remittance systems.

To test collection compliance, we audited tickets lifted from passengers for flights involving the following city pairs, on the following dates. We understand that you have agreed that the sample below is representative of the markets in which you sold applicable tickets during the audit period.

| DATES | CITY PAIRS |
|---|---|
| 1. Feb 27, 2002 | Paris (CDG) -Miami (MIA) |
| 2. July 5, 2002 | Mexico (MEX) – Dallas (DFW) |
| 3. Oct 25, 2002 | Santo Domingo (SDQ) – New York (JFK) |
| 4. Dec 18, 2002 | Tokyo (NRT) – San Jose (SJC) |

To audit recording compliance, we traced the following tickets from the sales channels listed below to the Passenger Revenue Accounting System (PRAS).

| Issue Date | Reporting Entity | Ticket Number |
|---|---|---|
| 10/22/02 | ARC | 7308378940 |
| 10/23/02 | ARC | 7310722279 |
| 10/25/02 | ATO-SDQ | 2155787882 |
| 10/05/02 | ATO-BOS | 2155473176 |
| 10/16/02 | CTO-NYC | 2155646149 |
| 10/09/02 | CTO-SDQ | 2155537713 |
| 10/15/02 | HDQ-TBM Dallas | 2115545433 |
| 10/21/02 | BSP-Santo Domingo | 3612762676 |
| 10/19/02 | BSP-Santo Domingo | 3612733129 |

We traced employee flight coupons from the five sample flights listed above to the Non-Revenue Space Available (NRSA) database. In addition, we traced the totals from an AA generated report to the APHIS general ledger account.

To test reporting compliance, we traced monthly activity from PRAS to the general ledger.

Remittance compliance was tested by comparing remittance data to general ledger entries in the respective liability accounts.

Instances of noncompliance were used to determine an additional liability, using user fee dollars collected as the calculation basis.

The aircraft clearance fee was audited by comparing an auditee prepared schedule of landing counts by month by airport, to statistics provided by the U.S. Department of Transportation (DOT), Customs data and APHIS' remittance data.

The audit fieldwork was performed February 24 – 28, 2003, by Mr. Campbell.

APHIS retains the right to review and assess liability for unpaid user fees for this audit period if significant data, which was unavailable during the audit, is discovered subsequent to the audit.

IV. <u>Findings and Recommendations</u>

1. <u>Finding</u>: Of the 450 qualifying tickets audited for the air passenger user fee collections compliance, the number of tickets with no evidence of fee collection or remittance was 12. The associated error rate is 2.67%. The resulting amount due to APHIS is $773,109.18.

<u>Recommendation</u>: The additional liability amounts mentioned above should be remitted. Copies of the noncompliant tickets were given to the AA Financial Analyst so that measures can be implemented to improve collections compliance.

V. Financial Liability - APHIS

American Airline's Financial Liability Due to APHIS Resulting from a User Fee Audit

| QUARTER ENDED | PASSENGER LIABILITY |
|---|---|
| Mar-02 | $193.277.30 |
| Jun-02 | $193,277.30 |
| Sep-02 | $193,277.29 |
| Dec-02 | $193,277.29 |
| TOTALS | $773,109.18 |

DATE DUE: within 30 days after report issuance date.

V. Financial Liability - APHIS

American Airline's Financial Liability Due to APHIS Resulting from a User Fee Audit

1315027 98 Q A

| QUARTER ENDED | PASSENGER LIABILITY |
|---|---|
| Mar-02 021 | $193,277.30 |
| Jun-02 022 | $193,277.30 |
| Sep-02 023 | $193,277.29 |
| Dec-02 024 | $193,277.29 |
| TOTALS | $773,109.18 |

| P | I |
|---|---|
| 13,658.26 | 4,552.75 |
| 11,693.28 | 3897.76 |
| 7763.30 | 2587.77 |
| 4799.72 | 1599.91 |
| 37914.56 | 12638.19 |

82366193

DATE DUE: within 30 days after report issuance date.

