# A. KEVIN SHEA DEPOSITION
# EXHIBIT 12

AKIN GUMP
STRAUSS HAUER & FELD LLP

Attorneys at Law

MICHAEL QUIGLEY
(202) 887-4477/Fax: (202) 887-4288
mquigley@akingump.com

BRIAN S. GLEICHER
(202) 887-4562/Fax: (202) 887-4288
bgleicher@akingump.com

October 10, 2003

Mr. Pierre M. Arsenec
Chief, User Fee Auditing Branch
Resource Management & Evaluation Staff
U.S. Department of Agriculture - APHIS
4700 River Road
Riverdale, MD 20737

Re: **American Airlines**
**Request for Refund**
**<u>Overpayments of APHIS Inspection Fees</u>**

Dear Mr. Arsenec:

We submit this letter to the Animal and Plant Health Inspection Services of the United States Department of Agriculture ("APHIS") on behalf of American Airlines ("AA") to request a refund of overpayments AA has erroneously paid APHIS for inspection fees.

## I. PROCEDURAL BACKGROUND

As discussed in detail below, APHIS is empowered to prescribe and collect fees for the cost of certain inspection services in connection with the arrival of international air passengers into the United States. Although air carriers are to collect and remit them, these fees are imposed directly upon international passengers.

Exhibit S

EXHIBIT
12
5/16/07 abr
PENGAD 800-631-6989

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Mr. Pierre M. Arsenec
Page 2
October 10, 2003

As an air carrier, AA is obliged to collect and remit inspection fees to APHIS, however, AA is not directly liable for inspection fees that it was incapable of collecting from international passengers.

APHIS conducts periodic audits of AA's collection and remittance of APHIS inspection fees. In these audits, APHIS samples AA's flights from different regional international markets. Most recently, and by way of example, APHIS conducted an annual audit of AA's collection and remittance of APHIS inspection fees for 2002.

From a sampling of flights from AA's four principal regional international markets, APHIS determined a system-wide error rate of 2.6% and a resulting deficiency of $773,109. (*See*, April 28, 2003 APHIS letter, attached hereto as Exhibit 1). AA filed an administrative appeal on May 21, 2003, challenging the assumptions and the statistical sampling method used by APHIS to determine the system-wide error rate. After considering these additional materials, APHIS concluded, based upon a revised sampling method, that AA's error rate was 1.05% and that additional inspection fees of $298,298 were due. (*See*, August 14, 2003, letter of Mr. Frank C. Vollmerhausen, attached hereto as Exhibit 2). AA paid this amount on September 26, 2003.

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Mr. Pierre M. Arsenec
Page 3
October 10, 2003

As shown in the following schedule, APHIS has made similar findings in prior examinations.

| Period of Examination | Error Rate | Audit Liability | Date Paid |
|---|---|---|---|
| October 2000 – December 2001 | 1.02% | $ 592,391.85 | March 28, 2002 |
| July 1998 – June 2000 | 0.71% | $ 299,106.51 | November 15, 2000 |
| July 1996 – June 1998 | 0.57% | $ 150,572.48 | December 7, 1998 |
| June 1994 – June 1996 | 5.72% | $1,313,382.20 | September 26, 1996 |
| May 13, 1991 – March 31, 1993 | 5.53% | $1,099,143.00 | 1993 |

As a threshold matter, the system-wide error rates which APHIS has found are, on the whole, extraordinarily low. Indeed, they demonstrate that AA has collected better than 95% of inspection fees (and since 1996, almost 99% of fees) even including circumstances in which AA is incapable of collecting. These low error rates are direct statistical evidence that AA has exercised best efforts to comply fully with its obligation to collect and remit APHIS inspection fees.

AA submits that the error rates represent, in large measure, circumstances in which AA is precluded from collecting the APHIS fees from passengers. Collection is precluded by operation of foreign law and foreign regulatory restrictions in some countries. Foreign civil, consumer,

and aviation laws deprive AA of the power to deny boarding to a foreign passenger in a foreign country for failure or refusal to pay the United States imposed APHIS inspection fee. Moreover, foreign travel agencies (through which AA sells over 80% of its passenger tickets in foreign countries) are not subject to United States law and AA has no power to compel their compliance with United States law.[1] In these circumstances, AA has paid APHIS those amounts notwithstanding AA's inability to collect the fees from passengers.

To the extent the error rate estimates and the amounts AA paid based upon the error rates include amounts which AA was not able to collect, despite its best efforts to do so, AA seeks a refund of these amounts.

