# BARBARA BLESSING DEPOSITION
# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., Plaintiff, | ) | No. 04-1736C (Judge Braden) |
| v. | ) | |
| THE UNITED STATES, Defendant. | ) | |

## DECLARATION OF BARBARA BLESSING

I, Barbara Blessing, hereby declare as follows:

1. I am over the age of 18 years and competent to testify to the following facts, of which I have personal knowledge.

2. I am currently employed by the Department of Homeland Security, Bureau of Immigration and Customs Enforcement ("ICE") as Acting Director, Office of Financial Management.

3. I formerly worked for the Department of Justice, Immigration and Naturalization Service ("INS"), where I served as the Director of the Compliance Division in the Office of Financial Management from around April 2000 thru September 2003; however, I was detailed to U.S. Customs and Border Protection ("CBP") from September 2003 until February 2004 to assist with the transition of the airline review program. In my capacity as Director of the Compliance Division, I was delegated the authority from the INS Director, Office of Financial Management, to determine the amount that would be necessary for an airline to pay in order to satisfy a finding of audit liability. As part of this delegated authority, I was authorized to consider appeals from an airline as well as reduce or increase a finding of liability based on the information presented to me from an airline. In addition, the letters that our office sent out to the airlines prior to conducting the review (e.g., see Attached Exhibit A) were authorized under the delegation to our office and represented INS's official position concerning the purpose of the reviews.

4. In my capacity as Director of the Compliance Division, I was responsible for supervising the INS auditors, who would regularly conduct reviews of the airline industry for compliance

DEPOSITION EXHIBIT Blessing #1 5/15/07

with user fee regulations. In particular, I supervised Eugene Schulman, an INS auditor ("the auditor").

5. While I was Director, Mr. Schulman conducted three reviews of American Airlines under my supervision: the first on September 18-22, 2000, for the period covering July 1, 1998, thru June 30, 2000; the second on January 14-18, 2002, for the period covering July 1, 2000, thru December 31, 2001; and, the third on March 10-14, 2003, for the period covering January 1, 2002, thru December 31, 2002.

6. The purpose of each of the three reviews I supervised was threefold: 1) to evaluate internal control adequacy and reliability regarding user fee collections, recording, reporting, and remitting of fee systems; 2) to determine the company's compliance with the INS regulations implementing user fee collections from international passengers arriving into the United States; and, 3) to provide information and advice to facilitate the airlines' continued compliance with the regulations. While evaluating the airline's compliance with the regulations, our office would make findings of additional liability where an airline failed to remit all the user fees required by law to be collected. <u>See</u> Attached Exhibit A, p.4

7. For the three reviews that I supervised, the review procedure and methodology were generally the same. Mr. Schulman would work with American Airlines ahead of time to select a group of flights that accurately reflected American's typical flight schedules. Then, once beginning the review, the auditor would request documentation from specific flights within the agreed-upon group to show that American paid the user fee for each qualifying ticket on the selected flight. Those tickets that did not show payment of the user fee were considered "potential errors."

8. The auditor would then ask American to show other documentation to prove if, in fact, the user fee was paid for each potential error. For those tickets where fee payment could be shown through documentation or where the ticket was shown to have been exempt from payment of the fee, the potential error was clarified and struck from the list. A typical way that American would use to show that the fee had been paid was to refer the auditor to the miscellaneous tax portion of the ticket, which would have been sufficient to cover all necessary taxes as well as the immigration user fee for that particular ticket.

9. For those potential errors where no documentation was produced to demonstrate payment or no exemption had been sought for that ticket, the potential error became an "error." Next, an "error rate" was calculated by taking the number of errors and dividing it by the number of qualifying tickets in the sample that had been reviewed. This error rate was then extrapolated to the entire population of qualifying tickets for the given period of time and any additional liability was determined.

10. The sampling methodology outlined above in paragraphs 7-9 was developed in collaboration with the airline industry in approximately 1997, before I took over the airline review program. It is my understanding that American participated in the development of this methodology. In addition, while I was the program director, American Airlines participated in the INS User Fee Advisory Board, which regularly met to address issues concerning user fees. Never once during any meeting of the Advisory Board or during any of the reviews I supervised did American Airlines offer any objection to the methodology of the user fee reviews (prior to the stratification issue raised during the review covering 2002).

11. Moreover, during the review covering the period of January 1, 2002, thru December 31, 2002, our office recognized that for one selected flight originating from Santo Domingo, Dominican Republic, American had an unusually high number of errors. Our office considered the number of errors on this flight to be anomalous and requested an explanation from American. In response, American asserted that the Dominican Republic, as well as seven other Central and South American countries, had laws that prohibited American from collecting the user fee; however, American did not produce any evidence that such laws existed. Nevertheless, we accepted this explanation based mostly on the assertion by American but also because we had anecdotal information suggesting that such collection problems might occur in some countries. We thus attempted to craft a solution to prevent extrapolating the errors from the Santo Domingo flight across the entire pool of flights.

12. American first requested that the Santo Domingo flight be struck entirely from the review list. We indicated that this was an unacceptable resolution. Instead, we offered to conduct a full review of flights for the review period instead of the sampling methodology. This would have prevented the Santo Domingo flight ticket errors from being extrapolated to the entire pool of qualifying tickets. However, American rejected

this offer. Instead, American asked that we substitute a different flight for the selected Santo Domingo flight. This too was an unacceptable solution as far as our office was concerned. Once our office had uncovered errors on a flight, we would not pretend to not have known of such errors. Then, our office and American worked together to achieve a solution.

13. As a compromise, our office agreed to stratify the qualifying tickets from the region that American had asserted prohibited them from collecting the user fee at the time of ticketing, i.e., Dominican Republic and seven other South and Central American countries. Through stratification, the error rate from the South and Central American pool of flights would only be extrapolated to the total number of qualifying tickets from those countries. The error rate from all other flights would be extrapolated to the remaining international qualifying tickets. Ultimately, the stratification benefited American because had the errors from the Central and South American region been extrapolated to the entire population of qualifying tickets, American's liability would have increased. In addition, American representatives participated in the development of this stratification procedure, accepting it as a reasonable approach.

14. When my office stated in the Report of Compliance for the review period of January 1, 2002, thru December 31, 2002, that "[t]he above 8 [South and Central American] countries were grouped together, since those countries prohibited ticket agents from collecting user fees/taxes for foreign countries at the time of ticket sale," this statement was not intended to represent the legal position of the federal government on this subject. Our office did not consult with government counsel to confirm the assertion regarding the laws of other countries made by American. Nor did our office intend to make a legal conclusion about the state of the law in other countries. Rather, when agreeing to stratify, we simply were relying on the representations made to us by American, our own observations about the higher than usual error rate for the Santo Domingo flight, and anecdotal information about these types of collection problems.

15. In addition, our office worked with American Airlines to alter how we conducted reviews to accommodate American's recordkeeping system. As we were informed by American, American only had access to the previous nine months of records regarding tickets. This was based upon recent alterations to their financial and storage systems. Rather than making American go

back and pull tickets that were more than nine months old at great cost to them (as they informed us), we requested tickets each quarter from a flight we would select. This prevented American from having to access records that would be difficult to locate and still permitted the auditor to select a representative sample of flights. In fact, the auditor would even notify American of a flight to be reviewed before the flight had taken place. Thus, American could have initiated a remediation plan before any problem had even occurred.

16. There were even occasions when our office accommodated American concerning employee pleasure travel. During the review covering July 1, 2000, thru December 31, 2001, and the review covering January 1, 2002, thru December 31, 2002, our office could have made a finding of liability against American because they were unable to substantiate proper payment. Instead, we worked with American and provided it with an opportunity to self-correct their accounting procedures.

17. The Ernst and Young report referenced in Mr. Hobbs' Declaration, in Paragraph 9, was a different kind of audit than the review conducted by my office. The Ernst and Young report was simply designed to ensure that the funds on the general ledger were properly accounted for. It did not evaluate whether all the funds that should have been collected were in fact collected. See Attached Exhibit B. The Ernst and Young report, if provided at all, was of very little use for assisting the goals of our reviews.

18. During my supervision of the American Airlines reviews, I attended several meetings concerning the reviews, in person and by conference call, with American Airlines employees, including Monty Hobbs and his predecessor, John Parente. Never once during any of those meetings did American indicate that it had submitted information about passengers who had refused to pay the user fee, as required by 8 C.F.R. § 286.4(c).

19. Furthermore, in my supervision of each of the three reviews, I would have been made aware by Mr. Schulman if American had presented information about passengers who refused to pay the user fee, in accordance with 8 C.F.R. § 286.4(c). As far as I am aware, American has never submitted any such information about passengers who refused to pay the user fee in accordance with 8 C.F.R. § 286.4(c).

20. If American had submitted such information about passengers either during the review itself or to the INS Debt

Management Center along with its quarterly user fee collection remittances, INS would have followed its normal business practice. The Debt Management Center would have contacted the individual passenger to determine the reason for refusal to pay the user fee and would have pursued collection of the fee. If a passenger indicated that he or she had not refused to pay the fee or if the passenger indicated that the airline had not requested that the passenger pay the fee, INS would have sought additional information and/or payment from the airline.

21. If a passenger had, in fact, refused to pay and the information about that passenger had been submitted to INS by the airline as required by 8 C.F.R. § 286.4(c), then our office during a review would have checked the name of the passenger against the list of passengers with potential errors and removed that ticket, if it appeared, from the list of potential errors. In essence, if there a was a ticket that INS could verify that the passenger refused to pay the fee and the airline had provided INS with notice of the refusal, as required by 8 C.F.R. § 286.4(c), then our office would treat such a ticket as one for which the airline would not be required to remit the user fee.

