# BARBARA BLESSING DEPOSITION
# EXHIBIT 2

DEPOSITION EXHIBIT
Blessing #2
5/15/07



LEXSTAT 31 CFR 901.9

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2007, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE MAY 1, 2007 ISSUE OF ***
*** THE FEDERAL REGISTER ***

TITLE 31 -- MONEY AND FINANCE: TREASURY
SUBTITLE B -- REGULATIONS RELATING TO MONEY AND FINANCE
CHAPTER IX -- FEDERAL CLAIMS COLLECTION STANDARDS (DEPARTMENT OF THE TREASURY -- DEPARTMENT OF JUSTICE)
PART 901 -- STANDARDS FOR THE ADMINISTRATIVE COLLECTION OF CLAIMS

**Go to the CFR Archive Directory**

*31 CFR 901.9*

§ 901.9 Interest, penalties, and administrative costs.

(a) Except as provided in paragraphs (g), (h), and (i) of this section, agencies shall charge interest, penalties, and administrative costs on debts owed to the United States pursuant to *31 U.S.C. 3717.* An agency shall mail or hand-deliver a written notice to the debtor, at the debtor's most recent address available to the agency, explaining the agency's requirements concerning these charges except where these requirements are included in a contractual or repayment agreement. These charges shall continue to accrue until the debt is paid in full or otherwise resolved through compromise, termination, or waiver of the charges.

(b) Agencies shall charge interest on debts owed the United States as follows:

(1) Interest shall accrue from the date of delinquency, or as otherwise provided by law.

(2) Unless otherwise established in a contract, repayment agreement, or by statute, the rate of interest charged shall be the rate established annually by the Secretary in accordance with *31 U.S.C. 3717.* Pursuant to *31 U.S.C. 3717,* an agency may charge a higher rate of interest if it reasonably determines that a higher rate is necessary to protect the rights of the United States. The agency should document the reason(s) for its determination that the higher rate is necessary.

(3) The rate of interest, as initially charged, shall remain fixed for the duration of the indebtedness. When a debtor defaults on a repayment agreement and seeks to enter into a new agreement, the agency may require payment of interest at a new rate that reflects the current value of funds to the Treasury at the time the new agreement is executed. Interest shall not be compounded, that is, interest shall not be charged on interest, penalties, or administrative costs required by this section. If, however, a debtor defaults on a previous repayment agreement, charges that accrued but were not collected under the defaulted agreement shall be added to the principal under the new repayment agreement.

(c) Agencies shall assess administrative costs incurred for processing and handling delinquent debts. The calculation of administrative costs should be based on actual costs incurred or upon estimated costs as determined by the assessing agency.

(d) Unless otherwise established in a contract, repayment agreement, or by statute, agencies shall charge a penalty, pursuant to *31 U.S.C. 3717*(e)(2), not to exceed six percent a year on the amount due on a debt that is delinquent for more than 90 days. This charge shall accrue from the date of delinquency.

(e) Agencies may increase an "administrative debt" by the cost of living adjustment in lieu of charging interest and penalties under this section. "Administrative debt" includes, but is not limited to, a debt based on fines, penalties, and overpayments, but does not include a debt based on the extension of Government credit, such as those arising from

loans and loan guaranties. The cost of living adjustment is the percentage by which the Consumer Price Index for the month of June of the calendar year preceding the adjustment exceeds the Consumer Price Index for the month of June of the calendar year in which the debt was determined or last adjusted. Increases to administrative debts shall be computed annually. Agencies should use this alternative only when there is a legitimate reason to do so, such as when calculating interest and penalties on a debt would be extremely difficult because of the age of the debt.

(f) When a debt is paid in partial or installment payments, amounts received by the agency shall be applied first to outstanding penalties, second to administrative charges, third to interest, and last to principal.

(g) Agencies shall waive the collection of interest and administrative charges imposed pursuant to this section on the portion of the debt that is paid within 30 days after the date on which interest began to accrue. Agencies may extend this 30-day period on a case-by-case basis. In addition, agencies may waive interest, penalties, and administrative costs charged under this section, in whole or in part, without regard to the amount of the debt, either under the criteria set forth in these standards for the compromise of debts, or if the agency determines that collection of these charges is against equity and good conscience or is not in the best interest of the United States.

(h) Agencies shall set forth in their regulations the circumstances under which interest and related charges will not be imposed for periods during which collection activity has been suspended pending agency review.

(i) Agencies are authorized to impose interest and related charges on debts not subject to *31 U.S.C. 3717*, in accordance with the common law.

**HISTORY:** *[65 FR 70390, 70401*, Nov. 22, 2000]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*31 U.S.C. 3701*, 3711, 3716, 3717, 3718, and 3720B.

**NOTES:** [EFFECTIVE DATE NOTE: *65 FR 70390, 70401*, Nov. 22, 2000, added Chapter IX, effective Dec. 22, 2000.]
NOTES APPLICABLE TO ENTIRE TITLE:
EDITORIAL NOTE: Other regulations issued by Department of the Treasury appear in Title 12, Chapter I; Title 19, Chapter I; Title 26, Chapter I; Title 27, Chapter I; Title 31, Chapters II, IV, V, VI, and VII, and Title 48, Chapter 10.
CROSS REFERENCE: General Accounting Office: See 4 CFR Chapter I.

837 words

# BARBARA BLESSING DEPOSITION
# EXHIBIT 3

LEXSTAT 31 USC 3717

UNITED STATES CODE SERVICE
Copyright (c) 2007 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) Companies
All rights reserved

*** CURRENT THROUGH P.L. 110-24, APPROVED 5/3/2007 ***

TITLE 31. MONEY AND FINANCE
SUBTITLE III. FINANCIAL MANAGEMENT
CHAPTER 37. CLAIMS
SUBCHAPTER II. CLAIMS OF THE UNITED STATES GOVERNMENT

**Go to Code Archive Directory for this Jurisdiction**

*31 USCS § 3717*

§ 3717. Interest and penalty on claims

(a) (1) The head of an executive, judicial, or legislative agency shall charge a minimum annual rate of interest on an outstanding debt on a United States Government claim owed by a person that is equal to the average investment rate for the Treasury tax and loan accounts for the 12-month period ending on September 30 of each year, rounded to the nearest whole percentage point. The Secretary of the Treasury shall publish the rate before November 1 of that year. The rate is effective on the first day of the next calendar quarter.
(2) The Secretary may change the rate of interest for a calendar quarter if the average investment rate for the 12-month period ending at the close of the prior calendar quarter, rounded to the nearest whole percentage point, is more or less than the existing published rate by 2 percentage points.

(b) Interest under subsection (a) of this section accrues from the date--
(1) on which notice is mailed after October 25, 1982, if notice was first mailed before October 25, 1982; or
(2) notice of the amount due is first mailed to the debtor at the most current address of the debtor available to the head of the executive [, judicial,] or legislative agency, if notice is first mailed after October 24, 1982.

