# DUANE I. ROBINSON DEPOSITION
# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1736C |
| v. | ) | (Judge Braden) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSES TO PLAINTIFF'S INTERROGATORIES No. 1-4

Pursuant to Rule 33 of the Court's Rules, and agreement of counsel, defendant, the United States, responds as follows to the first four interrogatories in the discovery requests that plaintiff served by hand on April 6, 2007. (The parties have stipulated that we need not respond to the other discovery requests that plaintiff served on that date.)

PENGAD 800-631-6989
EXHIBIT
1
5/18/07

RESPONSES TO INTERROGATORIES

1. State the basis for your affirmative defense of accord and satisfaction.

Response:

We assert this defense with respect to the claims involving the (i) immigration inspection user fee audits covering (a) July 1998 through June 2000, and (b) July 2000 through December 2001; and (ii) the AQI user fee audits covering (a) July 1996 through June 1998, (b) July 1998 through June 2000, (c) October 2000 through December 2001, and (d) January through December 2002. A claim is discharged by accord and satisfaction when "some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim." Community Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1581 (Fed. Cir. 1993). This defense is essentially contractual. Its elements are authority to contract, relevant subject matter, an objectively expressed meeting of the minds, and consideration. Mil-Spec Contrs., Inc. v. United States, 835 F.2d 865, 867 (Fed. Cir. 1987); Brock & Blevins Co. v. United States, 170 Ct. Cl. 52, 59, 343 F.2d 951, 955 (1965).

By letter dated November 28, 2000, the INS advised AA it would "not be charged interest" upon the amount of immigration user fees that had been found to be due for the period from July 1998 through June 2000 ($412,855), provided AA made payment within 30 days. By letter dated May 3, 2002, the INS advised AA it would not be charged interest upon the amount of immigration user fees owed for July 2000 through December 2001 ($160,878), if AA paid within 30 days. It was also the policy of the APHIS auditing office to waive interest in return for prompt payment. That policy was followed for AA's payment of $150,572.48 in December 1998. Additionally, in undated correspondence in 2000, APHIS advised AA it would not be charged

interest on the amount of AQI user fees owed for July 1998 through June 2000 ($299,106.51), if AA paid "by November 15, 2000." By letter dated April 26, 2002, APHIS advised AA it would not be charged interest on the amount of AQI user fees owed for October 2000 through December 2001 ($345,936.76), if AA paid "by April 1, 2002." In each instance, AA remitted its audit liability in full, on or before the date indicated, and the agency assessed no interest. Because (i) AA and the authorized Government representatives expressly agreed that the parties would exchange consideration, viz., prompt and full payment by AA of its audit liabilities, in exchange for the agencies' waivers of interest, and (ii) both parties performed as agreed, any potential claims by either party with respect to the amounts owed by AA, including AA's illegal exaction claims, were extinguished by accord and satisfaction. See generally 29 Williston On Contracts § 73:27 (4th ed. 2006). "If plaintiff[] had intended to leave a claim . . . open, [its] intention to do so should have been made manifest and explicit . . . ." Cannon Constr. Co. v. United States, 162 Ct. Cl. 94, 319 F.2d 173, 177 (1963).

Separately, in April 2003, APHIS directed AA to remit $773,109.18 to resolve the AQI user fee audit covering calendar year 2002. In May 2003, AA appealed the amount of the audit liability. It did not challenge the existence of a liability. A letter to AA from APHIS dated August 14, 2003 memorializes the parties' settlement of that appeal, by agreement upon "a final audit liability amount of $298,298.37." Accordingly, the CY 2002 audit was resolved in exchange for AA's payment of the stated amount. Again, the parties' exchange of negotiated consideration conclusively resolved all claims by either party with respect to the subject matter of the audit; and accord and satisfaction bars AA from recovering the amount that it agreed to pay, and the Government agreed to accept, in settlement.

2. State the basis for your affirmative defense of equitable estoppel.

Response:

Equitable estoppel bars recovery where a claimant "acquiesced in the [underlying] transaction in such a manner as to change the relationship of the parties and make its repudiation of the proceedings contrary to equity and good conscience." Stevens Mfg. Co. v. United States, 8 F. Supp. 720, 80 Ct. Cl. 183, 192-93 (1934), quoted in Emeco Indus, Inc. v. United States, 202 Ct. Cl. 1006, 485 F.2d 652, 657 (1973); accord Union Pac. R.R. v. United States, 847 F.2d 1567, 1570 (Fed. Cir. 1988).

In designing each and every audit at issue in this case, the Government auditors, with AA's full knowledge and acquiescence, adopted the premise that instances in which AA failed to document the collection of a user fee would be deemed instances of "non-collection" and would be included in the statistical estimates of the "error rates." Thus, had AA, in fact, collected a user fee for a particular ticket in the audit, but failed to document the collection for the auditors for any reason (e.g., clerical error), the auditors would not have learned of this – nor did they have reason to care. Had the Government known at the time of the audits that AA would later claim it was not legally liable for "uncollected" user fees – and that AA would rely upon the user fee audit reports in seeking damages based upon every supposed instance of "non-collection" represented by the statistically derived "error rates" – the agencies could have, and probably would have, taken some or all of the following steps.

CBP and APHIS could have revised their user fee regulations, or sought legislative changes, to clarify their authority to require air carriers to remit user fee amounts that they have failed to collect. APHIS, in particular, had an especially clear opportunity to obtain such action

by Congress during the drafting of the 1996 farm bill. See Pub. L. No. 104-127, 110 Stat. 888 (1996); H.R. Conf. Rep. No. 104-494, at 474 (1996), reprinted in 1996 U.S.C.C.A.N. 683, 843. Independently, the agencies' auditors could have (i) performed additional reviews of AA's internal controls (similar to the close review performed on importers to confirm proper payment of import duties), to identify problem areas that could be resulting in failures to collect user fees; (ii) demanded fuller explanations for, or additional proof of, incidents of non-collection; and (iii) expressly qualified the audit results, to clarify that there was no affirmative "finding" that AA did not collect the fees that it told the auditors it did not collect. Additionally, when prescribing and periodically revising the amount of the AQI user fee, the Department of Agriculture could have factored in an increment for expected shortfalls in collections by airlines, had it known of AA's denial of liability. By remaining silent, AA inequitably deprived the Government of these logical options. Affiants Daune Robinson, Barbara Blessing, and Kevin Shea may be called to testify to the above.

3. State the basis for your affirmative defense of laches.

Response:

Laches will bar recovery if "unreasonable and unexcused" delay by plaintiff in asserting its claims results in either litigating or economic prejudice to defendant. Cornetta v. United States, 851 F.2d 1372, 1377-78 (Fed. Cir. 1988) (en banc). AA offers no justification for delaying the assertion of its illegal exaction claims until well after the audits at issue were concluded (except the final two audits, which were first properly alleged in February 2007, in the amended complaint, and were conducted during this litigation, prior to the resolution of the motions regarding liability).

The prejudice to the Government caused directly by AA's dilatory pursuit of its claims substantially resembles the prejudice identified above, with respect to equitable estoppel. The Government has suffered prejudice in the context of this litigation because no audits were conducted for the purpose of verifying AA's non-collection of user fees, for those audited tickets for which AA reported non-collection of a fee. Therefore, we lack the audit results or other data necessary to test AA's allegations that it made remittances, in particular amounts, of "uncollected" fees. Similarly, if AA recovers damages, CBP and APHIS will suffer economic prejudice as a result of having been deprived of their opportunities to avoid liability by amending their regulations; obtaining clarifications from Congress of the respective user fee statutes; conducting more detailed user fee audits; increasing the user fee rate (in APHIS's case); or a combination of these. Affiants Daune Robinson, Barbara Blessing, and Kevin Shea may be called to testify to the above.

4. State the basis for your affirmative defense of waiver.

Response:

Absent an express statutory prohibition (which does not exist here), a party may waive regulatory, statutory, and even constitutional rights or claims. Madigan v. Hobin Lumber Co., 986 F.2d 1401, 1403 (Fed. Cir.1993). Recovery is barred provided the waiver of a claim was knowing and voluntary. Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1563 (Fed. Cir. 1980) (citing Brookhard v. Janis, 384 U.S. 1, 4, 5 (1966)). By its conduct during the planning and conduct of the user fee audits, and by remitting the amounts that the auditors determined were owed, AA accepted voluntarily, and without reservation or objection, the premise that it was liable for fees that it should have collected from covered passengers and remitted to the Government, but which were not remitted, for any reason, regardless of whether those fees had been collected. AA did this not once, but repeatedly. Moreover, it had full knowledge of the user fee statutes and regulations the entire time. Accordingly, AA knowingly, voluntarily, and repeatedly forswore the illegal exaction theories that it advances now. Affiants Dawne Robinson, Barbara Blessing, and Kevin Shea may be called to testify to the above.

