# DUANE I. ROBINSON DEPOSITION
# EXHIBIT 5

LEXSTAT 31 USC 3717

UNITED STATES CODE SERVICE
Copyright (c) 2007 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) Companies
All rights reserved

*** CURRENT THROUGH P.L. 110-24, APPROVED 5/3/2007 ***

TITLE 31. MONEY AND FINANCE
SUBTITLE III. FINANCIAL MANAGEMENT
CHAPTER 37. CLAIMS
SUBCHAPTER II. CLAIMS OF THE UNITED STATES GOVERNMENT

**Go to Code Archive Directory for this Jurisdiction**

*31 USCS § 3717*

§ 3717. Interest and penalty on claims

(a) (1) The head of an executive, judicial, or legislative agency shall charge a minimum annual rate of interest on an outstanding debt on a United States Government claim owed by a person that is equal to the average investment rate for the Treasury tax and loan accounts for the 12-month period ending on September 30 of each year, rounded to the nearest whole percentage point. The Secretary of the Treasury shall publish the rate before November 1 of that year. The rate is effective on the first day of the next calendar quarter.
(2) The Secretary may change the rate of interest for a calendar quarter if the average investment rate for the 12-month period ending at the close of the prior calendar quarter, rounded to the nearest whole percentage point, is more or less than the existing published rate by 2 percentage points.

(b) Interest under subsection (a) of this section accrues from the date--
(1) on which notice is mailed after October 25, 1982, if notice was first mailed before October 25, 1982; or
(2) notice of the amount due is first mailed to the debtor at the most current address of the debtor available to the head of the executive [, judicial,] or legislative agency, if notice is first mailed after October 24, 1982.

(c) The rate of interest charged under subsection (a) of this section--
(1) is the rate in effect on the date from which interest begins to accrue under subsection (b) of this section; and
(2) remains fixed at that rate for the duration of the indebtedness.

(d) Interest under subsection (a) of this section may not be charged if the amount due on the claim is paid within 30 days after the date from which interest accrues under subsection (b) of this section. The head of an executive, judicial, or legislative agency may extend the 30-day period.

(e) The head of an executive, judicial, or legislative agency shall assess on a claim owed by a person--
(1) a charge to cover the cost of processing and handling a delinquent claim; and
(2) a penalty charge of not more than 6 percent a year for failure to pay a part of a debt more than 90 days past due.

(f) Interest under subsection (a) of this section does not accrue on a charge assessed under subsection (e) of this section.

(g) This section does not apply--
(1) if a statute, regulation required by statute, loan agreement, or contract prohibits charging interest or assessing charges or explicitly fixes the interest or charges; and
(2) to a claim under a contract executed before October 25, 1982, that is in effect on October 25, 1982.

EXHIBIT 5
5/18/07

(h) In conformity with standards prescribed jointly by the Attorney General, the Secretary of the Treasury, and the Comptroller General, the head of an executive, judicial, or legislative agency may prescribe regulations identifying circumstances appropriate to waiving collection of interest and charges under subsections (a) and (e) of this section. A waiver under the regulations is deemed to be compliance with this section.

(i) (1) The head of an executive, judicial, or legislative agency may increase an administrative claim by the cost of living adjustment in lieu of charging interest and penalties under this section. Adjustments under this subsection will be computed annually.

(2) For the purpose of this subsection--

(A) the term "cost of living adjustment" means the percentage by which the Consumer Price Index for the month of June of the calendar year preceding the adjustment exceeds the Consumer Price Index for the month of June of the calendar year in which the claim was determined or last adjusted; and

(B) the term "administrative claim" includes all debt that is not based on an extension of Government credit through direct loans, loan guarantees, or insurance, including fines, penalties, and overpayments.

**HISTORY:**

(Added Jan. 12, 1983, P.L. 97-452, § 1(16)(A), 96 Stat. 2471; April 26, 1996, P.L. 104-134, Title III, Ch 10, § 31001(c)(1), (g)(1)(C), (q), 110 Stat. 1321-359, 1321-363, 1321-372.)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

Prior law and revision:

| Revised section | Source (U.S. Code) | Source (Statutes at Large) |
| --- | --- | --- |
| 3717(a) | 31 App.: 952(e)(1) (1st-3d sentences). | July 19, 1966, Pub. L. 89-508, 80 Stat. 308, Sec. 3(e)(1)(1st-3d sentences), (2)-(7); added Oct. 25, 1982, Pub. L. 97-365, Sec. 11, 96 Stat. 1755. |
| 3717(b), (c) | 31 App.: 952(e)(5) | |
| 3717(d) | 31 App.: 952(e)(6) | |
| 3717(e) | 31 App.: 952(e)(2) | |
| 3717(f) | 31 App.: 952(e)(7) | |
| 3717(g)(1) | 31 App.: 952(e)(3)(1st sentence). | |
| 3717(g)(2) | 31 App.: 952(e)(4) | |
| 3717(h) | 31 App.: 952(e)(3) (2d, last sentences). | |

In subsection (a), the words "percentage point" and "percentage points" are substituted for "per centum" for clarity.

In subsections (a)(1) and (e), the words "Except as provided in paragraph (3)" are omitted as surplus.

In subsection (a)(2), the words "for a calendar quarter" are substituted for "quarterly", and the words "prior calendar quarter" are substituted for "that quarter", for clarity.

In subsection (b), before clause (1), the words "Subject to paragraph (6)" and "except as provided in subparagraph (B)" are omitted as surplus. In clause (2), the words "on the claim" are omitted as surplus. The words "if notice is first mailed after October 24, 1982" are added for clarity.

In subsection (c), the words "on a claim" are omitted as surplus.

In subsection (g)(1), the words "applicable" and "either" are omitted as surplus. The word "assessing" is added for clarity. The words "that apply to claims involved" are omitted as surplus.

In subsection (h), the words "under this section" are added for clarity.

Explanatory notes:

The bracketed matter ", judicial," has been inserted in subsec. (b)(2) to indicate wording probably intended by Congress.

Amendments:

1996. Act April 26, 1996 (effective on enactment, as provided by § 31001(a)(2)(A) of such Act, which appears as *31 USCS § 3322* note) purported to amend this section by striking "the head of an executive or legislative agency" each place it appeared and inserting "the head of an executive, judicial, or legislative agency". That substitution was made in subsec. (h), but in subsecs. (a)(1), (d), and (e), the amendment was executed by striking "The head of an executive or legislative agency" each place it appeared and inserting "The head of an executive, judicial, or legislative agency" in order to effectuate the probable intent of Congress.

Such Act further (effective as above), in subsec. (h), inserted ", the Secretary of the Treasury,"; and added subsec. (i).

**NOTES:**

Code of Federal Regulations:

Office of the Secretary of Agriculture--Debt management, 7 CFR Part 3.

Farm Service Agency, Department of Agriculture--Debt settlement policies and procedures, 7 CFR Part 792.

Animal and Plant Health Inspection Service, Department of Agriculture--User fees, 9 CFR Part 130.

Nuclear Regulatory Commission--Salary offset procedures for collecting debts owed by Federal employees to the Federal government, 10 CFR Part 16.

National Credit Union Administration--Requirements for insurance, 12 CFR Part 741.

Office of the Secretary of Commerce--Disclosure of government information, 15 CFR Part 4.

Bureau of the Census, Department of Commerce--Public information, 15 CFR Part 60.

Office of Workers' Compensation Programs, Department of Labor--Claims for compensation under the Federal Employees' Compensation Act, as amended, 20 CFR Part 10.

Office of Workers' Compensation Programs, Department of Labor--Claims for compensation under the Energy Employees Occupational Illness Compensation Program Act of 2000, as amended, 20 CFR Part 30.

Office of the Secretary, Department of Housing and Urban Development--Administrative claims, 24 CFR Part 17.

National Indian Gaming Commission, Department of the Interior--Debt collection, 25 CFR Part 513.

Department of Justice--Production or disclosure of material or information, 28 CFR Part 16.

Bureau of Prisons, Department of Justice--Cost of incarceration fee, 28 CFR Part 505.

Fiscal Service, Department of the Treasury--Indorsement and payment of checks drawn on the United States Treasury, 31 CFR Part 240.

Fiscal Service, Department of the Treasury--Waiver of interest, administrative costs, and penalties, 31 CFR Part 391.

Federal Claims Collection Standards (Department of the Treasury-Department of Justice)--Standards for the administrative collection of claims, 31 CFR Part 901.

Office of the Secretary, Department of Education--Debt collection, 34 CFR Part 30.

United States Patent and Trademark Office, Department of Commerce--Disclosure of government information, 37 CFR Part 102.

Department of Veterans Affairs--General provisions, 38 CFR Part 1.

National Foundation on the Arts and the Humanities--Collection of claims, 45 CFR Part 1150.

National Foundation on the Arts and the Humanities--Claims collection, 45 CFR Part 1177.

Related Statutes & Rules:

This section is referred to in *5 USCS § 5514*; *7 USCS §§ 2371, 7753, 7759, 8311*; *10 USCS § 2739*; *15 USCS § 80a-24*; *21 USCS § 136a*; *22 USCS § 2671*; *26 USCS § 6103*; *31 USCS §§ 3701, 3711*; *42 USCS §§ 404, 1383.*

Research Guide:

Federal Procedure:

21A Fed Proc L Ed, Judgments and Orders § 51:82.
29 Fed Proc L Ed, Railroads § 67:384.

Am Jur:

*70B Am Jur 2d, Social Security and Medicare § 1795.*

Interpretive Notes and Decisions:

1. Generally 2. Applicability 3. Relationship to other laws 4. --Common law 5. Rate of interest 6. Prejudgment interest 7. Attorney's fees and costs 8. Particular cases

**1. Generally**

Agencies are without discretion to waive interest charges required by *31 USCS § 3717* absent express exception; the exception for "contracts" in *31 USCS § 3717(g)(1)* refers to those contracts which specifically concern payment of money pursuant to particular government program involving loans administered by agencies, and not to contracts in general sense; agencies are not authorized to enter into collective bargaining agreement containing provision waiving application of required interest in penalty charges. *NFFE & US Army Engineer Dist., Kansas City, Mo., (1986) 21 FLRA 101*, 21 FLRA No. 20.