03AQI900215
Delete
2.22.03
KP

# A. KEVIN SHEA DEPOSITION
# EXHIBIT 9

AmericanAirlines

May 21, 2003

Mr. Frank Vollmerhausen
Director, Resource Management Systems and Evaluation Staff
USDA – APHIS
4700 Rover Road, Unit 151
Riverdale, Md 20737

Re: Appeal of APHIS fee liability

Dear Mr. Vollmerhausen:

American Airlines, Inc. files the attached appeal to seek the setting aside or modification of the liability notified by Mr. Pierre M. Arsenec, Chief, User Fee Auditing Branch, Resource Management System and Evaluation Staff on April 28, 2002. It also requests that when reviewing this appeal the Department of Agriculture take into consideration the exigent circumstances surrounding the audit. At the time AA was undergoing wrenching changes and uncertainty. It teetered and nearly filed twice for bankruptcy protection. Key personnel from many departments including Mr. Monty Hobbs in Revenue Accounting and Ms. Teresa Isakson (as myself) who were involved on the AA side on this audit were commandeered to attend meetings and supply and assist extensively in the preparation of a potential bankruptcy filing. Both Mr. Hobbs and Ms. Isakson were bound by a non-disclosure agreement from sharing this information with Mr. Michael Campbell the APHIS auditor.

We apologize to Mr. Campbell and the Department of Agriculture, to the extent that any short delay in producing AA's case may have inconvenienced the Department. However, AA did inform Mr. Campbell in a timely fashion that reliance on a particular SDQ-MIA flight produced results that were at odds with AA's field and system-wide collection results and with our confidence in the internal controls in place. Further, that we looked forward to working together to reach a representative sample.

We note that the INS in the course of its audit on inspection fees for the same period did agree with American Airlines that using Mr. Campbell's sample was unrepresentative and opted in our view correctly, to modify its approach to its audit. The random samples that American Airlines has produced and discussed in the appeal submission and attached herein establish conclusively that the underpayment is significantly less than that estimated by the Department of Agriculture and as such merits that this case be reconsidered and the liability adjusted accordingly.

I look forward to discussing this appeal at your first convenience.

Exhibit I

EXHIBIT
9
5/16/07



P.O. BOX 619616, DALLAS/FORT WORTH AIRPORT, TEXAS 75261-9616

Cordially yours,

Paul Salamone
Director & Sr. Tax Counsel – International

May 21, 2003

**American Airlines Appeal from the April 28th, 2003 Department of Agriculture Determination of APHIS Fee Liability**

**The Appeal**

This submission constitutes American Airlines, Inc's (AA) appeal from a notice of liability of $773,109 for APHIS international passenger inspection fees notified on April 28, 2003 by Mr. Pierre M. Arsenec, Chief, User Fee Auditing Branch, Resource Management Systems and Evaluation Staff. (Copy attached). AA's appeal rests on the fact that it has had in place strict and detailed internal controls system-wide for collections of APHIS and other taxes and fees. Secondly, that our tests of internal controls, validated by our extensive sampling through 3 different and in our opinion more accurate samples, and separately an overall check through an analytical test amply and convincingly demonstrate that the amount due to the Department of Agriculture is $280,871. Finally, that with the same facts the INS also determined that reliance on the SDQ-MIA flight chosen by the Department of Agriculture would produce results that are not representative with AA's collection experience.

For the reasons detailed below, AA respectfully requests that our appeal be accepted and that the Department of Agriculture set aside the notice of liability and review the additional evidence that AA has collected for this audit period and conclude that the amount undercollected was $280,871.

**Background and Chronology of the Audit**

Historically, inspection fee audits covered a two-year period. This past practice made it extremely onerous to respond within a compressed time frame to audit requests since part of the information had been purged from the systems. This has led to the new practice of annual audits where the information needed by the auditor is periodically requested throughout the audit period, leading to a more balanced workload throughout the year and a more timely response to auditor requests. Once the year closes the auditor normally meets on campus with revenue accounting personnel to perform further and final fieldwork and discuss the sampling results.

It is the auditor who initially determines what and when to sample and American like other airlines, produces the sample evidence as requested. This was accomplished for the audit period 2002 throughout 2002.[1] At the entrance meeting held on February 26,

[1] Due process and practice has always allowed airlines to challenge and present their side of the case when samples chosen and adhered to by an auditor are inconsistent with the collection experience of the airline. To not do so, would leave airlines not only with the cost of supporting a collection system world-wide but paying amounts that the government has already received on a timely basis through the normal remittance procedure.