## II. LEGAL AUTHORITIES

The Food, Agriculture, Conservation, and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990 (together, the "Farm Bill"), authorizes the United States Department of Agriculture ("USDA"), through APHIS, to prescribe and collect fees to cover, among others, the cost of certain inspection services provided in connection with the arrival of international air passengers.[2] Included in the various APHIS user fees is the "fee for

---

[1] *See United State v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936).
[2] *See* 21 U.S.C.S §136a(a)(1)(A)(2003).

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Mr. Pierre M. Arsenec
Page 5
October 10, 2003

inspection of international passengers."[3] Each international passenger aboard a commercial aircraft must pay an APHIS inspection fee upon arrival within the customs territory of the United States.[4] The APHIS statute states as follows:

> [T]he Secretary of Agriculture may prescribe and collect fees sufficient—(A) to cover the cost of providing agricultural quarantine and inspection services in connection with the arrival at a port in the customs territory of the United States, or the preclearance or preinspection at a site outside the custom territory of the United States, of an international passenger, commercial vessel, commercial aircraft, commercial truck, or railroad car.[5]

The APHIS statute further provides, "fees *collected* under this [section] by any person on behalf of the Secretary are held in trust for the United States and shall be remitted to the Secretary in such manner and at such times as the Secretary may prescribe."[6] (*emphasis supplied*). The statute also provides that, if a person subject to a fee fails to pay the fee when due, the Secretary has the authority to assess a late payment penalty and interest.[7]

---

[3] *See* 7 C.F.R. §354.3(f)(2003).

[4] *Id.*

[5] *See Supra* note 2.

[6] *Id.* at §136a(a)(3).

[7] *Id.* at §136a(a)(4).

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Mr. Pierre M. Arsenec
Page 6
October 10, 2003

APHIS, through regulations, imposes upon air carriers the responsibility to collect the APHIS inspection fees from the passengers on behalf of APHIS.[8] Specifically, the regulations promulgated under the APHIS user fee statute (the "Regulations") provide:

> [A]ny person who issues international airline tickets or travel documents is responsible for *collecting* the APHIS international airline passenger user fee from ticket purchasers. Issuers must *collect* the fee applicable at the time tickets are sold. In the event that ticket sellers do not collect the APHIS user fee when tickets are sold, the air carrier must *collect* the user fee from the passenger upon departure. Carriers must *collect* the fee applicable at the time of departure from the traveler."[9] (*emphasis supplied*).

The plain language of the statute and the Regulations make clear that the APHIS inspection fee is imposed directly upon international passengers. While the airline carriers have the burden of collecting fees from international passengers on behalf of the Secretary, nothing in the statute or the Regulations imposes an obligation on an air carrier to pay APHIS inspection fees it has been unable to collect from international passengers despite best efforts to do so.

---

[8] *Id.* In addition, APHIS is authorized to assess interest, penalties, and administrative costs for late payment of user fees. The collected fees are held in trust for the United States and are remitted to the Secretary of Agriculture (the "Secretary") in such manner and at such times as prescribed by the Secretary. In addition, all collected fees and any late payment penalties of accrued interest must be credited to the accounts that incur the cost and must remain available until expended without fiscal year limitation. *See* 7 C.F.R. § 354.3(a)-(f)(2003). In addition to specific authority under the Farm Bill, APHIS has authority to collect user fees pursuant to 31 U.S.C. §9701 (the User Fee Statute).

[9] *See Supra* note 3 at §354.3(f)(4)(i) (2003). The Regulations further state, "any person who issues tickets or travel documents on or after May 13, 1991, is responsible for *collecting* the APHIS user fee from all passengers transported into customs territory of the United States to whom the APHIS user fee applies." *Id.*

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law



In addressing the issue of statutory construction, the United States Supreme Court has ruled that, unless departure from a literal reading of the statute is indicated by relevant internal evidence of the statute itself, the words of statutes should be interpreted in their ordinary everyday sense.[10] Webster's New World Dictionary defines the word "collect" to mean, "to call for and receive (money) for (rent, a fund, taxes, bills, etc.)."[11] Furthermore, in *Yellow Transportation Inc., v. Michigan*, the Supreme Court, in deciding the reasonable meaning of the term "collected" in a state statute held that, "the statutory language 'collected or charged' can quite naturally be read to mean fees that a [State] *actually* collected or charged."[12] (*emphasis supplied*). In other words, the Supreme Court distinguished between fees that are *actually* collected or charged and those that are to be collected or charged.