22. In preparing this declaration, I was unable to review the INS Debt Management Center records or INS Compliance Division audits along with their support papers relating to airline user fees, which are now in the custody of U.S. Customs and Border Protection.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 25th day of May, 2005.

Barbara Blessing

Barbara Blessing

U.S. Department of Justice
Immigration and Naturalization Service

80/6.4

*Office of Financial Management*

*425 I Street NW*
*Washington, DC 20536*

August 22, 2000

John E. Parente, Director, State and Local Taxes
American Airlines
P.O Box 619616
Dallas/Fort Worth Airport, Texas 75261-9616

Dear Mr. Parente:

This letter confirms that the U.S. Department of Justice, Immigration and Naturalization Service (INS) will conduct a review of INS user fee collections of American Airlines for the inspection of the passengers arriving into the United States. The review will cover the period from July 1, 1998 through June 30, 2000. INS will perform a joint review of your carrier with the Department of Agriculture (USDA) and the Department of Treasury Customs Service. INS will prepare its own review report after the review is completed. The review will be performed in your office between September 18-22, 2000.

INS participated in conference phone calls on July 25 and August 3, 2000, along with USDA's representatives and your staff members to finalize sampling methodology related to sample flights and employee pleasure travel. On August 3, 2000, conference representatives from the Federal Government (INS, USDA, and Customs) and American Airlines finalized a flight sampling plan which consisted of eight (8) core flights for the three government entities with an additional two sample flights for Customs and one additional sample flight for INS. The reason for additional sample flights for INS and Customs are related to their agency's "user fee regulations" which differ slightly from the user fee regulations at USDA.

The objective of the review is threefold: 1) to evaluate internal control adequacy and reliability of user fee collections, recording, reporting and remitting systems; 2) to determine the company's compliance with the INS regulations implementing user fee collections from international passengers arriving into the United States; and, 3) to provide information and advice to facilitate your continued compliance with these regulations.

The information requested below should be provided to the INS review team upon their

arrival at your office on Monday, September 18, 2000 in order to facilitate the review process and minimize interruptions to your day-to-day operation. Please have the following information available.

1. Flight manifests, facsimiles of flight coupon TCN images, General Declaration, the statistics sheet completed by the captain, the airport agent post ticketing collection reports and all lifted tickets from the passengers for these arriving flights into the U.S. at each of the following airports, on the following randomly selected dates:

| FLIGHT DATE | REGION | CITY PAIR | USDA | CUSTOMS | INS |
|---|---|---|---|---|---|
| | | | (Applicable is "X") | | |
| Jan. 26, 2000 | Europe | LHR-JFK | X | X | X |
| Feb. 5, 2000 | Central America | SJO-MIA | X | X | X |
| March 15, 2000 | Caribbean | NAS-MIA | X | X | X |
| April 25, 2000 | South America | CCS-MIA | X | X | X |
| May 2, 2000 | Caribbean | SDQ-JFK | X | X | X |
| June 22, 2000 | South America | EZE-MIA | X | X | X |
| July 18, 2000 | Central America | MEX-DFW | X | X | X |
| August 3, 2000 | Caribbean | PAP-MIA | X | X | X |
| May 10, 2000 | South America | BOG-MIA | | X (Customs, ONLY) | |
| March 1, 2000 | Europe | LHR-ORD | | X (Customs, ONLY) | |
| June 5, 2000 | Canada | YYZ-ORD | | | X (INS, ONLY) |

NOTES: LHR=London, England; JFK=New York, NY; SJO=San Jose, Costa Rica; MIA=Miami, Florida; NAS=Nassau, Bahamas; CCS=Caracus, Venezuela; SDQ=Santo Domingo, Dominion Republic; EZE=Buenos Aires, Argentina; MEX=Mexico City, Mexico; DFW=Dallas-Fort Worth, Texas; PAP=Port of Prince, Haita; BOG=Botoga, Columbia; ORD=Chicago O'hare, Illinois; and YYZ=Toronto, Canada

2. The auditor coupons and sales reports for the following Airline Reporting Corporation (ARC) period: At the August 3, 2000 conference call, participants agreed to use Eugene Schulman's Omega written ARC ticket #001-7778103157-3 issued March 30, 2000 for travel from Trinidad and Tobago to Miami. Note: Please validate the Bank that processed the ticket.

| Year | Bank | Month | Week | Cycle |
|---|---|---|---|---|
| 2000 | 5 (if correct) | 3 | 4 | 4 |

3. As discussed, on the August3, 2000, conference call between USDA, INS and your airline, Eugene Schulman, INS staff member, and Michael Campbell, USDA staff member,

promised to coordinate American Airline tickets to be used for tracing sales reports to the appropriate agency user fee general ledger liability account(s). Michael Campbell provided the airport ticket office (ATO), city ticket office (CTO), and BSP to be used in this review. Please provide the representative sales reports that relate to these tickets: Dallas ATO ( AA Advantage Hotline) ticket number # 001-2102038310-5 dated February 25, 2000; the Milan CTO for ticket number #001-2168418521-0 dated April 13, 2000; and the Guatemala BSP ticket # 001-3379976905 dated July 20, 2000. Note: the AA Advantage ticket will be used as part of the walk-through.

4. A report of international charter flights/block ticket sales on scheduled/charter flights into the United States and territories for the review period. Include dates, passenger counts, and full itineraries. Please provide documentation of charter flight contracts that will indicate which entity is responsible for remitting INS user fees.

5. Flight statistics reports by airport (airport landing counts, including charter flights), date, and total passenger count for the review period (July 1998 thru June 30, 2000) for flights arriving to U.S. and territories only. Provide the book of codes which explain the codes found on the schedules.

6. Copies of the DOT Form T-100 filings to the U.S. Department of Transportation (DOT) for the review period (from January 1, 2000 through August 31, 2000). Be prepared to demonstrate how the numbers reported to DOT are determined and the parties responsible for reporting.

7. Copies of Code-sharing agreements/alliances and interline billing by usage type for the review period. As agreed at the conference call on August 3, 2000, American Airlines will provide "Other Airline Log (OAL)" information to reconcile American Airline flights for nine months (December 1999 thru August 2000).

8. Full User fee remittance history to INS and APHIS for the review period and the supporting documents used for determining the amount due to INS. This should include summary sales reports by month which reflect fees collected for INS Inspection User Fees. Also, please provide summary sales reports and associated general ledger account reflecting the same month's activity for the ARC, ATO, BSP, and/or telephone sales office (AA Advantage Hotline) identified in #2 and #3 above) for calendar year 2000 in February, March, April, and July.

9. American Airlines annual reports covering the review period (one report already provided).

10. Copies of the general ledger showing where and how INS user fee liability is posted for the review period from July 1, 1998 thru June 30, 2000. Include any necessary documentation needed to trace the total user fee dollars from the sales report in #2 and #3 above to the general ledger accounts.

11. As discussed at the July 25 and August 3, 2000 conference calls American Airlines does not currently participate in contracts whereby student consolidator agencies issue their own ticket stock for transportation on American airlines with destination of the United States by month and travel agent for the review period. If this situation changes at the time of the review, please advise.

12. A report of all infants/lap-children transported where tickets were not issued. This should include the process and policies regarding non-revenue lap children with a demonstration of how the carrier reports, collects and remits fees to the INS. for the review period. Specific data demonstrating any non-revenue infants on the sample flights should be provided with the sample.

13. Copies of internal audits and financial statement reports performed on the subject of ticket sales and various governmental user fees and taxes collected.

14. Copies of internal procedures for compiling and remitting the INS IUF liability. This should also include the processes and procedures used to record, collect, and report INS user fees for frequent flyers, employee business travel, internet sales, and E-tickets.

15. For employee pleasure travel, we will perform a separate ticket sample to ensure compliance for the review period. We will trace the INS user fees on the tickets to the appropriate General Ledger user fee liability account. We will select at least 281 tickets from your NRA employee travel system that captures applicable (INS user fees for qualifying flights into U.S. and its territories) employee pleasure travel (active and retired employees). Prior to the review, we will test employee pleasure travel tickets by requesting your programmers to produce four (4) separate daily listings (one middle of the week flight) for calendar 1999. We will review the sample daily employee pleasure travel runs. If the test data is deemed sufficient for sample testing, we will notify you of our sample results prior to the September 18-22, 2000 on-site review. Kindly, inform INS when the test data has been produced.

As mentioned, the review will cover the period from July 1, 1998 through June 30, 2000. *INS agreed in the conference calls to review sample flights for the period January through August 2000 since, American Airlines indicated their accounting system could not produce flight itineraries more than nine months old (to explain sample ticket exceptions found in the review).* ***However, INS retains the right to review and assess liability on areas of partial, sporadic or non-remittance of the IUF fee for a period of the past six years. In reviewing your data, if you find such a situation, alert the review team so that they can work with your staff in resolution of the issues.*** For the air passenger user fee, the lifted tickets from the sample selected will be audited. Any noncompliance rate resulting from auditing the sample of tickets will be extrapolated over the 24-month review period (July 1, 1998 thru June 30, 2000). The remittance history will be used as the basis for any additional assessment.

Please call Mr. Schulman by September 1, 2000 ,to discuss the status of the compilation of the above information. If you have any additional questions or need additional information, please do not hesitate to call Mr. Schulman at voice: (202) 616-9177; fax: 202-514-7860; and E-Mail on "Eugene.M.Schulman@usdoj.gov".