(c) The rate of interest charged under subsection (a) of this section--
(1) is the rate in effect on the date from which interest begins to accrue under subsection (b) of this section; and
(2) remains fixed at that rate for the duration of the indebtedness.

(d) Interest under subsection (a) of this section may not be charged if the amount due on the claim is paid within 30 days after the date from which interest accrues under subsection (b) of this section. The head of an executive, judicial, or legislative agency may extend the 30-day period.

(e) The head of an executive, judicial, or legislative agency shall assess on a claim owed by a person--
(1) a charge to cover the cost of processing and handling a delinquent claim; and
(2) a penalty charge of not more than 6 percent a year for failure to pay a part of a debt more than 90 days past due.

(f) Interest under subsection (a) of this section does not accrue on a charge assessed under subsection (e) of this section.

(g) This section does not apply--
(1) if a statute, regulation required by statute, loan agreement, or contract prohibits charging interest or assessing charges or explicitly fixes the interest or charges; and
(2) to a claim under a contract executed before October 25, 1982, that is in effect on October 25, 1982.

DEPOSITION EXHIBIT
Blessing #3
5/15/07

(h) In conformity with standards prescribed jointly by the Attorney General, the Secretary of the Treasury, and the Comptroller General, the head of an executive, judicial, or legislative agency may prescribe regulations identifying circumstances appropriate to waiving collection of interest and charges under subsections (a) and (e) of this section. A waiver under the regulations is deemed to be compliance with this section.

(i) (1) The head of an executive, judicial, or legislative agency may increase an administrative claim by the cost of living adjustment in lieu of charging interest and penalties under this section. Adjustments under this subsection will be computed annually.

(2) For the purpose of this subsection--

(A) the term "cost of living adjustment" means the percentage by which the Consumer Price Index for the month of June of the calendar year preceding the adjustment exceeds the Consumer Price Index for the month of June of the calendar year in which the claim was determined or last adjusted; and

(B) the term "administrative claim" includes all debt that is not based on an extension of Government credit through direct loans, loan guarantees, or insurance, including fines, penalties, and overpayments.

**HISTORY:**

(Added Jan. 12, 1983, P.L. 97-452, § 1(16)(A), 96 Stat. 2471; April 26, 1996, P.L. 104-134, Title III, Ch 10, § 31001(c)(1), (g)(1)(C), (q), 110 Stat. 1321-359, 1321-363, 1321-372.)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

Prior law and revision:

| Revised section | Source (U.S. Code) | Source (Statutes at Large) |
| --- | --- | --- |
| 3717(a) .... | 31 App.: 952(e)(1) (1st-3d sentences). ........ | July 19, 1966, Pub. L. 89-508, 80 Stat. 308, Sec. 3(e)(1)(1st-3d sentences), (2)-(7); added Oct. 25, 1982, Pub. L. 97-365, Sec. 11, 96 Stat. 1755. |
| 3717(b), (c) . | 31 App.: 952(e)(5) .. | |
| 3717(d) ..... | 31 App.: 952(e)(6) .. | |
| 3717(e) ..... | 31 App.: 952(e)(2) .. | |
| 3717(f) ..... | 31 App.: 952(e)(7) .. | |
| 3717(g)(1) ... | 31 App.: 952(e)(3)(1st sentence). | |
| 3717(g)(2) ... | 31 App.: 952(e)(4) .. | |
| 3717(h) ..... | 31 App.: 952(e)(3) (2d, last sentences). | |

In subsection (a), the words "percentage point" and "percentage points" are substituted for "per centum" for clarity.

In subsections (a)(1) and (e), the words "Except as provided in paragraph (3)" are omitted as surplus.

In subsection (a)(2), the words "for a calendar quarter" are substituted for "quarterly", and the words "prior calendar quarter" are substituted for "that quarter", for clarity.

In subsection (b), before clause (1), the words "Subject to paragraph (6)" and "except as provided in subparagraph (B)" are omitted as surplus. In clause (2), the words "on the claim" are omitted as surplus. The words "if notice is first mailed after October 24, 1982" are added for clarity.

In subsection (c), the words "on a claim" are omitted as surplus.

In subsection (g)(1), the words "applicable" and "either" are omitted as surplus. The word "assessing" is added for clarity. The words "that apply to claims involved" are omitted as surplus.
In subsection (h), the words "under this section" are added for clarity.

Explanatory notes:
The bracketed matter ", judicial," has been inserted in subsec. (b)(2) to indicate wording probably intended by Congress.

Amendments:

1996. Act April 26, 1996 (effective on enactment, as provided by § 31001(a)(2)(A) of such Act, which appears as *31 USCS § 3322* note) purported to amend this section by striking "the head of an executive or legislative agency" each place it appeared and inserting "the head of an executive, judicial, or legislative agency". That substitution was made in subsec. (h), but in subsecs. (a)(1), (d), and (e), the amendment was executed by striking "The head of an executive or legislative agency" each place it appeared and inserting "The head of an executive, judicial, or legislative agency" in order to effectuate the probable intent of Congress.
Such Act further (effective as above), in subsec. (h), inserted ", the Secretary of the Treasury,"; and added subsec. (i).

**NOTES:**

Code of Federal Regulations:
Office of the Secretary of Agriculture--Debt management, 7 CFR Part 3.
Farm Service Agency, Department of Agriculture--Debt settlement policies and procedures, 7 CFR Part 792.
Animal and Plant Health Inspection Service, Department of Agriculture--User fees, 9 CFR Part 130.
Nuclear Regulatory Commission--Salary offset procedures for collecting debts owed by Federal employees to the Federal government, 10 CFR Part 16.
National Credit Union Administration--Requirements for insurance, 12 CFR Part 741.
Office of the Secretary of Commerce--Disclosure of government information, 15 CFR Part 4.
Bureau of the Census, Department of Commerce--Public information, 15 CFR Part 60.
Office of Workers' Compensation Programs, Department of Labor--Claims for compensation under the Federal Employees' Compensation Act, as amended, 20 CFR Part 10.
Office of Workers' Compensation Programs, Department of Labor--Claims for compensation under the Energy Employees Occupational Illness Compensation Program Act of 2000, as amended, 20 CFR Part 30.
Office of the Secretary, Department of Housing and Urban Development--Administrative claims, 24 CFR Part 17.
National Indian Gaming Commission, Department of the Interior--Debt collection, 25 CFR Part 513.
Department of Justice--Production or disclosure of material or information, 28 CFR Part 16.
Bureau of Prisons, Department of Justice--Cost of incarceration fee, 28 CFR Part 505.
Fiscal Service, Department of the Treasury--Indorsement and payment of checks drawn on the United States Treasury, 31 CFR Part 240.
Fiscal Service, Department of the Treasury--Waiver of interest, administrative costs, and penalties, 31 CFR Part 391.
Federal Claims Collection Standards (Department of the Treasury-Department of Justice)--Standards for the administrative collection of claims, 31 CFR Part 901.
Office of the Secretary, Department of Education--Debt collection, 34 CFR Part 30.
United States Patent and Trademark Office, Department of Commerce--Disclosure of government information, 37 CFR Part 102.
Department of Veterans Affairs--General provisions, 38 CFR Part 1.
National Foundation on the Arts and the Humanities--Collection of claims, 45 CFR Part 1150.
National Foundation on the Arts and the Humanities--Claims collection, 45 CFR Part 1177.