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

OF COUNSEL:

ANDREW S. KOSEGI
Attorney
U.S. Customs and Border Protection
Indianapolis, IN

CYNTHIA A. KOCH
Senior Counsel
United States Department of Agriculture
Washington, DC

May 7, 2007

KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7561
Fax: (202) 305-7644

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 7th day of May 2007, I caused the attached discovery responses to be served by U.S. mail upon:

Adam P. Feinberg
Miller & Chevalier
655 15th Street, N.W.
Suite 900, Metro Square
Washington, DC 20005-2701

______________________________

# DUANE I. ROBINSON DEPOSITION
# EXHIBIT 2

U.S. Department of Homeland Security
Washington, DC 20229

U.S. Customs and
Border Protection

FEB 4 2005

Mr. Monty Hobbs
Supervisor – Transportation Tax Control
American Airlines, Inc.
Revenue Accounting
4333 Amon Carter Boulevard
Fort Worth, Texas 76155-2664

Dear Mr. Hobbs:

Enclosed is the U.S. Customs and Border Protection (CBP), Regulatory Audit Division report on our review of American Airlines' compliance with Immigration User Fees (IUF), Customs Passenger Processing Fees (PPF), and APHIS Passenger and Landing Fee regulations for the review period of January 1, 2003 to June 30, 2004, and APHIS Landing Fee for the prior period. This report includes operational observations and an assessment of the liability due to DHS for the fees. Details of the findings and financial liability were discussed with you and Ms. Teresa Isakson at the exit conference.

**Immigration User Fee Liability:**

The total financial liability finding of $270,274 represents findings regarding unremitted fees and errors only and does not include interest or penalties.

**Customs PPF Liability:**

The financial liability finding of $136,202 represents findings regarding unremitted fees and errors only and does not include interest or penalties.

**APHIS Passenger and Landing Fee Liability:**

The financial liability finding of $101,224 passenger fees and $832,394.25 landing fees represents findings regarding unremitted fees and errors only and does not include interest or penalties.

**Exhibit 2 to Hobbs Declaration**

EXHIBIT 2 5/18/07 abc

**Additional Charges:**

As notified in our initial letter to you, DHS and USDA are authorized by Federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to issue interest and any administrative charge assessments and/or penalties, as appropriate as a result of the findings in this audit. Any interest or charges will be issued directly from the U.S. Customs and Border Protection (CBP), National Finance Center (NFC) for the IUF and PPF and from the APHIS collection office for the APHIS fees in a separate mailing from this final audit report. Interest and penalties will be computed back to the period when the fees should have been remitted.

**Remittances:**

**Remittances of the IUF and PPF amounts due may be made by:**

**Checks:** Checks should be mailed to:

U.S. Customs and Border Protection
Attn: User Fee Team
6026 Lakeside Boulevard
Indianapolis, Indiana 46278

Please enclose the Exhibits with your check for clarity of payment intent.

**Wire Transfers:** ABA #021030004
Account #70 05 0096
U.S. Treasury – FRB New York
33 Liberty Street
New York, New York 10045
(212) 720-5000

The sender should make certain the following information is put on the payment:

1. Company Name
2. Company IRS Number
3. An indication of what the payment is for (include Exhibit(s) from Audit):
a. Passenger User Fees for quarter and year
b. Railroad User Fees for month and year
c. Promissory Note number, bill number or audit finding, if applicable.

Any questions concerning fed wire transfers can be addressed to Ms. Sue Warren at (202) 874-8896.

**ACH Credit:** Automated Clearinghouse (ACH) credit is an electronic process that allows companies to transmit their payment directly to the U.S. Customs and Border Protection, without disclosing their company's bank account information. If you have questions concerning the ACH credit process or would like to set up an account, please contact Ms. Dee Baskerville of the U.S. Customs and Border Protection at (317) 614-4466.

IUF and PPF billing and payment questions should be addressed to Kara Welty of the NFC, at (317) 614-4614.

**Remittances due for the APHIS Passenger and Landing Fees:**

Remit funds for APHIS fees to:

**Lockbox:**
USDA, APHIS, AQI
P.O. Box 952181
St. Louis, Missouri 63195-2181

Physical address for overnight deliveries:
US Bank
Attn: Government Lockbox – P.O. Box 952181
1005 Convention Plaza
St. Louis, Missouri 63101

**ACH Credit:** Automated Clearinghouse (ACH) credit is an electronic process that allows companies to transmit their payment directly to the APHIS account at US Bank in St. Louis, Missouri. Please process your electronic payment to the account listed below:

ABA Router Number - 081000210
Account Number - 1001104072
Refer to Lockbox Number: 952181

For ACH, please include your company name, company IRS taxpayer identification number and indicate that the payment is for an audit liability.

Any questions regarding payment of APHIS user fees should be addressed to the collection office via e-mail to abshelpline@aphis.usda.gov or by telephone to (612) 336-3400 or toll free in the US at (877) 777-2128.

**<u>To aid in all payments, please include a copy of the Exhibits with the appropriate payments.</u>**

The CBP team greatly appreciates the cooperation and assistance your staff provided us during this review.

Sincerely,

Daune I. Robinson
Director
Field Oversight Division I

Enclosures

# Inspection User Fee

# Report of Compliance

# On

# American Airlines, Inc.

**Review Period**
January 1, 2003 through June 30, 2004
IUF, Customs PPF, and APHIS

**Review Dates**
August 23-27, 2004

WARNING: CRIMINAL PENALTIES
This document contains trade secrets and commercial and financial information relating to the confidential business of private parties. The Trade Secrets Act, (18 U.S.C. 1905), provides penalties for disclosure of such information. Federal employees who violate this act by making wrongful disclosures of confidential commercial information may be subject to a personal fine not more than the greater of $100,000 or, if the person derives a financial gain from the offense, or the offense results in a financial loss to another person, a fine up to twice the gross gain or loss (18 U.S.C. 3571(b), (d)), imprisonment for not more than one year, or both; and shall be removed from employment. Also, improper disclosure of certain information contained in this document may constitute a violation of the Privacy Act (5 U.S.C. 552a) and violators could be subject to a fine of not more than $5,000.00.

Any disclosure, dissemination, or reproduction of this document or any of its contents is prohibited without the approval of the Regulatory Audit Field Director who signed the report.

# TABLE OF CONTENTS

Page

1. **Background** .......... 1
   a. Immigration User Fees
   b. Customs Passenger Processing Fees
   c. APHIS Passenger and Aircraft Landing Fees
   d. Data on American Airlines, Inc.
2. **Review Objectives** .......... 2
3. **Scope and Methodology** .......... 2
4. **Findings and Recommendations** .......... 4
5. **Liability** .......... 6

**EXHIBIT 1: IUF Liability Calculations**

**EXHIBIT 2: PPF Liability Calculations**

**EXHIBIT 3: APHIS Passenger Fee Liability Calculations**

**EXHIBIT 4: APHIS Aircraft Clearance Fee Liability Calculations**

**EXHIBIT 5: APHIS Aircraft Clearance Fee Liability Calculations Prior Periods**

# 1. Background

## a. Immigration User Fees (IUF)

In 1986, the U.S. Congress passed the Omnibus Appropriation Bill (PL 99-500 and PL 99-591). This legislation permits the U.S. Department of Homeland Security (DHS) to collect Immigration User Fees (IUF). These fees offset the cost of inspecting incoming passengers at U.S. Ports of Entry to ensure that they are admissible to the United States. On December 20, 1993, the user fee was established at $6 per passenger. Effective May 1, 2002, the fee was increased to $7. Effective February 28, 2003, a $3 fee was established for the previously exempt areas for cruise line travel.

## b. Customs Passenger Processing Fees (PPF)

Effective July 7, 1986, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Public Law 99-272, authorized Customs to collect user fees for certain services. On June 25, 1999 the Miscellaneous Trade and Technical Corrections Act of 1999 (Public Law 106-36) was signed into law. This law authorized: (1) continuation of the $5 fee for those passengers aboard commercial vessels or aircraft arriving in the United States territories, possessions, and adjacent islands, and (2) establishment of a new fee of $1.75 per passenger arriving aboard commercial vessels form Canada, Mexico, or the United States territories, possessions, and adjacent islands. Effective November 3, 2003, the authority provided Customs and Border Protection (CBP) to collect certain user fees under the Consolidated Omnibus Budget and Reconciliation Act was extended to March 1, 2005. The fees affected are those authorized by 19 U.S.C. 58c, subpart a.

## c. APHIS Passenger and Landing Fees

The Food, Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990 authorized the U.S. Department of Agriculture (USDA) through the Animal, Plant and Health Inspection Service (APHIS) to collect various user fees. These fees include agricultural quarantine and inspection services provided in connection with the arrival of commercial aircraft and international passenger arrivals at ports in the Customs territory of the U.S. The Farm Bill defines the U.S. Customs territory as the 50 States, the District of Columbia, and Puerto Rico.

APHIS published a final rule in the Federal Register on April 12, 1991, requiring airlines to collect a user fee from international air passengers arriving in the U.S. Customs territory from countries other than Canada. These fees became effective on May 13, 1991. On January 9, 1992, APHIS published a final rule requiring an inspection fee for commercial aircraft arriving in the U.S. from

countries other than Canada, effective February 9, 1992. Aircraft and passengers on flights originating in Canada are excluded from APHIS.