Purpose of Debt Collection Act was to ensure that government did not lose benefit of use of monies owed to it by contractors. *Capital Dev. Co. v United States (2001) 49 Fed Cl 178*, affd (2002, CA FC) *308 F3d 1283.*

**2. Applicability**

For purposes of *31 USCS §§ 3701, 3717*, Nuclear Regulatory Commission, although independent agency, is executive or legislative agency to which interest and penalty provisions of § 3717 apply; pursuant to § 3717, Commission is required to charge both interest and late penalty fee to overdue and unpaid portions of company's bill for license application review fees imposed pursuant to *31 USCS § 9701*. *Commonwealth Edison Co. v United States Nuclear Regulatory Com. (1987, CA7) 830 F2d 610.*

Food and Nutrition Service of Department of Agriculture is precluded from assessing interest against state Department of Social Services on debts owed to federal agency. *Perales v United States (1984, SD NY) 598 F Supp 19*, affd (1984, CA2 NY) *751 F2d 95.*

**3. Relationship to other laws**

Mine operator, who successfully sued government for reimbursement of mining reclamation fees under Surface Mining Control and Reclamation Act (*30 USCS §§ 1201* et seq.), was not entitled under *30 USCS § 1268(c)* to interest on that portion of refund representing civil penalties, because penalties at issue were assessed pursuant to *31 USCS § 3717*, rather than *30 USCS § 1268(c)*. *Horizon Coal Corp. v United States (1994, CA6 Ohio) 43 F3d 234, 40 Envt Rep Cas 2035, 25 ELR 20843, 1994 FED App 400P.*

Since *31 USCS § 3717(g)(1)* refers disjunctively to interest or charges, statute does not apply to actions brought under Oil Pollution Act (*33 USCS §§ 2701* et seq.), which provides for interest (*33 USCS § 2705*) but not penalties. *United States v Hyundai Merchant Marine Co. (1999, CA9 Alaska) 172 F3d 1187, 99 CDOS 2843, 99 Daily Journal DAR*

*3685, 48 Envt Rep Cas 1385, 1999 AMC 1521, 29 ELR 21131*, cert den *(1999) 528 US 963, 145 L Ed 2d 310, 120 S Ct 397, 49 Envt Rep Cas 1768.*

With respect to Nuclear Regulatory Commission fees for nuclear power reactor licenses, pursuant to *42 USCS § 2213*, it was reasonable for Commission not to include interest and late fees collected under *31 USCS § 3717* as deductible "other amounts collected," because (1) since purpose of § 2213 was to recover costs incurred by Commission, phrase "other amounts collected" can reasonably be interpreted to mean other cost-recovery measures, and penalties, fines, and interest charges are not cost-recovery measures; while (2) contrary interpretation would allow utilities that violate law and pay consequent penalties or fines, to benefit by recovering portion of penalty or fine as reduced user fee. *Florida Power & Light Co. v United States (1988, App DC) 269 US App DC 377, 846 F2d 765*, cert den *(1989) 490 US 1045, 104 L Ed 2d 422, 109 S Ct 1952.*

Generally, government contracts include clause which mandates that contractor pay interest on amounts due to government at rates established under Contract Disputes Act (*41 USCS §§ 601* et seq.), and where this clause is included in contract, it, and not Debt Collection Act (*31 USCS § 3717*), is authority for government to assess and collect interest due. Advanced Injection Molding, Inc. v General Services Administration (2005, GSBCA) 2005-2 BCA P 33097.

**4. --Common law**

In determining whether, under federal common law, state owes prejudgment interest to United States due to contractual obligation arising prior to 1982, United States Supreme Court will not attribute any significance to 1983 federal statute, which in *31 USCS § 3717* prescribes interest payable by persons to Federal Government, but in *31 USCS § 3701* excludes from definition of "person" any agency of state government, where, as stated in § 3717, 1983 statute does not apply to contracts entered into before October 25, 1982 and Supreme Court can draw no inference of Congresses' comprehension of federal common law of interest from Congress' enactment, without any discernible legislative history, of definitional exclusion. *West Virginia v United States (1987) 479 US 305, 93 L Ed 2d 639, 107 S Ct 702.*

Federal government's federal common law right to collect prejudgment interest on debt owed by state for lost food stamps is not abrogated by Debt Collection Act (*31 USCS §§ 3701* et seq.), since underlying claim is contractual obligation to pay money, and only obligation from which *31 USCS § 3701(c)* (which provides that states are not persons) exempts states is obligation to pay prejudgment interest in accordance with mandatory provisions of Act. *United States v Texas (1993) 507 US 529, 123 L Ed 2d 245, 113 S Ct 1631, 93 CDOS 2520, 93 Daily Journal DAR 4287, 7 FLW Fed S 145.*

Provisions of Debt Collection Act of 1982 (*31 USCS §§ 3701, 3717*) did not abrogate federal common-law right of Food and Nutrition Service of Department of Agriculture to assess interest on outstanding debts of states incurred pursuant to Food Stamp Act (*7 USCS §§ 2011-2030*) and specifically Service's mail loss regulation. *Gallegos v Lyng (1989, CA10 NM) 891 F2d 788.*

**5. Rate of interest**

Where United States obtained judgment against surety which had posted bond guaranteeing payment of overdue tax obligations owed by third party, interest owed to government from date of third party's default should be calculated at rate established by Internal Revenue Code (*26 USCS § 6621*), rather than under terms of *31 USCS § 3717(a). United States v American Ins. Co. (1994, CA3 Pa) 18 F3d 1104, 94-1 USTC P 50131, 73 AFTR 2d 1469,* 94 TNT 55-22.

When statutory cause of action sets it own rate of interest, *31 USCS § 3717* does not apply. *United States v Hyundai Merchant Marine Co. (1999, CA9 Alaska) 172 F3d 1187, 99 CDOS 2843, 99 Daily Journal DAR 3685, 48 Envt Rep Cas 1385, 1999 AMC 1521, 29 ELR 21131*, cert den *(1999) 528 US 963, 145 L Ed 2d 310, 120 S Ct 397, 49 Envt Rep Cas 1768.*

*31 USCS § 3717*(a)(1) plainly provides authority for agency to decide what interest rate is compensatory or even to impose greater than compensatory rate. *Amax Land Co. v Quarterman (1999, App DC) 337 US App DC 64, 181 F3d 1356.*

**6. Prejudgment interest**

In determining whether, under federal common law, state owes prejudgment interest to United States due to contractual obligation arising prior to 1982, United States Supreme Court will not attribute any significance to 1983 federal statute, which in *31 USCS § 3717* prescribes interest payable by persons to Federal Government, but in *31 USCS § 3701*

excludes from definition of "person" any agency of state government, where, as stated in § 3717, 1983 statute does not apply to contracts entered into before October 25, 1982 and Supreme Court can draw no inference of Congresses' comprehension of federal common law of interest from Congress' enactment, without any discernible legislative history, of definitional exclusion. *West Virginia v United States (1987) 479 US 305, 93 L Ed 2d 639, 107 S Ct 702.*

Federal government's federal common law right to collect prejudgment interest on debt owed by state for lost food stamps is not abrogated by Debt Collection Act (*31 USCS §§ 3701* et seq.), since underlying claim is contractual obligation to pay money, and only obligation from which *31 USCS § 3701(c)* (which provides that states are not persons) exempts states is obligation to pay prejudgment interest in accordance with mandatory provisions of Act. *United States v Texas (1993) 507 US 529, 123 L Ed 2d 245, 113 S Ct 1631, 93 CDOS 2520, 93 Daily Journal DAR 4287, 7 FLW Fed S 145.*

As to state agency's argument that Labor Secretary was precluded by Debt Collection Act of 1982 from requiring agency to pay prejudgment interest on repayments of certain costs in connection with CETA grants, Act is inapplicable, since it does not apply to claim under contract executed before 10/25/82 that is in effect on that date, agency does not contest that CETA grants may be considered contracts, grant period extended from 10/1/80-6/30/82, and agency, as part of its monitoring obligation, engaged in such activities into 1984. *Florida Dep't of Labor & Employment Sec. v United States Dep't of Labor (1990, CA11) 893 F2d 1319,* cert den *(1990) 498 US 812, 112 L Ed 2d 25, 111 S Ct 49.*

Mere fact that government has secured judgment on contract does not entitle it to prejudgment interest absent underlying contractual obligation by contractor to pay money. *Thermalon Indus. v United States (2002) 51 Fed Cl 464.*

**7. Attorney's fees and costs**

U.S. is awarded default final judgment on unpaid national direct student loan but is granted only part of costs and fees requested, where U.S. sought recovery on 1974 3 percent fixed rate loan in principal sum of $ 600 plus $ 1,492.40 in costs and attorney's fees, because U.S. does not pay $ 120 filing fee under *28 USCS § 1914(a)* and "administrative/collection costs" of $ 158.15 are not collectible on this loan under *31 USCS §§ 3717(g)(1)* and (2). *United States v Spann (1992, SD Fla) 797 F Supp 980, 6 FLW Fed D 380.*

To extent U.S. could prove that power company lacked good faith basis for denying payment on any "claims," clear language of statute seemed to indicate that U.S. was not only permitted, but was required to assess costs of attorneys fees under *31 USCS § 3717* in its collection efforts; however, assuming attorneys' fees were recoverable as "costs" under § 3717(e), § 3717(g)(2) prohibited U.S. from seeking such "costs" associated with any of their claims arising out of power company's two subject project licenses, memorandum of understanding, or special use permit, as "costs" provision of § 3717(e) did not apply to claim under contract executed before October 25, 1982, that was in effect on October 25, 1982. *United States v S. Cal. Edison Co. (2004, ED Cal) 300 F Supp 2d 964,* motion to strike gr, in part, motion den (2005, ED Cal) *2005 US Dist LEXIS 24748,* motion to strike den, motion den (2005, ED Cal) *2005 US Dist LEXIS 24597,* different results reached on reconsideration (2005, ED Cal) *2005 US Dist LEXIS 24592.*