Exhibit J

[redacted]

2003 and in a subsequent meeting held on February 28, 2003, Mr. Michael Campbell the auditor was informed by Mr. Monty Hobbs from AA Revenue Accounting, that the SDQ-MIA flight chosen as a sample produced results that were unrepresentative. He was further advised that a reappraisal of the sample was warranted and invited him to engage in a dialogue with AA on how to proceed. Despite this, at the February 28, 2003 meeting the auditor presented his proposed liability that relied on the unrepresentative SDQ-MIA flight as a sample. This prompted Mr. Hobbs to follow up with a letter dated March 5, 2003 (attached herein)[2] reiterating the need for the auditor to reconsider the use of such unrepresentative sample as a basis for assessment; he proposed alternate sampling methods and concluded by inviting Mr. Campbell to engage him in a discussion on this issue the following day.

During this same period of March 10-14, the INS was also on campus performing their fieldwork on the INS inspection fee. Since our experience has been that INS and the Dept. of Agriculture endeavor to coordinate and consult on agreeing on sample methodology, Mr. Hobbs was under the reasonable impression that reaching an agreement with INS on samples would also move the APHIS fee case to a conclusion in a timely but parallel path. This impression was further fueled by Mr. Campbell's response to Mr. Hobbs March 5, 2003 letter e-mailed on March 12, 2003. (Copy attached.) The latter, clarified some items that reduced the proposed liability and in turn suggested a conference call on the following day to discuss the remaining and more important items of sampling. The conference did not take place because of mutual scheduling conflicts.

While this is happening AA was undergoing severe financial stress, unprecedented turmoil and wrenching changes associated with management layoffs and accelerated attrition.[3] In response, AA had established a working group to plan for a potential bankruptcy filing at the end of March of 2003 unless agreements were reached with the unions on pay and work rule changes. Mr. Monty Hobbs and Ms. Teresa Isakson were commandeered to assist in this process and given the sensitivities of the matter were asked to sign non-disclosure agreements. While a potential bankruptcy filing was already the subject of speculation in the press, what Mr. Campbell was not aware of – and Mr. Hobbs could not volunteer – was the level of his and others involvement in the process to prepare for bankruptcy.

Bankruptcy was averted at the end of March only with the commitment of the unions that a vote to adopt pay cuts and work rule changes would be completed by April 15,$^{th}$ 2003. Mr. Hobbs as Ms. Isakson, were then required to continue to assist in a potential bankruptcy filing which was again narrowly averted on April 15th by the ratification of the company's wage and work rules proposals to the unions. But the crisis that erupted thereafter that resulted in AA Chairman and CEO Mr. Donald Carty's departure again raised the specter that one of the unions would back-out of the deal and precipitate a bankruptcy filing. Working under these very difficult circumstances, Mr. Hobbs produced further analysis and on April 17th, 2003 he sent it to Mr. Campbell and

---

[2] The letter was both e-mailed and mailed to Mr. Campbell.

[3] In the last 15 months AA has lost in excess 22% of its management personnel.

the INS auditors. As a result INS agreed to reconsider the use of the SDQ flight relied upon Mr. Campbell. Despite this, Mr. Campbell informed Mr. Hobbs that the Department of Agriculture stood by its sample and method and would issue the proposed liability as modified by the March 12, 2003 e-mail in final form. (Copy attached). Naturally, this took American Airlines by surprise since Mr. Campbell had agreed to engage Mr. Hobbs in a meaningful discussion about the sampling method used by the Department of Agriculture. The final assessment was subsequently notified by Mr. Arsenec and is dated April 28, 2003.(Letter is attached).

**Statutory and Regulatory Background**

Pursuant to 21 USC Section 136a(a)(a)(A), the US Department of Agriculture is directed to charge passengers fees to cover the costs of the inspection of international passengers. The triggering event for such collection is fixed at the time APHIS renders its inspection services to the passenger:

> "Except as specified in paragraph (f)(2) of this section, each passenger aboard a commercial aircraft who is subject to inspection under part 330 of this chapter or 9 CFR, chapter I, subchapter D, upon arrival from a place outside of the customs territory of this United States, must pay an APHIS user fee."[4]