That the Regulations do not impose secondary liability on air carriers is further supported by regulations APHIS issued in January 1992. More specifically, in response to comments on the double-billing of user fees for aircraft passenger and aircraft inspection, APHIS acknowledged that, "[a]irlines are not responsible for paying passenger fees, though they collect the fee along with the price of the ticket, taxes, and any other charges that apply, and then remit

---

[10] *Malat Et Ux v. Riddell, District Director of Internal Revenue*, 383 U.S. 569, 572 (1966).
[11] WEBSTER'S NEW WORLD DICTIONARY 274 (3d ed. 1991).
[12] *Yellow Transp. Inc. v. Michigan*, 537 U.S. 36, 45-46 (2002).

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Mr. Pierre M. Arsenec
Page 8
October 10, 2003

the APHIS user fee to APHIS."[13] The language of this notice shows that the APHIS user fee statute does not impose a direct obligation on issuers of international air tickets to pay fees that the air carriers are incapable of collecting. Indeed, secondary liability is never presumed or implied merely because a statute or regulation requires a carrier or seller of goods of services to collect a tax or fee from a passenger or buyer of services or goods.[14] Secondary liability is not assumed or implied and, when Congress wishes to impose such liability, it knows how to do so and uses clear and unequivocal language.[15]

The language of the APHIS statute is clear. It requires issuers of international air tickets to collect the APHIS inspection fee from passengers and to remit such fees to APHIS. Nothing in the APHIS statute or regulations imposes a direct obligation on issuers of international air tickets to pay APHIS inspection fees in those circumstances where it is unable to collect the APHIS fee from passengers.

---

[13] *See* 57 Fed. Reg. 755 (Jan. 9, 1992).

[14] *Air Tour Acquisition v. United States of America*, 781 F. Supp. 669 (DC Hawaii 1991).

[15] *Pinter v. Dahl*, 486 US 622, 650 (1988) ("When Congress wished to create such [secondary] liability, it has had little trouble doing so.").

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Mr. Pierre M. Arsenec
Page 9
October 10, 2003

## III. REQUEST FOR REFUND

For these reasons, on behalf of AA, we hereby respectfully request a refund of $3,752,894 for APHIS inspection fees that AA was unable to collect from passengers and that AA nevertheless paid to APHIS from its own funds.

Sincerely,

Michael Quigley

Brian S. Gleicher

cc: Paul Salamone
Director & Sr. Tax Counsel - International
American Airlines
P.O. Box 619616, MD 5656
4333 Amon Carter Blvd.
Dallas/Fort Worth Airport, TX 75261-9616

Tom Walsh
Assistant General Counsel for Regulatory and Marketing
U.S. Department of Agriculture
1400 Independence Avenue, SW
Washington, DC 20250

Frank C. Vollmorhausen
Director
Resource Management Systems & Evaluation Staff
U.S. Department of Agriculture - APHIS
4700 River Road, Unit 151
Riverdale, MD 20737

# Exhibit 1

USDA

April 28, 2003

nited States
epartment of
griculture

arketing and
egulatory
rograms

nimal and
lant Health
spection
ervice

700 River Road
iverdale, MD 20737

American Airlines
Attn: Teresa Isakson
4333 Amon Carter Blvd., Mail Drop 5657
Fort Worth, TX 76155

Dear Ms. Isakson:

Enclosed is the report of the U.S. Department of Agriculture (USDA), Animal and Plant Health Inspection Service (APHIS), user fee audit of American Airlines, which was conducted by Mr. Michael Campbell. As you know, this report includes operational findings and recommendations. I understand that Mr. Campbell discussed details of the findings and financial liability with you.

The financial liability outlined in the enclosed report does not include interest or penalties. Your company will not be charged interest for any amounts received within 30 days after the date of this audit report. For any amounts received after that date, you will be subsequently billed interest effective from the end of the quarter in which the fee was supposed to have been collected.

The liability amount on the last one page of this report should be mailed to the same address to which the quarterly payments are mailed. **Please send a copy of the last page of this report with your check.**

If you have any questions or comments, please contact Mr. Campbell at (301) 734-4796; fax (301) 734-5403 or e-mail at Michael.K.Campbell@aphis.usda.gov. The cooperation and assistance of your staff during this audit is greatly appreciated.