Sincerely,

Barbara A. Blessing, Director
Compliance Division
Office of Financial Management

U.S. Department of Justice
Immigration and Naturalization Service

80/6.4

*Office of Financial Management*

*425 I Street NW*
*Washington, DC 20536*

November 28, 2000

John E. Parente
Director, State and Local Taxes
American Airlines
P.O. Box 619616
Dallas Fort Worth Airport, TX 75261-9616

Dear Mr. Parente:

Attached is the Immigration and Naturalization Services (INS) report on our review of American Airlines compliance with Immigration User Fees (IUF) regulations between July 1, 1998 and June 30, 2000. This report includes operational observations and an assessment of the liability due to INS. Details of the findings and financial liability were discussed with you and your staff at the exit conference and in subsequent discussions as audit items were closed.

The financial liability finding of $412,855 does not include interest or penalties. Your firm will not be charged interest for any amounts received by INS within thirty (30) days from the date of this letter. For any amount received after that date, you subsequently will be billed interest effective from the end of the quarter in which the overdue fees should have been remitted.

Remittances of the amount due INS may be made by wire transfer or check in U.S. dollars. Check must be payable to the U.S. Immigration and Naturalization Service. To ensure proper handling and crediting of your remittance, we ask that you include the INS account number, 93963, and your taxpayer identification number on your check, which should be sent as follows:

By U.S. Postal Service:

U.S. Immigration and Naturalization Service
c/o Bank One
P.O. Box 93963
Chicago, IL 60673-3963

By Express Mail Center:

U.S. Immigration and Naturalization Service
c/o Bank One
INS Account Number 93963
525 West Monroe Street
7th Floor Mail Room
Chicago, IL 60661

If you remit your fee by wire transfer, Bank One requires the information below in order to process the transfer.

Bank One's bank routing number: 071000013
INS electronic account number: 1115146

Billing and payment questions should be addressed to Lois Jarvis of the Debt Management Center, at 802-872-6206. The INS team greatly appreciates the cooperation and assistance that your staff provided us during this review.

Sincerely,

Barbara A. Blessing, Director
Compliance Division
Office of Financial Management

Attachment

# Review of IUF Remittances
# by
# AMERICAN AIRLINES
# between
# July 1, 1998 and JUNE 30, 2000

*Reviewed September 18-22, 2000*

## Contents


1. Background........................................1

2. Review Objectives..............................2

3. Scope and Methods.............................2

4. Observations......................................5

5. IUF Liability.......................................6

# 1. Background

## A. INS User Fees

In 1986, the U.S. Congress passed the Omnibus Appropriation Bill (PL 99-500 and PL 99-591), which permits the U.S. Immigration and Naturalization Service (INS) to collect inspection user fees (IUF). These fees offset the cost of inspecting incoming passengers at U.S. Ports of Entry to ensure that they are admissible to the United States. On December 20, 1993, the user fee was established at $6.00 per passenger.

## B. AMERICAN AIRLINES

American Airlines (AMR) is a major United States airline whose corporate headquarters is in Fort Worth, Texas. American Airlines is one of the largest scheduled passenger airlines in the world. According to the November 2000 Yahoo finance web site profile, this carrier operates its own scheduled service to more than 169 cities throughout North America, the Caribbean, Latin America, Europe, and the Pacific. Its internet web site is: http://www.amrcorp.com. American Airlines had 111,600 employees as of December 31, 1999 (AMR Corporation Annual Report 1999). According to its 1999 Annual Report, American and its AMR Eagle subsidiary owned 549 airlines and leased 276 others.

AMR Eagle Holding Corporation (AMR Eagle) is the holding company for American Airlines. AMR Eagle, a wholly owned subsidiary of AMR, owns three regional airlines that operate as American Eagle: American Eagle Airlines, Inc,, Executive Airlines, Inc., and Business express Airlines, Inc. These carriers provide connecting service from American Airlines U.S. major/smaller markets to Canada, Bahamas, and the Caribbean. Also, American Airlines provided charter passenger services to these entities during the review period: Club Med Sales and Princess Cruise Lines (INS user fees to be paid by Club Med Sales and Princess Cruise Lines); Bush/Capital South; Miami Dolphins; Dallas Cowboys; Canadian Masters; Gators Basketball; A.Porter Travel; and Airline Brokers Co. AMR's operating revenues at the end of December 1999 were $17,730 million. American Airlines remitted $116,668,942 in INS IUF for the review period from July 1, 1998 through June 30, 2000.

American Airlines participates in the global network with other international airline partners called the "Oneworld Partnership." Its major strategic alliance partners under the "Oneworld Partnership" are British Airways, Cathay Pacific, Finnair, Iberia, Qantas, Aer Lingus and LanChile. Codeshare partners include: Air Pacific; Asiana Airlines; Canadian Airlines; China Eastern Airlines; Eva Air; Finnair; Grupo Taca; Gulf Air; Hawaiian Airlines; Iberia; Japan Airlines; LOT Polish Airlines; LanChile; Qantas Airways; Sabena; Swissair; and TAM Airlines.

## 2. Review Objectives

A. Evaluate the reliability of user fee **collection, recording, reporting, and remittance systems.**

B. Determine compliance with IUF regulations cited above.

C. Provide information and advice to the carrier to facilitate continued compliance.

## 3. Scope and Methods

### A. Review Period

The review covered the period between July 1, 1998 and June 30, 2000 and was performed in American Airlines' headquarters in Fort Worth, Texas, during the week of September 18 to September 22, 2000. During the period reviewed, American Airlines remitted **$116,668,942** in inspection user fees to INS. The review was performed jointly with the United States Department of Agriculture which will issue a separate review report to the carrier.

### B. Methods

American Airlines remits IUF based on ticket sales; however, INS user fee liability is accrued in the accounting month as a sales reporting stream. Tickets are processed from various sales channels (Airline Reporting Corporation, Billing and Settlement Plan, Airline City/Airport Ticket Office, etc.). The "PATH" database contains all sales sources (automated and manual). The ticket's imaged information is contained in the database and ticket summary information is retrieved from the databases (tables) by Ticket Control Number (TCN). American Airlines' revenue system aggregates sales transactions by sublevel codes such as: Q2 (Tax PFC PRAS Feeder-INS user fees ); C5 (Passenger Revenue Accounting-charters); and F3 (NRSA Feeder-Employee Pleasure Travel).

The integrity of the revenue database flows from the sales channels to the revenue database/subledgers then to the General Ledger accrual liability account (2040-200,General Ledger Immigration User fees). INS verified the carrier's processes for collecting, recording, reporting, and remitting IUF.

**Reporting and Remitting:** INS traced dollar remittances from for the period July 1, 1998 to June 30, 2000 from the American Airlines' General Ledger collections through deposits to the American Airlines' INS user fee liability account to payments to INS. American Airlines confirmed that their accounting month is the first to last day of the month, and reports are produced by the 8th working day of the month following the

accounting month.

**Recording:** INS traced auditor coupons from carrier sale channels to the corresponding report batch summary for these sales channels: Airline Reporting Corporation (ARC); Airport Ticket Office (ATO); City Ticket Office (CTO); and Billing and Settlement Plan (BSP).

| REPORTS | DATE | TICKET # | Bank/Month/Cycle | Traced |
|---|---|---|---|---|
| ARC | 4/1/2000 | 001777810357 | 5,3,4,4 | YES |
| ATO DALLAS | 2/25/2000 | 0012102038310 | Not Applicable | YES |
| CTO Milan | 4/13/2000 | 0012168418521 | Not Applicable | YES |
| BSP Guatemala | 7/20/2000 | 0013379976905 | Not Applicable | YES |

American Airlines indicated that they receive four (4) electronic feeds from ARC and BSP each week. The data goes into a sales stream and then into their financial revenue system. Further, sales data that comes into ARC as "ZZ" is sampled each month. Typically, 60-65 tickets are sampled and the sampling provides the tax average per user fee applied against the "ZZ" total for the month. American Airlines' independent accounting firm, Ernst and Young, approved this sampling method.

American Airlines indicated that the INS user fee @ $6 per trip to the U.S. are hard coded into their revenue database system. Consequently, this carrier adjusts underages/overages to provide the correct user fees for its accrual to the INS user fee liability account.

As concerns BSPs, these sales reporting information are received at American Airlines via tape/manual input to the "PATH" database system. INS verified that the full amount of XY taxes collected was remitted including the difference due to currency conversion.

The INS representative found many exception tickets/facsimiles in the sample flights which indicated no evidence of the INS XY code on the ticket. However, American Airlines provided an audit trail through its revenue ledger screen print that verified the capture and recordation by sales date of INS IUF fees for tickets that did not originally, specify the XY codes on the face of the ticket(s).

**Collection:** INS audited tickets lifted from passengers for 9 randomly selected flights which were statistically representative of American Airlines' flight population for the review period. INS agreed during the review to substitute a September 15, 2000, sample flight in place of a similar flight dated June 5, 2000 (The flight was from Toronto, Canada to Chicago, Illinois.). Also, American Airlines produced ticket images for sample flight uplifted coupons derived from their Auditors Coupon Facsimile automated

system. According to American Airlines, each sample flight ticket information was provided from the facsimile.

Where the system indicated no ticket image was available, American Airlines queried the system to produce a sample of ticket images for the sample flights selected. Actual coupons were not lifted from the passenger where the electronic flight coupon machine was utilized. Alternatively, when manual coupons were lifted, those manual coupons were submitted to the Juarez, Mexico office for key entry.

Prior to the review, American Airlines indicated that the carrier had constraints to produce only a nine-month archive history of ticket images for completed flights. Consequently, INS agreed with American Airlines to sample tickets for flights which were completed in calendar year 2000. However, INS and the airline's representative agreed to apply the error rate computed for the 9 flights against the total carrier remittances for the period (July 1, 1998 to June 30, 2000).

Additionally, the INS representative reviewed American Airlines process and procedures used to record, collect, and report INS user fees for frequent flyers, employee business (exempt)/pleasure travel (payroll), infants/lap-children, internet sales, E-tickets, and charter sales.