Related Statutes & Rules:

This section is referred to in *5 USCS § 5514; 7 USCS §§ 2371, 7753, 7759, 8311; 10 USCS § 2739; 15 USCS § 80a-24; 21 USCS § 136a; 22 USCS § 2671; 26 USCS § 6103; 31 USCS §§ 3701, 3711; 42 USCS §§ 404, 1383.*

Research Guide:

Federal Procedure:

21A Fed Proc L Ed, Judgments and Orders § 51:82.

29 Fed Proc L Ed, Railroads § 67:384.

Am Jur:

*70B Am Jur 2d, Social Security and Medicare § 1795.*

Interpretive Notes and Decisions:

1. Generally 2. Applicability 3. Relationship to other laws 4. --Common law 5. Rate of interest 6. Prejudgment interest 7. Attorney's fees and costs 8. Particular cases

**1. Generally**

Agencies are without discretion to waive interest charges required by *31 USCS § 3717* absent express exception; the exception for "contracts" in *31 USCS § 3717(g)(1)* refers to those contracts which specifically concern payment of money pursuant to particular government program involving loans administered by agencies, and not to contracts in general sense; agencies are not authorized to enter into collective bargaining agreement containing provision waiving application of required interest in penalty charges. *NFFE & US Army Engineer Dist., Kansas City, Mo., (1986) 21 FLRA 101,* 21 FLRA No. 20.

Purpose of Debt Collection Act was to ensure that government did not lose benefit of use of monies owed to it by contractors. *Capital Dev. Co. v United States (2001) 49 Fed Cl 178,* affd (2002, CA FC) *308 F3d 1283.*

**2. Applicability**

For purposes of *31 USCS §§ 3701, 3717,* Nuclear Regulatory Commission, although independent agency, is executive or legislative agency to which interest and penalty provisions of § 3717 apply; pursuant to § 3717, Commission is required to charge both interest and late penalty fee to overdue and unpaid portions of company's bill for license application review fees imposed pursuant to *31 USCS § 9701. Commonwealth Edison Co. v United States Nuclear Regulatory Com. (1987, CA7) 830 F2d 610.*

Food and Nutrition Service of Department of Agriculture is precluded from assessing interest against state Department of Social Services on debts owed to federal agency. *Perales v United States (1984, SD NY) 598 F Supp 19,* affd (1984, CA2 NY) *751 F2d 95.*

**3. Relationship to other laws**

Mine operator, who successfully sued government for reimbursement of mining reclamation fees under Surface Mining Control and Reclamation Act (*30 USCS §§ 1201* et seq.), was not entitled under *30 USCS § 1268(c)* to interest on that portion of refund representing civil penalties, because penalties at issue were assessed pursuant to *31 USCS § 3717,* rather than *30 USCS § 1268(c). Horizon Coal Corp. v United States (1994, CA6 Ohio) 43 F3d 234, 40 Envt Rep Cas 2035, 25 ELR 20843, 1994 FED App 400P.*

Since *31 USCS § 3717(g)(1)* refers disjunctively to interest or charges, statute does not apply to actions brought under Oil Pollution Act (*33 USCS §§ 2701* et seq.), which provides for interest (*33 USCS § 2705*) but not penalties. *United States v Hyundai Merchant Marine Co. (1999, CA9 Alaska) 172 F3d 1187, 99 CDOS 2843, 99 Daily Journal DAR*

*3685, 48 Envt Rep Cas 1385, 1999 AMC 1521, 29 ELR 21131*, cert den *(1999) 528 US 963, 145 L Ed 2d 310, 120 S Ct 397, 49 Envt Rep Cas 1768.*

With respect to Nuclear Regulatory Commission fees for nuclear power reactor licenses, pursuant to *42 USCS § 2213*, it was reasonable for Commission not to include interest and late fees collected under *31 USCS § 3717* as deductible "other amounts collected," because (1) since purpose of § 2213 was to recover costs incurred by Commission, phrase "other amounts collected" can reasonably be interpreted to mean other cost-recovery measures, and penalties, fines, and interest charges are not cost-recovery measures; while (2) contrary interpretation would allow utilities that violate law and pay consequent penalties or fines, to benefit by recovering portion of penalty or fine as reduced user fee. *Florida Power & Light Co. v United States (1988, App DC) 269 US App DC 377, 846 F2d 765*, cert den *(1989) 490 US 1045, 104 L Ed 2d 422, 109 S Ct 1952.*

Generally, government contracts include clause which mandates that contractor pay interest on amounts due to government at rates established under Contract Disputes Act (*41 USCS §§ 601* et seq.), and where this clause is included in contract, it, and not Debt Collection Act (*31 USCS § 3717*), is authority for government to assess and collect interest due. Advanced Injection Molding, Inc. v General Services Administration (2005, GSBCA) 2005-2 BCA P 33097.

**4. --Common law**

In determining whether, under federal common law, state owes prejudgment interest to United States due to contractual obligation arising prior to 1982, United States Supreme Court will not attribute any significance to 1983 federal statute, which in *31 USCS § 3717* prescribes interest payable by persons to Federal Government, but in *31 USCS § 3701* excludes from definition of "person" any agency of state government, where, as stated in § 3717, 1983 statute does not apply to contracts entered into before October 25, 1982 and Supreme Court can draw no inference of Congresses' comprehension of federal common law of interest from Congress' enactment, without any discernible legislative history, of definitional exclusion. *West Virginia v United States (1987) 479 US 305, 93 L Ed 2d 639, 107 S Ct 702.*

Federal government's federal common law right to collect prejudgment interest on debt owed by state for lost food stamps is not abrogated by Debt Collection Act (*31 USCS §§ 3701* et seq.), since underlying claim is contractual obligation to pay money, and only obligation from which *31 USCS § 3701(c)* (which provides that states are not persons) exempts states is obligation to pay prejudgment interest in accordance with mandatory provisions of Act. *United States v Texas (1993) 507 US 529, 123 L Ed 2d 245, 113 S Ct 1631, 93 CDOS 2520, 93 Daily Journal DAR 4287, 7 FLW Fed S 145.*

Provisions of Debt Collection Act of 1982 (*31 USCS §§ 3701, 3717*) did not abrogate federal common-law right of Food and Nutrition Service of Department of Agriculture to assess interest on outstanding debts of states incurred pursuant to Food Stamp Act (*7 USCS §§ 2011-2030*) and specifically Service's mail loss regulation. *Gallegos v Lyng (1989, CA10 NM) 891 F2d 788.*

**5. Rate of interest**

Where United States obtained judgment against surety which had posted bond guaranteeing payment of overdue tax obligations owed by third party, interest owed to government from date of third party's default should be calculated at rate established by Internal Revenue Code (*26 USCS § 6621*), rather than under terms of *31 USCS § 3717(a)*. *United States v American Ins. Co. (1994, CA3 Pa) 18 F3d 1104, 94-1 USTC P 50131, 73 AFTR 2d 1469*, 94 TNT 55-22.