### d. American Airlines

American Airlines, Inc. is the largest United States airline and a subsidiary of AMR Corporation. According to October 2004 Yahoo finance website, American Airlines has a fleet of 740 airplanes and has hubs in Dallas/Fort Worth, Miami, Chicago, and San Juan, Puerto Rico. American Airlines flies to over 150 destinations worldwide. AMR also owns a commuter airline, AMR Eagle Holding, which itself owns American Eagle Airlines (flies to/from Canada, Bahamas, and the Caribbean) and Executive Airlines (flies from/to Miami and San Juan, Puerto Rico). AMR purchased the assets of TWA about 3 years ago. AMR is part of the "Oneworld" airline alliance with major strategic partners such as: British Airways, Cathay Pacific, Finnair, Iberia, Qantas, Aer Lingus, and Lan Chile. American Airlines had approximately 96,000 airline employees at the end of 2003. American Airlines' website is "www.aa.com."

## 2. Review Objectives

The objectives were to: 1) evaluate the adequacy and reliability of internal controls, collections, recording, reporting, and remittance systems for user fees; 2) determine compliance with user fee regulations; and 3) partner with the company, providing information and advice to facilitate continued compliance with prevailing regulations.

## 3. Scope and Methodology

### a. Scope

The review covered the period January 1, 2003 to June 30, 2004, for IUF, PPF, and APHIS and was performed at the company's office in Dallas, Texas, between August 23-27, 2004.

### b. Methodology

We tested for collection, recording, reporting, and remittance compliance.

**<u>Collection compliance</u>:**

Collections based on Sales:


SENSITIVE – PROPRIETARY INFORMATION

To test collection compliance for the sales based remittance, passenger ticket-lifts for nine random sample flights were negotiated with American Airlines for flights from September 2003 through May 2004. This resulted in a net qualifying sample count of 1,444 for Immigration (XY), 1,335 for APHIS (XA), and 1,100 for Customs PPF (YC).

Random sample review:

We traced the collection of fees from a random sample of net qualifying ticket-lifts, manifests and passenger reports through the separate sales methods and to the general ledger (GL) liability account. Errors found during this process were:

| | |
|---|---|
| Immigration User Fee | 3.5 |
| Customs PPF | 4.0 |
| APHIS Passenger Fee | 3.0 |

| **Flight Arrival Date** | **Flight #** | **AIRPORTS** | **REMARKS** |
|---|---|---|---|
| November 30, 2003 | AA447 | Toronto-ORD | XY only |
| January 1, 2004 | AA5381 | British VI-San Juan | XA/XY |
| February 18, 2004 | AA2132 | Panama-MIA | All Fees |
| January 3, 2004 | AA954 | Honduras-MIA | All Fees |
| February 7, 2004 | AA49 | France-DFW | All Fees |
| September 9, 2003 | AA176 | Japan-DFW | All Fees |
| March 19, 2004 | AA1638 | Mexico-DFW | XY/XA |
| April 18, 2004 | AA970 | Nicaragua-MIA | All Fees |
| May 21, 2004 | AA906 | Brazil-MIA | All Fees |

**Recording activity:**

To test recording compliance, airline tickets from the Airport Ticket Offices (ATO), the City Ticket Office (CTO), the Airline Reporting Corporation (ARC), and the Bank Settlement Plan (BSP) for the APHIS, Immigration, and Customs Passenger User Fee liabilities were traced from recorded ticket user fees to month-end journal entries and/or the summary of the general ledger accrual accounts. Tickets processed in April 2004 were used for walk-through for the above sales channels.

The company does not have contracts with student consolidators.

Employee, frequent flyer, infant tickets, etc:


SENSITIVE – PROPRIETARY INFORMATION

We selected employee pleasure and business travel tickets/passes from the sample flights to supporting documentation for applicable user fee collections from the employee payroll-personnel system to the user fee general ledger liability accounts. The company is in compliance with user fee regulations for frequent flyer and infant tickets.

*Charter Flights:*

We reviewed the two categories of charter contracts and traced collections for the user fee accounts to the respective subsidiary general ledger accounts.

**Reporting activity:**

To test reporting compliance, each sales channel was traced to associated sales reports and to the general ledger liability accounts.

**Remitting activity:**

During the period reviewed, American Airlines remitted:

| | |
|---|---|
| $ 112,343,888.58 | Immigration User Fees |
| $ 37,697,927.34 | Customs Passenger Fees |
| $ 45,909,527.33 | APHIS Passenger Fees |
| $ 6,023,553.75 | APHIS Landing Fees |

To test remittance compliance, data from American Airlines was traced to remittances received for the report period.

Method of remitting:

During the period January 2003 through June 2004, remittance was based on sales. A summary of the sales reports was prepared and accumulated monthly. At end of the quarter the remittance was generated based on the GL balance(s).

## 4. Findings and Recommendations:

**User Fees:**

**FINDING 1: Error Rate on Qualifying Tickets for IUF, PPF, and APHIS**

Of the 1,444 passengers that qualified for Immigration User Fee (IUF) for the period January 2003 through June 2004, the company failed to collect or allocate collected user fees on 3.5 tickets, which translates to an error rate of 0.24

percent. Of the 1,100 passengers that qualified for Customs Passenger Processing Fees for the period January 2003 through June 2004, the company failed to collect or allocate collected user fees on 4 tickets, which translates to an error rate of 0.36 percent. Of the 1,335 passengers that qualified for APHIS Passenger Processing Fee for the period January 2003 through June 2004, the company failed to collect or allocate collected user fees on 3 tickets, which translates to an error rate of 0.22 percent.

The additional liability due as a result of the error rate applied to user fees collected for the review period is as follows:

| | |
|---|---|
| Immigration User Fees (IUF) | $270,274 (See Exhibit 1) |
| Customs Passenger Processing Fees | $136,202 (See Exhibit 2) |
| APHIS Passenger Fees | $101,224 (See Exhibit 3) |

**Recommendation:** The company should immediately remit the additional liability mentioned above. In addition, the company should implement procedures to improve remittance compliance.

**APHIS Aircraft Landing Fees:**

**Finding 2: Difference in APHIS Aircraft Landing Remittance Current Audit Period**

Our review of the APHIS aircraft landing fees determined that the company did not report and remit aircraft landing fees on 9,856 flights. This resulted in additional liability of $643,104. (See Exhibit 4).

During our audit, the company conducted an assessment of landing fees reported on the prior audit and discovered that 2,901 flights were not reported for review period October 2001 through December 2002. The additional landing liability for the prior period is $189,290.25. (See Exhibit 5).

**Recommendation:** The company should immediately remit the additional APHIS aircraft landing fees and is encouraged to implement complete internal reviews to lessen the impact of differences in remitting APHIS aircraft landing fees.

## 5. Liability

**a. Immigration User Fees (IUF) and Customs Passenger Processing Fees (PPF):**



SENSITIVE – PROPRIETARY INFORMATION

IUF - A total outstanding liability of $270,274 is assessed. (See Exhibit 1)
PPF – A total outstanding liability of $136,202 is assessed. (See Exhibit 2)

Note: The CBP, National Finance Center (NFC), will determine if interest and penalty amounts are due on Immigration User Fees and Customs Passenger Processing Fees collected by the carrier but not remitted. Interest and penalties will be computed back to the period when the fees should have been remitted and the carrier will be invoiced by the NFC for these amounts after the receipt of this final audit report. Audit liability amounts attributable to errors (such as those found by sampling during the audit process) will be subject to interest and penalties.

**b. APHIS Passenger and Aircraft Landing Fees:**

APHIS Passenger Fee - A total outstanding liability of $101,224 is assessed. (See Exhibit 3)

APHIS Aircraft Landing Fee

A total outstanding liability of $643,104 is assessed for the current review period. (See Exhibit 4)

A total additional outstanding liability of $189,290.25 is assessed for the prior review period as a result of the self-assessment conducted by the company during our audit. (See Exhibit 5)

Note: The USDA, APHIS Collections Office will determine if interest and penalty amounts are due on APHIS Passenger User Fees collected by the carrier but not remitted. Interest and penalties will be computed back to the period when the fees should have been remitted and the carrier will be invoiced for these amounts after the receipt of this final audit report. Audit liability amounts attributable to errors (such as those found by sampling during the audit process) will be subject to interest and penalty.