**8. Particular cases**

For purposes of *31 USCS §§ 3701, 3717,* Nuclear Regulatory Commission, although independent agency, is executive or legislative agency to which interest and penalty provisions of § 3717 apply; pursuant to § 3717, Commission is required to charge both interest and late penalty fee to overdue and unpaid portions of company's bill for license application review fees imposed pursuant to *31 USCS § 9701. Commonwealth Edison Co. v United States Nuclear Regulatory Com. (1987, CA7) 830 F2d 610.*

Unless Congress prescribes different policies or specific requirements for particular grant or grants, interest earned by grantee on funds advanced by US belongs to US rather than grantee and must be paid to US; thus, Syracuse University must pay Department of Navy interest earned on congressionally mandated grant (Urgent Supplemental Appropriations Act, July 2, 1986, P.L. 99-349, 100 Stat. 710) to University, and six-month Treasury rate is proper rate to compute amount of interest due. *Syracuse University (1990) 69 Comp Gen 660.*

With respect to computation of debts owed HUD on defaulted, FHA-guaranteed manufactured home loans, and assessment of interest on those loans and property improvement loans, FHA properly subtracts from outstanding loan balance greater of sale proceeds or appraised value of manufactured home, and properly assesses interest on debts at lesser of note rate or Treasury rate. *Calculation of Debt, and Interest on Debt, Owed to Department of Housing and Urban Development (1992) 71 Comp Gen 449.*

During pendency of appeal under Contract Disputes Act (*41 USCS §§ 601* et seq.), Forest Service is not required, pursuant to *31 USCS § 3717*, to discontinue assessment of interest, late payment penalties or administrative costs on delinquent debts arising from national forest timber sales contracts. *Interest Under Federal Claims Collection Act, as Amended, on Debts Appealed Under Contract Disputes Act of 1978 (1991) 70 Comp Gen 517.*

Under both Surface Mining Control and Reclamation Act (*30 USCS §§ 1201* et seq.) and Debt Collection Act (*31 USCS § 3717(e)(2)*), Secretary of Interior is empowered to promulgate regulations which provide six percent annual penalty on all reclamation fees more than 91 days overdue, and nowhere in language of either statute is there provision limiting applicability of such penalty; thus, mining company's contention that penalty should not be based upon mere innocent failure to pay reclamation fee is without merit. *Addington Mining v United States (1996) 35 Fed Cl 754.*

# DUANE I. ROBINSON DEPOSITION
# EXHIBIT 6

U.S. Department of Homeland Security
Washington, DC 20229

U.S. Customs and
Border Protection

MAR 2 2 2004

Mr. David Bowman
Manager, Domestic & International Taxes
Continental Airlines
P.O. Box 4607 HQSTX
Houston, Texas 77210-4607

Dear Mr. Bowman:

This letter confirms that the Department of Homeland Security (DHS), U.S. Customs and Border Protection (CBP), Regulatory Audit Division (RAD), will conduct a compliance review of the Immigration User Fee (IUF), the Customs Passenger Processing Fee (PPF), and Animal, Plant and Health Services (APHIS) passenger and landing fees collections by Continental Airlines' for the inspection of passengers and aircraft arriving into the United States. The review will cover the period from January 1, 2002 through December 31, 2003, and will be performed at your office in Houston, Texas on May 10-14, 2004 by Carol Lynn Heatherly.

The objective of this review is threefold:

1) evaluate internal control adequacy and reliability of user fee collections, recording, reporting and remitting systems;
2) determine the company's compliance with regulations implementing user fee collections from international passengers arriving into the United States; and,
3) to partner with the company, providing information and advice to facilitate continued compliance with prevailing regulations.

The review will concentrate on validation of all funds due for the fees for the review period. To that end, the company must disclose the full number of sales, landings and passengers transported where the fees apply. The review will validate:

- the quarterly reports submitted by the company to the financial records of the company
- those reports and records to the manifest reporting process by the company
- the reports provided to DOT and remittances to each agency
- the amount or number of interline, code share, charter, etc. passengers and
- the number of inspections conducted by the government



EXHIBIT 6 5/18/07 nbc

We expect that the company will be able to validate its sales, transported passengers, net interline and code share sales, charters or any other entity involved in the fee collection process. In addition, the company will be expected to disclose all sales entities that support its financial records, including subsidiaries. Below we request a variety of information intended to allow us to validate company activity with regard to inspection and landing fees. We expect to work in cooperation with you and your staff, and if you are aware of more appropriate information to conduct this review, we request that you supply it.

The information requested below should be provided to the review team upon their arrival at your offices on the first day of the review in order to facilitate the review process and minimize interruptions to your day-to-day operation. Failure to provide the requested data may contribute to additional error findings, resulting in greater liability for the company. Thus, it is imperative that you compile the necessary data before the audit date.

1. Flight manifests, passenger statistic sheets, Advanced Passenger Information System, and/or any other reports that will validate passenger load by flight. Be prepared to validate the actual data that is the basis of your remittance process, with number of sales and passenger count on the flights. We ask that you query your operational database for the number of passengers and crew by date, flight number and location. If interline data is available, it will also be helpful in determining fee remittance responsibility for passenger loads.

| FLIGHT ARRIVAL DATE | FLIGHT # | AIRPORT |
|---|---|---|
| March 6, 2002 | 465 | Houston (IAH) |
| June 30, 2002 | 8 | Newark (EWR) |
| September 2, 2002 | 67 | Cleveland (CLE) |
| October 12, 2002 | 2 | Honolulu (HLU) |
| January 19, 2003 | 2983 | Miami (MIA) |
| May 11, 2003 | 1103 | Houston (IAH) |
| July 3, 2003 | 25 | Newark (EWR) |
| November 11, 2003 | 889 | Houston (IAH) |

2. The auditor coupons and the sales reports for the following Airlines Reporting Corporation periods. Also the detail general ledger account reflecting the same sales activity.

| YEAR | BANK | MONTH | WEEK | CYCLE |
|---|---|---|---|---|
| 2003 | 05 | 08 | 2 | 4 |

3. Auditor coupons and sales report for August 10, 2003 for the airport ticket office (ATO) at Houston and for the Newark City Ticket Offices (CTO) for August 31, 2003. Also the detail general ledger account reflecting the same month's sales activity.

4. Auditor coupons and sales report for the Billing and Settlement Plan (BSP) sales for Japan for the second half of August 2003. Also, the detail general ledger account reflecting the same month's sales activity.

5. A report of international charter flights/block ticket sales on scheduled/charter flights into the United States and territories for the review period. Include dates, passenger counts, and full itineraries. Please provide documentation of charter flight contracts that will indicate which entity is responsible for remitting user fees.

6. Flight statistics reports by airport (airport landing counts, including charter flights), date and total passenger count for the review period for flights arriving to U.S. and territories only. Provide the book of codes that explain the codes found on the schedules.

7. Copies of the T-100 data filings to U.S. Department of Transportation (DOT) for the review period. Be prepared to demonstrate how the numbers reported to DOT are determined and the parties responsible for reporting. Also, a listing of all flights under 50 passengers that were excluded from the DOT-100 reporting requirement.

8. Copies of Code-sharing agreements/alliances for the review period. A listing of all subsidiaries and what methods are utilized for remittance of user fees.

9. Full fee remittance history for each of the fees for the review period and the supporting documents used for determining the amount remitted, including summary sales or passenger reports, by month, that were used to support the remittances submitted. If applicable, copies of internal procedures for compiling and remitting the fees should be available.

10. Procedures and processes used to record, collect, and report user fees for frequent flyers, employee business pleasure travel, Internet sales, E-tickets and any other sales method.

11. Company annual reports covering the review period.

12. Copies of internal audits and financial statement reports performed on the subject of ticket sales and various governmental user fees and taxes collected.

13. Copies of the general ledger showing where and how user fee liability is posted. Include any necessary documentation needed to trace the total user fee dollars from all sales sources to the general ledger accounts.

14. One report of all student consolidator tickets issued for transportation by or through your company, with destination of the United States by month and travel agent for the audit period. This report should include the tickets with airline ticket stock 000. Please include appropriate documents to trace these tickets to the remittances and a copy of any policy or protocol that demonstrates the method ensuring compliance with remittance requirements.

15. A report of all infants transported where tickets were not issued. This should include the process and policies regarding non-revenue lap children with a demonstration of how the carrier reports, collects and remits fees for the review period. Specific data demonstrating any non-revenue infants on the sample flights should be provided with the sample.

16. A monthly schedule of aircraft landings into the United States (all flights into the 50 United States, D.C., or Puerto Rico) for the review period, listed by port.

17. Detailed worksheet of prepaid trip passes for employee pleasure travel, which includes trip and buddy passes used by employees.

As mentioned, the review will cover the period from January 1, 2002 through December 31, 2003. However, DHS retains the right to review and assess liability on areas of partial, sporadic or non-remittance of the inspection user fees for a period of the past 6 years. In reviewing your data, if you find such a situation, alert the review team so that they can work with your staff in resolution of the issues. For the air passenger user fee, the lifted tickets from the sample selected will be audited. Any noncompliance rate resulting from auditing the sample of tickets will be extrapolated over the 24-month review period. The remittance history will be used as the basis for any additional liability assessment.

You will be given a copy of audit exceptions and be able to provide additional information which may clear any/all of those exceptions. For consideration, the additional information should be received by our staff 2-weeks post review, unless you obtain a written agreement to extend the timeframe. A final report will be issued after this timeframe.

DHS and USDA are authorized by Federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to assess and collect interest and penalty amounts, in addition to principal on debts owed. The financial liability finding for the fees will represent findings regarding unremitted fees and error determinations and will not include interest or penalties. DHS and USDA retain the right to issue interest and any administrative charge assessments and/or penalties as deemed appropriate as a result of the findings in this audit. Any interest or charges will be issued directly from the DHS, CBP, National Finance Center (NFC) for the IUF and PPF, or from the USDA, APHIS Collection Office for the APHIS related fees, in a separate mailing after the issuance of the final audit report. Interest and penalties will be computed back to the period when the fees should have been remitted.