Both 21 USC Section 136a and 7 CFR Section 354.3(f)(1) require the US Dept. of Agriculture to collect the inspection fee on the passenger upon arrival. However, the law allows the Dept. of Agriculture to transfer collection responsibilities and it did so through regulations. The regulations in turn direct travel agencies, tour operator and any entities that issue tickets to collect such taxes upon the issuance of tickets or travel documents:

> (i) "[a]ny person that issues tickets or travel documents on or after May 13, 1991, is responsible for collecting the APHIS user fee from all passengers transported into the customs territory of the United States to whom the APHIS user fee applies".[5]

To "issue tickets" means when a travel agent, tour operator, airline or other person actually executes and tenders legally enforceable travel documents or tickets to a passenger.[6] In actual practice travel agencies issue over 80 percent of tickets issued

---

[4] 7 CFR Section 354.3(f)(1). (My emphasis). Similarly, this triggering event is also emphasized in 7 CFR Section 354.3(f)(3)(iii).("APHIS user fees shall be collected...(iii)when passengers arrive...and are inspected by APHIS.)

[5] 7 CFR Section 354.3(f)(4)(i). (My emphasis).

[6] The meaning is clear from how the term is used in 7 CFR Section 354.3(f)(4)(i)(B) ("...the passenger's tickets or travel documents were issued...").

domestically and in foreign locations for most airlines including AA. Naturally, US law and regulations, including 7 CFR Section 354.3 does not and cannot govern a foreign travel agency or tour operator's conduct that occurs and originates solely in a foreign country since US laws are presumed territorial in nature. United States v Curtiss-Wright Export Corp., 299 US 304, 318 (1936)("...neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens." By the same token, there is no US law or authority under 7 CFR Section 354.3 that either does or can compel a US airline to coerce through denied boarding a foreigner while he remains in his own country in order to induce him to pay the fee that such country has specifically indicated cannot be collected without the passenger's consent.

**AA's collections procedures in the Dominican Republic**

The Dominican Republic (DR) has taken the position that US airlines cannot compel payment of US ticket taxes and inspection fees on originating Dominican passengers for tickets sold in the DR. The DR's view is that collection somehow injures or offends the country's sovereignty. Armed with this policy, travel agencies in the Dominican Republic routinely override the CRS system auto price mechanism to exclude collection of US ticket taxes and inspection fees. This required AA to design and implement additional procedures and train our ticket counter agents world-wide to collect inspection fees on passengers that had not paid. In fact, the regulations accommodate for such a situation and then require an airline to collect when the passenger attempts to depart from a US gateway.[7]

Four or five years ago, at the insistence of American Airlines, this policy of no collection in the DR was later relaxed to allow both the travel agency and the airline to "invite" the passenger at point-of-sale or check-in to pay the ticket tax. In light of this policy change AA has instituted strict procedures to request payment and account for such payment. When a passenger pays the fees at AA DR ticket counter, the ticket agent is required to fill out a form called a Miscellanous Sale Receipt (MSR) that details the type of tax or fee collected, the amount etc. This information is later coded to the appropriate tax account and the balance of the fees collected are remitted to the government.

Travel agencies are also evaluated for their success in inducing passengers to comply at point of sale in the DR with their collection obligations. High incidence of undercollections only increases our employee's work at the DR ticket counter (at the expense of speedy processing of other passengers) and is factored in as an important element to determine whether to continue to do business with that particular travel agency. AA has taken drastic action against errant travel agencies that has included pulling the "plates" and terminating the agency relationship. AA also orients and evaluates ticket counter personnel for their success in collecting and accounting for the fees in the DR.

---

[7] 7 CFR Section 354.3(f)(4)(i)(B).

Furthermore, AA's Miami, Central and Latin America (MCLA) division monitors the performance of the collections of US taxes and fees in addition to the many audit procedures performed by our DR controller. Supplementing this dual effort, AA Internal Audits also periodically inspects our field internal controls.

Thus, AA has extensive (and costly) internal controls in place that provides us with the confidence that collections of ticket taxes and fees proceed normally with a small error rate. As we shall discuss below, our analytical review and three different statistical samples, amply and convincingly bears this out and reveals a significantly lower result than that obtained by the Department of Agriculture.