Sincerely,

Pierre M. Arsenec
Chief, User Fee Auditing Branch
Resource Management Systems
and Evaluation Staff

Enclosure

cc:
W.J. Hudnall, MRPBS, Washington, DC (w/copy of enclosure)
D. Ford, BASE, Riverdale, MD (w/copy of enclosure)
D. Crews, MRPBS-MNPLS, Minneapolis, MN (w/copy of enclosure)

# TABLE OF CONTENTS

I. Background .......... 1

II. Audit Objectives .......... 1

III. Audit Scope and Methods .......... 2

IV. Findings and Recommendations .......... 3

V. Financial Liability - APHIS .......... 4

## I. Background

In 1990, Congress established new user fee legislation. The Food, Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990, authorized the U.S. Department of Agriculture (USDA) through the Animal and Plant Health Inspection Service (APHIS) to collect various user fees. These fees include agricultural quarantine and inspection services provided in connection with the arrival of commercial aircraft and international passenger arrivals at ports in the Customs territory of the U.S. The Farm Bill defines the U.S. Customs territory as the 50 States, the District of Columbia, and Puerto Rico.

APHIS published a final rule in the Federal Register on April 12, 1991, requiring airlines to collect a user fee from international air passengers arriving in the U.S. Customs territory from other countries, except Canada. These fees became effective on May 13, 1991. On January 9, 1992, APHIS published a final rule requiring an inspection fee for commercial aircraft arriving in the U.S. from other countries except Canada, effective February 9, 1992. Aircraft and passengers on flights originating in Canada are excluded from APHIS fees because of a negligible agricultural health threat to U.S. agriculture.

User fees must be remitted for receipt no later than 31 days after the close of each calendar quarter in which they are collected.

American Airlines (AA) headquarters is in Dallas, TX. AA had qualifying passenger and cargo flights operating during the audit period of January 2002 through December 2002. The scheduled flight ports of entry into the U.S. are Boston (BOS), Chicago (ORD), Dallas-Fort Worth (DFW), Los Angeles (LAX), Miami (MIA), New York (JFK), Orlando (MCO), and San Juan (SJU).

AA is a wholly owned subsidiary of AMR Corporation.

For the above mentioned audit period, AA's user fee remittances for APHIS passengers and aircraft were $28,218,485.10 and $4,021,683.75, respectively.

## II. Audit Objectives

1. Evaluate internal control adequacy and reliability of user fee collections, recording, reporting, and remittance systems.

2. Determine compliance with regulations (mentioned above).

3. Develop a rapport with the payer. Provide information and advice to the payer to facilitate continued compliance.

## III. Audit Scope and Methods

The audit coverage period is January 1, 2002 through December 31, 2002. The audit was conducted in accordance with the Government Auditing Standards issued by the Comptroller General of the United States and included such tests that were deemed necessary. We tested internal controls associated with the collection, recording, reporting, and remittance systems.

To test collection compliance, we audited tickets lifted from passengers for flights involving the following city pairs, on the following dates. We understand that you have agreed that the sample below is representative of the markets in which you sold applicable tickets during the audit period.

| DATES | CITY PAIRS |
|---|---|
| 1. Feb 27, 2002 | Paris (CDG) -Miami (MIA) |
| 2. July 5, 2002 | Mexico (MEX) – Dallas (DFW) |
| 3. Oct 25, 2002 | Santo Domingo (SDQ) – New York (JFK) |
| 4. Dec 18, 2002 | Tokyo (NRT) – San Jose (SJC) |

To audit recording compliance, we traced the following tickets from the sales channels listed below to the Passenger Revenue Accounting System (PRAS).

| Issue Date | Reporting Entity | Ticket Number |
|---|---|---|
| 10/22/02 | ARC | 7308378940 |
| 10/23/02 | ARC | 7310722279 |
| 10/25/02 | ATO-SDQ | 2155787882 |
| 10/05/02 | ATO-BOS | 2155473176 |
| 10/16/02 | CTO-NYC | 2155646149 |
| 10/09/02 | CTO-SDQ | 2155537713 |
| 10/15/02 | HDQ-TBM Dallas | 2115545433 |
| 10/21/02 | BSP-Santo Domingo | 3612762676 |
| 10/19/02 | BSP-Santo Domingo | 3612733129 |

We traced employee flight coupons from the five sample flights listed above to the Non-Revenue Space Available (NRSA) database. In addition, we traced the totals from an AA generated report to the APHIS general ledger account.

To test reporting compliance, we traced monthly activity from PRAS to the general ledger.

Remittance compliance was tested by comparing remittance data to general ledger entries in the respective liability accounts.

Instances of noncompliance were used to determine an additional liability, using user fee dollars collected as the calculation basis.