American Airlines indicated that they provide a ticket for each passenger, whether those passengers are revenue/non-revenue. Children under 2 years of age are considered non-revenue passengers.

American Airlines indicated that all employees' pleasure travel is recorded monthly and posted to the General Ledger separately (ledger code F3, NRSA Feeder). INS will address this issue in the "observation" section of the report.

American Airlines does follow the procedures set forth in 8 Code of Federal Regulations, Section 286.5(e) of the INS User Fee regulation. This section states that each U.S.based remitter, which retains an independent accountant and which remits $10,000 or more in fees in any one calendar quarter, shall submit to the INS Associate Commisioner, Finance a report from the independent accountant, an accompanying Statement of INS Immigration User Fees Collected and Remitted for the *each* year ended. American Airlines provided an independent report for the year ended December 31, 1999.

The INS representatives confirmed that American Airlines did not contract with Student Consolidator Agencies for those agencies to issue tickets (using the consolidator ticket stock #000). Instead, American Airlines accepts Student Consolidator Agency travel business using ARC tickets which cite the American Airlines ticket numbers.

In order to confirm the accuracy of American Airlines' DOT Form T-100 flight statistics, the INS review team compared them to U.S. Customs Service ECARS and

U.S.D.A. APHIS PAX from July 1, 1998 to June 30, 2000. Sample data also compared to INS Inspection data and confirmed to flight count. American Airlines indicated that the source of the T-100 data was from American Airlines' flight statistics (revenue only). American Airlines separately, validates flight statistical information using two reports: General Declaration Forms from each flight and the monthly summary totals for all flights completed (flight statistics).

## 4. OBSERVATIONS:

### A. Error Rate on Sampled Flights

Of the 1177 sampled tickets that qualified for INS inspection user fees, American Airlines failed to collect IUF, or failed to allocate collected user fees to the proper authority, on 4 tickets or .34% (less than 1 percent). This error rate was applied to the American Airlines' INS user fee remittances of $116,668,942 for the review period. The outstanding IUF liability for ticket errors results in an additional liability of **$397,844** (see Exhibit 1).

### B. EMPLOYEE PLEASURE TRAVEL for JUNE 2000

For purposes of closing this review report, American Airlines and INS agreed to extrapolate the unpaid employee pleasure ticket sales/passes over the review period. INS reviewed the June 2000 employee pleasure travel sample listing provided by American Airlines and found exceptions (no evidence of user fees recorded) for 126 tickets/passes. The employee pleasure travel population for the June 2000 monthly reporting period was 18,026 items which computed to an error rate of .00698 % (less than 1%). Conversely, American Airlines paid 99.302% of all INS user fees related to employee pleasure travel for the review period. The American Airlines INS sub-ledger totals for booking employee pleasure travel computed to $2,135,682 (for the 24 review period months). The resultant IUF that should have been paid computed to $2,150,693. Therefore, American Airlines would have underpaid the INS user fees related to employee pleasure travel sales during the review period of **$15,011**.

### C. POTENTIAL FINDING

Section 286.6 of the IUF requires carriers to maintain records for a period of two years from the date of fee collection. American Airlines current financial systems retains data for a nine month period, historically. Although other records potentially exist, American Airlines has indicated it would be overly cumbersome to obtain data from those files for purposes of Ins reviews. Given that, for this review, INS agreed to reduce the sample data to the nine month period for purposes of this review. For future reviews, INS proposed to American Airlines to move to annual reviews, with quarterly sample pulls of selected flights.

A very collaborative conversation held during the review period indicated that American Airlines was open to this, and American Airlines' personnel provided a draft methodology process for future reviews. This methodology would more clearly meet the spirit of the Immigration laws, while collaborating with American Airlines to not cause overly burdensome review activities. Initial conversations seem to indicate that this is an acceptable process to consider, thus, INS will continue dialog with American Airlines after this review in preparation for the FY01 review. Thus, as a result of this finding, INS recommends American Airlines meet the requirements of the INS legislation, and in order to aid them in this process, INS will offer alternatives for enactment of the legislative requirements. There is no financial liability assessed in this area.

5. **IUF liability**

| | | |
|---|---|---|
| A. | **Sample Flight Liability:** | **$397,844.00** |
| B. | **Employee Pleasure Liability:** | **$ 15,011.00** |
| C. | **Potential Finding:** | **NO DOLLAR AMOUNT** |

TOTAL ADDITIONAL IUF LIABILITY: **$ 412,855.00**

Exhibit 1

## AMERICAN AIRLINES
## IUF Liability Calculation
(Principal Only)

| | |
|---|---|
| Sampled qualifying tickets | 1,177 |
| IUF not collected | 4 |
| Error rate | 0.34% |

| Year | Months | Reported PAX | IUF Remitted | Audited PAX | IUF Due | IUF Outstanding |
|---|---|---|---|---|---|---|
| 1998 | Jul-Aug | 1,419,859 | 8,519,151 | 1,424,700 | 8,548,202 | 29,051 |
| | Sep | 723,490 | 4,340,940 | 725,957 | 4,355,743 | 14,803 |
| | Oct-Dec | 2,062,726 | 12,376,357 | 2,069,760 | 12,418,561 | 42,204 |
| 1999 | Jan-Mar | 2,486,598 | 14,919,589 | 2,495,078 | 14,970,466 | 50,877 |
| | Apr-Jun | 2,522,840 | 15,137,038 | 2,531,443 | 15,188,656 | 51,618 |
| | Jul-Aug | 1,747,524 | 10,485,145 | 1,753,483 | 10,520,900 | 35,755 |
| | Sep | 837,407 | 5,024,439 | 840,262 | 5,041,573 | 17,134 |
| | Oct-Dec | 2,221,230 | 13,327,379 | 2,228,804 | 13,372,826 | 45,447 |
| 2000 | Jan-Mar | 2,659,404 | 15,956,426 | 2,668,473 | 16,010,836 | 54,410 |
| | Apr-Jun | 2,763,746 | 16,582,478 | 2,773,171 | 16,639,023 | 56,545 |
| Total | | 19,444,823 | $116,668,942 | 19,511,131 | $117,066,786 | $397,844 |
| TOTAL EMPLOYEE PLEASURE TRAVEL | | | | | | $15,011.00 |
| GRAND TOTAL ADDITIONAL IUF LIABILITY | | | | | | $412,855.00 |

U.S. Department of Justice
Immigration and Naturalization Service

80/6.4

*425 I Street NW*
*Washington, DC 20536*

January 8, 2002

John Parente, Director, State and Local Taxes
**ATTN: Cheri Pennington**
**American Airlines**
PO BOX 6196
DFW Airport
Dallas, TX

Dear Mr. Parente:

This letter confirms that the U.S. Department of Justice, Immigration and Naturalization Service (INS), will conduct a compliance review of the INS Inspection User Fee (IUF) collections by American Airlines for the inspection of the passengers arriving into the United States. The review will cover the period from July 1, 2000 through December 31, 2001, and will be performed at your office in Dallas, TX from January 14-18, 2002. Eugene Schulman and Cheri Pennington discussed the specific requirements for the review in telephone conversations which took place during the months of September to December 2001. This letter includes final changes based on E-Mail communication from American Airlines to INS as of Friday, January 4, 2002.

Although INS will be conducting the review separately from USDA, representatives of the two government agencies coordinated the documentation requirements (sample flights, employee pleasure travel documentation, and walk-through tickets) with Cheri Pennington of your office. INS representatives Eugene Schulman and Shirley Harrison will perform the review.

The objectives of this review are threefold:

1) to evaluate internal control adequacy and reliability of user fee collections, recording, reporting and remitting systems;
2) to determine the company's compliance with the INS regulations implementing user fee collections from international passengers arriving into the United States; and,
3) to provide information and advice to facilitate your continued compliance with these regulations.

The information requested below should be provided to the INS review team upon their arrival at your offices on January 14, 2002 in order to facilitate the review process and minimize

Blessing Exh. A

interruptions to your day-to-day operation. Please have the following information available. Failure to provide the requested data may contribute to additional error findings, resulting in greater liability for the company. Thus, it is imperative that you compile the necessary data before the audit date.

1. Flight manifests, General Declaration, the statistics sheet completed by the captain, the load factor sheets, the airport agent post ticketing collection reports, and any other reports that will validate flight loads. Be prepared to validate the actual data that is the basis of your remittance process, with number of sales and passenger count on the flights. This will be in comparison with your General Ledger and passenger counts supporting either sales or counts used for remittance, DOT reporting and INS and other government data on passengers transported. We ask that you query your operational database for the number of passengers and crew by date, flight number and location. If interline data is available, it will also be helpful in determining IUF remittance responsibility with regard to tickets you sold.