When statutory cause of action sets it own rate of interest, *31 USCS § 3717* does not apply. *United States v Hyundai Merchant Marine Co. (1999, CA9 Alaska) 172 F3d 1187, 99 CDOS 2843, 99 Daily Journal DAR 3685, 48 Envt Rep Cas 1385, 1999 AMC 1521, 29 ELR 21131*, cert den *(1999) 528 US 963, 145 L Ed 2d 310, 120 S Ct 397, 49 Envt Rep Cas 1768.*

*31 USCS § 3717*(a)(1) plainly provides authority for agency to decide what interest rate is compensatory or even to impose greater than compensatory rate. *Amax Land Co. v Quarterman (1999, App DC) 337 US App DC 64, 181 F3d 1356.*

**6. Prejudgment interest**

In determining whether, under federal common law, state owes prejudgment interest to United States due to contractual obligation arising prior to 1982, United States Supreme Court will not attribute any significance to 1983 federal statute, which in *31 USCS § 3717* prescribes interest payable by persons to Federal Government, but in *31 USCS § 3701*

excludes from definition of "person" any agency of state government, where, as stated in § 3717, 1983 statute does not apply to contracts entered into before October 25, 1982 and Supreme Court can draw no inference of Congresses' comprehension of federal common law of interest from Congress' enactment, without any discernible legislative history, of definitional exclusion. *West Virginia v United States (1987) 479 US 305, 93 L Ed 2d 639, 107 S Ct 702.*

Federal government's federal common law right to collect prejudgment interest on debt owed by state for lost food stamps is not abrogated by Debt Collection Act (*31 USCS §§ 3701* et seq.), since underlying claim is contractual obligation to pay money, and only obligation from which *31 USCS § 3701(c)* (which provides that states are not persons) exempts states is obligation to pay prejudgment interest in accordance with mandatory provisions of Act. *United States v Texas (1993) 507 US 529, 123 L Ed 2d 245, 113 S Ct 1631, 93 CDOS 2520, 93 Daily Journal DAR 4287, 7 FLW Fed S 145.*

As to state agency's argument that Labor Secretary was precluded by Debt Collection Act of 1982 from requiring agency to pay prejudgment interest on repayments of certain costs in connection with CETA grants, Act is inapplicable, since it does not apply to claim under contract executed before 10/25/82 that is in effect on that date, agency does not contest that CETA grants may be considered contracts, grant period extended from 10/1/80-6/30/82, and agency, as part of its monitoring obligation, engaged in such activities into 1984. *Florida Dep't of Labor & Employment Sec. v United States Dep't of Labor (1990, CA11) 893 F2d 1319,* cert den *(1990) 498 US 812, 112 L Ed 2d 25, 111 S Ct 49.*

Mere fact that government has secured judgment on contract does not entitle it to prejudgment interest absent underlying contractual obligation by contractor to pay money. *Thermalon Indus. v United States (2002) 51 Fed Cl 464.*

**7. Attorney's fees and costs**

U.S. is awarded default final judgment on unpaid national direct student loan but is granted only part of costs and fees requested, where U.S. sought recovery on 1974 3 percent fixed rate loan in principal sum of $ 600 plus $ 1,492.40 in costs and attorney's fees, because U.S. does not pay $ 120 filing fee under *28 USCS § 1914(a)* and "administrative/collection costs" of $ 158.15 are not collectible on this loan under *31 USCS §§ 3717(g)(1)* and (2). *United States v Spann (1992, SD Fla) 797 F Supp 980, 6 FLW Fed D 380.*

To extent U.S. could prove that power company lacked good faith basis for denying payment on any "claims," clear language of statute seemed to indicate that U.S. was not only permitted, but was required to assess costs of attorneys fees under *31 USCS § 3717* in its collection efforts; however, assuming attorneys' fees were recoverable as "costs" under § 3717(e), § 3717(g)(2) prohibited U.S. from seeking such "costs" associated with any of their claims arising out of power company's two subject project licenses, memorandum of understanding, or special use permit, as "costs" provision of § 3717(e) did not apply to claim under contract executed before October 25, 1982, that was in effect on October 25, 1982. *United States v S. Cal. Edison Co. (2004, ED Cal) 300 F Supp 2d 964,* motion to strike gr, in part, motion den (2005, ED Cal) *2005 US Dist LEXIS 24748,* motion to strike den, motion den (2005, ED Cal) *2005 US Dist LEXIS 24597,* different results reached on reconsideration (2005, ED Cal) *2005 US Dist LEXIS 24592.*

**8. Particular cases**

For purposes of *31 USCS §§ 3701, 3717,* Nuclear Regulatory Commission, although independent agency, is executive or legislative agency to which interest and penalty provisions of § 3717 apply; pursuant to § 3717, Commission is required to charge both interest and late penalty fee to overdue and unpaid portions of company's bill for license application review fees imposed pursuant to *31 USCS § 9701. Commonwealth Edison Co. v United States Nuclear Regulatory Com. (1987, CA7) 830 F2d 610.*

Unless Congress prescribes different policies or specific requirements for particular grant or grants, interest earned by grantee on funds advanced by US belongs to US rather than grantee and must be paid to US; thus, Syracuse University must pay Department of Navy interest earned on congressionally mandated grant (Urgent Supplemental Appropriations Act, July 2, 1986, P.L. 99-349, 100 Stat. 710) to University, and six-month Treasury rate is proper rate to compute amount of interest due. *Syracuse University (1990) 69 Comp Gen 660.*

With respect to computation of debts owed HUD on defaulted, FHA-guaranteed manufactured home loans, and assessment of interest on those loans and property improvement loans, FHA properly subtracts from outstanding loan balance greater of sale proceeds or appraised value of manufactured home, and properly assesses interest on debts at lesser of note rate or Treasury rate. *Calculation of Debt, and Interest on Debt, Owed to Department of Housing and Urban Development (1992) 71 Comp Gen 449.*