Daune I. Robinson


SENSITIVE – PROPRIETARY INFORMATION

AMERICAN AIRLINES Exhibit

# DHS - IUF Liability Calculations

| | |
|---|---|
| Sampled qualifying tickets: | 1444 |
| IUF not collected: | 3.5 |
| Error rate: | 0.24% |

| Year | Periods | Net Collections Posted to G/L | +Error Rate | Total IUF Due(1) | IUF Remitted | IUF Outstanding |
|---|---|---|---|---|---|---|
| 2003 | Jan-Mar | $ 16,323,141 | $ 39,270 | $ 16,362,411 | $ 16,323,141 | $ 39,270 |
| | Apr-Jun | $ 18,363,738 | $ 44,179 | $ 18,407,917 | $ 18,363,738 | $ 44,179 |
| | Jul-Aug | $ 12,859,056 | $ 30,935 | $ 12,889,991 | $ 12,859,056 | $ 30,935 |
| | Sep | $ 6,032,797 | $ 14,515 | $ 6,047,312 | $ 6,032,797 | $ 14,515 |
| | Oct-Dec | $ 17,122,415 | $ 41,193 | $ 17,163,608 | $ 17,122,415 | $ 41,193 |
| 2004 | Jan-Mar | $ 20,253,016 | $ 48,724 | $ 20,301,740 | $ 20,253,016 | $ 48,724 |
| | Apr-Jun | $ 21,389,726 | $ 51,458 | $ 21,441,184 | $ 21,389,726 | $ 51,458 |
| | TOTAL | $ 112,343,889 | $ 270,274 | $ 112,614,163 | $ 112,343,889 | $ 270,274 |

(1) (Recorded+Unrecorded)/(1-error rate)

AMERICAN AIRLINES

# DHS - PPF Liability Calculations

| | |
|---|---|
| Sampled qualifying tickets: | 1100 |
| PPF not collected: | 4 |
| Error rate: | 0.36% |

| Year | Periods | Net Collections Posted to G/L | +Error Rate | Total PPF Due(1) | PPF Remitted | PPF Outstanding |
|---|---|---|---|---|---|---|
| 2003 | Jan-Mar | $ 5,378,093 | $ 19,430 | $ 5,397,523 | $ 5,378,093 | $ 19,430 |
| | Apr-Jun | $ 6,141,196 | $ 22,188 | $ 6,163,384 | $ 6,141,196 | $ 22,188 |
| | Jul-Sep | $ 7,263,203 | $ 26,242 | $ 7,289,445 | $ 7,263,203 | $ 26,242 |
| | Oct-Dec | $ 4,835,047 | $ 17,469 | $ 4,852,516 | $ 4,835,047 | $ 17,469 |
| 2004 | Jan-Mar | $ 6,995,743 | $ 25,276 | $ 7,021,019 | $ 6,995,743 | $ 25,276 |
| | Apr-Jun | $ 7,084,645 | $ 25,597 | $ 7,110,242 | $ 7,084,645 | $ 25,597 |
| | TOTAL | $ 37,697,927 | $ 136,202 | $ 37,834,129 | $ 37,697,927 | $ 136,202 |

(1) (Recorded+Unrecorded)/(1-error rate)

American Airlines, Inc. Exhibit 3

# APHIS Passenger Liability Calculations

Sampled qualifying tickets: 1335
APHIS not collected: 3
Error rate: 0.22%

| Year | Periods | Net Collections Posted to G/L | +Error Rate | Total APHIS Due(1) | APHIS Remitted | APHIS Outstanding |
|---|---|---|---|---|---|---|
| 2003 | Jan-Mar | $ 6,683,029 | $ 14,745 | $ 6,697,774 | $ 6,683,028 | $ 14,745 |
| | Apr-Jun | $ 7,482,548 | $ 16,516 | $ 7,499,064 | $ 7,482,548 | $ 16,516 |
| | Jul-Sep | $ 7,662,823 | $ 16,916 | $ 7,679,739 | $ 7,662,823 | $ 16,916 |
| | Oct-Dec | $ 7,068,782 | $ 15,599 | $ 7,084,381 | $ 7,068,782 | $ 15,599 |
| | | | | | | |
| 2004 | Jan-Mar | $ 8,403,886 | $ 18,499 | $ 8,422,385 | $ 8,403,886 | $ 18,499 |
| | Apr-Jun | $ 8,608,459 | $ 18,949 | $ 8,627,408 | $ 8,608,459 | $ 18,949 |
| | Jul-Sep | | $ - | | | $ - |
| | Oct-Dec | | $ - | | $ - | $ - |
| | | | | | | |
| | TOTAL | $45,909,527 | $ 101,224 | $ 46,010,751 | $45,909,527 | $ 101,224 |

(1) (Recorded+Unrecorded)/(1-error rate)

## Aircraft Clearance Fee Liability Calculations

| Year | Periods | Calculated from Record | APHIS Aircraft Clearance Remitted | APHIS Aircraft Clearance Outstanding (2) |
|---|---|---|---|---|
| 2003 | Jan-Mar | $ 1,086,543 | $ 985,210 | $ 101,333 |
| | Apr-Jun | $ 1,044,131 | $ 934,837 | $ 109,294 |
| | Jul-Sep | $ 1,127,324 | $ 1,026,317 | $ 101,007 |
| | Oct-Dec | $ 1,099,071 | $ 997,477 | $ 101,594 |
| | | | | |
| 2004 | Jan-Mar | $ 1,150,749 | $ 1,042,695 | $ 108,054 |
| | Apr-Jun | $ 1,158,840 | $ 1,037,018 | $ 121,822 |
| | Jul-Sep | | | |
| | Oct-Dec | | | |
| | | | | |
| | TOTAL | $ 6,666,658 | $ 6,023,554 | $ 643,104 |

(2) Based on 61 American and 9,795 American Eagle/Executive @ $65.25 equals $643,104.00
The 61 flights unpaid were allocated straight line; the 9,795 were allocated as reported

# Aircraft Clearance Fee Liability Calculations

Prior Periods: Self Assessment Conducted by the Carrier During the Review

| Year | Prior Periods | Calculated from Record | APHIS Aircraft Clearance Remitted | APHIS Aircraft Clearance Outstanding (1) |
|---|---|---|---|---|
| 2001 | Jan-Mar | $ 991,323 | $ 991,323 | $ - |
| | Apr-Jun | $ 1,051,346 | $ 1,051,346 | $ - |
| | Jul-Sep | $ 991,128 | $ 991,128 | $ - |
| | Oct-Dec | $ 943,189 | $ 913,174 | $ 30,015.00 |
| | | | | |
| 2002 | Jan-Mar | $ 1,020,706 | $ 948,148 | $ 72,558.00 |
| | Apr-Jun | $ 999,891 | $ 992,714 | $ 7,177.50 |
| | Jul-Sep | $ 1,078,517 | $ 1,078,517 | $ - |
| | Oct-Dec | $ 1,081,845 | $ 1,002,305 | $ 79,539.75 |
| | | | | |
| | **TOTAL** | **$ 8,157,944.25** | **$ 7,968,654.00** | **$ 189,290.25** |

**(1) Based on 2,901 American Eagle/Executive @ $65.25 equals $189,290.25**

# DUANE I. ROBINSON DEPOSITION
# EXHIBIT 3

**U.S. Department of Justice**
Immigration and Naturalization Service

80/6.4

*Office of Financial Management*

*425 I Street NW*
*Washington, DC 20536*

July 17, 2003

AMERICAN AIRLINES
Mr. Monty Hobbs
ATTN: Ms. Christi White
P.O. Box 619616
Dallas/Fort Worth Airport
Texas 75-261-9616

Dear Monty Hobbs:

Attached is the Department of Homeland Security (DHS), Immigration Office of Financial Management report on our review of AMERICAN AIRLINES' compliance with Immigration User Fees (IUF) and Customs Passenger Processing Fees (PPF) regulations between January 1, 2002 and December 31, 2002. This report includes operational observations and an assessment of the liability due to DHS for the IUF and Customs PPF. Details of the findings and financial liability were discussed with you at the exit conference and subsequent telephone calls/E-Mail messages.

**Immigration User Fee Liability:**

The total financial liability finding of $603,840 does not include interest or penalties. Your firm will not be charged interest for $603,840 of the liability amount, if received by DHS within thirty (30) days from the date of this letter. As notified in our initial letter, audit liability amounts attributable to errors (such as those found by sampling during the audit process) will not be subject to interest and penalty, unless they remain unpaid for 30 days following the date of this audit report. For any amount received after that date, you subsequently will be billed interest effective from the end of the quarter in which the overdue fees should have been remitted.

Remittances of the amount due DHS may be made by wire transfer or check in U.S. dollars. Checks must be payable to the U.S. Department of Homeland Security. To ensure proper handling and crediting of your remittance, we ask that you include the DHS account number, 93963, and your taxpayer identification number on your check, which should be sent as follows:

By U.S. Postal Service:

U.S. Department of Homeland Security
c/o Bank One
P.O. Box 93963
Chicago, IL 60673-3963

EXHIBIT 3 5/18/07

**Exhibit 1 to Hobbs Declaration**

By Express Mail Center:

U.S. Department of Homeland Security
c/o Bank One
DHS Account Number 93963
525 West Monroe Street
7th Floor Mail Room
Chicago, IL 60661

If you remit your fee by wire transfer, Bank One requires the information below in order to process the transfer. Your company is responsible for any wire fees, please include them with any payment via this method.