Please contact Carol Lynn Heatherly by May 3, 2004, to discuss the status of the compilation of the above information. If you have any additional questions or need additional information, please do not hesitate to contact Ms. Heatherly at (949) 770-7617.

Sincerely,

Daune I. Robinson
Director
Field Oversight Division I

# DUANE I. ROBINSON DEPOSITION
# EXHIBIT 7A

USDA

April 28, 2003

United States
Department of
Agriculture

Marketing and
Regulatory
Programs

Animal and
Plant Health
Inspection
Service

4700 River Road
Riverdale, MD 20737

American Airlines
Attn: Teresa Isakson
4333 Amon Carter Blvd., Mail Drop 5657
Fort Worth, TX 76155

Dear Ms. Isakson:

Enclosed is the report of the U.S. Department of Agriculture (USDA), Animal and Plant Health Inspection Service (APHIS), user fee audit of American Airlines, which was conducted by Mr. Michael Campbell. As you know, this report includes operational findings and recommendations. I understand that Mr. Campbell discussed details of the findings and financial liability with you.

The financial liability outlined in the enclosed report does not include interest or penalties. Your company will not be charged interest for any amounts received within 30 days after the date of this audit report. For any amounts received after that date, you will be subsequently billed interest effective from the end of the quarter in which the fee was supposed to have been collected.

The liability amount on the last one page of this report should be mailed to the same address to which the quarterly payments are mailed. **Please send a copy of the last page of this report with your check.**

If you have any questions or comments, please contact Mr. Campbell at (301) 734-4796; fax (301) 734-5403 or e-mail at Michael.K.Campbell@aphis.usda.gov. The cooperation and assistance of your staff during this audit is greatly appreciated.

Sincerely,

Pierre M. Arsenec
Chief, User Fee Auditing Branch
Resource Management Systems
and Evaluation Staff

Enclosure

cc:
W.J. Hudnall, MRPBS, Washington, DC (w/copy of enclosure)
D. Ford, BASE, Riverdale, MD (w/copy of enclosure)
D. Crews, MRPBS-MNPLS, Minneapolis, MN (w/copy of enclosure)

APHIS - Protecting American Agriculture
An Equal Opportunity Employer

Exhibit H

EXHIBIT
7A
5/18/07 abc
PENGAD 800-631-6989

# DUANE I. ROBINSON DEPOSITION
# EXHIBIT 7B

TABLE OF CONTENTS


I. Background ........ 1

II. Audit Objectives ........ 1

III. Audit Scope and Methods ........ 2

IV. Findings and Recommendations ........ 3

V. Financial Liability - APHIS ........ 4


Exhibit G
[redacted]

EXHIBIT 7B 5/18/07 PENGAD 800-631-6989

I. Background

In 1990, Congress established new user fee legislation. The Food, Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990, authorized the U.S. Department of Agriculture (USDA) through the Animal and Plant Health Inspection Service (APHIS) to collect various user fees. These fees include agricultural quarantine and inspection services provided in connection with the arrival of commercial aircraft and international passenger arrivals at ports in the Customs territory of the U.S. The Farm Bill defines the U.S. Customs territory as the 50 States, the District of Columbia, and Puerto Rico.

APHIS published a final rule in the Federal Register on April 12, 1991, requiring airlines to collect a user fee from international air passengers arriving in the U.S. Customs territory from other countries, except Canada. These fees became effective on May 13, 1991. On January 9, 1992, APHIS published a final rule requiring an inspection fee for commercial aircraft arriving in the U.S. from other countries except Canada, effective February 9, 1992. Aircraft and passengers on flights originating in Canada are excluded from APHIS fees because of a negligible agricultural health threat to U.S. agriculture.

User fees must be remitted for receipt no later than 31 days after the close of each calendar quarter in which they are collected.

American Airlines (AA) headquarters is in Dallas, TX. AA had qualifying passenger and cargo flights operating during the audit period of January 2002 through December 2002. The scheduled flight ports of entry into the U.S. are Boston (BOS), Chicago (ORD), Dallas-Fort Worth (DFW), Los Angeles (LAX), Miami (MIA), New York (JFK), Orlando (MCO), and San Juan (SJU).

AA is a wholly owned subsidiary of AMR Corporation.

For the above mentioned audit period, AA's user fee remittances for APHIS passengers and aircraft were $28,218,485.10 and $4,021,683.75, respectively.

II. Audit Objectives

1. Evaluate internal control adequacy and reliability of user fee collections, recording, reporting, and remittance systems.

2. Determine compliance with regulations (mentioned above).

3. Develop a rapport with the payer. Provide information and advice to the payer to facilitate continued compliance.

III. Audit Scope and Methods

The audit coverage period is January 1, 2002 through December 31, 2002. The audit was conducted in accordance with the Government Auditing Standards issued by the Comptroller General of the United States and included such tests that were deemed necessary. We tested internal controls associated with the collection, recording, reporting, and remittance systems.

To test collection compliance, we audited tickets lifted from passengers for flights involving the following city pairs, on the following dates. We understand that you have agreed that the sample below is representative of the markets in which you sold applicable tickets during the audit period.

| DATES | CITY PAIRS |
|---|---|
| 1. Feb 27, 2002 | Paris (CDG) -Miami (MIA) |
| 2. July 5, 2002 | Mexico (MEX) – Dallas (DFW) |
| 3. Oct 25, 2002 | Santo Domingo (SDQ) – New York (JFK) |
| 4. Dec 18, 2002 | Tokyo (NRT) – San Jose (SJC) |

To audit recording compliance, we traced the following tickets from the sales channels listed below to the Passenger Revenue Accounting System (PRAS).

| Issue Date | Reporting Entity | Ticket Number |
|---|---|---|
| 10/22/02 | ARC | 7308378940 |
| 10/23/02 | ARC | 7310722279 |
| 10/25/02 | ATO-SDQ | 2155787882 |
| 10/05/02 | ATO-BOS | 2155473176 |
| 10/16/02 | CTO-NYC | 2155646149 |
| 10/09/02 | CTO-SDQ | 2155537713 |
| 10/15/02 | HDQ-TBM Dallas | 2115545433 |
| 10/21/02 | BSP-Santo Domingo | 3612762676 |
| 10/19/02 | BSP-Santo Domingo | 3612733129 |

We traced employee flight coupons from the five sample flights listed above to the Non-Revenue Space Available (NRSA) database. In addition, we traced the totals from an AA generated report to the APHIS general ledger account.

To test reporting compliance, we traced monthly activity from PRAS to the general ledger.

Remittance compliance was tested by comparing remittance data to general ledger entries in the respective liability accounts.

Instances of noncompliance were used to determine an additional liability, using user fee dollars collected as the calculation basis.

The aircraft clearance fee was audited by comparing an auditee prepared schedule of landing counts by month by airport, to statistics provided by the U.S. Department of Transportation (DOT), Customs data and APHIS' remittance data.

The audit fieldwork was performed February 24 – 28, 2003, by Mr. Campbell.

APHIS retains the right to review and assess liability for unpaid user fees for this audit period if significant data, which was unavailable during the audit, is discovered subsequent to the audit.

IV. Findings and Recommendations

1. Finding: Of the 450 qualifying tickets audited for the air passenger user fee collections compliance, the number of tickets with no evidence of fee collection or remittance was 12. The associated error rate is 2.67%. The resulting amount due to APHIS is $773,109.18.

Recommendation: The additional liability amounts mentioned above should be remitted. Copies of the noncompliant tickets were given to the AA Financial Analyst so that measures can be implemented to improve collections compliance.

V. Financial Liability - APHIS

American Airline's Financial Liability Due to APHIS Resulting from a User Fee Audit

| QUARTER ENDED | PASSENGER LIABILITY |
|---|---|
| Mar-02 | $193.277.30 |
| Jun-02 | $193,277.30 |
| Sep-02 | $193,277.29 |
| Dec-02 | $193,277.29 |
| TOTALS | $773,109.18 |

DATE DUE: within 30 days after report issuance date.

V. Financial Liability - APHIS

American Airline's Financial Liability Due to APHIS Resulting from a User Fee Audit

1315027? QA

| QUARTER ENDED | | PASSENGER LIABILITY |
|---|---|---|
| Mar-02 | 021 | $193,277.30 |
| Jun-02 | 022 | $193,277.30 |
| Sep-02 | 023 | $193,277.29 |
| Dec-02 | 024 | $193,277.29 |
| TOTALS | | $773,109.18 |

| P | I |
|---|---|
| 13,658.26 | 4,552.75 |
| 11,693.28 | 3897.76 |
| 7763.30 | 2587.77 |
| 4799.72 | 1599.91 |
| 37914.56 | 12638.19 |

823661.93

DATE DUE: within 30 days after report issuance date.

03AQI900215

Delete

8.22.03

KD

# DUANE I. ROBINSON DEPOSITION
# EXHIBIT 8

AmericanAirlines

May 21, 2003

Mr. Frank Vollmerhausen
Director, Resource Management Systems and Evaluation Staff
USDA – APHIS
4700 Rover Road, Unit 151
Riverdale, Md 20737

Re: Appeal of APHIS fee liability

Dear Mr. Vollmerhausen:

American Airlines, Inc. files the attached appeal to seek the setting aside or modification of the liability notified by Mr. Pierre M. Arsenec, Chief, User Fee Auditing Branch, Resource Management System and Evaluation Staff on April 28, 2002. It also requests that when reviewing this appeal the Department of Agriculture take into consideration the exigent circumstances surrounding the audit. At the time AA was undergoing wrenching changes and uncertainty. It teetered and nearly filed twice for bankruptcy protection. Key personnel from many departments including Mr. Monty Hobbs in Revenue Accounting and Ms. Teresa Isakson (as myself) who were involved on the AA side on this audit were commandeered to attend meetings and supply and assist extensively in the preparation of a potential bankruptcy filing. Both Mr. Hobbs and Ms. Isakson were bound by a non-disclosure agreement from sharing this information with Mr. Michael Campbell the APHIS auditor.

We apologize to Mr. Campbell and the Department of Agriculture, to the extent that any short delay in producing AA's case may have inconvenienced the Department. However, AA did inform Mr. Campbell in a timely fashion that reliance on a particular SDQ-MIA flight produced results that were at odds with AA's field and system-wide collection results and with our confidence in the internal controls in place. Further, that we looked forward to working together to reach a representative sample.