**The Analytical Review and Sampling Methods Used**

With regards to audits the regulations simply state that "[e]ach carrier, travel agent, United States-based tour wholesaler, or other entity, subject to this section, must allow APHIS personnel to verify the accuracy of the APHIS user fees collected and remitted and to otherwise determine compliance with the 21 USC 136a and this paragraph."[8] The regulations provide no further guidance or benchmarks on what methodology must be used to conduct such audit. The final report and assessment simply states that the "audit was conducted in accordance with the Government Auditing Standards issued by the Comptroller General of the United States" but our review of such standards reveal no meaningful guidance or even particular guidance for ticket tax audits. However, these government audit standards, refer to the AICPA audit standards. These in turn generally require that samples be taken in order to ensure that the audit evidence is "sufficient and competent" on which to base conclusions about the entity's internal controls and reasonableness of account balances.

Now naturally, sampling makes sense so long as the assumptions surrounding the sampling are reasonable and other evidence does not reflect that the sample is unrepresentative. During the audit planning stage best practices under the AICPA standards call for the auditor to assess the level of audit risk associated with a process or an account balance. That assessment of risk in turn should guide the auditor in planning the fieldwork. Analytical tests are an indispensable tool to assess audit risk and the value of the audit evidence obtained during fieldwork through the study of plausible relationships among accounting and non accounting data.[9] As we shall discuss, AA performed analytical tests and four separate, substantive tests of transactions using statistical samples randomly generated that separately and collectively evidence a significantly lower error rate than that elicited by the Department of Agriculture's method of sampling.

**The Department of Agriculture's Sampling Method**

---

[8] 7 CFR 354.3(f)(7).

[9] SAS No. 56, Analytical Procedures (AICPA, Professional Standards, Vol 1, AU section 329).

To perform the audit, Mr. Michael Campbell divided AA's international markets into four principal sub-markets, to wit, Asia Pacific, Europe, the Caribbean and Latin America. Within those markets he then selected for each quarter purposely – and not at random – all the tickets of a flight within a route, with a known high volume of passenger traffic.[10] He proceeded to weight each region and sample equivalently. The sample flights, sample size, errors and error rates for each flight were as follows:

| Flights | Sample Size | Errors | Error Rate |
|---|---|---|---|
| Feb. 27, 2002, Flight #63 CDG-MIA | 83 | 2 | 2.41% |
| July 5, 2002 Flight # 1542 MEX-DFW | 101 | 0 | 0.00% |
| Oct. 25, 2002 Flight #780 SDQ-MIA | 115 | 10 | 8.70% |
| Dec. 18, 2002, Flight # 128 NRT-SJC | 151 | 0 | 0.00% |
| | 450 | 12 | |

Using this method, an average error rate of 2.67% resulted, for an audit assessment of $773,109. The table above indicates that the SDQ-MIA sample was 361% worse than the Paris-Miami flight that reflected an error rate of 2.41%. Once the result came in, both Mr. Monty Hobbs and Ms. Isakson of AA communicated to Mr. Campbell, that such result was not representative and that it should be looked into further.[11] Such a huge spike in the error rate as we shall demonstrate is plainly inconsistent with analytical test results, and called for further confirmation through more audit fieldwork. As the AICIPA counsels,

> "Occasionally, the sample results might not support acceptance of the recorded amount because the sample is not representative of the population, even though the sample was selected in a manner that was expected to be representative of the population. When the auditor believes the sample might not be representative of the population, he or she might <u>select additional sampling units to try to obtain a sufficiently representative sample or perform alternative procedures as an aid in determining whether the</u>

[10] In the course of a previous audit, Mr. Michael Campbell requested information on AA's 30 top international routes by passenger volume. Flights from SDQ-MIA ranked very high within these top international routes.

[11] The Department of Agriculture's report and notice of underpayment of April 28th, 2002, at page 2, states that "we understand that [AA has] agreed that the sample below is representative of the markets in which you sold applicable tickets during the audit period." That is incorrect. AA agreed to cooperate with the auditor and provide him with the samples he requested and not limit his ability and discretion to conduct his audit. However, AA did not communicate or indicate to the auditor that it was forfeiting its opportunity to then present its case using further samples if the samples and results chosen by the Department of Agriculture produced - as it did - results that were at variance with AA's collection experience.

recorded amount of the population is misstated." (Our emphasis).[12]

The Department of Agriculture conclusions were not tested against any result product of an analytical test to determine the reasonableness of the sample or results. Further, weighting of each region equally without taking into considerations each market's dynamics, size etc[13] and does not conform to generally accepted audit sampling practices.[14]

In this last regard, AICPA Audit and Accounting Guide Audit Sampling, (2002 Revised version), Section 5.27, at pg. 63-4, instructs that the misstatement should have been projected to each group separately, taking into consideration the size of the region or group and particular factors associated with operating in such group. In this case the Caribbean region is a significantly smaller, culturally, operationally different and self contained market than the Central and South American market and for that matter also Europe and Asia Pacific.