The aircraft clearance fee was audited by comparing an auditee prepared schedule of landing counts by month by airport, to statistics provided by the U.S. Department of Transportation (DOT), Customs data and APHIS' remittance data.

The audit fieldwork was performed February 24 – 28, 2003, by Mr. Campbell.

APHIS retains the right to review and assess liability for unpaid user fees for this audit period if significant data, which was unavailable during the audit, is discovered subsequent to the audit.

IV. Findings and Recommendations

1. Finding: Of the 450 qualifying tickets audited for the air passenger user fee collections compliance, the number of tickets with no evidence of fee collection or remittance was 12. The associated error rate is 2.67%. The resulting amount due to APHIS is $773,109.18.

Recommendation: The additional liability amounts mentioned above should be remitted. Copies of the noncompliant tickets were given to the AA Financial Analyst so that measures can be implemented to improve collections compliance.

V. <u>Financial Liability - APHIS</u>

American Airline's Financial Liability Due to APHIS Resulting from a User Fee Audit

| QUARTER ENDED | PASSENGER LIABILITY |
|---|---|
| Mar-02 | $193.277.30 |
| Jun-02 | $193,277.30 |
| Sep-02 | $193,277.29 |
| Dec-02 | $193,277.29 |
| TOTALS | $773,109.18 |

DATE DUE: within 30 days after report issuance date.

# Exhibit 2

USDA

United States
Department of
Agriculture

Marketing and
Regulatory
Programs

Animal and
Plant Health
Inspection
Service

4700 River Road
Riverdale, MD 20737

August 14, 2003

Mr. Paul Salamone
Director & Sr. Tax Counsel – International
American Airlines
4333 Amon Carter Blvd., Mail Drop 5657
Fort Worth, TX 76155

Dear Mr. Salamone:

This is a follow up to our letter dated June 12, 2003, in which we determined that "Statistical Sample Number Three" as related in your May 21, 2003 letter, is most closely aligned with our sampling methodology. APHIS performed an on-site visit June 16, 2003, to obtain concurrence on the error rate through review of the methodology and sample elements employed by American Airlines (AA). Based on this analysis, we combined the audited error rate with the three remaining sample flights to come up with an overall error rate for the audit.

Mr. Hobbs and Mr. Campbell have agreed on a revised error rate of 1.05%, or a final audit liability amount of $298,298.37. We understand that AA has remitted $280,870.00 that was applied to the audit liability. AA should remit an additional $17,428.37, within 30 days of the date of this letter.

For subsequent audits, we will sample the system-wide international arrivals database, as proposed by Mr. Hobbs, assuming that we can obtain reasonable assurance that it includes all applicable sales activity. APHIS is in agreement with the AA proposal that the audit period for Federal Inspection Fee audits run through June 30th of each calendar year. Accordingly, the audit period for the next APHIS audit will cover January 2003 through June 2004.

If you have any questions or comments, please contact Mr. Campbell at (301) 734-4796; fax (301) 734-5403 or e-mail at Michael.K.Campbell@aphis.usda.gov.

Sincerely,

Frank C. Vollmerhausen
Director
Resource Management Systems
and Evaluation Staff

Enclosure

cc: D. Crews, MRPBS-MNPLS, Minneapolis, MN (w/copy of enclosure)

APHIS - Protecting American Agriculture
An Equal Opportunity Employer

# A. KEVIN SHEA DEPOSITION
# EXHIBIT 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC.<br><br>Plaintiff,<br><br>v.<br><br><br>THE UNITED STATES OF AMERICA,<br>Defendant. | ) | No. 04-1736C<br>(Judge Braden) |

DECLARATION OF KEVIN SHEA

I, Kevin Shea, make the following representations based upon my personal knowledge and upon facts made known to me in my capacity as an official of the Animal and Plant Health Inspection Service (APHIS) of the United States Department of Agriculture (USDA).

1. I am the Associate Administrator and Chief Operating Officer for the Animal and Plant Health Inspection Service (APHIS), United States Department of Agriculture (USDA). As Associate Administrator and Chief Operating Officer, it is my duty to ensure the smooth day-to-day functioning of APHIS. Prior to becoming Associate Administrator, I spent four years as the head of APHIS' Policy and Program Development staff (PPD). Before becoming the Director of PPD, I served as Director of APHIS' Budget and Accounting Division for eight years, following a short period of service as PPD's Assistant Director and a year practicing law at a private law firm. In addition, I worked for APHIS for ten years as a budget analyst, section head, and chief of the

EXHIBIT 13

Program Analysis Branch for the Budget and Accounting Division. Finally, I also served for three years as the Chief of the Policy Analysis and Development Staff of PPD. I am a graduate of the University of Maryland at College Park with a Bachelors degree in political science, and I earned a juris doctorate from the University of Baltimore School of Law.