2. Pull all lifted tickets from the passengers for the first arriving flight into the U.S. at each of the following airports, on the following randomly selected dates. These selected dates were agreed upon in telephone conversations from December 2000 to December 2001 between Cheri Pennington and Eugene Schulman. INS agreed that four sample flights would be used to cover the review period from July 1, 2000 to December 31, 2001. As of December 14, 2001, three sample flights with complete audited coupons, manifests, etc. have been received at INS. The fourth flight dated December 14, 2001 from Toronto, Canada to St. Louis, MO, will be documented by American Airlines and will be available for the review. This latter flight was formerly operated by Trans World Airlines, now a wholly owned subsidiary of American Airlines.

| FLIGHT DATE | DEPARTING AIRPORT | ARRIVING AIRPORT |
|---|---|---|
| (NOTE: INS has the flight data for the first three flights. | | |
| April 24, 2001 | Mexico City, Mexico | Dallas (DFW) |
| July 2, 2001 | Lima, Peru | Miami (MIA) |
| December 15, 2000 | Frankfurt, Germany | DRW |
| December 14, 2001 | Toronto, Canada | St. Louis |

3. For purposes of walk-through INS has identified these tickets for review and tracing to the respective sales channel and then to the revenue system general ledger accrual liability accounts:

| SALES CHANNEL | TICKET NUMBER | ISSUE DATE | FLIGHT |
|---|---|---|---|
| Account Reporting Corp. (ARC) | 001-7166834938-6 | March 23, 2001 | MEX-DFW |
| City Ticket Office (CTO) | 001-2177584871-4 | June 26, 2001 | LIM-MIA |
| Airport Ticket Office (ATO) | 001-2177615035-5 | June 27, 2001 | LIM-MIA |
| ATO | 001-3462601575 | February 10, 2001 | MEX-DFW |
| Bank Settlement Plan (BSP) | 001-3312486815 | June 30, 2001 | LIM-MIA |
| BSP | 001-3312472760 | June 22, 2001 | LIM-MIA |
| BSP | 001-3462544312 | February 12, 2001 | MEX-DFW |

4. A report of international charter flights/block ticket sales on scheduled/charter flights into the United States and territories for the review period. Include dates, passenger counts, and full itineraries. Please provide documentation of charter flight contracts that will indicate which entity is responsible for remitting INS user fees.

5. Flight statistics reports by airport (airport landing counts, including charter flights), date and total passenger count for the review period for flights arriving to U.S. and territories only. Provide the book of codes that explain the codes found on the schedules.

6. Copies of the T-100 data filings to U.S. Department of Transportation (DOT) for the review period. Be prepared to demonstrate how the numbers reported to DOT are determined and the parties responsible for reporting. Also, a listing of all flights under 50 passengers that were excluded from the DOT-100 reporting requirement.

7. Copies of Code- sharing agreements/alliances for the review period.

8. Full User fee remittance history to INS for the review period and the supporting documents used for determining the amount due to INS, including summary sales reports by month that reflects fees collected for INS Inspection User Fees. Also, include copies of internal procedures for compiling and remitting the INS IUF liability. This should also include the processes and procedures used to record, collect, and report INS user fees for frequent flyers, employee business pleasure travel, internet sales, E-tickets and any other sales method.

9. Company annual reports covering the review period. Copies of internal audits and financial statement reports performed on the subject of ticket sales and various governmental user fees and taxes collected.

10. Copies of the general ledger showing where and how INS user fee liability is posted. Include any necessary documentation needed to trace the total user fee dollars from the sales report in #2 and #3 above to the general ledger accounts. Also, American Airlines has indicated that this carrier does not utilize student travel agencies (blue tickets). Student Travel Agencies sell ARC and BSP tickets just like U.S. and international travel agencies which sell airline tickets for American Airlines.

11. A report of all infants transported where tickets were not issued. This should include the process and policies regarding non-revenue lap children with a demonstration of how the carrier reports, collects and remits fees to the INS for the review period. Specific data demonstrating any non-revenue infants on the sample flights should be provided with the sample.

12. Please include the methodology for computing/allocating user fees from the suspense codes (ZZ and XT, etc.).

13. For employee pleasure travel, we will perform a separate ticket sample for the period July 1-31, 2001 to ensure compliance for the review period. We will trace INS user fees on the tickets/passes to the appropriate general ledger liability feeder account (F3, last review). We will select at least 281 tickets from your NRSA Tax Audit database. For the previous INS review, your NRSA produced over 19,000 employee pleasure usage entries (regular seats and jumpseats) for the month of June 2000. INS initially identified 126 exceptions to be reviewed by your carrier. American Airline subsequently validated all but 8 ticket exceptions. The criteria for the database sort should be all employees whom traveled on pleasure from outside the U.S. to U.S. ports and territories. Please note that travel from Mexico and Canada to U.S. ports and territories (include Guam, San Juan) have fees. INS will provide a page from the previous NRSA Tax Audit for your information.

As mentioned, the review will cover the period from July 1, 2000 through December 31, 2001. However, INS retains the right to review and assess liability on areas of partial, sporadic or non-remittance of the IUF fee for a period of the past six years. In reviewing your data, if you find such a situation, alert the review team so that they can work with your staff in resolution of the issues. For the air passenger user fee, the lifted tickets from the sample selected will be audited. Any noncompliance rate resulting from auditing the sample of tickets will be extrapolated over the 18month review period. The remittance history will be used as the basis for any additional liability assessment.

You will be given a copy of audit exceptions and be able to provide additional information which may clear that exception. It is expected that all paperwork regarding exceptions will be received by our staff within two weeks after the exit interview to receive consideration.

INS is authorized by Federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to assess and collect interest and penalty amounts, in addition to principal on debts owed to the INS. The final audit report will identify principal amounts owed for the Immigration User Fee. The INS Debt Management Center (DMC) located in Williston, Vermont, will determine if interest and penalty amounts are due on Immigration User Fees collected by the carrier but not remitted. Interest and penalties will be computed back to the period when the fees should have been remitted and the carrier will be invoiced by DMC for these amounts after the issuance of the final audit report. Audit liability amounts attributable to errors (such as those found by sampling during the audit process) will not be subject to interest and penalty, unless they remain unpaid for 30 days following the date of the audit report.

If you have any additional questions or need additional information, please do not hesitate to call Eugene Schulman on 202-616-9177. E-Mail should be sent to eugene.m.schulman@usdoj.gov and geneschulman@aol.com.

Sincerely,

Barbara Blessing, Director
Compliance Section
Office of Financial Management

U.S. Department of Justice
Immigration and Naturalization Service

80/6.4

*Office of Financial Management*

*425 I Street NW*
*Washington, DC 20536*

May 3, 2002

John Parente, Director, State and Local Taxes
ATTN: Cheri Pennington
American Airlines
PO Bos 6196
DFW Airport
Dallas, TX

Dear: Mr. Parente

Attached is the Immigration and Naturalization Services (INS) report on our review of American Airlines' compliance with Immigration User Fees (IUF) regulations between July 1, 2000 to December 31, 2001 . This report includes operational observations and an assessment of the liability due to INS. Details of the findings and financial liability were discussed with you at the exit conference and subsequent.

The financial liability finding of $160.878 does not include interest or penalties.

Of the total liability:. Your firm will not be charged interest for $160,878 of the liability amount, if received by INS within thirty (30) days from the date of this letter. As notified in our initial letter, audit liability amounts attributable to errors (such as those found by sampling during the audit process) will not be subject to interest and penalty, unless they remain unpaid for 30 days following the date of this audit report. For any amount received after that date, you subsequently will be billed interest effective from the end of the quarter in which the overdue fees should have been remitted.

Remittances of the amount due INS may be made by wire transfer or check in U.S. dollars. Check must be payable to the U.S. Immigration and Naturalization Service. To ensure proper handling and crediting of your remittance, we ask that you include the INS account number, 93963, and your taxpayer identification number on your check, which should be sent as follows:

By U.S. Postal Service:

U.S. Immigration and Naturalization Service
c/o Bank One
P.O. Box 93963
Chicago, IL 60673-3963

By Express Mail Center:

U.S. Immigration and Naturalization Service
c/o Bank One
INS Account Number 93963
525 West Monroe Street
7th Floor Mail Room
Chicago, IL 60661

If you remit your fee by wire transfer, Bank One requires the information below in order to process the transfer. Your company is responsible for any wire fees, please include them with any payment via this method.

Bank One's bank routing number: 071000013
INS electronic account number: 1115146

Billing and payment questions should be addressed to Cheri Deschamps of the Debt Management Center, at 802-872-6200 extension 3061. The INS team greatly appreciates the cooperation and assistance that your staff provided us during this review.

Sincerely,

Barbara A. Blessing, Director
Compliance Division
Office of Financial Management

Attachment

**U.S. Department of Justice**
*Immigration and Naturalization Service*

# Immigration User Fee Remittance

# Report of Compliance

# On

# *AMERICAN AIRLINES*

Review Period
July 1, 2000 to December 31, 2001

Review Dates:

January 14-18, 2002

# INS Review of User Fees Remittances

By
Eugene Schulman and Shirley Harrison

## American Airlines

Review Period:
July 1, 2000 to December 31, 2001

Dates of Review:
January 14-18, 2002

U.S. Department of Justice
Immigration and Naturalization Service

# TABLE OF CONTENTS

Page

1. BACKGROUND ....................1
 a. INS User Fees ....................1
 b. American Airlines ....................1
  - Company Information
  - Company Profile
  - Website (www.aa.com) on the World Wide Web
 c. Transworld Airlines/TWA LLC ....................2

2. REVIEW OBJECTIVES ....................2

3. SCOPE AND METHODS ....................3
 a. Review Period ....................3
 b. Methods ....................3

4. OBSERVATIONS AND FINDINGS ....................6
 a. Error Rate on Sampled Flight Coupons ....................6
 b. Employee Pleasure Travel ....................6

5. IUF LIABILITY ....................7

EXHIBIT 1: IUF Liability Calculations ....................8

## 1. Background

### a. INS User Fees

In 1986, the U.S. Congress passed the Omnibus Appropriation Bill (PL 99-500 and PL 99-591), which permits the U.S. Immigration and Naturalization Service (INS) to collect inspection user fees (IUF). These fees offset the cost of inspecting incoming passengers at U.S. Ports of Entry to ensure that they are admissible to the United States. On December 20, 1993, the user fee was established at $6.00 per passenger.