During pendency of appeal under Contract Disputes Act (*41 USCS §§ 601* et seq.), Forest Service is not required, pursuant to *31 USCS § 3717*, to discontinue assessment of interest, late payment penalties or administrative costs on delinquent debts arising from national forest timber sales contracts. *Interest Under Federal Claims Collection Act, as Amended, on Debts Appealed Under Contract Disputes Act of 1978 (1991) 70 Comp Gen 517.*

Under both Surface Mining Control and Reclamation Act (*30 USCS §§ 1201* et seq.) and Debt Collection Act (*31 USCS § 3717(e)(2)*), Secretary of Interior is empowered to promulgate regulations which provide six percent annual penalty on all reclamation fees more than 91 days overdue, and nowhere in language of either statute is there provision limiting applicability of such penalty; thus, mining company's contention that penalty should not be based upon mere innocent failure to pay reclamation fee is without merit. *Addington Mining v United States (1996) 35 Fed Cl 754.*

# BARBARA BLESSING DEPOSITION
# EXHIBIT 4

MILLER & CHEVALIER
CHARTERED

655 FIFTEENTH STREET, N.W., SUITE 900
WASHINGTON, D.C. 20005-5701
202.626.5800 FAX: 202.628.0858
WWW.MILLERCHEVALIER.COM

October 13, 2003

***BY MESSENGER***

Immigration and Naturalization Service
Department of Homeland Security
Office of Financial Management
425 I Street, N.W.
Washington, D.C. 20536

Re: <u>Request for Refund of Immigration Passenger Processing Fees</u>

Dear Sir or Madam:

On behalf of American Airlines, Inc. ("American"), we hereby request a refund of $1,225,614 (plus applicable interest), representing the amount of uncollected immigration user fees remitted by American to the Immigration and Naturalization Service ("INS") from July 1998 to the present. The uncollected fee amounts and supporting documentation are attached as **Exhibit A** to this letter.

Title 8, United States Code, section 1356, authorizes the Department of Homeland Security ("DHS")[1] to collect fees for the immigration inspection of passengers aboard a commercial aircraft or vessel arriving in the United States. With respect to the fee (hereinafter referred to as the "User Fee"), the INS regulations governing the assessment, collection, and enforcement of the User Fee require the carrier whose ticket stock reflects collection of the fee to be responsible for remittance of the fee to DHS.

This refund request is based on the legal conclusion that American cannot be held liable for uncollected User Fees that the airline is unable to collect. American does not challenge the amount or validity of the fee, nor the authority of DHS to assess or collect it. Rather, American asserts that the INS regulatory provisions do not obligate carriers to remit to the INS uncollected User Fees. To read such a requirement into the regulations would improperly transform a passenger pay-as-you-use service fee arrangement into one that has conscripted carriers into guaranteeing payments on behalf of passengers that failed and or refused to pay their user fees despite reasonable efforts by the carrier to collect such fees.

---

[1] The INS is no longer a stand-alone agency under the Department of Justice. Its functions have been transferred to various offices under the Department of Homeland Security. For ease of presentation, however, this letter will refer to the responsible agency as the INS.

DEPOSITION EXHIBIT
Blessing #4
5/15/07

This letter will first discuss the U.S. statutory and regulatory authorities regarding the assessment, collection, and enforcement of the User Fee. Next, we will discuss the legal and practical limitations with respect to assessing and collecting the User Fees against tickets issued in foreign jurisdictions. The letter concludes with legal arguments as to the reasons why DHS should grant this refund request.

## I. The User Fee

Title 8, United States Code, section 1356 (hereinafter referred to as "Section 1356," the "User Fee Statute," or the "Statute") establishes a fee for the immigration inspection of each passenger aboard a commercial aircraft or commercial vessel arriving at a U.S. port of entry, or the pre-inspection of a passenger in a place outside the U.S. prior to such arrival. The applicable INS regulations providing for the administration of the User Fee is found at title 8, Code of Federal Regulations, section 286) (hereinafter referred to as the "the INS Regulations").

### A. Assessment and Collection of the Fee

Under Section 1356 of the Statute, the person that issues the travel document or ticket to an individual for covered transportation must collect the fee. If the ticket is issued in a foreign country and the fee is not collected **at the time the ticket is issued**, the enplaning carrier shall collect the fee prior to departure from the United States. *See* 8 U.S.C. 1356(f)(2). Section 1356(f)(3) directs the enplaning carrier to remit only "**those**" fees (referring to the actual fees collected) to the Attorney General. It does not require remission of fees that the carrier could not collect because a passenger refused to pay the fee.

### B. Payment of Fees Uncollected Fees at the Time of Departure from the United States

The User Fee Statute provides very specific guidance to the INS on the collection and remittance responsibilities of carriers. Section 1356 directs carriers to remit only the fees that were actually collected. It says nothing about payment of fees that are not collected where the passenger refuses to pay the fee. Further, Section 1356(f)(3) requires that the regulations issued governing the collection and remittance of the fees "shall be consistent" with the regulations issued by the Secretary of the Treasury for the collection and remittance of transportation excise taxes imposed by subchapter C of Chapter 33 of Title 26.[2] Those regulations do not require the remittance of uncollected taxes to the Internal Revenue Service ("IRS").

---

[2] Reg. 49.4291-1 issued under 26 U.S.C. 4261 directs the carrier to inform the Internal Revenue Service of the names of passengers who have refused to pay the transportation excise tax but it does not make the carrier secondarily liable.

Similarly, the INS Regulations do not require remittance of uncollected fees. Section 286.5 of the Regulations requires the carrier to remit to INS only those fees for which the ticket stock or document for collection "reflects collection."

## II. Procedures for the Collection of the User Fee

American takes its commitment to enforcing the collection of the User Fee very seriously, as demonstrated by the results of recent audits of its User Fee collections. American's 97.53 percent compliance rate for 2002, as determined by the Department of Homeland Security's recent audit findings for this period, underscores American's success in this regard.

### A. Collection Procedures in Place

American has instituted various policies and procedures, which are costly and labor intensive, to achieve the highest possible collection rate possible. These procedures include various steps aimed at attempting to collect the fee from a passenger that was not assessed the fee at the time the ticket was issued. These procedures underscore American's efforts to collect the User Fee in all instances where it can legally do so, even though American does not have the legal obligation to remit fees it cannot collect.