Bank One's bank routing number: 071000013
DHS electronic account number: 1115146

Billing and payment questions should be addressed to Michelle King of the Debt Management Center, at 802-288-7714.

**U.S. Customs PPF Liability:**

The financial liability finding of $62,743 for U.S. Customs PPF represents findings regarding unremitted fees and errors only and does not include interest or penalties. DHS retains the right to issue interest and any administrative charge assessments and/or penalties as it deems appropriate as a result of the findings in this report. Any interest or charges will be issued directly from DHS regarding the Customs PPF in a separate mailing after the issuance of this report.

Remittances of the amount due DHS may be made by check in U.S. dollars. Checks must be payable to the U.S. Department of Homeland Security and sent to:

U.S. Department of Homeland Security
Collections Team-User Fees
6026 Lakeside Blvd.
Indianapolis, IN 46278

Customs billing and payment questions should be addressed to the Office of Finance, Cost Management Group, at (202) 927-0310.

The DHS team greatly appreciates the cooperation and assistance your staff provided us during this review.

Sincerely,

Barbara A. Blessing, Director
Compliance Division
Office of Financial Management

Attachment

# Department of Homeland Security
## *Immigration Office of Finance*

# *Immigration User Fee Remittance*

## Report of Compliance

## On

AmericanAirlines

# *American Airlines*

Review Period
January 1, 2002 to December 31, 2002
Review Dates:
March 10-14, 2003

# User Fee Remittance

# Report of Compliance

# On

# *AMERICAN AIRLINES*

Review Period
January 1, 2002 to December 31, 2002

Review Dates:
March 10-14, 2003

# TABLE OF CONTENTS

Page

1. BACKGROUND ....................1
   a. Immigration User Fees
   b. U.S. Customs PPF
   c. Data on American Airlines ....................2
2. REVIEW OBJECTIVES ....................3
3. SCOPE AND METHODS ....................3
4. OBSERVATIONS ....................7
5. FINDINGS AND RECOMMENDATIONS ....................9
6. IUF LIABILITY ....................9

EXHIBIT 1: IUF Liability Calculations ....................12

EXHIBIT 1A: IUF Liability Calculations for Central/South American at 4.8% ....................13

EXHIBIT 1B: IUF Liability Calculations for Rest of Population at 95.2% ....................14

EXHIBIT 2: PPF Liability Calculations ....................15

## 1. Background

### a. Immigration User Fees (IUF)

In 1986, the U.S. Congress passed the Omnibus Appropriation Bill (PL 99-500 and PL 99-591). This legislation permits the U.S. Department of Homeland Security (DHS) to collect Immigration User Fees (IUF). These fees offset the cost of inspecting incoming passengers at U.S. Ports of Entry to ensure that they are admissible to the United States. On December 20, 1993, the user fee was established at $6.00 per passenger. Effective May 1, 2002, the fee was increased to $7.00. Effective February 28, 2003, a $3.00 fee was established for the previously exempt areas for cruise line travel (no change for airlines as there are no exempt areas for IUF fees).

### b. Customs Passenger Processing Fees (PPF)

Effective July 7, 1986, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Public Law 99-272, authorized DHS to collect user fees for certain services. On June 25, 1999 the Miscellaneous Trade and Technical Corrections Act of 1999 (Public Law 106-36) was signed into law. This law authorized two things: (1) continuation of the $5.00 fee for those passengers aboard commercial vessels or aircraft arriving in the United States territories, possessions, and adjacent islands, and (2) establishment of a new fee of $1.75 per passenger arriving aboard commercial vessels form Canada, Mexico, or the United States territories, possessions, and adjacent islands.

### c. AMERICAN AIRLINES

American Airlines (AMR) is a major United States airline whose corporate headquarters are in Fort Worth, Texas. American Airlines is one of the largest scheduled airlines in the world. According to the June 2003 Yahoo finance website profile, AMR, which includes substantial assets of Trans World Airlines (TWA0 as of December 31, 2002), provided scheduled jet service to more than 152 destinations throughout North America, the Caribbean, Latin America, Europe, and the Pacific. Its internet website is www.aa.com. As of December 31, 2002, AMR had 109,600 employees. According to www.hoovers.com, American Airlines and its American Eagle subsidiary had a fleet of over 800 jets and hubs in Chicago, Dallas/Fort Worth, Miami, and San Juan, Puerto Rico. The fleet includes airlines such as: Fokker F-100, Boeing Super 80, Boeing 737-800, Boeing 757, Boeing 767, Airbus A300, Boeing 777-200, and American Eagle CRJ 700, ATR 42/72, ERJ 135, 140 and 145, and SAAB 340B.

AMR Eagle Holding, a wholly owed subsidiary of AMR, owns two regional airlines: American Eagle Airlines and Executive Airlines. These airlines provide connecting service from American Airlines U.S. major/smaller markets to Canada,

Bahamas, and the Caribbean serving 130 cities. AMR has announced plans to sell Executive Airlines which flies out of Miami and San Juan.

American Airline participates in the global network with other international airlines called the "Oneworld Partnership." Its major strategic alliance partners include: British Airways, Cathay Pacific, Finnair, Iberia, Qantas, Aer Lingus, and Lan Chile. Its other partners include: Air Pacific, Asiana Airlines, China Eastern Airlines, LOT polish Airlines, Swissair, El Al Israel Airlines, Eva Air, Japan Airlines, Turkish Airlines, and TAM Airlines.

American Airlines provided charter passenger services to these entities during the 2002 calendar review period.: Club Med; ABC; the Philadelphia Phillies and Tampa Bay professional baseball teams; Apple Vacations; and Holiday Express.

During the review, this office performed statistical sampling of tickets for flights from these international locations: Paris, France; Mexico City, Mexico; Narita, Japan; Toronto, Canada; Aruba; Santo Domingo, Dominican Republic; Brussels; San Jose, Costa Rica; Bogota, South American; and Guatemala City, Guatemala. Some of the departure cities have legal regulations which prohibit the collection of the respective XY user fees at source of ticket sales. Consequently, American Airline ticket agents enforce "post ticketing' collections of user fees.

## 2. Review Objectives

a. Evaluate the adequacy and reliability of internal controls, collections, recording, reporting, and remittance systems for user fees.

b. Determine compliance with user fee regulations.

c. Provide information and advice to the company to facilitate continued compliance.

## 3. Scope and Methods

### a. Review Period

The review covered the period between January 1, 2002 through December 31, 2002 and was performed at the company's office in Dallas, Texas, between March 10-14, 2003, by Eugene Schulman and Shirley Harrison, auditors. During the period reviewed, American Airlines remitted $66,281,357, in Immigration User Fees and $ 24,423,902 was remitted for the Customs Passenger Processing Fees. There were substantial issues

to complete, thus final activity was completed in late June 2003 which provided a final closure to data for the audit.

## b. Methods

User Fee regulations require airlines, travel agents, cruise lines and other ticket sellers to collect user fees during ticket sale. The sales should next be recorded on a sales report and posted to the general ledger with fees identified by appropriate categories (XY, YC, etc.). At the end of each specific payment period, the amount to be remitted should then be the cumulative balance in a general ledger liability account, which should be remitted to the appropriate agencies. When the user fees are collected in this manner the internal procedures and controls associated with **collecting, recording, reporting and remitting** user fees are reviewed.

American Airlines remits IUF and PPF based on ticket sales; however, fee liability is accrued in the accounting month as sales report stream of tickets is processed from various sales channels: Airline Reporting corporation (ARC), Billing and Settlement Plan (BSP), City Ticket Office (CTO), and direct sales including internet sales through the AMR website. The "PATH" database contains all sales sources (automated and manual). The ticket(s) image information is contained in the database and ticket summary information is retrieved from the databases (tables) by Ticket Number.

AMR also authorizes general sales agents throughout the world to use AMR's ticket stock to sell tickets for international travel. AMR accounts for these sales as 'direct reporting agencies" sales. Many of the general sales agents do not belong to ARC and/or BSP. Also, many of these agents provide manual tickets with a log of their ticket sales to American Airlines semi-monthly/monthly. American Airlines contracts with a private company in Juarez, Mexico to input source information into American Airlines sales revenue database related to the ticket fares, taxes including user fees.

The revenue database system aggregates sales transactions by sublevel codes such as: Q2 (Tax PFC PRAS Feeder INS user fees/PPF user fees; C5 (Passenger Revenue Accounting Charters; and F3 NRSA feeder-Employee Pleasure Travel. The integrity of the revenue database flows from the sales channels to the revenue database/subledgers then to the General Ledger accruals liability accounts for IUF and PPF. DHS verified the carrier's processes for collecting, recording, reporting, and remitting IUF and PPF.

For this review, we verified employee pleasure travel entries from a report generated from the NRSA database supporting the journal entry for both IUF and PPF for the accounting month of October 2002. Accordingly, we reduced the basis for extrapolating sample ticket exceptions for XY in the amount of $1,051,083 (see Exhibit 1A and 1B) and in the amount of $326,683 for YC (see Exhibit 2).