We note that the INS in the course of its audit on inspection fees for the same period did agree with American Airlines that using Mr. Campbell's sample was unrepresentative and opted in our view correctly, to modify its approach to its audit. The random samples that American Airlines has produced and discussed in the appeal submission and attached herein establish conclusively that the underpayment is significantly less than that estimated by the Department of Agriculture and as such merits that this case be reconsidered and the liability adjusted accordingly.

I look forward to discussing this appeal at your first convenience.

Exhibit I

PENGAD 800-631-6989 EXHIBIT 8 5/18/07 abc



P.O. BOX 619616, DALLAS/FORT WORTH AIRPORT, TEXAS 75261-9616

Cordially yours,

Paul Salamone
Director & Sr. Tax Counsel – International

May 21, 2003

**American Airlines Appeal from the April 28th, 2003 Department of Agriculture Determination of APHIS Fee Liability**

**The Appeal**

This submission constitutes American Airlines, Inc's (AA) appeal from a notice of liability of $773,109 for APHIS international passenger inspection fees notified on April 28, 2003 by Mr. Pierre M. Arsenec, Chief, User Fee Auditing Branch, Resource Management Systems and Evaluation Staff. (Copy attached). AA's appeal rests on the fact that it has had in place strict and detailed internal controls system-wide for collections of APHIS and other taxes and fees. Secondly, that our tests of internal controls, validated by our extensive sampling through 3 different and in our opinion more accurate samples, and separately an overall check through an analytical test amply and convincingly demonstrate that the amount due to the Department of Agriculture is $280,871. Finally, that with the same facts the INS also determined that reliance on the SDQ-MIA flight chosen by the Department of Agriculture would produce results that are not representative with AA's collection experience.

For the reasons detailed below, AA respectfully requests that our appeal be accepted and that the Department of Agriculture set aside the notice of liability and review the additional evidence that AA has collected for this audit period and conclude that the amount undercollected was $280,871.

**Background and Chronology of the Audit**

Historically, inspection fee audits covered a two-year period. This past practice made it extremely onerous to respond within a compressed time frame to audit requests since part of the information had been purged from the systems. This has led to the new practice of annual audits where the information needed by the auditor is periodically requested throughout the audit period, leading to a more balanced workload throughout the year and a more timely response to auditor requests. Once the year closes the auditor normally meets on campus with revenue accounting personnel to perform further and final fieldwork and discuss the sampling results.

It is the auditor who initially determines what and when to sample and American like other airlines, produces the sample evidence as requested. This was accomplished for the audit period 2002 throughout 2002.[1] At the entrance meeting held on February 26,

[1] Due process and practice has always allowed airlines to challenge and present their side of the case when samples chosen and adhered to by an auditor are inconsistent with the collection experience of the airline. To not do so, would leave airlines not only with the cost of supporting a collection system world-wide but paying amounts that the government has already received on a timely basis through the normal remittance procedure.



Exhibit J

[redacted]

2003 and in a subsequent meeting held on February 28, 2003, Mr. Michael Campbell the auditor was informed by Mr. Monty Hobbs from AA Revenue Accounting, that the SDQ-MIA flight chosen as a sample produced results that were unrepresentative. He was further advised that a reappraisal of the sample was warranted and invited him to engage in a dialogue with AA on how to proceed. Despite this, at the February 28, 2003 meeting the auditor presented his proposed liability that relied on the unrepresentative SDQ-MIA flight as a sample. This prompted Mr. Hobbs to follow up with a letter dated March 5, 2003 (attached herein)[2] reiterating the need for the auditor to reconsider the use of such unrepresentative sample as a basis for assessment; he proposed alternate sampling methods and concluded by inviting Mr. Campbell to engage him in a discussion on this issue the following day.

During this same period of March 10-14, the INS was also on campus performing their fieldwork on the INS inspection fee. Since our experience has been that INS and the Dept. of Agriculture endeavor to coordinate and consult on agreeing on sample methodology, Mr. Hobbs was under the reasonable impression that reaching an agreement with INS on samples would also move the APHIS fee case to a conclusion in a timely but parallel path. This impression was further fueled by Mr. Campbell's response to Mr. Hobbs March 5, 2003 letter e-mailed on March 12, 2003. (Copy attached.). The latter, clarified some items that reduced the proposed liability and in turn suggested a conference call on the following day to discuss the remaining and more important items of sampling. The conference did not take place because of mutual scheduling conflicts.

While this is happening AA was undergoing severe financial stress, unprecedented turmoil and wrenching changes associated with management layoffs and accelerated attrition.[3] In response, AA had established a working group to plan for a potential bankruptcy filing at the end of March of 2003 unless agreements were reached with the unions on pay and work rule changes. Mr. Monty Hobbs and Ms. Teresa Isakson were commandeered to assist in this process and given the sensitivities of the matter were asked to sign non-disclosure agreements. While a potential bankruptcy filing was already the subject of speculation in the press, what Mr. Campbell was not aware of – and Mr. Hobbs could not volunteer – was the level of his and others involvement in the process to prepare for bankruptcy.

Bankruptcy was averted at the end of March only with the commitment of the unions that a vote to adopt pay cuts and work rule changes would be completed by April 15,th 2003. Mr. Hobbs as Ms. Isakson, were then required to continue to assist in a potential bankruptcy filing which was again narrowly averted on April 15th by the ratification of the company's wage and work rules proposals to the unions. But the crisis that erupted thereafter that resulted in AA Chairman and CEO Mr. Donald Carty's departure again raised the specter that one of the unions would back-out of the deal and precipitate a bankruptcy filing. Working under these very difficult circumstances, Mr. Hobbs produced further analysis and on April 17th, 2003 he sent it to Mr. Campbell and

---

[2] The letter was both e-mailed and mailed to Mr. Campbell.

[3] In the last 15 months AA has lost in excess 22% of its management personnel.

the INS auditors. As a result INS agreed to reconsider the use of the SDQ flight relied upon Mr. Campbell. Despite this, Mr. Campbell informed Mr. Hobbs that the Department of Agriculture stood by its sample and method and would issue the proposed liability as modified by the March 12, 2003 e-mail in final form. (Copy attached). Naturally, this took American Airlines by surprise since Mr. Campbell had agreed to engage Mr. Hobbs in a meaningful discussion about the sampling method used by the Department of Agriculture. The final assessment was subsequently notified by Mr. Arsenec and is dated April 28, 2003.(Letter is attached).

**Statutory and Regulatory Background**

Pursuant to 21 USC Section 136a(a)(a)(A), the US Department of Agriculture is directed to charge passengers fees to cover the costs of the inspection of international passengers. The triggering event for such collection is fixed at the time APHIS renders its inspection services to the passenger:

> "Except as specified in paragraph (f)(2) of this section, each passenger aboard a commercial aircraft who is subject to inspection under part 330 of this chapter or 9 CFR, chapter I, subchapter D, upon arrival from a place outside of the customs territory of this United States, must pay an APHIS user fee."[4]

Both 21 USC Section 136a and 7 CFR Section 354.3(f)(1) require the US Dept. of Agriculture to collect the inspection fee on the passenger upon arrival. However, the law allows the Dept. of Agriculture to transfer collection responsibilities and it did so through regulations. The regulations in turn direct travel agencies, tour operator and any entities that issue tickets to collect such taxes upon the issuance of tickets or travel documents:

> (i) "[a]ny person that issues tickets or travel documents on or after May 13, 1991, is responsible for collecting the APHIS user fee from all passengers transported into the customs territory of the United States to whom the APHIS user fee applies".[5]

To "issue tickets" means when a travel agent, tour operator, airline or other person actually executes and tenders legally enforceable travel documents or tickets to a passenger.[6] In actual practice travel agencies issue over 80 percent of tickets issued

---

[4] 7 CFR Section 354.3(f)(1). (My emphasis). Similarly, this triggering event is also emphasized in 7 CFR Section 354.3(f)(3)(iii).("APHIS user fees shall be collected...(iii)when passengers arrive...and are inspected by APHIS.)

[5] 7 CFR Section 354.3(f)(4)(i). (My emphasis).

[6] The meaning is clear from how the term is used in 7 CFR Section 354.3(f)(4)(i)(B) ("...the passenger's tickets or travel documents were issued...").

domestically and in foreign locations for most airlines including AA. Naturally, US law and regulations, including 7 CFR Section 354.3 does not and cannot govern a foreign travel agency or tour operator's conduct that occurs and originates solely in a foreign country since US laws are presumed territorial in nature. United States v Curtiss-Wright Export Corp., 299 US 304, 318 (1936)("...neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens." By the same token, there is no US law or authority under 7 CFR Section 354.3 that either does or can compel a US airline to coerce through denied boarding a foreigner while he remains in his own country in order to induce him to pay the fee that such country has specifically indicated cannot be collected without the passenger's consent.

**AA's collections procedures in the Dominican Republic**

The Dominican Republic (DR) has taken the position that US airlines cannot compel payment of US ticket taxes and inspection fees on originating Dominican passengers for tickets sold in the DR. The DR's view is that collection somehow injures or offends the country's sovereignty. Armed with this policy, travel agencies in the Dominican Republic routinely overrode the CRS system auto price mechanism to exclude collection of US ticket taxes and inspection fees. This required AA to design and implement additional procedures and train our ticket counter agents world-wide to collect inspection fees on passengers that had not paid. In fact, the regulations accommodate for such a situation and then require an airline to collect when the passenger attempts to depart from a US gateway.[7]

Four or five years ago, at the insistence of American Airlines, this policy of no collection in the DR was later relaxed to allow both the travel agency and the airline to "invite" the passenger at point-of-sale or check-in to pay the ticket tax. In light of this policy change AA has instituted strict procedures to request payment and account for such payment. When a passenger pays the fees at AA DR ticket counter, the ticket agent is required to fill out a form called a Miscellanous Sale Receipt (MSR) that details the type of tax or fee collected, the amount etc. This information is later coded to the appropriate tax account and the balance of the fees collected are remitted to the government.