Sampling on the basis of one flight produces a "snap-shot" of collection procedures at the AA DR ticket counter at only one particular time with one set of employees during such shift. This is unrepresentative of how those procedures and the employees in charge of enforcing them actually worked throughout a wider time-line throughout the quarter or for that matter for the whole year.

In light of this limited and in our view highly unrepresentative sample, AA performed four separate tests using significantly enlarged samples to test Mr. Campbell's results.[15] The first was an analytical test that sets the stage to benchmark and assess whether the other audit tests based on sampling produced reasonable and consistent results with the internal controls in place. All four tests indicated that the system error rate arrived at using the SDQ-MIA flight sample was non-representative of the Caribbean or AA's system as a whole.

**AA's First Test – Analysis of APHIS Fee Collections**

---

[12] AICPA Audit and Accounting Guide – Audit Sampling (2002, revised version), Section 5. 30, at page 64.

[13] Mr. Campbell weighted the Caribbean region equally with the other three regions when in reality the Caribbean market represents approximately 25% of the AA's point of sales for only the Latin America and Caribbean regions combined.

[14] This also leads to statistically unreliable results. Our analysis indicates that if AA's compliance were perfect or nearly perfect everywhere except the DR and AA did not collect APHIS fees for any DR sales the amount owed by AA would only be approximately $811,000, or an overall error rate of 2.79%. Granted this is a very extreme set of circumstances but they highlight how unrealiable the statistical sampling method used by the Department of Agriculture. This is only slightly higher than the Department computed 2.67% error rate overly weighted by the statistically unrepresentative error rate of 8.70% resulting from the SDQ-MIA flight.

[15] The samples have been made part of this appeal and are presented by separate cover.

The first test was an analytical test of the overall collections of APHIS fees for 2002 vs eligible tickets.[16] For 2002 AA remitted a total of $28,218,485.10[17] in APHIS inspection fees. Per our records, the total of APHIS eligible tickets issued worldwide in 2002 were 9,193,341.

Dividing the 2002 APHIS remittance of $28,218,485.10 by $3.10 results in 9,102,737 tickets for which AA remitted system-wide. The difference between the eligible tickets vs. tickets that reflect payments is 90,603; when this figure is multiplied by $3.10, the APHIS charge produces a system-wide under-collection figure of $280,871 (rather than $773,109 reflected in the APHIS report) for an error rate of just .99%. This error rate constitutes a significant improvement from that obtained in the prior audit for the period of July 2000-December 2001 which was 1.71%. What's more, the .99% error rate for 2002 mirrors the result obtained in 2001 for the Non NRSA[18] transactions.

**AA's Second Test – Statistical Sample Number One**

Under the second method employed by AA, 1979 tickets sold in fourth quarter of 2002 throughout our world-wide system for flights departing any international market including the Dominican Republic were sampled at random.[19] Twenty errors were detected for an error rate of 1.01%, a result that again is closer to last year's error rate and contrasts markedly with the 2.67% reflected in the Department of Agriculture's APHIS report. Further, we submit that this sample error rate arrived at by AA is eminently more accurate than that employed by the Department of Agriculture when compared to the error rate obtained by performing analytical reviews conducted and discussed in the First Test.

**AA's Third Test – Statistical Sample Number Two**

Under the third test employed by AA, 1983 tickets sold in the Dominican Republic were sampled at random[20] for 4th quarter of 2002 for flights and passengers

---

16 "Eligible tickets" consist of flights originating from international locations (except Canada) to the US or from Puerto Rico to the US issued in 2002. Flights from the US Virgin Islands to Puerto Rico are also excluded.