2. I have reviewed the material entitled " U.S. Dep't of Agriculture, Budget Summary 2005, at http://www.usda.gov/agency/obpa/Budget-Summary/2005" and the material entitled "U.S. Dep't of Agriculture, Budget Summary 2006, at http://www.usda.gov/agency/ obpa/Budget-Summary/2006 " that American Airlines has included in its Factual Appendix for the brief it filed entitled " Plaintiff's Consolidated Brief In Opposition To Defendant's Motion To Dismiss And In Support Of Plaintiff's Motion for Partial Summary Judgment" in the case entitled American Airlines, Inc. v. the United States of America, No. 04-1736C.

3. The 2005 and 2006 budget summaries of the Department of Agriculture referenced in paragraph 2 above indicate that in addition to AQI (Agricultural Quarantine Inspection) funds generated by user fees, APHIS received $28 million in appropriated funds in 2003 and $25 million in 2004 for AQI activities; that an estimated $25 million in appropriated funds is budgeted for 2005; and that the same amount is expected in fiscal year 2006. What is not indicated in these budget summaries, however, is the important fact that these appropriated funds are earmarked solely for domestic AQI activities, along with international AQI activities that involve pedestrian and vehicle traffic entering the customs territory of the United States , which are funded solely by appropriated funds. Included in the category "domestic AQI activities" are a number of different activities. One of these is the inspection of domestic air passengers who travel from Hawaii or Puerto Rico to the mainland of the United States. In contrast, international

AQI activities regarding international air passenger inspection, whose fee collection and remittance is at issue in this litigation, are funded solely by user fees that are authorized by 21 U.S.C. § 136a. International AQI air passenger inspections are a separate and distinct category of activities from the aforementioned activities that are funded by appropriated funds. Since October 1, 2002, APHIS' international air passenger AQI activities have not been tied in any manner to the appropriation of funds, and since that time, APHIS has received no appropriated funds for any activities involving AQI for international air passengers.

4. APHIS first proposed regulations for international passenger AQI user fees and their collection on February 27,1991 (56 Fed. Reg. 8148), and subsequently finalized and implemented the regulations on May 13, 1991 ( 56 Fed. Reg. 14837 ).

6. Since APHIS implemented the international passenger regulations, currently set forth in 7 C.F.R. § 354.3(f), it has performed six audits of American Airlines to determine whether American has complied with APHIS' statute (21 U.S.C. § 136a) and regulations (7 C.F.R. § 354.3(f)) which require airlines to collect and remit a fee from every international passenger who arrives aboard a commercial aircraft at a port of entry in the United States or who is preinspected for agricultural safety purposes outside the customs territory of the United States prior to arriving at a port of entry, subject only to the exemptions in 7 C.F.R .§ 354.3(f)(2). These six audits were performed beginning in July through August 1993, and thereafter in 1996, 1998, 2000, 2002, and 2003, respectively.

7. It was not until October 10, 2003, when American sent a letter to an APHIS official - over 12 years after the international inspection fee regulations had been implemented, over 10 years after the first audit had been conducted of American, and after payment in full had been

made to resolve six audits conducted of it - that American claimed in a letter to APHIS, a true and correct copy of which is enclosed, that a refund of the money it had paid to resolve the six audits should be made to it because: 1) the audit amounts paid allegedly represented international passenger inspection fees that American had not been able to collect but nevertheless paid APHIS notwithstanding its alleged inability to collect such fees; and 2) nothing in APHIS' statute ( 21 U.S.C. 136a) or its regulations imposed an obligation on an air carrier to pay international passenger inspection fees it had been unable to collect from international passengers. Def. App. 324-350 ( Exh. S) Further, it was not until American filed this lawsuit that APHIS learned that American considered the money it paid to resolve audits various audits to have been " illegally exacted "from it.

8. If APHIS had been informed of American's position long ago, in a timely manner when it should have been, that it was not responsible for remitting to APHIS international passenger fees it "allegedly" could not collect because a passenger refused to pay the fee and/or because a foreign country prohibited American from assessing and collecting the fee, it would have considered and assessed this position, and would have included in its auditing procedures the requesting of documentation from American that substantiated its assertions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of May, 2005 in Washington, D.C.

Kevin Shea

Kevin Shea