### b. AMERICAN AIRLINES

American Airlines (AMR) is a major United States airline whose corporate headquarters is in Fort Worth, Texas. American Airlines is one of the largest scheduled airlines in the world. According to the April 2002 Yahoo finance website profile, AMR which includes substantial assets of Trans World Airlines (TWA) as of December 2, 2001, provides scheduled jet service to more than 161 destinations throughout North America, the Caribbean, Latin America, Europe, and the Pacific. Its internet website is "http://www.aa.com." American Airlines had 122,820 employees as of the last reported count. According to its March 31, 2002 quarterly report, American Airlines and its American Eagle subsidiary had 852 airplanes (owned/leased) which included: Airbus A300-600R: Boeing 717, 727, 737, 757, 767, and 777, series: Fokker, McDonnell Douglas; ATR; Bombardier; Embraer, Super ATR, and Saab.

AMR Eagle, a wholly owned subsidiary of AMR, owns three regional airlines that operate as American Eagle: American Eagle Airline, Inc, Executive Airlines, Inc., and Business Express Airlines, Inc. These carriers provide connecting service from American Airlines U.S. major/smaller markets to Canada, Bahamas, and the Caribbean.

Also, American Airlines provided charter passenger services to these entities during the review period: ABC; Club Med; and the Dallas Stars professional sport team. AMR's operating revenues for the three months ending March 31, 2002, were $4.14 billion with a net loss of $575 million.

American Airlines participates in the global network with other international airlines called the "Oneworld Partnership." Its major strategic alliance partners under the partnership include: British Airways, Cathay Pacific, Finnair, Iberia, Qantas, Aer Lingus, and Lan Chile. Its codeshare partners include: Air Pacific, Asiana Airlines, China Eastern Airlines, Eva Air, Finnair, Grupo Taca, Gulf Air, Hawaiian Airlines, Japan Airlines, LOT Polish Airlines, Swissair, and TAM Airlines.

c. TRANSWORLD AIRLINES and TWA LLC

On April 9, 2001, American Airlines, Inc. (a wholly owned subsidiary of AMR) purchased substantially all of the assets and assumed certain liabilities of Trans World Airlines, Inc. (TWA). American Airlines included the operating results of TWA in its March 31, 2002 financial reports. The Department of Transportation approved the transfer of passenger certificates from Trans World Airlines, Inc. to American Airlines and its subsidiary, TWA Airlines LLC. On December 2, 2001, TWA counters and gates were combined with American Airlines; American Airline ticket numbers were issued in place of TWA ticket numbers.

INS had made numerous attempts to review the carrier, TWA LLC (Tax ID: 752923767) which existed from April 9, 2001 until November 30, 2001 before its full consolidation into American Airlines. The INS representative attempted to review the TWA LLC accounting documents to support user fee remittances to INS either before or during this American Airline user fee review. INS was not able to perform a user fee review of TWA LLC due to person resource constraints at the new TWA LLC. Substantially, all the accounting/financial supervisory personnel had left the old TWA (bankrupt) and were not available to provide the resources required to assist INS to complete the review. According to INS deposit information for TWA LLC, this entity remitted $1,536,424 in user fees mostly from April 2001 through December 2001.

TWA (ID: 43-1145889) remitted $5,228,724 in INS user fees since December 1999 (last INS review) for the reporting period from April 2000 through September 2001. On January 10, 2001, TWA announced it had reached agreement with American Airlines to sell its airline assets and 20,000 employees, 190 aircraft, and 800 daily flights.

## 2. Review Objectives

a. Evaluate the adequacy and reliability of IUF internal controls, collections, recording, reporting, and remittance systems.

b. Determine compliance with IUF regulations.

c. Provide information and advice to the carrier to facilitate continued compliance.

## 3. Scope and Methods

### a. Review Period

The review covered the period between July 1, 2000 through December 31, 2001 and was performed at the airline's office in Dallas, TX, between January 14-18, 2002, by Eugene Schulman and Shirley Harrison.. During the period reviewed, American Airlines remitted/accrued $89,599,828 (September to December 31, 2001 was not due until January 31, 2002), in inspection user fees to INS.

### b. Methods

INS reviewed the internal procedures and controls associated with **collecting, recording, reporting and remitting** INS user fees.

American Airlines remits IUF based on ticket sales; however, INS user fee liability is accrued in the accounting month as sales report stream of tickets is processed from various sales channels (Airline Reporting Corporation, Billing and Settlement Plan, Airline/City Ticket Office, etc.). The "PATH" database contains all sales sources (automated and manual). The tickets image information is contained in the database and ticket summary information is retrieved from the databases (tables) by Ticket Number.

The revenue system aggregates sales transactions by sublevel codes such as : Q2 (Tax PFC PRAS Feeder-INS user fees); C5(Passenger RevenueAccounting-charters); and F3 (NRSA feeder-Employee Pleasure Travel). The integrity of the revenue database flows from the sales channels to the revenue database/subledgers then to the General Ledger accrual liability account 2040-200, General Ledger Immigration User Fees). INS verified the carrier's processes for collecting, recording, reporting, and remitting IUF.

As in the review for the period July 1, 1998 to June 30, 2000 which was done in September 2000, INS performed a separate review of American Airlines' "Employee Pleasure Travel". This area will be addressed in the OBSERVATIONS and FINDINGS area of this report.

INS traced the dollar remittances for the period July 1, 2000 to December 31, 2001 from the American Airlines' General Ledger collections through deposits to the American Airlines' INS user fee liability account to payments to INS. American Airlines confirmed that their accounting month is the first to last day of the month, and reports are produced by the 8th working day following the accounting month.

The INS representatives reviewed the passenger arrivals and/or remittances submitted to the USDA and CUSTOMS (through June 30, 2001 available at the time of the review). However, the Department of Transportation's DOT report for U.S. segment

arrivals (revenue only) was found to be not reliable, so this report could not be used to analyze the American Airlines' passenger arrival totals for the period.

INS further traced auditor coupons from carrier sale channels to the corresponding report batch summary for these sales channels: Airline Reporting Corporation (ARC); Airport Ticket Office (ATO); City Ticket Office (CTO); and Billing and Settlement Plan (BSP).

| REPORTS | ISSUE DATE | TICKET # | TRACED/FLIGHT |
|---|---|---|---|
| ARC | 3-23-2001 | 001-7166834938 | YES/MEX-DFW |
| CTO | 6-26-2001 | 001-2177584871 | YES/LIM-MIA |
| ATO | 6-27-2001<br>2-10-2001 | 001-2177615035<br>001-3462601575 | YES/LIM-MIA<br>YES/MEX-DFW |
| BSP | 6-30-2001<br>6-22-2001<br>2-12-2001 | 001-3312486815<br>001-3312472760<br>001-3462544312 | YES/LIM-MIA<br>YES/LIM-MIA<br>YES/MEX-DFW |

As in the INS review report for the period ending June 30, 2000 which was performed in September 2001, American Airlines indicated that their auditors sample 60-65 tickets per month to determine the proper allocation of taxes/user fees for ARC tickets that have a ZZ field totals for the month. Ernst and Young approved this sampling method. Futher, American Airlines indicated that the carrier adjusts underages/overages to provide the correct user fees for its accrual to the INS user fee liability account. As relates to BSPs, the carrier indicated that it receives tape submissions during the month which update the PATH revenue database system.

The INS representatives found a few exception tickets/facsimiles in the five (5) sample flights which indicated no evidence of the INS XY code on the ticket(s). However, American Airlines provided an audit trail through its revenue ledger screen print that verified the capture and recordation by sales date of INS IUF fees for tickets that did not originally, specify the codes on the face of the ticket(s).

INS audited tickets lifted from passengers for 5 randomly selected flights which were statistically representative of American Airlines' flight population for the review period. The sample flights were the following: December 15, 2000 from Frankfurt, Germany to Dallas, TX with 211 qualifying tickets and one (1) final exception; March 23, 2001 from Mexico to Miami, FL with 59 qualifying tickets and no exceptions; July 2, 2001 from Lima, Peru to Miami, FL with 221 qualifying tickets and no exceptions; December 14, 2001 from Toronto, Canada to St. Louis, MO (a former TWA flight now part of the American Airlines system) which had only 13

qualifying tickets and no exceptions; and a December 28, 2001 flight from Puerto Plata, to JFK which had 44 qualifying tickets and no exceptions.

Section 286.6 of the IUF requires carriers to maintain records for a period of two years from the date of fee collection. American Airlines' current financial system retains data for a nine month period, historically. Although other records potentially exist, American had indicated in September 2000 it would be overly cumbersome to obtain data from those files for purpose of INS audits. Consequently, INS agreed to perform annual reviews of American Airlines in September 2000 and would use quarterly sample pulls of selected flights. INS would continue to monitor and evaluate the results of completing annual audits of this carrier. It should be noted that INS received the first American Airline quarterly sample flight for the next review in April 2002.

The INS representatives reviewed American Airlines processes and procedures used to record, collect, and report INS user fees for frequent flyers, employee business (exempt)/pleasure travel (payroll/check payment for retired personnel), infants/lap-children, internet sales, E-tickets, and charter sales. The INS representatives traced the recordation of user fees to the appropriate general ledger account for American Airline's charter sales.

American Airlines indicated and the INS representatives confirmed through sample ticket results that the carrier provided a ticket for each passenger, whether those passengers are revenue/non-revenue. Children under 2 years of age that do not occupy a seat are considered non-revenue passengers.

INS performed a separate sample of American Airlines' employee pleasure travel (NRSA Feeder) for the period July 1-31, 2001, to ensure compliance for the review period. We selected a random sample of over 279 entries out of a database of over 35,000 entries and had American Airline provide validation for a small number of the sample entries which indicated that the $6 XY INS user fee was collected from the employee and posted to the representative INS general ledger account (2040-200). American Airlines was able to provide documentation to trace from one sample ticket number to the representative employee (purchaser) through NRSA system for the employee work number payroll deduction transaction (includes XY user fee) to the batch summary total recapping like monthly employee pleasure purchase ticket transactions for GL INS user fee account (2040-200).