### B. Limitations on Collection of the User Fee in Foreign Jurisdictions

Despite American's efforts, however, there are significant limitations on its ability to collect the User Fee. Many Latin American countries where American provides service adhere strictly to a broader version of the so–called "revenue rule." Under this rule, countries generally refuse to have their courts, institutions and laws employed to facilitate the collection of foreign exactions directly or through a collection agent[3] on their nationals.[4] The U.S. also adheres to this rule but only on exactions that are considered taxes in the U.S. sense.[5]

American has experienced first-hand efforts by foreign governments that prohibit user fee assessments at ticket counters. American encountered problems in some of these cases even when its actions were limited to simply inviting the passenger to pay the inspection fees prior to boarding. For example, the Government of Guatemala issued a decree to that effect that

---

[3] 1 Dicey & Morris, The Conflict of Laws, 91 (13th ed., 2000)("indirect enforcement occurs when a foreign State (*or its nominee*) in form seeks a remedy…")

[4] Harvey P. Dale, *Withholding Tax on Payments of Foreign Persons*, 36 Tax L. Rev., 49, 50 (Fall 1980)("[a]s a matter of durable international practice, no state will assist any other state in the collection of a tax.")

[5] *The Attorney General of Canada v R. J. Reynolds Tobacco Holding, Inc.*, 268 F. 3d 103 (2d Cir. 2001) (collection of Canadian customs duties not enforced)

American challenged without success. *See* **Exhibit B**. Similarly, in Colombia and the Dominican Republic, American engaged in prolonged negotiations to permit American to simply "invite" the passenger to pay U.S. ticket taxes and inspection fees upon check-in. *See* **Exhibit C.** Panama and Honduras also were countries in which American faced government opposition to U.S. tax collection. *See* **Exhibit D**. Travel agencies in these countries for the most part refuse to collect the inspection fees. Consequently, American has been forced to modify its "post ticketing" collection procedures in these countries.

Under these modifications, when a ticket agent notices on a passenger's ticket that the User Fee was not paid at the time of issuance, the agent legally may only "invite" the passenger to pay the User Fee during the time prior to departure of the flight from the foreign country and prior to departure of the return flight from the United States. American may not impede or prohibit a passenger from boarding in a foreign country for failure to pay the User Fee without running a nearly certain risk of a lawsuit and potentially regulatory enforcement actions and penalties. Consequently, American has implemented post ticketing collection procedures on the return leg in the U.S. as a back-up procedure for collecting the fee. However, these are principally manual and labor intensive procedures and, as a result, costly to implement.

## III. Basis for Granting American's Refund Request

As summarized above and further discussed below, neither the relevant statutory nor regulatory provisions require carriers to be guarantors and, therefore, secondarily liable for any and all uncollected User Fees. The proper reading of the User Fee Statute is that Congress legislated and intended that INS look to the passenger for the User Fee for payment of uncollected User Fees. The INS correctly interpreted the User Fee Statute by limiting the carrier's remittance authority to fees that the carrier actually collected.

### 1. The INS Regulations accurately reflect the intent of Congress with respect to carrier liability for uncollected user fees.

Section 1356 of the Statute and its legislative history are conspicuously silent on secondary liability for fees not collected by the enplaning carrier upon the passenger's return departure from the United States. This was not an oversight, but the exercise of a careful and deliberate policy not to overburden carriers when other alternate reasonable methods exist to collect the User Fees. In this regard, Congress has provided INS with the enforcement authority necessary to elicit compliance from passengers that have refused to pay the User Fees. The INS has correctly recognized this authority by requiring that carriers only notify the INS when passengers refuse to pay the User Fee. Neither the Statute nor the INS Regulations provides the carrier with the enforcement authority to compel a passenger to pay the User Fee when it could not be collected either at the time the ticket was issued or when the passenger departs the United States.

Secondary liability has never been presumed or implied in statutes, just because a law requires a carrier or seller of goods or services to collect a tax or fee from a passenger or buyer of services or goods.[6] Rather, Congressional practice has been to reserve this option as a rule of *exception* that Congress has seen fit to enact sparingly and more importantly clearly and very explicitly.[7] When Congress has wanted to impose secondary liability on carriers for uncollected taxes or fees, it does so expressly and unequivocally. For example, only since 1997 has Congress specifically imposed liability on the carrier for undercollection of transportation excise taxes.[8] Similarly, secondary liability was explicitly imposed on parts installers on the excise tax on sale at retail of heavy trucks and trailers.[9]

There are numerous statutory schemes where Congress could have imposed secondary liability on service providers for the under-collection of taxes, but it elected not to do so.[10] Further, in none of these cases did Congress impose any other restrictions tied to the collection of the fee, such as refusal to provide the service being taxed. Accordingly, if Congress had wanted to impose similar secondary liability on carriers with respect to the User Fee, it could and would have done so, but significantly, did not.

Although the INS Regulations do not explicitly address the issue of enforcement of uncollectable fees, the regulations must be interpreted to reflect that the INS is responsible for any User Fees that are uncollectable by a carrier. INS exceeds its delegated authority by interpreting its regulations to require that the carrier be secondarily liable for the User Fee.

---

6 *Air Tour Acquisition v United States of America*, 781 F. Supp. 669 (DC Hawaii 1991).

7 *Pinter v Dahl*, 486 US 622, 650 (1988)("When Congress wished to create such [secondary] liability, it has had little trouble doing so.")

8 *See* 26 U.S.C. 4263(c). However, this secondary liability is conditioned upon regulations which the IRS to date has not issued.

9 *See* 26 U.S.C. 4051(b)(3).

10 *See, e.g.*, with respect to air carriers engaged in transport of cargo within the United States for the cargo excise tax, 26 U.S.C. 4271 *et seq.*; with respect to sellers of firearms required to collect the excise tax on the sale of firearms, 26 U.S.C. 4181 *et seq.*; with respect to sellers of luxury passenger automobiles for the excise tax, 26 U.S.C. 4001; with respect to sellers of vaccines for the excise tax, 26 U.S.C. 4131 *et seq.*; with respect to sellers of fuels for the excise tax, 26 U.S.C. 4041 *et seq.*; and with respect to telephone carriers for the communications excise tax, 26 U.S.C. 4251 *et seq.*; *Cf.* 26 U.S.C. 4261 *et seq.* (Congress specifically added secondarily liability for air carriers).

**2. American's interpretation of the INS Regulations satisfies the condition specified in the enforcement provisions of the User Fee Statute requiring that the INS Regulations be consistent with the IRS regulations governing the collection and remittance of a transportation excise tax imposed on airline passengers.**

The INS Regulations properly do not impose liability on the carrier for payment of uncollected fees. Section 1356(f)(3) requires that the INS Regulations be consistent with the regulations promulgated for the transport excise tax under subchapter C of Chapter 33 of the Internal Revenue Code ("IRC"). Those regulations specifically reject secondary liability and require that the IRS seek payment of uncollected fees from recalcitrant passengers.[11]

Nothing in the INS Regulations requires the carrier to remit to the government amounts representing uncollected fees. Rather, the INS Regulations provide that if at the time of the departure from the U.S. the passenger refuses to pay the fee, the carrier must notify INS regarding this occurrence. In order for the INS Regulations to be consistent with the IRS regulations under Chapter 33 of the IRC, the INS must interpret its regulations so that the carrier is not liable for the payment of uncollected User Fees.