We traced the dollar remittances for the period from January 1, 2002 to December 31, 2002, from the American Airlines' General Ledger collections through deposits to the American Airlines' IUF and PPF fee liability account payments to DHS for IUF and PPF.

*Collection compliance:*

To test collection compliance, the initial (notification letter dated February 28, 2003) passenger ticket-lifts for six (6) random flights were negotiated with American Airlines. One of the original six flights (October 25, 2002 from Santo Domingo, Dominion Republic to New York (JFK) resulted in an sample ticket error rate of in excess of 7% (XY flight only as flights from the Caribbean to the U.S. are currently exempt for PPF and YC). This office agreed to stratify the sample results using this flight and 4.8%/95.2% geographic population split for ticket sales from SDQ and seven other countries versus the rest of the international ticket population. Based on discussions during the audit in March 2003 and immediately after the audit in April 2003, this office agreed that three additional flights to Central America and the Caribbean be added to the SDQ-JFK flight for a stratified total qualifying ticket count of 416 for XY at 4.8% and 400 qualifying ticket count for 95.2%. Thus, this office stratified the ticket sales and resulting XY remittances as $3,265,630 for 4.8% and $62,568,483 for 95.2% for extrapolation of sample ticket error rates. Exhibit 1, 1A, and 1B depict the sample ticket collection findings. *Note: Exhibit 1 for XY would apply if the qualified sample ticket population was not stratified.*

Thus, the initial six sample flights (two sample flights qualified for YC user fees) produced 516 qualifying tickets for XY and 246 qualifying tickets for YC which was less than the required representative statistical sample number of 333. Consequently, another flight was added for the YC which was on December 23, 2002 from Brussels to Chicago. When this flight's qualified sample tickets were added to the previous two original flights, American Airlines' qualified tickets for YC was then 385.

*Random sample review:*

We successfully traced the collection of user fees from a random sample of net qualifying ticket-lifts through the separate sales methods and ultimately to the general ledger liability account. For XY and its stratified random sample ticket review: this office found 17.142 errors were detected on 416 qualified tickets or a sample error rate of 4.12% at 4.8% stratified population and 3 errors were detected on 400 qualified tickets or a 0.75 error rate at 95.2% stratified population during this process for IUF; and 1 of error on 385 qualifying tickets or a sample error rate of .0026% for Customs PPF.

*Random sample review flights:*

| Arrival Date | | Flight # | XY | YC | Remarks |
|---|---|---|---|---|---|
| CDG-MIA | 2/27/02 | #63 | Yes | Yes | Original six |

| | | | | | |
|---|---|---|---|---|---|
| MEX-DFW | 7/5/02 | #1542 | Yes | No | Original six |
| NRT-LAS | 12/18/02 | #128 | Yes | Yes | Original six |
| YOW-ORD | 12/23/01 | #4308 | Yes | No | Original six |
| ARU-SJU | 12/23/02 | #5517 | Yes | No | Original six |
| SDQ-JFK | 10/25/02 | #180 | Yes | No | Original six |
| BUR-ORD | 12/23/02 | #89 | No | Yes | Added YC |
| GUA-DFW | 4/15/03 | #2196 | Yes | No | Added XY |
| SJO-DFW | 4/15/03 | #2166 | Yes | No | Added XY |
| BOG-MIA | 4/15/03 | #0914 | Yes | No | Added XY |

*Note: Added Flight SJO-DFW on 158 qualified tickets resulted in no sample ticket errors. The other two added XY flights from GUA and from BOG did result in 5 and 4 sample ticket errors.*

*__Recording activity:__*

To test recording compliance, data regarding Airlines Reporting Corporation (ARC), Bank Settlement Plan (BSP), Airport Ticket Offices (ATO), and City Ticket Offices (CTO), and other revenue sources were traced. The company represented it had no contracts with student consolidators during the review period. Accordingly, sales source tickets were traced for ARC, ATO, CTO, and BSP sales sources. All tickets reviewed were successfully traced to the respective XY and YC sales reports and to the respective XY and YC collection sources.

*Charter Flight:*

We satisfactorily reviewed a schedule of American Airlines' **charter flights** for the review period and compared the calculated user fee liability to the amount posted in the general ledger.

*Employee Pleasure Travel*

We performed a separate sample of American Airlines' employee pleasure travel (NRSA) for the period October 2002 to ensure compliance for the review period. For the review period NRSA provided a database that contained employee pleasure travel net collections of #156,480 or $1,051,083 for XY and #65,337 or $326,684 for YC. We selected a representative sample of transactions to validate the entries for XY and YC, respectively to test that the respective $7 XY and $5 YC fees were properly recorded in the NRSA database and journaled to the PATH system. We paid special attention to refunds paid/contra collections for transactions recorded in the NRSA database. Based on the review, we believe that generally American Airlines was able to provide sufficient documentation to trace collections to the NRSA from the employee payroll account for travel that was completed and recorded in the NRSA. We could not determine if all

employee pleasure travel for qualified international travel to the U.S. that was completed during the review period was recorded in the NRSA. We could not perform random tests by employee to determine if all applicable pleasure travel was properly recorded in the NRSA and then journaled to the respective XY and YC accrual liability general ledger accounts.

*Frequent flyer, infant tickets, etc:*

We satisfactorily reviewed a monthly schedule of user fee payments made by the company on **employee travel passes (separate sample), frequent flyer award tickets** and **infant tickets** which were traced to the general ledger.

American Airlines does follow the procedures set forth in 8 Code of Federal Regulations, Section 286.5(e) of the INS User Fee regulation. This section states that each "U.S. based remitter, which retains an independent accountant and which remits $10,000 or more in fees in any one calendar quarter, shall submit to the INS Associate Commissioner, Finance a report from the independent accountant, an accompanying Statement of INS Immigration User Fees Collected and remitted for each year ended. American Airlines provided an independent report for the year ended December 31, 2001."

The DHS representative confirmed that American Airlines did not contract with any student consolidator agencies for those agencies to issue tickets (using the consolidator ticket stock #000). Instead, American Airlines accepts student consolidator agency travel business using ARC and/or BSP tickets which cite the American Airlines ticket numbers.

***Reporting activity:***

To test **reporting** compliance, each sales channel was traced to associated sales reports and to the general ledger liability accounts.

*DOT and other agency reporting consistency:*

In order to confirm the accuracy of American Airlines' DOT Form T-100 flight statistics, the DHS review team representatives compared them to the ECAR and U.S.D.A. PAX from January 1, 2002, to December 31, 2002.

***Remitting activity:***

To test **remittance** compliance, data from the Company was traced to remittances received for IUF and Customs PPF for the report period.

*Method of remitting:*

User fees are recorded in a separate general ledger liability account. All payments were made in an accurate and timely manner.

*Comparison of Reporting Consistency:*

To obtain a reasonable assurance about company records in relation to remittances we successfully conducted a comparative analysis of the passenger counts used as a basis for user fee remittances for the IUF, Customs PPF, and USDA/APHIS in comparison to relevant data with the Department of Transportation segment data and the Custom's Entrance and Clearance Replicated (ECAR) The data was analyzed and compared favorably with the remittances by American Airlines for the review period.

## 4. OBSERVATIONS

### a. Employee Staff Pleasure Travel

For the 2002 calendar year audit of American Airlines, this office coordinated the review process for the validation of employee staff travel net collections for user fees (XY and YC). The notification letter dated February 28, 2003, indicated that this office would perform a review of the October 2002 NRSA database which supported the October 2002 journal entry for user fee collections. American Airlines provided this office with a net transaction database of #14,851 entries for XY and 8,334 entries for YC staff pleasure travel for qualified foreign travel to the U.S. We selected every 60 entry from the respective database for YC and XY and had American Airlines validate the entries against authorized travel to the U.S.

We were able to verify that database entries to the NRSA system were valid. However, we could not determine if all the qualified population of staff pleasure travel universe was included in the NRSA database. Consequently, we asked American Airlines to validate employee pleasure travel passes found on the third (additional YC) flight and on the three additional XY Central America flights. We found that American Airlines could not validate all employee pleasure travel found on the three additional XY flights, so ticket errors resulted. For the next review, we will review all qualified employee staff pleasure travel and ask American Airlines to validate.

### b. Post Ticketing Collections of User Fees for Dominion Republic and Seven Other Central and South American Countries

For the 2002 calendar year audit of American Airlines, this office coordinated the selection of six sample flights with representatives of American Airlines to ensure compliance for the XY and YC user fee remittances to DHS. Among the six sample

flights was a flight on October 25, 2002, from Santo Domingo, Dominion Republic to New York (JFK). American Airlines has a significant customer base who fly from Dominion Republic, Central America, and South American into the U.S. and its territories. This office believed that one of the six sample flights was therefore, representative of the population as a whole statistically for sample ticket review purposes. The above 8 countries were grouped together, since those countries prohibited ticket agents from collecting user fees/taxes for foreign countries at the time of ticket sale. American Airline therefore, had to implement strict debt collection procedures and "post ticketing collections" to collect user fees from customers that purchased tickets for international travel in those countries. *American Airline representatives indicated to this office that they were aware the error rate on tickets sold in those foreign countries was higher than the general ticket population.*

This office found 8.142 errors on 116 qualifying tickets on this flight alone (XY) about a 7% error rate. This office found 3 total errors on the other 5 qualifying XY sample flights on 400 qualifying tickets or a 0.75% rate. American Airlines believed that the Dominion Republic flight was an aberration and the results should not be applied against the population as a whole. American's premise that this flight was possibly an aberration had some merit. Sample flights from Puerto Plata, Dominion Republic, during the July 2000 to December 2001 audit, and sample flights from San Jose, Costa Rica; and from Santo Domingo, Dominion Republic to the U.S. in the audit of 1998 to June 2000, had resulted in either zero or 1 ticket error.