Travel agencies are also evaluated for their success in inducing passengers to comply at point of sale in the DR with their collection obligations. High incidence of undercollections only increases our employee's work at the DR ticket counter (at the expense of speedy processing of other passengers) and is factored in as an important element to determine whether to continue to do business with that particular travel agency. AA has taken drastic action against errant travel agencies that has included pulling the "plates" and terminating the agency relationship. AA also orients and evaluates ticket counter personnel for their success in collecting and accounting for the fees in the DR.

---

[7] 7 CFR Section 354.3(f)(4)(i)(B).

Furthermore, AA's Miami, Central and Latin America (MCLA) division monitors the performance of the collections of US taxes and fees in addition to the many audit procedures performed by our DR controller. Supplementing this dual effort, AA Internal Audits also periodically inspects our field internal controls.

Thus, AA has extensive (and costly) internal controls in place that provides us with the confidence that collections of ticket taxes and fees proceed normally with a small error rate. As we shall discuss below, our analytical review and three different statistical samples, amply and convincingly bears this out and reveals a significantly lower result than that obtained by the Department of Agriculture.

**The Analytical Review and Sampling Methods Used**

With regards to audits the regulations simply state that "[e]ach carrier, travel agent, United States-based tour wholesaler, or other entity, subject to this section, must allow APHIS personnel to verify the accuracy of the APHIS user fees collected and remitted and to otherwise determine compliance with the 21 USC 136a and this paragraph."[8] The regulations provide no further guidance or benchmarks on what methodology must be used to conduct such audit. The final report and assessment simply states that the "audit was conducted in accordance with the Government Auditing Standards issued by the Comptroller General of the United States" but our review of such standards reveal no meaningful guidance or even particular guidance for ticket tax audits. However, these government audit standards, refer to the AICPA audit standards. These in turn generally require that samples be taken in order to ensure that the audit evidence is "sufficient and competent" on which to base conclusions about the entity's internal controls and reasonableness of account balances.

Now naturally, sampling makes sense so long as the assumptions surrounding the sampling are reasonable and other evidence does not reflect that the sample is unrepresentative. During the audit planning stage best practices under the AICPA standards call for the auditor to assess the level of audit risk associated with a process or an account balance. That assessment of risk in turn should guide the auditor in planning the fieldwork. Analytical tests are an indispensable tool to assess audit risk and the value of the audit evidence obtained during fieldwork through the study of plausible relationships among accounting and non accounting data.[9] As we shall discuss, AA performed analytical tests and four separate, substantive tests of transactions using statistical samples randomly generated that separately and collectively evidence a significantly lower error rate than that elicited by the Department of Agriculture's method of sampling.

**The Department of Agriculture's Sampling Method**

[8] 7 CFR 354.3(f)(7).

[9] SAS No. 56, Analytical Procedures (AICPA, Professional Standards, Vol 1, AU section 329).

To perform the audit, Mr. Michael Campbell divided AA's international markets into four principal sub-markets, to wit, Asia Pacific, Europe, the Caribbean and Latin America. Within those markets he then selected for each quarter purposely – and not at random – all the tickets of a flight within a route, with a known high volume of passenger traffic.[10] He proceeded to weight each region and sample equivalently. The sample flights, sample size, errors and error rates for each flight were as follows:

| Flights | Sample Size | Errors | Error Rate |
|---|---|---|---|
| Feb. 27, 2002, Flight #63 CDG-MIA | 83 | 2 | 2.41% |
| July 5, 2002 Flight # 1542 MEX-DFW | 101 | 0 | 0.00% |
| Oct. 25, 2002 Flight #780 SDQ-MIA | 115 | 10 | 8.70% |
| Dec. 18, 2002, Flight # 128 NRT-SJC | 151 | 0 | 0.00% |
| | 450 | 12 | |

Using this method, an average error rate of 2.67% resulted, for an audit assessment of $773,109. The table above indicates that the SDQ-MIA sample was 361% worse than the Paris-Miami flight that reflected an error rate of 2.41%. Once the result came in, both Mr. Monty Hobbs and Ms. Isakson of AA communicated to Mr. Campbell, that such result was not representative and that it should be looked into further.[11] Such a huge spike in the error rate as we shall demonstrate is plainly inconsistent with analytical test results, and called for further confirmation through more audit fieldwork. As the AICIPA counsels,

> "Occasionally, the sample results might not support acceptance of the recorded amount because the sample is not representative of the population, even though the sample was selected in a manner that was expected to be representative of the population. When the auditor believes the sample might not be representative of the population, he or she might select additional sampling units to try to obtain a sufficiently representative sample or perform alternative procedures as an aid in determining whether the

[10] In the course of a previous audit, Mr. Michael Campbell requested information on AA's 30 top international routes by passenger volume. Flights from SDQ-MIA ranked very high within these top international routes.

[11] The Department of Agriculture's report and notice of underpayment of April 28th, 2002, at page 2, states that "we understand that [AA has] agreed that the sample below is representative of the markets in which you sold applicable tickets during the audit period." That is incorrect. AA agreed to cooperate with the auditor and provide him with the samples he requested and not limit his ability and discretion to conduct his audit. However, AA did not communicate or indicate to the auditor that it was forfeiting its opportunity to then present its case using further samples if the samples and results chosen by the Department of Agriculture produced - as it did - results that were at variance with AA's collection experience.

recorded amount of the population is misstated." (Our emphasis).[12]

The Department of Agriculture conclusions were not tested against any result product of an analytical test to determine the reasonableness of the sample or results. Further, weighting of each region equally without taking into considerations each market's dynamics, size etc[13] and does not conform to generally accepted audit sampling practices.[14]

In this last regard, AICPA Audit and Accounting Guide Audit Sampling, (2002 Revised version), Section 5.27, at pg. 63-4, instructs that the misstatement should have been projected to each group separately, taking into consideration the size of the region or group and particular factors associated with operating in such group. In this case the Caribbean region is a significantly smaller, culturally, operationally different and self contained market than the Central and South American market and for that matter also Europe and Asia Pacific.

Sampling on the basis of one flight produces a "snap-shot" of collection procedures at the AA DR ticket counter at only one particular time with one set of employees during such shift. This is unrepresentative of how those procedures and the employees in charge of enforcing them actually worked throughout a wider time-line throughout the quarter or for that matter for the whole year.

In light of this limited and in our view highly unrepresentative sample, AA performed four separate tests using significantly enlarged samples to test Mr. Campbell's results.[15] The first was an analytical test that sets the stage to benchmark and assess whether the other audit tests based on sampling produced reasonable and consistent results with the internal controls in place. All four tests indicated that the system error rate arrived at using the SDQ-MIA flight sample was non-representative of the Caribbean or AA's system as a whole.

**AA's First Test – Analysis of APHIS Fee Collections**

---

[12] AICPA Audit and Accounting Guide – Audit Sampling (2002, revised version), Section 5. 30, at page 64.

[13] Mr. Campbell weighted the Caribbean region equally with the other three regions when in reality the Caribbean market represents approximately 25% of the AA's point of sales for only the Latin America and Caribbean regions combined.

[14] This also leads to statistically unreliable results. Our analysis indicates that if AA's compliance were perfect or nearly perfect everywhere except the DR and AA did not collect APHIS fees for any DR sales the amount owed by AA would only be approximately $811,000, or an overall error rate of 2.79%. Granted this is a very extreme set of circumstances but they highlight how unrealiable the statistical sampling method used by the Department of Agriculture. This is only slightly higher than the Department computed 2.67% error rate overly weighted by the statistically unrepresentative error rate of 8.70% resulting from the SDQ-MIA flight.

[15] The samples have been made part of this appeal and are presented by separate cover.

The first test was an analytical test of the overall collections of APHIS fees for 2002 vs eligible tickets.[16] For 2002 AA remitted a total of $28,218,485.10[17] in APHIS inspection fees. Per our records, the total of APHIS eligible tickets issued worldwide in 2002 were 9,193,341.

Dividing the 2002 APHIS remittance of $28,218,485.10 by $3.10 results in 9,102,737 tickets for which AA remitted system-wide. The difference between the eligible tickets vs. tickets that reflect payments is 90,603; when this figure is multiplied by $3.10, the APHIS charge produces a system-wide under-collection figure of $280,871 (rather than $773,109 reflected in the APHIS report) for an error rate of just .99%. This error rate constitutes a significant improvement from that obtained in the prior audit for the period of July 2000-December 2001 which was 1.71%. What's more, the .99% error rate for 2002 mirrors the result obtained in 2001 for the Non NRSA[18] transactions.

**AA's Second Test – Statistical Sample Number One**

Under the second method employed by AA, 1979 tickets sold in fourth quarter of 2002 throughout our world-wide system for flights departing any international market including the Dominican Republic were sampled at random.[19] Twenty errors were detected for an error rate of 1.01%, a result that again is closer to last year's error rate and contrasts markedly with the 2.67% reflected in the Department of Agriculture's APHIS report. Further, we submit that this sample error rate arrived at by AA is eminently more accurate than that employed by the Department of Agriculture when compared to the error rate obtained by performing analytical reviews conducted and discussed in the First Test.

**AA's Third Test – Statistical Sample Number Two**

Under the third test employed by AA, 1983 tickets sold in the Dominican Republic were sampled at random[20] for 4th quarter of 2002 for flights and passengers

[16] "Eligible tickets" consist of flights originating from international locations (except Canada) to the US or from Puerto Rico to the US issued in 2002. Flights from the US Virgin Islands to Puerto Rico are also excluded.

[17] The total amount remitted in 2002 includes the amounts associated with 2002 sales net of refunds as well as similar amounts related to 2001 transactions processed by AA in 2002, principally December 2001 sales. Furthermore, the total amount does not include some transactions that occurred principally in December of 2002 that were not processed by AA until 2003.

[18] NRSA is the acronym for Non Revenue Space Available tickets used by employees for leisure travel.

[19] The same sampling process used in the AA third test was employed to obtain the sample for the second test.