17 The total amount remitted in 2002 includes the amounts associated with 2002 sales net of refunds as well as similar amounts related to 2001 transactions processed by AA in 2002, principally December 2001 sales. Furthermore, the total amount does not include some transactions that occurred principally in December of 2002 that were not processed by AA until 2003.

18 NRSA is the acronym for Non Revenue Space Available tickets used by employees for leisure travel.

19 The same sampling process used in the AA third test was employed to obtain the sample for the second test.

20 Consistent and pursuant to AICPA Audit sample standards, a minimal statistically valid sample size would have been approximately 150 tickets. The sample size for this test and for the remainder tests AA conducted were calculated using the same formula for determining sample size as that used by Mr.

originating in the Dominican Republic with different destinations to the United States. This method was employed to isolate and highlight any collection problems associated with the Dominican Republic travel agencies and airport ticket agents. Conceivably this would provide a broader and deeper view of the actual collection experience in the Dominican Republic. As it turned out, 83 errors were detected of this broad and large sample of 1,983 tickets that were sampled from the system, for an error rate of 3.18%. This result is significantly lower than the snapshot error rate of 8.7% arrived at by the Department of Agriculture.

**AA's Fourth Test – Statistical Sample Number Three**

Under the fourth method AA selected a sample size of 500 tickets at random[21] based on departures from the Dominican Republic in the fourth quarter of 2002. This method provides a broader and more accurate view of how the internal control procedures worked at AA's ticket counter at different times with different shifts of employees. This contrast with the approach used by the Department of Agriculture that employed one sample flight that at most would elicit a snapshot of how one particular group of employees performed their fee collection responsibilities. With this method, the number of errors detected was 2.8%, nearly three times lower than the 8.7% under the Department of Agriculture's sampling method.

**Conclusions**

The above amply demonstrates that both under analytical methods and sampling tests conducted by AA under generally accepted audit sampling practices, the error rates produced for the Dominican Republic and system-wide are significantly less than those produced by the Department of Agriculture.

We emphasize that under two separate tests of AA system-wide collection procedures resulted in statistically identical error rates of approximately 1%. In addition the remaining two other tests conducted by AA, clearly indicate that compliance with regulations associated with collections of APHIS fees in the Dominican Republic, were significantly better than the snapshot test and conclusions drawn by the Department of Agriculture.

In light of the above, AA respectfully requests that that the Department of Agriculture reconsider and set aside its notice of proposed liability notified on April 28,

---

Campbell. The formula is detailed and discussed in Johnson & Bhattacharyya, Statistics, Principles and Methods, Third, Edition 1996. For all tests AA chose a larger sample size than the minimum statistically valid sample to decrease the margin of error in the sample. The sample was produced by AA's internal audit department using a software program known from its acronym ACL, which stands for Audit Command Language a windows based product, version 7. ACL is commonly used to analyze large data populations. The samples were drawn using ACL's random sample generator from the entire APHIS eligible tickets issued in the Dominican Republic from a population of over 65,372 tickets during the fourth quarter for 2002.

[21] The minimum statistically valid sample was ~~260~~ 250 using the formula provided by Mr. Campbell.

2002 by Mr. Pierre M. Arsenec, Chief, User Fee Auditing Branch, Resource Management Systems and Evaluation Staff. Furthermore, AA requests that the Department of Agriculture adpot the AA test results establishing the undercollection to be $280,870.

Paul Salamone
Director & Sr. Tax Counsel – International
American Airline, Inc.

Tel. (817) 967-3881
E-mail: Paul.Salamone@aa.com

cc P. Arsenec

# A. KEVIN SHEA DEPOSITION
# EXHIBIT 10

June 11, 2003

Mr. Paul Salamone
Director & Sr. Tax Counsel – International
American Airlines
4333 Amon Carter Blvd., Mail Drop 5657
Fort Worth, TX 76155

Dear Mr. Salamone:

We are writing in response to your draft appeal letter dated May 21, 2003. We have reviewed your concerns and have the following observations and conclusions.

At American's request, we changed our normal audit methodology to limit our sample flights to four per year. As you know, for the AA audit we pre-select flights to ensure that we have access to all of the flight coupons on a given flight. With other carriers, we select eight flights covering a two year period. APHIS understands that by only including four flights in our sample, we were limiting the sample size and not achieving the level of sampling precision that we are normally accustomed to. However, this seemed to be the best option in light of the peculiarities present in the AA record retention system when this plan was conceived by AA.