American Airlines does follow the procedures set forth in 8 Code of Federal Regulations, Section 286.5(e) of the INS User Fee regulation. This section states that each U.S. based remitter, which retains an independent accountant and which remits $10,000 or more in fees in any one calendar quarter, shall submit to the INS Associate Commissioner, Finance a report from the independent accountant, an accompanying Statement of INS immigration User Fees Collected and remitted for each year ended. American Airlines provided an independent report for the year ended December 31, 2000.

The INS representatives confirmed that American Airlines did not contract with any student consolidator agencies for those agencies to issue tickets (using the consolidator ticket

stock #000). Instead, American Airlines accepts student consolidator agency travel business using ARC and/or BSP tickets which cite the American Airlines ticket numbers.

In order to confirm the accuracy of American Airlines' DOT Form T-100 flight statistics, the INS review team representatives compared them to the U.S. Treasury's Customs Service ECARS and U.S.D.A. PAX from July 1, 2000 to December 31, 2001. The ECAR data and U.S.D.A equivalent PAX data was analyzed and compared favorably with the remittances by American Airlines for the review period (July 1, 1999 through August 31, 2001 was remitted before the review in January 2002). However, the DOT data was not accurate for monthly aggregate PAX totals. INS representatives have discussed this data report summary with DOT. The INS representatives received a second summary transmission of American Airlines DOT segment data at the end of March 2002; however, this segment data was still not considered reliable as the monthly PAX totals of incoming arrivals to the U.S. was excessive for the review period. INS will work with DOT (will work with American Airlines) to resolve the data provided in the report.

## 4. OBSERVATIONS AND FINDINGS

### A. ERROR RATE ON SAMPLED FLIGHTS

Of the 545 sampled tickets that qualified for INS inspection user fees, American Airlines failed to collect IUF, or failed to allocate collected user fees to the proper authority, on one (1) ticket or 0.18% (less than 1 percent). This error rate was applied to the American Airlines remittances/accrued liability (September to December 31, 2001) of $87,520,875 for the review period. The outstanding IUF liability for ticket error results in an additional liability of $160,878 (see Exhibit 1). The basis for the American Airline remittances for sample ticket liability was adjusted downward to take out the applicable remittances for the period related to the employee pleasure travel.

### B. EMPLOYEE PLEASURE TRAVEL FOR JULY 2001

INS did not have a monetary liability finding resulting from its review of American Airlines employee pleasure travel database for travel collections coded in the NRSA system database for July 2001. However, the original NRSA database file was rather large and contained database entries for travel from/to U.S. ports for July 2001. The database contained in excess of 35,000 transactions when less than half were for U.S. arrival travel. INS had to sort and resort the database to work with it. Additionally, after INS selected a sample for validation (280 entries), American Airlines had a difficult time providing the supporting documentation for all but a few of the selected entries. INS and American Airlines will need to discuss the methodology for future review of the employee pleasure travel database to ensure that American Airline collections for user fees from active employees/retired employees are in compliance with INS user fee regulations.

5. IUF LIABILITY

| | |
|---|---|
| SAMPLE FLIGHT LIABILITY: | $160,878 |
| TOTAL ADDITIONAL IUF LIABILITY: | <u>$160,878</u> |

## AMERICAN AIRLINES
## IUF Liability Calculation
## (Principal Only)

Exhibit 1

| | |
|---|---|
| Sampled qualifying tickets | 545 |
| IUF not collected | 1 |
| Error rate | 0.18% |

| Year | Months | Reported PAX | IUF Remitted | AUDITED PAX | IUF DUE | IUF OUTSTAND |
|---|---|---|---|---|---|---|
| 2000 | Jul-Aug | 1,740,517 | $10,443,100 | 1,743,641 | $10,461,845 | $18,745 |
| | Sep | 904,999 | 5,429,995 | 906,624 | 5,439,742 | 9,747 |
| | Oct-Dec | 2,451,803 | 14,746,819 | 2,262,215 | 14,773,294 | 26,475 |
| 2001 | Jan-Mar | 2,615,455 | 15,692,728 | 2,620,150 | 15,720,899 | 28,171 |
| | Apr-Jun | 2,883,684 | 17,302,102 | 2,888,861 | 17,333,170 | 31,068 |
| | Jul-Aug | 1,928,548 | 11,571,229 | 1,932,001 | 11,592,003 | 20,774 |
| | Sep | 511,227 | 3,067,364 | 512,146 | 3,072,878 | 5,514 |
| | Oct-Dec | 1,891,082 | 11,346,491 | 1,894,479 | 11,366,875 | 20,384 |
| Total | | 14,927,315 | $89,599,828 | 14,960,117 | $89,760,706 | $160,878 |

Note: TOTAL REMITTED INCLUDES EMPLOYEE PLEASURE PAX
SAMPLING LIABILITY TOTAL REMITTED/ACCRUED July 2000 -Dec.2001: $87,520,875
At above 0.18 % error rate, recomputation of ticket liability is $87,681,753
SAMPLING LIABILITY: $87,681,753 minus paid/accrued $87,520,875 equals: $160,878

U.S. Department of Justice
Immigration and Naturalization Service

*Office of Financial Management*
*425 I Street NW*
*Washington, DC 20536*

February 28, 2003

American Airlines
Mr. Monty Hobbs
ATTN: Ms. Christi While
P.O. Box 619616
Dallas/Fort Worth Airport
Texas 75261-9616

Dear Mr. Hobbs:

This letter confirms that the U.S. Department of Justice, Immigration and Naturalization Service (INS), will conduct a compliance review of the INS Inspection User Fee (IUF) and the U.S. Customs Passenger Processing Fee (PPF) collections by American Airlines for the inspection of passengers arriving into the United States. The review will cover the period from January 1, 2002 through December 31, 2002, and will be performed at your office in Dallas, TX from March 10 through March 14, 2003, by Eugene Schulman and Shirley Harrison, INS.

The objective of this review is threefold:

1) evaluate internal control adequacy and reliability of user fee collections, recording, reporting and remitting systems;
2) determine the company's compliance with regulations implementing user fee collections from international passengers arriving into the United States; and,
3) to provide information and advice to facilitate your continued compliance with these regulations.

The review will concentrate on validation of all funds due to the INS and Customs for the review period. To that end, the company must disclose the full number of sales and passengers transported where the user fee applies. The review will validate:

- the quarterly reports submitted by the company to the financial records of the company
- those reports and records to the manifest reporting process by the company
- the reports provided to DOT and remittances to each agency
- the amount or number of interline, code share, charter, etc. passengers and
- the number of inspections conducted by the government

We expect that the American Airlines will be able to validate its sales, transported passengers, net interline and code share sales, charters or any other entity involved in the fee

collection process. In addition, American Airlines will be expected to disclose all sales entities that support its financial records, including subsidiaries. Below we request a variety of information intended to allow us to validate American Airlines' activity with regard to inspection fees. We expect to work in cooperation with you and your staff, and if you are aware of more appropriate information to conduct this review, we request that you supply it.

The information requested below should be provided to the INS review team upon their arrival at your offices on the first day of the review in order to facilitate the review process and minimize interruptions to your day-to-day operation. Failure to provide the requested data may contribute to additional error findings, resulting in greater liability for the company. Thus, it is imperative that you compile the necessary data before the audit date.

1. Flight manifests, passenger statistic sheets, APIS, and/or any other reports that will validate passenger load by flight. Be prepared to validate the actual data that is the basis of your remittance process, with number of sales and passenger count on the flights. We ask that you query your operational database for the number of passengers and crew by date, flight number and location. If interline data is available, it will also be helpful in determining fee remittance responsibility for passenger loads.

   Where possible, select random flights utilizing ECAR or DOT as a guide to flights and locations to ensure that the sample will have enough qualifying tickets and reduce having to add flights or have a small ticket level. Use specific flight numbers where possible. When not possible, use the following paragraph, change as needed

   Pull all lifted tickets from the passengers for the first arriving flight into the U.S. at each of the following airports, on the following randomly selected dates. These selected dates were agreed upon in your a series of E-Mails and telephone conversations between August 2002 to January 2003 between yourself and your staff member, Christi White, with Eugene Schulman, INS.

   Note: As of January 16, 2003 the first three flights tickets images have been provided to Eugene Schulman, INS. INS had reviewed the first two sample flights and requested validation on October 11, 2002 for a number of tickets. While, American Airlines provided validation/feedback on December 13, 2002, most of the tickets (in question), a few ticket validations remain. for the first few flights. INS will review the third flight ticket images and combine additional questions from the first two flights with the third flight tickets which require further validation/clarifications.) As of the week ending January 31, 2003, American Airlines sent the remaining three sample flights to INS.

| FLIGHT ARRIVAL DATE | | DEPARTURE/ARRIVAL IN U.S. | |
|---|---|---|---|
| February 27, 2002 | #63 | Paris (CDG) to Miami (MIA) | XY+1 |
| July 5, 2002 | #1542 | Mexico City (MEX) to Dallas (DFW) | XY+1 |
| October 25, 2002 | #180 | Santo Domingo (SDQ) to New York (JFK)FLT | XY |
| December 18, 2002 | #128 | Narita, Japan to San Jose, CA | XY0 |
| December 23, 2002 | #4308 | Ottawa to Chicago (ORD) | XY |
| December 23, 2002 | #5117 | Aruba to San Juan | |

2. Ticket histories from the XY and YC (same as XA) tax databases for the following tickets, as well as sub-totals per sales source booked during the reporting period:

| Issue Date | Reporting Entity | Ticket Number |
|---|---|---|
| 10/22/02 | ARC | 7308378940 |
| 10/23/02 | ARC | 7310722279 |
| 10/25/02 | ATO-SDQ | 2155787882 |
| 10/05/02 | ATO-BOS | 2155473176 |
| 10/16/02 | CTO-NYC | 2155646149 |
| 10/21/02 | BSP-Santo Domingo | 3612762676 |
| 10/19/02 | BSP-Santo Domingo | 3612733129 |

3. A report generated from the NRSA database supporting the journal entry for the month of October 2002 that lists origin-destination information for travel into the U.S. and its territories including Puerto Rico and Guam for AA employee-related travel. Note: include itineraries with travel from Canada, Mexico, and the Caribbean. XY + YC ? XY

4. A report of international charter flights/block ticket sales on scheduled/charter flights into the United States and territories for the review period. Include dates, passenger counts, and full itineraries. Please provide documentation of charter flight contracts that will indicate which entity is responsible for remitting user fees.