It is instructive to consider how the same type of user fee is collected by other agencies. Regulations promulgated by the Animal and Plant Health Inspection Service ("APHIS") implement a similarly constructed statute imposing user fees on airline passengers for agricultural quarantine and inspection services. When faced with similar delegation to issue regulations for passenger inspection fees, APHIS correctly concluded that imposing secondary liability on the carrier was not part of the Congressional delegation.

**3. Because airline passengers -- and not the airlines -- are primarily liable for the payment of the User Fee, DHS should look to the passenger for payment of uncollected fees.**

Under the User Fee Statute, passengers are primarily liable for the payment of the User Fee. Accordingly, INS should look exclusively to the passenger, not the carrier, for payment of any uncollected User Fees. It is INS, not the carrier, that has the necessary enforcement authority to compel payment of the fee.

---

[11] Reg. 49.4291-1 issued under 26 U.S.C. 4261 *et seq.* directs the carrier to inform the IRS of the names of passengers who have refused to pay the transport excise tax but it does not make the carrier secondarily liable. Although the statute was changed in 1997 to impose liability on the carrier, the original language of the statute did not impose such liability. Accordingly, the statutory change is immaterial to the intent of Congress when it enacted the User Fee Statute in 1986.

The only requirement the INS Regulations impose on the carrier with respect to uncollected fees is the obligation to notify the agency when it is unable to collect the User Fee from a non-compliant passenger. To American's knowledge, however, INS has not implemented any procedures to allow carriers to provide this information to the INS. Certainly, the INS Regulations do not contemplate a phone call from the carrier to the INS each and every time that a passenger refuses to pay. This would be a costly, inefficient and labor-intensive approach to implementing this regulatory requirement. Rather, a more systematic approach was likely envisioned. Because information on passengers who have not paid the User Fee is captured electronically in company databases, American could provide this information to the INS electronically if the INS were to establish procedures for the collection of this information.

Further, failure to notify the INS regarding non-compliant passengers does not establish liability on the part of the carrier for uncollected User Fees. Liability with respect to uncollected User Fees remains with the agency regardless of whether the notification requirement is satisfied. Carrier notification, however, is one of the many tools the agency could and should use in the exercise of its enforcement authority to collect the fee. In this regard, to facilitate INS's enforcement responsibilities, American would be glad to work with INS to make available information on those passengers from which American could not collect the User Fee.

4. **Enforcement of the INS Regulations would violate the Revenue Rule.**

As noted above, virtually all of the uncollected fees that are the subject of this refund request involve tickets issued in foreign jurisdictions. As discussed previously, this implicates the "revenue rule." Under this rule, countries generally refuse to have their courts, institutions and laws employed to facilitate the collection of foreign exactions directly or through a collection agent on their nationals.

Nothing in the User Fee Statute or its legislative history suggests that Congress intended to overturn the revenue rule with respect to the collection of the User Fee or excuse the INS from seeking collection of User Fees directly from passengers when they have refused to pay the fee to a carrier. To interpret the User Fee Statute otherwise puts American in the untenable position of paying fees to the U.S. government that under longstanding principles of U.S. and international law, it will never be able to collect. Accordingly, American requests the INS to grant this refund request in order to avoid violating the revenue rule.

5. **American is prevented by legal and practical reasons from using coercive means to collect the User Fee from passengers who refuse to pay the fee, and doing so would subject American to significant liability.**

Congress did not authorize or direct carriers to engage in the costly practice of collecting the User Fee from a passenger who refuses to pay the fee, either at the time the ticket is issued or upon departure from the United States. For legal and practical reasons, American is unable to enforce collection by declining to issue the ticket to or refusing to board the passenger. Equally important, Congress did not shield carriers from the consequences of pursuing collection practices that otherwise would subject the carriers to significant liability. The silence of Congress in this regard demonstrates its intent that the INS use its existing powers to enforce collection of the User Fee rather than have the carrier refuse boarding to a passenger. Until Congress provides protection for the airlines against passenger suits for refusing a passenger to board a flight for failure to pay the User Fee, American cannot amend its contract of carriage in this respect.

## IV. Conclusion

For the foregoing reasons, American requests that the DHS refund American $1,225,614 (plus applicable interest), the amount representing the uncollected fees set forth in Exhibit A to this letter. Despite the legal authority prohibiting the INS from holding carriers liable for uncollected User Fee amounts, American has undertaken its best efforts to collect the User Fee from all passengers. As the DHS would acknowledge, American's compliance rate with respect to the collection of the User Fee is very high. As such, American will continue to make all reasonable efforts to collect the User Fee, even though American ultimately cannot be held liable if the fee is not collected.

We would be glad to meet with the appropriate DHS officials to discuss this refund request.

Sincerely,

Matthew M. Nolan
David R. Hamill
Counsel to American Airlines, Inc.

# BARBARA BLESSING DEPOSITION
# EXHIBIT 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONTINENTAL AIRLINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06-432C |
| v. | ) | (Judge Margolis) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF BARBARA BLESSING

I, Barbara Blessing, hereby declare as follows:

1. I am over the age of 18 years and competent to testify to the following facts, of which I have personal knowledge.

2. I am currently employed by the Department of Homeland Security ("DHS"), Bureau of Immigration and Customs Enforcement ("ICE") as the Strategic Planning and Special Projects Officer. I have been standing up this office for the past few months. Prior to holding this position, I worked in the ICE-Office of Financial Management as the Director of Financial Operations for about one year and nine months and the Acting Director, ICE-Office of Financial Management for approximately one year.

3. Before ICE became part of DHS, I worked for the Department of Justice, Immigration and Naturalization Service ("INS"), where I served as the Director of the Compliance Division in the Office of Financial Management from around April 2000 through September 2003. I was then detailed to U.S. Customs and Border Protection ("CBP") from September 2003 until February 2004 to assist with the transition of the airline review program, which was transferred from INS to CBP.

4. In my capacity as Director of the Compliance Division, I was responsible for administering procedures to review airline carriers for compliance with immigration user fee regulations. In this capacity, I also served as the INS representative at routine meetings with the airline industry, including International Air Transport Association (IATA) and other regional conferences, to discuss compliance activities. In addition, I personally oversaw the compliance reviews, which also included assessing any outstanding immigration user fee liabilities. [Throughout this declaration, the terms "immigration user fee" and "user fee" are used interchangeably.]