American Airlines provided documentation at the end of the audit in March through April 2003 that flights from the Dominion Republic and 7 other Central America and South America countries including: Columbia, Costa Rica, El Salvador, Honduras, Nicaragua, and Panama comprised 3.17% of the total international arrivals during 2002. Based on this information and other documentation that American Airlines provided, this office computed the above region at 4.80% of total remittances for 2002 based on what America Airlines provided for international arrivals by sales source (sales made in the U.S. and in those 8 international countries.)

If the results of this flight or region were not stratified, then American Airlines would face a sampling liability of $1,439,398 on the original six XY flights. This office agreed to sample 3 additional flights from the same region and add the results to the Santo Domingo to JFK flight results through a stratified population for remittances. The three flights added were from April 15, 2003, from BOG to MIA, from SJO-DFW, and from GUA-DFW.

This office reviewed the flights in the second week of May 2003 and the findings were completed in the middle of June 2003. This office found that only the San Jose, Costa Rica flight (158 qualifying tickets) had zero errors while the other two flights totaled 9 ticket errors on 142 qualifying tickets. Consequently, this region had a 4.12% error rate on 416 qualifying tickets.

The resultant liability by stratifying the population and applying 4.80% to this region resulted in a sampling liability of $134,577 and applying a 95.2% to the other general population resulted in a sampling liability of $469, 263 or a total stratified sampling liability of $603,840 less than the sampling liability for the population as a whole of $1,651,991 (based on 816 qualifying tickets with 20.142 errors or a 2.47% error rate.

This office coordinated the sampling process with the American Airlines' contact and his staff members to complete sample flight selections which both parties agreed were representative of American Airlines' ticket sales during the 2002 calendar year audit. Additionally, the DHS office jointly coordinated the flight selections with the USDA representative, as well.

The DHS office has consistently applied its flight sampling methodology with airlines (domestic and foreign) in its auditing database during the history of auditing carrier user fee remittances. This office believes the sampling process is sound and will continue to use this process to ensure compliance with user fee remittances. For the 2003 calendar year review for XY, we will discuss the process of flight selection with American Airline representative to ensure a representative ticket samples and minimize the need to stratify the sample liability results.

c. **Monthly Report on IUF Collections**

The requirements set forth in 286.2(b) of the User Fee regulations are not followed. The section states that where monthly collections in any month exceed $50,000 a summary statement showing the amount of the user fees collected is to be submitted to DHS.

> **Recommendation:** Effective immediately, submit the required collection report in adherence with the law.

## 5. FINDINGS AND RECOMMENDATIONS:

***Immigration User Fees:***

### FINDING 1: Error Rate on qualifying tickets for IUF

Of the 816 passengers that qualified for inspection user fees, the company failed to collect, or failed to allocate collected user fees on 20.142 passengers, which translates to an error rate of 2.47%. *When the error rate is applied to IUF collected and properly allocated during the period, an additional liability of $ 1,651,991 resulted.* (See Exhibit 1). However, Exhibit 1 is provided to depict the IUF if the sample flights and the resulting sample exceptions were not stratified as agreed.

Of the 416 passengers that qualified for inspection user fees, the company failed to collect, or failed to allocate collected user fees on 17.142 passengers, which translates to an error rate of 4.12%. When the error rate is applied to IUF collected and properly allocated during the period, an additional liability of $134,577 resulted. (See Exhibit 1A).

Of the 400 passengers that qualified for inspection user fees, the company failed to collect, or failed to allocate collected user fees on 3 passengers, which translates to an error rate of 0.75%. When the error rate is applied to IUF collected and properly allocated during the period, an additional liability of $469,263 resulted. (See Exhibit 1B).

Recommendation: Company is assessed liability due DHS for IUF and is encouraged to complete internal reviews to lessen the impact of errors in collecting IUF fees. Remit fees to DHS within 30 days of issuance of this report.

*Customs Passenger Processing Fees:*

FINDING 1: Error Rate on qualifying tickets for Customs PPF

Of the number passengers that qualified for inspection user fees, the company failed to collect, or failed to allocate collected user fees on 1 passenger, which translates to an error rate of .0026%. When the error rate is applied to PPF collected and properly allocated during the period, an additional liability of $62,743 resulted. (See Exhibit 2).

Recommendation: American Airlines is assessed liability due for Customs PPF and is encouraged to complete internal reviews to lessen the impact of errors in collecting PPF fees.

## 6. LIABILITY

### a. *Immigration User Fees:*

A total outstanding liability of $603,840 is assessed and should be remitted upon receipt of this report. See Exhibit 1A and Exhibit 1B.

Note: DHS is authorized by Federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to assess and collect interest and penalty amounts, in addition to principal on debts owed to the DHS. This final audit report identifies principal amounts owed for the Immigration User Fee. The Immigration Debt Management Center (DMC) located in Williston, Vermont, will determine if interest and penalty amounts are due on Immigration User Fees collected by the carrier but not remitted. Interest and penalties will be computed back to the period when the fees should have been remitted and the carrier will be invoiced by DMC for these amounts after the receipt of this final audit report. Audit liability amounts attributable to errors (such as

those found by sampling during the audit process) will not be subject to interest and penalty, unless they remain unpaid for 30 days following the date of the audit report.

b. *Customs Passenger Processing Fees:*

American Airlines should remit the net outstanding liability of $62,743 to DHS for Customs PPF as noted above, upon receipt of this report. (See Exhibit 2).

DHS retains the right to issue interest and any administrative charge assessments and/or penalties as it deems appropriate as a result of the findings in this report. Any interest or charges will be issued directly from DHS for the Customs PPF in a separate mailing after the issuance of this report.

American Airlines — Exhibit 1

## DHS - IUF Liability Calculations

BEFORE STRATIFICATION

| | |
|---|---|
| Sampled qualifying tickets: | 816 |
| IUF not collected: | 20.142 |
| Error rate: | 2.47% |

| Year | Periods | Net Collections Posted to G/L | MINUS PAYROLL STAF TRV | NET REMITT | NET TOTAL IUF DUE | TOTAL IUF Remitted | IUF Outstanding |
|---|---|---|---|---|---|---|---|
| 2002 | Jan-Mar | $ 14,559,037 | $ 230,876 | 14,328,161 | 14,691,024 | 14,559,037 | $ 362,868 |
| | Apr-Jun | $ 17,340,700 | $ 274,987 | 17,065,713 | 17,497,939 | 17,345,700 | $ 432,199 |
| | May-Jun | $ - | | | | | |
| | Jul-Sep | $ 12,693,789 | $ 201,297 | 12,492,492 | 12,808,890 | 12,643,751 | $ 316,379 |
| | Sep | $ - | | | | | |
| | Oct-Dec | $ 21,687,831 | $ 343,923 | 21,343,908 | 21,884,412 | 21,687,171 | $ 540,545 |
| | TOTAL | $ 66,281,357 | $ 1,051,083 | $65,230,274 | $'66,882,265 | $ 66,281,357 | $ 1,651,991 |

Exhibit 1A

# American Airlines

## DHS - IUF Liability Calculations

CENTRAL AMERICA/SOUTH AMERICA COUNTRIES STRATIFICATION

| | |
|---|---|
| Sampled qualifying tickets: | 416 |
| IUF not collected: | 17.142 |
| Error rate: | 4.12% |

| Year | Period | IUF Remitted | Less Staff Travel Remit | Net Remitted | TOTAL IUF @4.80% DUE | Net Remit Stratification | IUF 4.80% Outstanding |
|---|---|---|---|---|---|---|---|
| 2002 | Jan-Mar | 14,559,037 | 230,876 | 14,328,161 | 717,312 | 687,751 | 29,561 |
| | Apr-Jun | 17,340,700 | 274,987 | 17,065,713 | 854,364 | 819,156 | 35,208 |
| | Jul-Aug | 12,693,789 | 201,297 | 12,492,492 | 625,414 | 599,641 | 25,773 |
| | Sept | 5,261,408 | 83,448 | 5,177,960 | 259,225 | 248,542 | 10,683 |
| | Oct-Dec | 16,426,423 | 260,475 | 16,165,948 | 809,315 | 775,963 | 33,352 |
| | TOTAL | 66,281,357 | 1,051,083 | 65,230,274 | 3,265,630 | 3,131,053 | 134,577 |