[20] Consistent and pursuant to AICPA Audit sample standards, a minimal statistically valid sample size would have been approximately 150 tickets. The sample size for this test and for the remainder tests AA conducted were calculated using the same formula for determining sample size as that used by Mr.

originating in the Dominican Republic with different destinations to the United States. This method was employed to isolate and highlight any collection problems associated with the Dominican Republic travel agencies and airport ticket agents. Conceivably this would provide a broader and deeper view of the actual collection experience in the Dominican Republic. As it turned out, 83 errors were detected of this broad and large sample of 1,983 tickets that were sampled from the system, for an error rate of 3.18%. This result is significantly lower than the snapshot error rate of 8.7% arrived at by the Department of Agriculture.

**AA's Fourth Test – Statistical Sample Number Three**

Under the fourth method AA selected a sample size of 500 tickets at random[21] based on departures from the Dominican Republic in the fourth quarter of 2002. This method provides a broader and more accurate view of how the internal control procedures worked at AA's ticket counter at different times with different shifts of employees. This contrast with the approach used by the Department of Agriculture that employed one sample flight that at most would elicit a snapshot of how one particular group of employees performed their fee collection responsibilities. With this method, the number of errors detected was 2.8%, nearly three times lower than the 8.7% under the Department of Agriculture's sampling method.

**Conclusions**

The above amply demonstrates that both under analytical methods and sampling tests conducted by AA under generally accepted audit sampling practices, the error rates produced for the Dominican Republic and system-wide are significantly less than those produced by the Department of Agriculture.

We emphasize that under two separate tests of AA system-wide collection procedures resulted in statistically identical error rates of approximately 1%. In addition the remaining two other tests conducted by AA, clearly indicate that compliance with regulations associated with collections of APHIS fees in the Dominican Republic, were significantly better than the snapshot test and conclusions drawn by the Department of Agriculture.

In light of the above, AA respectfully requests that that the Department of Agriculture reconsider and set aside its notice of proposed liability notified on April 28,

---

Campbell. The formula is detailed and discussed in Johnson & Bhattacharyya, Statistics, Principles and Methods, Third, Edition 1996. For all tests AA chose a larger sample size than the minimum statistically valid sample to decrease the margin of error in the sample. The sample was produced by AA's internal audit department using a software program known from its acronym ACL, which stands for Audit Command Language a windows based product, version 7. ACL is commonly used to analyze large data populations. The samples were drawn using ACL's random sample generator from the entire APHIS eligible tickets issued in the Dominican Republic from a population of over 65,372 tickets during the fourth quarter for 2002.

[21] The minimum statistically valid sample was ~~260~~ 250 using the formula provided by Mr. Campbell.

2002 by Mr. Pierre M. Arsenec, Chief, User Fee Auditing Branch, Resource Management Systems and Evaluation Staff. Furthermore, AA requests that the Department of Agriculture adpot the AA test results establishing the undercollection to be $280,870.

Paul Salamone
Director & Sr. Tax Counsel – International
American Airline, Inc.

Tel. (817) 967-3881
E-mail: Paul.Salamone@aa.com

cc P. Arsenec

# DUANE I. ROBINSON DEPOSITION
# EXHIBIT 9

M&C MILLER & CHEVALIER
CHARTERED

655 FIFTEENTH STREET, N.W., SUITE 900
WASHINGTON, D.C. 20005-5701
202.626.5800 FAX: 202.628.0858
WWW.MILLERCHEVALIER.COM

October 13, 2003

*BY MESSENGER*

Immigration and Naturalization Service
Department of Homeland Security
Office of Financial Management
425 I Street, N.W.
Washington, D.C. 20536

Re: Request for Refund of Immigration Passenger Processing Fees

Dear Sir or Madam:

On behalf of American Airlines, Inc. ("American"), we hereby request a refund of $1,225,614 (plus applicable interest), representing the amount of uncollected immigration user fees remitted by American to the Immigration and Naturalization Service ("INS") from July 1998 to the present. The uncollected fee amounts and supporting documentation are attached as **Exhibit A** to this letter.

Title 8, United States Code, section 1356, authorizes the Department of Homeland Security ("DHS")[1] to collect fees for the immigration inspection of passengers aboard a commercial aircraft or vessel arriving in the United States. With respect to the fee (hereinafter referred to as the "User Fee"), the INS regulations governing the assessment, collection, and enforcement of the User Fee require the carrier whose ticket stock reflects collection of the fee to be responsible for remittance of the fee to DHS.

This refund request is based on the legal conclusion that American cannot be held liable for uncollected User Fees that the airline is unable to collect. American does not challenge the amount or validity of the fee, nor the authority of DHS to assess or collect it. Rather, American asserts that the INS regulatory provisions do not obligate carriers to remit to the INS uncollected User Fees. To read such a requirement into the regulations would improperly transform a passenger pay-as-you-use service fee arrangement into one that has conscripted carriers into guaranteeing payments on behalf of passengers that failed and or refused to pay their user fees despite reasonable efforts by the carrier to collect such fees.

---

[1] The INS is no longer a stand-alone agency under the Department of Justice. Its functions have been transferred to various offices under the Department of Homeland Security. For ease of presentation, however, this letter will refer to the responsible agency as the INS.

EXHIBIT
PENGAD 800-631-6989
9
5/18/07

This letter will first discuss the U.S. statutory and regulatory authorities regarding the assessment, collection, and enforcement of the User Fee. Next, we will discuss the legal and practical limitations with respect to assessing and collecting the User Fees against tickets issued in foreign jurisdictions. The letter concludes with legal arguments as to the reasons why DHS should grant this refund request.

## I. The User Fee

Title 8, United States Code, section 1356 (hereinafter referred to as "Section 1356," the "User Fee Statute," or the "Statute") establishes a fee for the immigration inspection of each passenger aboard a commercial aircraft or commercial vessel arriving at a U.S. port of entry, or the pre-inspection of a passenger in a place outside the U.S. prior to such arrival. The applicable INS regulations providing for the administration of the User Fee is found at title 8, Code of Federal Regulations, section 286) (hereinafter referred to as the "the INS Regulations").

### A. Assessment and Collection of the Fee

Under Section 1356 of the Statute, the person that issues the travel document or ticket to an individual for covered transportation must collect the fee. If the ticket is issued in a foreign country and the fee is not collected **at the time the ticket is issued**, the enplaning carrier shall collect the fee prior to departure from the United States. *See* 8 U.S.C. 1356(f)(2). Section 1356(f)(3) directs the enplaning carrier to remit only "**those**" fees (referring to the actual fees collected) to the Attorney General. It does not require remission of fees that the carrier could not collect because a passenger refused to pay the fee.

### B. Payment of Fees Uncollected Fees at the Time of Departure from the United States

The User Fee Statute provides very specific guidance to the INS on the collection and remittance responsibilities of carriers. Section 1356 directs carriers to remit only the fees that were actually collected. It says nothing about payment of fees that are not collected where the passenger refuses to pay the fee. Further, Section 1356(f)(3) requires that the regulations issued governing the collection and remittance of the fees "shall be consistent" with the regulations issued by the Secretary of the Treasury for the collection and remittance of transportation excise taxes imposed by subchapter C of Chapter 33 of Title 26.[2] Those regulations do not require the remittance of uncollected taxes to the Internal Revenue Service ("IRS").

---

[2] Reg. 49.4291-1 issued under 26 U.S.C. 4261 directs the carrier to inform the Internal Revenue Service of the names of passengers who have refused to pay the transportation excise tax but it does not make the carrier secondarily liable.

Similarly, the INS Regulations do not require remittance of uncollected fees. Section 286.5 of the Regulations requires the carrier to remit to INS only those fees for which the ticket stock or document for collection "reflects collection."

## II. Procedures for the Collection of the User Fee

American takes its commitment to enforcing the collection of the User Fee very seriously, as demonstrated by the results of recent audits of its User Fee collections. American's 97.53 percent compliance rate for 2002, as determined by the Department of Homeland Security's recent audit findings for this period, underscores American's success in this regard.

### A. Collection Procedures in Place

American has instituted various policies and procedures, which are costly and labor intensive, to achieve the highest possible collection rate possible. These procedures include various steps aimed at attempting to collect the fee from a passenger that was not assessed the fee at the time the ticket was issued. These procedures underscore American's efforts to collect the User Fee in all instances where it can legally do so, even though American does not have the legal obligation to remit fees it cannot collect.

### B. Limitations on Collection of the User Fee in Foreign Jurisdictions

Despite American's efforts, however, there are significant limitations on its ability to collect the User Fee. Many Latin American countries where American provides service adhere strictly to a broader version of the so–called "revenue rule." Under this rule, countries generally refuse to have their courts, institutions and laws employed to facilitate the collection of foreign exactions directly or through a collection agent[3] on their nationals.[4] The U.S. also adheres to this rule but only on exactions that are considered taxes in the U.S. sense.[5]

American has experienced first-hand efforts by foreign governments that prohibit user fee assessments at ticket counters. American encountered problems in some of these cases even when its actions were limited to simply inviting the passenger to pay the inspection fees prior to boarding. For example, the Government of Guatemala issued a decree to that effect that

---

[3] 1 Dicey & Morris, The Conflict of Laws, 91 (13th ed., 2000)("indirect enforcement occurs when a foreign State (*or its nominee*) in form seeks a remedy...")

[4] Harvey P. Dale, *Withholding Tax on Payments of Foreign Persons*, 36 Tax L. Rev., 49, 50 (Fall 1980)("[a]s a matter of durable international practice, no state will assist any other state in the collection of a tax.")

[5] *The Attorney General of Canada v R. J. Reynolds Tobacco Holding, Inc.*, 268 F. 3d 103 (2d Cir. 2001) (collection of Canadian customs duties not enforced).

American challenged without success. *See* **Exhibit B**. Similarly, in Colombia and the Dominican Republic, American engaged in prolonged negotiations to permit American to simply "invite" the passenger to pay U.S. ticket taxes and inspection fees upon check-in. *See* **Exhibit C.** Panama and Honduras also were countries in which American faced government opposition to U.S. tax collection. *See* **Exhibit D**. Travel agencies in these countries for the most part refuse to collect the inspection fees. Consequently, American has been forced to modify its "post ticketing" collection procedures in these countries.