Under the sampling scheme that AA and APHIS jointly agreed to, we identified the significant markets in which AA operates in and select prominent routes to use as the basis for our sample (i.e., SDQ-JFK). The only divergence from this methodology during the 2002 audit was the inclusion of the Tokyo to San Jose flight at the request of the INS auditor.

Accordingly, of the four tests performed by your staff, we believe that "Statistical Sample Number Three" is most closely aligned with our sampling methodology. APHIS will perform the following: 1) An on-site visit during the week of June 16, 2003, or soon thereafter, to review the methodology and sample elements to obtain concurrence on the error rate; and 2) Combine the audited error rate with the three remaining sample flights to come up with an overall error rate for the audit. Please make scheduling arrangements with the auditor, Michael Campbell.

AA needs to remit the proposed audit liability amount of $280,870.00 within ten days of this letter to avoid any interest charges. In the future, we will sample the system-wide international arrivals database, as proposed by Mr. Hobbs, assuming that we can obtain reasonable assurance that it includes all applicable sales activity. We will perform this exercise during the site visit to review "Statistical Sample Number Three."

Exhibit K
[redacted]

EXHIBIT
PENGAD 800-631-6989
10
5/16/07 abc

If you have any questions or comments, please contact Mr. Campbell at (301) 734-4796; fax (301) 734-5403 or e-mail at Michael.K.Campbell@aphis.usda.gov.

Sincerely,

Frank C. Vollmerhausen
Director
Resource Management Systems
and Evaluation Staff

Enclosure

cc:
W.J. Hudnall, MRPBS, Washington, DC (w/copy of enclosure)
D. Ford, BASE, Riverdale, MD (w/copy of enclosure)
D. Crews, MRPBS-MNPLS, Minneapolis, MN (w/copy of enclosure)

# A. KEVIN SHEA DEPOSITION
# EXHIBIT 11

August 14, 2003

Mr. Paul Salamone
Director & Sr. Tax Counsel – International
American Airlines
4333 Amon Carter Blvd., Mail Drop 5657
Fort Worth, TX 76155

Dear Mr. Salamone:

This is a follow up to our letter dated June 12, 2003, in which we determined that "Statistical Sample Number Three" as related in your May 21, 2003 letter, is most closely aligned with our sampling methodology. APHIS performed an on-site visit June 16, 2003, to obtain concurrence on the error rate through review of the methodology and sample elements employed by American Airlines (AA). Based on this analysis, we combined the audited error rate with the three remaining sample flights to come up with an overall error rate for the audit.

Mr. Hobbs and Mr. Campbell have agreed on a revised error rate of 1.05%, or a final audit liability amount of $298,298.37. We understand that AA has remitted $280,870.00 that was applied to the audit liability. AA should remit an additional $17,428.37, within 30 days of the date of this letter.

For subsequent audits, we will sample the system-wide international arrivals database, as proposed by Mr. Hobbs, assuming that we can obtain reasonable assurance that it includes all applicable sales activity. APHIS is in agreement with the AA proposal that the audit period for Federal Inspection Fee audits run through June 30th of each calendar year. Accordingly, the audit period for the next APHIS audit will cover January 2003 through June 2004.

If you have any questions or comments, please contact Mr. Campbell at (301) 734-4796; fax (301) 734-5403 or e-mail at Michael.K.Campbell@aphis.usda.gov.

Sincerely,

Frank C. Vollmerhausen
Director
Resource Management Systems
and Evaluation Staff

Exhibit L

[redacted]

Enclosure

cc: D. Crews, MRPBS-MNPLS, Minneapolis, MN (w/copy of enclosure)

PENGAD 800-631-6989
EXHIBIT
11
5/16/07

V. Financial Liability - APHIS

American Airline's Financial Liability Due to APHIS Resulting from a User Fee Audit

| QUARTER ENDED | PASSENGER LIABILITY |
|---|---|
| Mar-02 | $74,574.59 |
| Jun-02 | $74,574.59 |
| Sep-02 | $74,574.59 |
| Dec-02 | $74,574.60 |
| TOTALS | $298,298.37 |

DATE DUE: 30 days after report date.