5. Flight statistics reports by airport (airport landing counts, including charter flights), date and total passenger count for the review period for flights arriving to U.S. and territories only. Provide the book of codes that explain the codes found on the schedules

6. Copies of the T-100 data filings to U.S. Department of Transportation (DOT) for the review period. Be prepared to demonstrate how the numbers reported to DOT are determined and the parties responsible for reporting. Also, a listing of all flights under 50 passengers that were excluded from the DOT-100 reporting requirement.

7. Copies of Code- sharing agreements/alliances for the review period.

8. Full User fee remittance history to INS and Customs for the review period and the supporting documents used for determining the amount remitted, including summary sales or passenger reports, by month, that were used to support the remittances submitted. If applicable, copies of internal procedures for compiling and remitting the fees.

9. Procedures and processes used to record, collect, and report user fees for frequent flyers, employee business pleasure travel, internet sales, E-tickets and any other sales method. . Copies of the general ledger showing where and how INS user fee liability

is posted (American Airlines and its subsidiary airlines to include American Eagle and Executive Airlines for the 12 months from January 1, 2002 to December 31, 2002. The subtotals by sales source will be reconciled to the totals in the general ledger account. This step is to obtain a level of assurance that all sales channel collections/refunds are included in your financial records. INS will trace American Airlines' debits to the associated user fee remittances for the review period. A report of all infants transported where tickets were not issued. This should include the process and policies regarding non-revenue lap children with a demonstration of how the carrier reports, collects and remits fees to the INS for the review period.

10. Company annual reports covering the review period.

12. Copies of internal audits and financial statement reports performed on the subject of ticket sales and various governmental user fees and taxes collected.

13. Copies of the general ledger showing where and how user fee liability is posted. Include any necessary documentation needed to trace the total user fee dollars from all sales sources to the general ledger accounts.

14. One report of all student consolidator tickets issued for transportation by or through your company, with destination of the United States by month and travel agent for the audit period. This report should include the tickets with airline ticket stock 000. Please include appropriate documents to trace these tickets to the remittances and a copy of any policy or protocol that demonstrates the method ensuring compliance with remittance requirements. *The previous two reviews indicated that American Airlines does not contract with student consolidator travel agencies for those agencies to issue separate student consolidator agency ticket stock (000) to customers for transportation on airlines with destination of the United States and its territories. Instead, American Airlines allows the student travel agencies to act as ARC or BSP agents to issue tickets which cite American Airlines reporting ticket numbers.* If this has changed, please update the reviewer.

15. A report of all infants transported where tickets were not issued. This should include the process and policies regarding non-revenue lap children with a demonstration of how the carrier reports, collects and remits fees to the INS for the review period. Specific data demonstrating any non-revenue infants on the sample flights should be provided with the sample.

As mentioned, the review will cover the period from January 1, 2002 through December 31, 2002. However, INS retains the right to review and assess liability on areas of partial, sporadic or non-remittance of the IUF and PPF fees for a period of the past six years. In reviewing your data, if you find such a situation, alert the review team so that they can work with your staff in resolution of the issues. For the air passenger user fee, the lifted tickets from the sample selected will be audited. Any noncompliance rate resulting from auditing the sample of tickets will be extrapolated over the 12-month

review period. The remittance history will be used as the basis for any additional liability assessment.

You will be given a copy of audit exceptions and be able to provide additional information which may clear any/all of those exceptions. For consideration, the additional information should be received by our staff two weeks post review, unless you obtain a written agreement to extend the timeframe. A final report will be issued by INS after this timeframe.

INS is authorized by Federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to assess and collect interest and penalty amounts, in addition to principal on debts owed to the INS. The final audit report will identify principal amounts owed for the Immigration User Fee. The INS Debt Management Center (DMC) located in Williston, Vermont, will determine if interest and penalty amounts are due on Immigration User Fees collected by the carrier but not remitted. Interest and penalties will be computed back to the period when the fees should have been remitted and the carrier will be invoiced by DMC for these amounts after the issuance of the final audit report. Audit liability amounts attributable to errors (such as those found by sampling during the audit process) will not be subject to interest and penalty, unless they remain unpaid for 30 days following the date of the audit report.

Customs Liability - The financial liability finding for U.S. Customs will represent findings regarding unremitted fees and error determinations and will not include interest or penalties. Customs retains the right to issue interest and any administrative charge assessments and/or penalties as it deems appropriate as a result of the findings in this audit. Any interest or charges will be issued directly from Customs in a separate mailing after the issuance of the final audit report.

Please call Eugene Schulman by March 7, 2003, to discuss the status of the compilation of the above information. If you have any additional questions or need additional information, please do not hesitate to call Eugene Schulman at telephone number 202-616-9177 and/or E-Mail, eugene.m.schulman@usdoj.gov, and geneschulman@aol.com.

Sincerely,

Barbara Blessing

Barbara Blessing, Director
Compliance Division
Office of Financial Management

ERNST & YOUNG LLP

Suite 1500
2121 San Jacinto Street
Dallas, Texas 75201

Phone: 214 969 8000
Fax: 214 969 8587
Telex: 6710375

# Independent Accountants' Report on Applying Agreed-Upon-Procedures

The Board of Directors and Management
American Airlines, Inc.

We have performed the procedures enumerated below, which were agreed to by the management of American Airlines, Inc. (American), the parent of Trans World Airlines LLC (the Company), and Immigration and Naturalization Services, to the accompanying Statement of INS Immigration User Fees Collected and Remitted for the period beginning April 9, 2001 and ending December 1, 2001 (the "Statement"), of the Company. This agreed-upon procedures engagement was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of the specified users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose. We were informed by officials of American, who have responsibility for accounting and financial matters, that the Statement is presented on the basis prescribed by the Immigration and Naturalization Service Rule regarding Immigration User Fees.

Our procedures and findings are as follows:

1. We compared each of the amounts (except for the totals) in the Statement under the column "Collections Per Ledger" to the corresponding amounts credited to general ledger account No. 2040-200, Immigration User Fees and found them to be in agreement.

2. We compared each of the amounts, dates and check numbers in the Statement under the columns "Tax Paid," "Remittance Date" and "Check Number" to the corresponding amounts, dates and check numbers included on the copies of canceled checks made payable to the Immigration and Naturalization Service - Office of the Comptroller and found them to be in agreement.

3. We compared the amounts on the copies of canceled checks referred to in the preceding paragraph with the corresponding amounts included on the related bank statement in the month the check cleared the bank and found the amounts to be in agreement for all payments except for the month of September. Due to the timing of the late payment made for the month of September on March 5, 2002, we were unable to obtain a bank statement that included this check clearing the bank before the issuance of this report.

Blessing Exh. B



Ernst & Young LLP is a member of Ernst & Young International, Ltd.

4. We footed the amounts in the Statement under the column "Collections Per Ledger" for each month in each quarter and found them to be in agreement with the amount listed as the "Quarter Total."

We were not engaged to, and did not perform an audit, the objective of which would be the expression of an opinion on the Statement. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

This report is intended solely for the use of American Airlines, Inc. and the Immigration and Naturalization Service and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes. However, this restriction is not intended to limit the distribution of this report, which is a matter of public record.

Ernst + Young LLP

March 27, 2002

TRANS WORLD AIRLINES LLC

STATEMENT OF INS IMMIGRATION USER FEES
COLLECTED AND REMITTED

For the Period Beginning April 9, 2001 and Ending December 1, 2001 [(1)]

| Month | Collections Per Ledger | Tax Paid | Remittance Date | Check Number |
|---|---|---|---|---|
| April | $ 186,927.52 | | | |
| May | $ 295,590.67 | | | |
| June | $ 282,787.71 | | | |
| Second Quarter Total | $ 765,305.90 | $ 765,305.90 | 07/23/2001 | 0001003203 |
| July | $ 348,772.50 | | | |
| August | $ 331,535.65 | | | |
| Third Quarter Total | $ 680,308.15 | $ 680,308.15 | 09/16/2001 | 0001011664 |
| September | $ 123,202.99 | | | |
| September Payment | $ 123,202.99 | $ 123,208.99 | 03/05/2002 | 0002842067 |
| October | $ 62,557.35 | | | |
| November | $ 36,183.55 | | | |
| December | $ (23,194.26) | | | |
| Fourth Quarter Total | $ 75,546.64 | $ 75,546.64 | 01/30/2002 | 0002805399 |

(1) On April 9, 2001, American Airlines, Inc. purchased substantially all of the assets of TWA, Inc. and assumed certain liabilities. However, American Airlines, Inc., did not assume TWA, Inc. INS immigration user fees owed as of April 8, 2001, and so this Statement does not reflect amounts owed prior to the acquisition. Additionally, this Statement only reflects user fee activity through December 1, 2001, as TWA LLC (the entity that operated the assets purchased from TWA, Inc.) discontinued the sale of tickets on their own ticket stock as of this date.