5. While I was Director of the Compliance Division, I supervised two of the user fee audits of Continental Airlines ("Continental") at issue in this case, which were



DEPOSITION EXHIBIT Blessing #5 5/15/07

performed by Mr. Muhamed Ayodeji ("auditor"), a contract member of my staff, as well as Shirley Harrison, an INS employee, who supported Mr. Ayodeji during these audits. The first Continental audit was performed from March 27 through March 30, 2001, and covered the period of April 1, 1999, through December 31, 2000. The second Continental audit was performed from August 5 through August 8, 2002, and covered the period of January 1, 2001, through December 31, 2001.

6. For these user fee audits, as was generally the case, our office utilized a sampling methodology whereby we would select a fixed number of Continental's flights and review all the qualifying tickets of the selected flights for evidence of user fee collection. [A "qualifying ticket" is one for which user fee collection would have been required.] There were also instances where certain categories of tickets, e.g. travel passes, where our office would consider segregating the treatment of certain tickets from the general methodology described herein. Based on negotiations with Continental, our office did in fact segregate the treatment of travel passes in the first Continental audit noted above.

7. Until Continental filed its original complaint to recover the user fee liability resulting from these audits, I was not aware that Continental had any concerns or raised any objections about the user fee audit methodology outlined herein. This was in spite of the fact that Mr. David Bowman, on behalf of Continental, was rather outspoken about other areas of concern during the user fee audits.

8. There were at least two purposes for the sampling methodology utilized in the Continental user fee audits: (1) to ensure that Continental remitted to the Government a user fee for every ticket for which there was evidence that Continental had collected such user fee; and (2) to assess a liability if there were any qualifying tickets for which Continental failed to demonstrate that a user fee was collected.

9. During the audits, if the auditor identified a qualifying ticket that failed to evidence collection of the user fee, the ticket would be considered a "potential error." The auditor would then provide Continental with the opportunity to present evidence that Continental had collected the user fee for the "potential error" ticket. This typically was accomplished either by demonstrating that the user fee had been collected in some other way (e.g., in the miscellaneous tax portion of the ticket) or that no user fee was owed for that ticket (e.g., it was an exchanged ticket where the user fee was already paid for that passenger's travel on the original ticket issued). If Continental provided evidence of user fee collection for a "potential error" ticket, the auditor would then ensure that the collected user fee was properly remitted to the Government. If there was evidence that the collected user fee was properly remitted to the Government, the "potential error" ticket was removed from the potential error list and was treated as having had the user fee properly collected and remitted.

10. If Continental failed to present evidence that the user fee was collected for a "potential error" ticket, the ticket would then be considered to represent an "error." In

addition, if Continental failed to demonstrate that a user fee that had been collected for a ticket was remitted to the Government, this too would be considered an "error."

11. All errors of a certain type (e.g., those errors for fees collected but not remitted and those errors for which no evidence of collection was presented) were then extrapolated across Continental's qualifying tickets from the selected flights to arrive at a finding of liability. Specifically, the "error rate" was calculated by taking the total number of a given type of errors during the review period and dividing it by the number of qualifying tickets in the selected flights that had been reviewed. Our office would then take the error rate for each quarter and extrapolate it against Continental's total user fee remittances from that quarter to arrive at the liability finding due for that quarter. We arrived at a total liability finding by adding together the amounts due for each quarter of the review.

12. When Continental failed to produce evidence that a user fee was collected for a qualifying ticket, the auditor would accept Continental's statement that no such user fee was collected and would not verify Continental's assertion. Thus, if Continental had collected the user fee but failed to disclose such a user fee collection for whatever reason (e.g., poor accounting), the auditor would not have known about it.

13. The sampling methodology outlined above was developed in collaboration with the airline industry in approximately 1997, before I took over the airline review program. In addition, while I was the program director, Continental participated in the INS User Fee Advisory Board, which regularly met to address issues concerning user fees. Never once during any meeting of the Advisory Board or during any of the reviews I supervised did Continental offer any objection to the methodology of the user fee reviews.

14. A goal of the audits was to ensure that a liability was assessed and a payment was received for those qualifying tickets for which Continental should have collected a user fee. Once Continental agreed to make payment, our office viewed this payment as an admission of liability; and, therefore, at the time of the audit, there was no need for the auditor to verify whether Continental's statement concerning non-collection was accurate. Because of this longstanding and mutual understanding between Continental and INS regarding Continental's liability for fees (whether collected from passengers or not), it did not occur to us that Continental would later contest its user fee liability for alleged non-collection of the user fees from passengers.

15. Had a timely challenge to the audit methodology been made by Continental, our office could have, and would have, taken earlier actions to clarify that it is lawful to require Continental (as well as all international air carriers) to remit international air passenger fees that it did not collect.

16. To my knowledge, at no time during these user fee audits or at any time thereafter did Continental ever present to INS any information about specific passengers – including those passengers from Central and South American countries –

who allegedly refused to pay the immigration user fee, as required by 8 C.F.R. § 286.4(c). Such required information would include the passenger's full name, complete address, nationality, passport number, and alien file number. As the program director, I would have been made aware of such passenger refusals if they had been presented to the auditor.

17. As I explained in my declaration in the American Airlines case, which has been referenced in this case, when my office stated in the Report of Compliance for Americans' review period of January 1, 2002, thru December 31, 2002, that "[t]he above 8 [South and Central American] countries were grouped together, since those countries prohibited ticket agents from collecting user fees/taxes for foreign countries at the time of ticket sale," this statement was not intended to represent the legal position of the federal government on this subject. Our office did not consult with government counsel to confirm the assertion regarding the laws of other countries made by American. Nor did our office intend to make a legal conclusion about the state of the law in other countries. Rather, we simply were relying on the representations made to us by American, our own observations about the higher than usual error rate for the selected Santo Domingo flight, and anecdotal information about these types of collection problems.

18. If Continental had submitted information about passengers refusing to pay them the user fees, INS would have followed its normal business practice. Specifically, the INS-Debt Management Center would have contacted the individual passenger to determine the reason for refusal to pay the user fee and would have pursued collection of the fee. If a passenger indicated that he or she had not refused to pay the fee or if the passenger indicated that the airline had not requested that the passenger pay the fee, INS would have sought additional information and/or payment from the airline.

19. If a passenger had, in fact, refused to pay and the information about that passenger had been submitted to INS by the airline as required by 8 C.F.R. § 286.4(c), then our office during a review would have checked the name of the passenger against the list of passengers with potential errors and removed that ticket, if it appeared, from the list of potential errors. In essence, if there a was a ticket that INS could verify that the passenger refused to pay the fee and the airline had provided INS with notice of the refusal, as required by 8 C.F.R. § 286.4(c), then our office would treat such a ticket as one for which the airline would not be required to remit the user fee.

20. In preparing this declaration, I was unable fully to review the INS Debt Management Center records or INS Compliance Division audits along with their support papers relating to airline user fees, which are now in the custody of CBP.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 20th day of March 2007.

Barbara Blessing