Exhibit 1B

# American Airlines

## DHS - IUF Liability Calculations

POPULATION EXCEPT 1A at 95.20%

| | |
|---|---|
| Sampled qualifying tickets: | 400 |
| IUF not collected: | 3 |
| Error rate: | 0.75% |

| Year | Period | IUF Remitted | Less Staff Travel Remitted | Net Remitted | Total IUF 95.2% Due | Net Remit Stratification | IUF 95.2% Outstanding |
|---|---|---|---|---|---|---|---|
| 2002 | Jan-Mar | 14,559,037 | 230,876 | 14,328,161 | 13,743,468 | 13,640,392 | 103,076 |
| | Apr-Jun | 17,340,700 | 274,987 | 17,065,713 | 16,369,334 | 16,246,564 | 122,770 |
| | Jul-Aug | 12,693,789 | 201,297 | 12,492,492 | 11,982,730 | 11,892,860 | 89,870 |
| | Sept | 5,261,408 | 83,448 | 5,177,960 | 4,966,677 | 4,929,426 | 37,251 |
| | Oct-Dec | 16,426,423 | 260,475 | 16,165,948 | 15,506,274 | 15,389,978 | 116,296 |
| | TOTAL | 66,281,357 | 1,051,083 | 65,230,274 | 62,568,483 | 62,099,220 | 469,263 |
| | TOTAL | EXHIBIT 1B | | | | | 134,577 |
| | GRAND TOTAL EXHIBIT 1A and 1B | | | | | | 603,840 |

American Airlines — Exhibit 2

# Customs - PPF Liability Calculations

Sampled qualifying tickets: 385
PPF not collected: 1
Error rate: 0.0026%

| Year | Periods | Net Collections Posted to G/L | MINUS PAYROLL STAF TRV | NET REMITT | NET Total PPF Due(1) | TOTAL PPF Remitted | PPF Outstanding |
|---|---|---|---|---|---|---|---|
| 2002 | Jan-Mar | $ 6,086,009 | $ 81,404 | $6,004,605 | $ 6,020,239 | $ 6,086,009 | $ 15,634 |
| | Apr-Jun | $ 6,582,726 | $ 88,048 | $6,494,678 | $ 6,511,588 | $ 6,582,726 | $ 16,910 |
| | Jul-Sep | $ 5,922,439 | $ 79,216 | $5,843,223 | $ 5,858,437 | $ 5,922,439 | $ 15,214 |
| | Oct-Dec | $ 5,832,728 | $ 78,015 | $5,754,713 | $ 5,769,697 | $ 5,832,728 | $ 14,985 |
| | TOTAL | $ 24,423,902 | $ 326,683 | 24,097,218 | 24,159,961 | $ 24,423,902 | $ 62,743 |

# DUANE I. ROBINSON DEPOSITION EXHIBIT 4

U.S. Department of Homeland Security
Washington, DC 20229

U.S. Customs and
Border Protection

JUL 26 2004

American Airlines
Attn: Mr. Monty Hobbs
4333 Amon Carter Blvd.
Fort Worth, TX 76155

Dear Mr. Hobbs:

This letter confirms arrangements made on July 2, 2004, by Mr. Eugene Schulman, Auditor, Regulatory Audit Division (RAD) to conduct a compliance review of the Immigration User Fee (IUF), the Customs Passenger Processing Fee (PPF), and APHIS passenger and landing fees collections by American Airlines for the inspection of passengers and aircraft arriving into the United States. The review will cover the period from January 1, 2003 to June 30, 2004 for the IUF, PPF, and APHIS. It will be performed at your office in Dallas, TX from August 23 through August 27, 2004 by Eugene Schulman, auditor. In addition, Ms. Betty Bridgewater, auditor and Ms. Gwen Stapleton, auditor, and Ms. Yea Browning, Supervisory Auditor will be assisting Eugene Schulman to perform the audit during the week.

The objective of this review is to: 1) evaluate internal control adequacy and reliability of user fee collections, recording, reporting and remitting systems; 2) determine the company's compliance with regulations implementing user fee collections from international passengers arriving into the United States; and, 3) partner with the company, providing information and advice to facilitate continued compliance with prevailing regulations.

This review will verify:

- the quarterly reports submitted by the company to the financial records;
- the quarterly reports and records to the manifest reporting process;
- the reports provided to DOT and remittances to each agency;
- the number passengers for interline, code share, charter, etc. passengers; and.
- tail numbers and records for reconciliation of landings.

Failure to provide the requested data may contribute to additional error findings, resulting in greater liability for the company. Thus, it is imperative that you compile the necessary data before the audit date.

1. All tickets lifted from passengers, electronic ticket facsimiles, the flight manifests, the general declaration, and the airport agent post ticketing collection reports for the first flights arriving at the following airports, on the following dates. (Sales Base)

EXHIBIT
4
5/18/07

Browning Exh. A

| FLIGHT ARRIVAL DATE | FLIGHT # | AIRPORTS | FEE: YC/XA/XY |
|---|---|---|---|
| March 28, 2003 | AA0131 | LHR-JFK | All User Fees Apply |
| February 18, 2004 | AA2132 | PTY-MIA | All User Fees Apply |
| January 3, 2004 | AA954 | TGU-MIA | All User Fees Apply |
| February 7, 2004 | AA49 | CDG-DFW | All User Fees Apply |
| February 29, 2004 | AA 176 | NRT-DFW | All User Fees Apply |
| March 19, 2004 | AA1638 | CUN-DFW | XY and XA |
| April 18, 2004 | AA970 | MGA-MIA | All User Fees Apply |
| May 21, 2004 | AA906 | GRU-MIA | All User Fees Apply |

2. A report of international charter flights/block ticket sales on scheduled/charter flights into the United States and territories for the review period. Include dates, passenger counts, and full itineraries. Please provide documentation of charter flight contracts that will indicate which entity is responsible for remitting user fees.

3. Flight statistics reports by airport (airport landing counts, including charter flights), date and total passenger count for the review period for flights arriving to U.S. and territories only.

4. Copies of the T-100 data filings to U.S. Department of Transportation (DOT) for the review period.

5. Copies of code- share agreements/alliances for the review period. A listing of all subsidiaries and what methods are utilized for remittance of User Fees.

6. Copies of tail numbers used for international flights to the U.S. from January 1, 2003 through June 30, 2004.

7. Full fee remittance history for each agency fees for the review period and the supporting documents used for determining the amount remitted, including summary sales or passenger reports, by month, that were used to support the remittances submitted. If applicable, copies of internal procedures for compiling and remitting the fees should be available.

8. Procedures and processes used to record, collect, and report user fees for frequent flyers, employee business and pleasure travel, internet sales, E-tickets and any other sales method.

9. Company annual reports covering the review period.

10. Copies of internal audits performed on the subject of ticket sales and various governmental user fees and taxes collected.

11. Copies of the general ledger showing where and how user fee liability is posted. Include any necessary documentation needed to trace the total user fee dollars from all sales sources to the general ledger accounts.

12. A report of all infants transported where tickets were not issued. This should include the process and policies regarding non-revenue lap children with a demonstration of how the carrier reports, collects and remits fees for the review period.

We will review airport ticket office (ATO), city ticket office (CTO) and Billing and Settlement Plan (BSP) sales channel sample tickets taken from flights reviewed on Monday, August 23, 2004. These tickets will function as walk through to trace the tickets to the appropriate sales reports and detailed General Ledger Accounts for the respective user fee liability accounts.

As mentioned, the review will cover the period from January 1, 2003 through June 30, 2004. However, CBP retains the right to review and assess liability on areas of partial, sporadic or non-remittance of the inspection user fees for a period of the past six years. In reviewing your data, if you find such a situation, alert the review team so that they can work with your staff in resolution of the issues. For the air passenger user fee, the lifted tickets from the sample selected will be audited. Any noncompliance rate resulting from auditing the sample of tickets will be extrapolated over the 18-month review period. The remittance history will be used as the basis for any additional liability assessment.

You will be given a copy of audit exceptions and liability at the exit conference. A final report will be issued after completion of the audit.

U.S. Customs and Border Protection (CBP) and U.S. Department of Agriculture (USDA), Animal and Plant Health Inspection Service (APHIS) are authorized by Federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to assess and collect interest and penalty amounts, in addition to principal on debts owed. DHS and APHIS retain the right to issue interest and any administrative charge assessments and/or penalties as considered appropriate as a result of the findings in this audit. Any interest or charges will be issued directly from CBP National Finance Center (NFC) for the IUF and PPF, or from the APHIS Collection Office for the APHIS related fees, in a separate mailing after the issuance of the final audit report. Interest and penalties will be computed back to the period when the fees should have been remitted.

If you have any additional questions or need additional information please call Eugene Schulman, auditor at 202-344-2963 by July 28, 2004 to discuss the status of the compilation of the above information.

Sincerely,

Yea Browning

Yea Browning
Supervisory Auditor
Regulatory Audit Division