Under these modifications, when a ticket agent notices on a passenger's ticket that the User Fee was not paid at the time of issuance, the agent legally may only "invite" the passenger to pay the User Fee during the time prior to departure of the flight from the foreign country and prior to departure of the return flight from the United States. American may not impede or prohibit a passenger from boarding in a foreign country for failure to pay the User Fee without running a nearly certain risk of a lawsuit and potentially regulatory enforcement actions and penalties. Consequently, American has implemented post ticketing collection procedures on the return leg in the U.S. as a back-up procedure for collecting the fee. However, these are principally manual and labor intensive procedures and, as a result, costly to implement.

## III. Basis for Granting American's Refund Request

As summarized above and further discussed below, neither the relevant statutory nor regulatory provisions require carriers to be guarantors and, therefore, secondarily liable for any and all uncollected User Fees. The proper reading of the User Fee Statute is that Congress legislated and intended that INS look to the passenger for the User Fee for payment of uncollected User Fees. The INS correctly interpreted the User Fee Statute by limiting the carrier's remittance authority to fees that the carrier actually collected.

### 1. The INS Regulations accurately reflect the intent of Congress with respect to carrier liability for uncollected user fees.

Section 1356 of the Statute and its legislative history are conspicuously silent on secondary liability for fees not collected by the enplaning carrier upon the passenger's return departure from the United States. This was not an oversight, but the exercise of a careful and deliberate policy not to overburden carriers when other alternate reasonable methods exist to collect the User Fees. In this regard, Congress has provided INS with the enforcement authority necessary to elicit compliance from passengers that have refused to pay the User Fees. The INS has correctly recognized this authority by requiring that carriers only notify the INS when passengers refuse to pay the User Fee. Neither the Statute nor the INS Regulations provides the carrier with the enforcement authority to compel a passenger to pay the User Fee when it could not be collected either at the time the ticket was issued or when the passenger departs the United States.

Secondary liability has never been presumed or implied in statutes, just because a law requires a carrier or seller of goods or services to collect a tax or fee from a passenger or buyer of services or goods.[6] Rather, Congressional practice has been to reserve this option as a rule of *exception* that Congress has seen fit to enact sparingly and more importantly clearly and very explicitly.[7] When Congress has wanted to impose secondary liability on carriers for uncollected taxes or fees, it does so expressly and unequivocally. For example, only since 1997 has Congress specifically imposed liability on the carrier for undercollection of transportation excise taxes.[8] Similarly, secondary liability was explicitly imposed on parts installers on the excise tax on sale at retail of heavy trucks and trailers.[9]

There are numerous statutory schemes where Congress could have imposed secondary liability on service providers for the under-collection of taxes, but it elected not to do so.[10] Further, in none of these cases did Congress impose any other restrictions tied to the collection of the fee, such as refusal to provide the service being taxed. Accordingly, if Congress had wanted to impose similar secondary liability on carriers with respect to the User Fee, it could and would have done so, but significantly, did not.

Although the INS Regulations do not explicitly address the issue of enforcement of uncollectable fees, the regulations must be interpreted to reflect that the INS is responsible for any User Fees that are uncollectable by a carrier. INS exceeds its delegated authority by interpreting its regulations to require that the carrier be secondarily liable for the User Fee.

---

[6] *Air Tour Acquisition v United States of America*, 781 F. Supp. 669 (DC Hawaii 1991).

[7] *Pinter v Dahl*, 486 US 622, 650 (1988)("When Congress wished to create such [secondary] liability, it has had little trouble doing so.")

[8] *See* 26 U.S.C. 4263(c). However, this secondary liability is conditioned upon regulations which the IRS to date has not issued.

[9] *See* 26 U.S.C. 4051(b)(3).

[10] *See, e.g.*, with respect to air carriers engaged in transport of cargo within the United States for the cargo excise tax, 26 U.S.C. 4271 *et seq.*; with respect to sellers of firearms required to collect the excise tax on the sale of firearms, 26 U.S.C. 4181 *et seq.*; with respect to sellers of luxury passenger automobiles for the excise tax, 26 U.S.C. 4001; with respect to sellers of vaccines for the excise tax, 26 U.S.C. 4131 *et seq.*; with respect to sellers of fuels for the excise tax, 26 U.S.C. 4041 *et seq.*; and with respect to telephone carriers for the communications excise tax, 26 U.S.C. 4251 *et seq.*; *Cf.* 26 U.S.C. 4261 *et seq.* (Congress specifically added secondarily liability for air carriers).

2. **American's interpretation of the INS Regulations satisfies the condition specified in the enforcement provisions of the User Fee Statute requiring that the INS Regulations be consistent with the IRS regulations governing the collection and remittance of a transportation excise tax imposed on airline passengers.**

The INS Regulations properly do not impose liability on the carrier for payment of uncollected fees. Section 1356(f)(3) requires that the INS Regulations be consistent with the regulations promulgated for the transport excise tax under subchapter C of Chapter 33 of the Internal Revenue Code ("IRC"). Those regulations specifically reject secondary liability and require that the IRS seek payment of uncollected fees from recalcitrant passengers.[11]

Nothing in the INS Regulations requires the carrier to remit to the government amounts representing uncollected fees. Rather, the INS Regulations provide that if at the time of the departure from the U.S. the passenger refuses to pay the fee, the carrier must notify INS regarding this occurrence. In order for the INS Regulations to be consistent with the IRS regulations under Chapter 33 of the IRC, the INS must interpret its regulations so that the carrier is not liable for the payment of uncollected User Fees.

It is instructive to consider how the same type of user fee is collected by other agencies. Regulations promulgated by the Animal and Plant Health Inspection Service ("APHIS") implement a similarly constructed statute imposing user fees on airline passengers for agricultural quarantine and inspection services. When faced with similar delegation to issue regulations for passenger inspection fees, APHIS correctly concluded that imposing secondary liability on the carrier was not part of the Congressional delegation.

3. **Because airline passengers -- and not the airlines -- are primarily liable for the payment of the User Fee, DHS should look to the passenger for payment of uncollected fees.**

Under the User Fee Statute, passengers are primarily liable for the payment of the User Fee. Accordingly, INS should look exclusively to the passenger, not the carrier, for payment of any uncollected User Fees. It is INS, not the carrier, that has the necessary enforcement authority to compel payment of the fee.

---

[11] Reg. 49.4291-1 issued under 26 U.S.C. 4261 *et seq.* directs the carrier to inform the IRS of the names of passengers who have refused to pay the transport excise tax but it does not make the carrier secondarily liable. Although the statute was changed in 1997 to impose liability on the carrier, the original language of the statute did not impose such liability. Accordingly, the statutory change is immaterial to the intent of Congress when it enacted the User Fee Statute in 1986.

The only requirement the INS Regulations impose on the carrier with respect to uncollected fees is the obligation to notify the agency when it is unable to collect the User Fee from a non-compliant passenger. To American's knowledge, however, INS has not implemented any procedures to allow carriers to provide this information to the INS. Certainly, the INS Regulations do not contemplate a phone call from the carrier to the INS each and every time that a passenger refuses to pay. This would be a costly, inefficient and labor-intensive approach to implementing this regulatory requirement. Rather, a more systematic approach was likely envisioned. Because information on passengers who have not paid the User Fee is captured electronically in company databases, American could provide this information to the INS electronically if the INS were to establish procedures for the collection of this information.

Further, failure to notify the INS regarding non-compliant passengers does not establish liability on the part of the carrier for uncollected User Fees. Liability with respect to uncollected User Fees remains with the agency regardless of whether the notification requirement is satisfied. Carrier notification, however, is one of the many tools the agency could and should use in the exercise of its enforcement authority to collect the fee. In this regard, to facilitate INS's enforcement responsibilities, American would be glad to work with INS to make available information on those passengers from which American could not collect the User Fee.

4. **Enforcement of the INS Regulations would violate the Revenue Rule.**

As noted above, virtually all of the uncollected fees that are the subject of this refund request involve tickets issued in foreign jurisdictions. As discussed previously, this implicates the "revenue rule." Under this rule, countries generally refuse to have their courts, institutions and laws employed to facilitate the collection of foreign exactions directly or through a collection agent on their nationals.

Nothing in the User Fee Statute or its legislative history suggests that Congress intended to overturn the revenue rule with respect to the collection of the User Fee or excuse the INS from seeking collection of User Fees directly from passengers when they have refused to pay the fee to a carrier. To interpret the User Fee Statute otherwise puts American in the untenable position of paying fees to the U.S. government that under longstanding principles of U.S. and international law, it will never be able to collect. Accordingly, American requests the INS to grant this refund request in order to avoid violating the revenue rule.

5. **American is prevented by legal and practical reasons from using coercive means to collect the User Fee from passengers who refuse to pay the fee, and doing so would subject American to significant liability.**

Congress did not authorize or direct carriers to engage in the costly practice of collecting the User Fee from a passenger who refuses to pay the fee, either at the time the ticket is issued or upon departure from the United States. For legal and practical reasons, American is unable to enforce collection by declining to issue the ticket to or refusing to board the passenger. Equally important, Congress did not shield carriers from the consequences of pursuing collection practices that otherwise would subject the carriers to significant liability. The silence of Congress in this regard demonstrates its intent that the INS use its existing powers to enforce collection of the User Fee rather than have the carrier refuse boarding to a passenger. Until Congress provides protection for the airlines against passenger suits for refusing a passenger to board a flight for failure to pay the User Fee, American cannot amend its contract of carriage in this respect.

## IV. Conclusion

For the foregoing reasons, American requests that the DHS refund American $1,225,614 (plus applicable interest), the amount representing the uncollected fees set forth in Exhibit A to this letter. Despite the legal authority prohibiting the INS from holding carriers liable for uncollected User Fee amounts, American has undertaken its best efforts to collect the User Fee from all passengers. As the DHS would acknowledge, American's compliance rate with respect to the collection of the User Fee is very high. As such, American will continue to make all reasonable efforts to collect the User Fee, even though American ultimately cannot be held liable if the fee is not collected.

We would be glad to meet with the appropriate DHS officials to discuss this refund request.

Sincerely,

Matthew M. Nolan
David R. Hamill
Counsel to American Airlines, Inc.