# DUANE I. ROBINSON DEPOSITION
# EXHIBIT 10

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

MICHAEL QUIGLEY
(202) 887-4477/Fax: (202) 887-4288
mquigley@akingump.com

BRIAN S. GLEICHER
(202) 887-4582/Fax: (202) 887-4288
bgleicher@akingump.com

October 10, 2003

Mr. Pierre M. Arsenec
Chief, User Fee Auditing Branch
Resource Management & Evaluation Staff
U.S. Department of Agriculture - APHIS
4700 River Road
Riverdale, MD 20737

**Re: American Airlines**
**Request for Refund**
**<u>Overpayments of APHIS Inspection Fees</u>**

Dear Mr. Arsenec:

We submit this letter to the Animal and Plant Health Inspection Services of the United States Department of Agriculture ("APHIS") on behalf of American Airlines ("AA") to request a refund of overpayments AA has erroneously paid APHIS for inspection fees.

## I. PROCEDURAL BACKGROUND

As discussed in detail below, APHIS is empowered to prescribe and collect fees for the cost of certain inspection services in connection with the arrival of international air passengers into the United States. Although air carriers are to collect and remit them, these fees are imposed directly upon international passengers.

EXHIBIT
10
5/18/07
PENGAD 800-631-6989

Exhibit S
[redacted]

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Mr. Pierre M. Arsenec
Page 2
October 10, 2003

As an air carrier, AA is obliged to collect and remit inspection fees to APHIS, however, AA is not directly liable for inspection fees that it was incapable of collecting from international passengers.

APHIS conducts periodic audits of AA's collection and remittance of APHIS inspection fees. In these audits, APHIS samples AA's flights from different regional international markets. Most recently, and by way of example, APHIS conducted an annual audit of AA's collection and remittance of APHIS inspection fees for 2002.

From a sampling of flights from AA's four principal regional international markets, APHIS determined a system-wide error rate of 2.6% and a resulting deficiency of $773,109. (*See*, April 28, 2003 APHIS letter, attached hereto as Exhibit 1). AA filed an administrative appeal on May 21, 2003, challenging the assumptions and the statistical sampling method used by APHIS to determine the system-wide error rate. After considering these additional materials, APHIS concluded, based upon a revised sampling method, that AA's error rate was 1.05% and that additional inspection fees of $298,298 were due. (*See*, August 14, 2003, letter of Mr. Frank C. Vollmerhausen, attached hereto as Exhibit 2). AA paid this amount on September 26, 2003.

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Mr. Pierre M. Arsenec
Page 3
October 10, 2003

As shown in the following schedule, APHIS has made similar findings in prior examinations.

| Period of Examination | Error Rate | Audit Liability | Date Paid |
|---|---|---|---|
| October 2000 – December 2001 | 1.02% | $ 592,391.85 | March 28, 2002 |
| July 1998 – June 2000 | 0.71% | $ 299,106.51 | November 15, 2000 |
| July 1996 – June 1998 | 0.57% | $ 150,572.48 | December 7, 1998 |
| June 1994 – June 1996 | 5.72% | $1,313,382.20 | September 26, 1996 |
| May 13, 1991 – March 31, 1993 | 5.53% | $1,099,143.00 | 1993 |

As a threshold matter, the system-wide error rates which APHIS has found are, on the whole, extraordinarily low. Indeed, they demonstrate that AA has collected better than 95% of inspection fees (and since 1996, almost 99% of fees) even including circumstances in which AA is incapable of collecting. These low error rates are direct statistical evidence that AA has exercised best efforts to comply fully with its obligation to collect and remit APHIS inspection fees.

AA submits that the error rates represent, in large measure, circumstances in which AA is precluded from collecting the APHIS fees from passengers. Collection is precluded by operation of foreign law and foreign regulatory restrictions in some countries. Foreign civil, consumer,

and aviation laws deprive AA of the power to deny boarding to a foreign passenger in a foreign country for failure or refusal to pay the United States imposed APHIS inspection fee. Moreover, foreign travel agencies (through which AA sells over 80% of its passenger tickets in foreign countries) are not subject to United States law and AA has no power to compel their compliance with United States law.[1] In these circumstances, AA has paid APHIS those amounts notwithstanding AA's inability to collect the fees from passengers.

To the extent the error rate estimates and the amounts AA paid based upon the error rates include amounts which AA was not able to collect, despite its best efforts to do so, AA seeks a refund of these amounts.

## II. LEGAL AUTHORITIES

The Food, Agriculture, Conservation, and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990 (together, the "Farm Bill"), authorizes the United States Department of Agriculture ("USDA"), through APHIS, to prescribe and collect fees to cover, among others, the cost of certain inspection services provided in connection with the arrival of international air passengers.[2] Included in the various APHIS user fees is the "fee for

---

[1] *See United State v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936).

[2] *See* 21 U.S.C.S §136a(a)(1)(A)(2003).

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Mr. Pierre M. Arsenec
Page 5
October 10, 2003

inspection of international passengers."[3] Each international passenger aboard a commercial aircraft must pay an APHIS inspection fee upon arrival within the customs territory of the United States.[4] The APHIS statute states as follows:

> [T]he Secretary of Agriculture may prescribe and collect fees sufficient—(A) to cover the cost of providing agricultural quarantine and inspection services in connection with the arrival at a port in the customs territory of the United States, or the preclearance or preinspection at a site outside the custom territory of the United States, of an international passenger, commercial vessel, commercial aircraft, commercial truck, or railroad car.[5]

The APHIS statute further provides, "fees *collected* under this [section] by any person on behalf of the Secretary are held in trust for the United States and shall be remitted to the Secretary in such manner and at such times as the Secretary may prescribe."[6] (*emphasis supplied*). The statute also provides that, if a person subject to a fee fails to pay the fee when due, the Secretary has the authority to assess a late payment penalty and interest.[7]

[3] *See* 7 C.F.R. §354.3(f)(2003).

[4] *Id.*

[5] *See Supra* note 2.

[6] *Id.* at §136a(a)(3).

[7] *Id.* at §136a(a)(4).

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Mr. Pierre M. Arsenec
Page 6
October 10, 2003

APHIS, through regulations, imposes upon air carriers the responsibility to collect the APHIS inspection fees from the passengers on behalf of APHIS.[8] Specifically, the regulations promulgated under the APHIS user fee statute (the "Regulations") provide:

> [A]ny person who issues international airline tickets or travel documents is responsible for *collecting* the APHIS international airline passenger user fee from ticket purchasers. Issuers must *collect* the fee applicable at the time tickets are sold. In the event that ticket sellers do not collect the APHIS user fee when tickets are sold, the air carrier must *collect* the user fee from the passenger upon departure. Carriers must *collect* the fee applicable at the time of departure from the traveler."[9] (*emphasis supplied*).

The plain language of the statute and the Regulations make clear that the APHIS inspection fee is imposed directly upon international passengers. While the airline carriers have the burden of collecting fees from international passengers on behalf of the Secretary, nothing in the statute or the Regulations imposes an obligation on an air carrier to pay APHIS inspection fees it has been unable to collect from international passengers despite best efforts to do so.

[8] *Id.* In addition, APHIS is authorized to assess interest, penalties, and administrative costs for late payment of user fees. The collected fees are held in trust for the United States and are remitted to the Secretary of Agriculture (the "Secretary") in such manner and at such times as prescribed by the Secretary. In addition, all collected fees and any late payment penalties of accrued interest must be credited to the accounts that incur the cost and must remain available until expended without fiscal year limitation. *See* 7 C.F.R. § 354.3(a)-(f)(2003). In addition to specific authority under the Farm Bill, APHIS has authority to collect user fees pursuant to 31 U.S.C. §9701 (the User Fee Statute).

[9] *See Supra* note 3 at §354.3(f)(4)(i) (2003). The Regulations further state, "any person who issues tickets or travel documents on or after May 13, 1991, is responsible for *collecting* the APHIS user fee from all passengers transported into customs territory of the United States to whom the APHIS user fee applies." *Id.*

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Mr. Pierre M. Arsenec
Page 7
October 10, 2003

In addressing the issue of statutory construction, the United States Supreme Court has ruled that, unless departure from a literal reading of the statute is indicated by relevant internal evidence of the statute itself, the words of statutes should be interpreted in their ordinary everyday sense.[10] Webster's New World Dictionary defines the word "collect" to mean, "to call for and receive (money) for (rent, a fund, taxes, bills, etc.)."[11] Furthermore, in *Yellow Transportation Inc., v. Michigan*, the Supreme Court, in deciding the reasonable meaning of the term "collected" in a state statute held that, "the statutory language 'collected or charged' can quite naturally be read to mean fees that a [State] *actually* collected or charged."[12] (*emphasis supplied*). In other words, the Supreme Court distinguished between fees that are *actually* collected or charged and those that are to be collected or charged.

That the Regulations do not impose secondary liability on air carriers is further supported by regulations APHIS issued in January 1992. More specifically, in response to comments on the double-billing of user fees for aircraft passenger and aircraft inspection, APHIS acknowledged that, "[a]irlines are not responsible for paying passenger fees, though they collect the fee along with the price of the ticket, taxes, and any other charges that apply, and then remit

[10] *Malat Et Ux v. Riddell, District Director of Internal Revenue*, 383 U.S. 569, 572 (1966).
[11] WEBSTER'S NEW WORLD DICTIONARY 274 (3d ed. 1991).
[12] *Yellow Transp. Inc. v. Michigan*, 537 U.S. 36, 45-46 (2002).

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law



the APHIS user fee to APHIS."[13] The language of this notice shows that the APHIS user fee statute does not impose a direct obligation on issuers of international air tickets to pay fees that the air carriers are incapable of collecting. Indeed, secondary liability is never presumed or implied merely because a statute or regulation requires a carrier or seller of goods of services to collect a tax or fee from a passenger or buyer of services or goods.[14] Secondary liability is not assumed or implied and, when Congress wishes to impose such liability, it knows how to do so and uses clear and unequivocal language.[15]

The language of the APHIS statute is clear. It requires issuers of international air tickets to collect the APHIS inspection fee from passengers and to remit such fees to APHIS. Nothing in the APHIS statute or regulations imposes a direct obligation on issuers of international air tickets to pay APHIS inspection fees in those circumstances where it is unable to collect the APHIS fee from passengers.

---

[13] *See* 57 Fed. Reg. 755 (Jan. 9, 1992).

[14] *Air Tour Acquisition v. United States of America*, 781 F. Supp. 669 (DC Hawaii 1991).

[15] *Pinter v. Dahl*, 486 US 622, 650 (1988) ("When Congress wished to create such [secondary] liability, it has had little trouble doing so.").

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law



## III. REQUEST FOR REFUND

For these reasons, on behalf of AA, we hereby respectfully request a refund of $3,752,894 for APHIS inspection fees that AA was unable to collect from passengers and that AA nevertheless paid to APHIS from its own funds.

Sincerely,

Michael Quigley

Brian S. Gleicher

cc: Paul Salamone
Director & Sr. Tax Counsel - International
American Airlines
P.O. Box 619616, MD 5656
4333 Amon Carter Blvd.
Dallas/Fort Worth Airport, TX 75261-9616

Tom Walsh
Assistant General Counsel for Regulatory and Marketing
U.S. Department of Agriculture
1400 Independence Avenue, SW
Washington, DC 20250

Frank C. Vollmerhausen
Director
Resource Management Systems & Evaluation Staff
U.S. Department of Agriculture - APHIS
4700 River Road, Unit 151
Riverdale, MD 20737

# Exhibit 1

USDA

April 28, 2003

ited States
partment of
riculture

rketing and
gulatory
grams

imal and
nt Health
pection
rvice

0 River Road
rerdale, MD 20737

American Airlines
Attn: Teresa Isakson
4333 Amon Carter Blvd., Mail Drop 5657
Fort Worth, TX 76155

Dear Ms. Isakson:

Enclosed is the report of the U.S. Department of Agriculture (USDA), Animal and Plant Health Inspection Service (APHIS), user fee audit of American Airlines, which was conducted by Mr. Michael Campbell. As you know, this report includes operational findings and recommendations. I understand that Mr. Campbell discussed details of the findings and financial liability with you.

The financial liability outlined in the enclosed report does not include interest or penalties. Your company will not be charged interest for any amounts received within 30 days after the date of this audit report. For any amounts received after that date, you will be subsequently billed interest effective from the end of the quarter in which the fee was supposed to have been collected.

The liability amount on the last one page of this report should be mailed to the same address to which the quarterly payments are mailed. **Please send a copy of the last page of this report with your check.**

If you have any questions or comments, please contact Mr. Campbell at (301) 734-4796; fax (301) 734-5403 or e-mail at Michael.K.Campbell@aphis.usda.gov. The cooperation and assistance of your staff during this audit is greatly appreciated.

Sincerely,

Pierre M. Arsenec
Chief, User Fee Auditing Branch
Resource Management Systems
and Evaluation Staff

Enclosure

cc:
W.J. Hudnall, MRPBS, Washington, DC (w/copy of enclosure)
D. Ford, BASE, Riverdale, MD (w/copy of enclosure)
D. Crews, MRPBS-MNPLS, Minneapolis, MN (w/copy of enclosure)

APHIS - Protecting American Agriculture
An Equal Opportunity Employer

TABLE OF CONTENTS

I. Background .......... 1

II. Audit Objectives .......... 1

III. Audit Scope and Methods .......... 2

IV. Findings and Recommendations .......... 3

V. Financial Liability - APHIS .......... 4

## I. Background

In 1990, Congress established new user fee legislation. The Food, Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990, authorized the U.S. Department of Agriculture (USDA) through the Animal and Plant Health Inspection Service (APHIS) to collect various user fees. These fees include agricultural quarantine and inspection services provided in connection with the arrival of commercial aircraft and international passenger arrivals at ports in the Customs territory of the U.S. The Farm Bill defines the U.S. Customs territory as the 50 States, the District of Columbia, and Puerto Rico.

APHIS published a final rule in the Federal Register on April 12, 1991, requiring airlines to collect a user fee from international air passengers arriving in the U.S. Customs territory from other countries, except Canada. These fees became effective on May 13, 1991. On January 9, 1992, APHIS published a final rule requiring an inspection fee for commercial aircraft arriving in the U.S. from other countries except Canada, effective February 9, 1992. Aircraft and passengers on flights originating in Canada are excluded from APHIS fees because of a negligible agricultural health threat to U.S. agriculture.

User fees must be remitted for receipt no later than 31 days after the close of each calendar quarter in which they are collected.

American Airlines (AA) headquarters is in Dallas, TX. AA had qualifying passenger and cargo flights operating during the audit period of January 2002 through December 2002. The scheduled flight ports of entry into the U.S. are Boston (BOS), Chicago (ORD), Dallas-Fort Worth (DFW), Los Angeles (LAX), Miami (MIA), New York (JFK), Orlando (MCO), and San Juan (SJU).

AA is a wholly owned subsidiary of AMR Corporation.

For the above mentioned audit period, AA's user fee remittances for APHIS passengers and aircraft were $28,218,485.10 and $4,021,683.75, respectively.

## II. Audit Objectives

1. Evaluate internal control adequacy and reliability of user fee collections, recording, reporting, and remittance systems.

2. Determine compliance with regulations (mentioned above).

3. Develop a rapport with the payer. Provide information and advice to the payer to facilitate continued compliance.

## III. Audit Scope and Methods

The audit coverage period is January 1, 2002 through December 31, 2002. The audit was conducted in accordance with the Government Auditing Standards issued by the Comptroller General of the United States and included such tests that were deemed necessary. We tested internal controls associated with the collection, recording, reporting, and remittance systems.

To test collection compliance, we audited tickets lifted from passengers for flights involving the following city pairs, on the following dates. We understand that you have agreed that the sample below is representative of the markets in which you sold applicable tickets during the audit period.

| DATES | CITY PAIRS |
|---|---|
| 1. Feb 27, 2002 | Paris (CDG) -Miami (MIA) |
| 2. July 5, 2002 | Mexico (MEX) – Dallas (DFW) |
| 3. Oct 25, 2002 | Santo Domingo (SDQ) – New York (JFK) |
| 4. Dec 18, 2002 | Tokyo (NRT) – San Jose (SJC) |

To audit recording compliance, we traced the following tickets from the sales channels listed below to the Passenger Revenue Accounting System (PRAS).

| Issue Date | Reporting Entity | Ticket Number |
|---|---|---|
| 10/22/02 | ARC | 7308378940 |
| 10/23/02 | ARC | 7310722279 |
| 10/25/02 | ATO-SDQ | 2155787882 |
| 10/05/02 | ATO-BOS | 2155473176 |
| 10/16/02 | CTO-NYC | 2155646149 |
| 10/09/02 | CTO-SDQ | 2155537713 |
| 10/15/02 | HDQ-TBM Dallas | 2115545433 |
| 10/21/02 | BSP-Santo Domingo | 3612762676 |
| 10/19/02 | BSP-Santo Domingo | 3612733129 |

We traced employee flight coupons from the five sample flights listed above to the Non-Revenue Space Available (NRSA) database. In addition, we traced the totals from an AA generated report to the APHIS general ledger account.

To test reporting compliance, we traced monthly activity from PRAS to the general ledger.

Remittance compliance was tested by comparing remittance data to general ledger entries in the respective liability accounts.

Instances of noncompliance were used to determine an additional liability, using user fee dollars collected as the calculation basis.

The aircraft clearance fee was audited by comparing an auditee prepared schedule of landing counts by month by airport, to statistics provided by the U.S. Department of Transportation (DOT), Customs data and APHIS' remittance data.

The audit fieldwork was performed February 24 – 28, 2003, by Mr. Campbell.

APHIS retains the right to review and assess liability for unpaid user fees for this audit period if significant data, which was unavailable during the audit, is discovered subsequent to the audit.

IV. Findings and Recommendations

1. Finding: Of the 450 qualifying tickets audited for the air passenger user fee collections compliance, the number of tickets with no evidence of fee collection or remittance was 12. The associated error rate is 2.67%. The resulting amount due to APHIS is $773,109.18.

Recommendation: The additional liability amounts mentioned above should be remitted. Copies of the noncompliant tickets were given to the AA Financial Analyst so that measures can be implemented to improve collections compliance.

V. Financial Liability - APHIS

American Airline's Financial Liability Due to APHIS Resulting from a User Fee Audit

| QUARTER ENDED | PASSENGER LIABILITY |
|---|---|
| Mar-02 | $193,277.30 |
| Jun-02 | $193,277.30 |
| Sep-02 | $193,277.29 |
| Dec-02 | $193,277.29 |
| TOTALS | $773,109.18 |

DATE DUE: within 30 days after report issuance date.

# Exhibit 2

USDA

nited States
epartment of
griculture

arketing and
egulatory
ograms

nimal and
ant Health
spection
rvice

00 River Road
verdale, MD 20737

August 14, 2003

Mr. Paul Salamone
Director & Sr. Tax Counsel – International
American Airlines
4333 Amon Carter Blvd., Mail Drop 5657
Fort Worth, TX 76155

Dear Mr. Salamone:

This is a follow up to our letter dated June 12, 2003, in which we determined that "Statistical Sample Number Three" as related in your May 21, 2003 letter, is most closely aligned with our sampling methodology. APHIS performed an on-site visit June 16, 2003, to obtain concurrence on the error rate through review of the methodology and sample elements employed by American Airlines (AA). Based on this analysis, we combined the audited error rate with the three remaining sample flights to come up with an overall error rate for the audit.

Mr. Hobbs and Mr. Campbell have agreed on a revised error rate of 1.05%, or a final audit liability amount of $298,298.37. We understand that AA has remitted $280,870.00 that was applied to the audit liability. AA should remit an additional $17,428.37, within 30 days of the date of this letter.

For subsequent audits, we will sample the system-wide international arrivals database, as proposed by Mr. Hobbs, assuming that we can obtain reasonable assurance that it includes all applicable sales activity. APHIS is in agreement with the AA proposal that the audit period for Federal Inspection Fee audits run through June 30th of each calendar year. Accordingly, the audit period for the next APHIS audit will cover January 2003 through June 2004.

If you have any questions or comments, please contact Mr. Campbell at (301) 734-4796; fax (301) 734-5403 or e-mail at Michael.K.Campbell@aphis.usda.gov.

Sincerely,

Frank C. Vollmerhausen
Director
Resource Management Systems
and Evaluation Staff

Enclosure

cc: D. Crews, MRPBS-MNPLS, Minneapolis, MN (w/copy of enclosure)

# DUANE I. ROBINSON DEPOSITION
# EXHIBIT 11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONTINENTAL AIRLINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06-432C |
| v. | ) | (Judge Margolis) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF DAUNE ROBINSON

I, Daune Robinson, hereby declare as follows:

1. I am over the age of 18 years and competent to testify to the following facts, of which I have personal knowledge.

2. I have a Bachelor's degree in Accounting from San Diego State University, and over the last 19 years have worked as an auditor, a computer audit specialist, an assistant field director, a field director, and a field oversight director. Through each of these positions, I have gained extensive experience performing financial audits, which involve the review of trial balance activity, general ledger accounts and entries, and financial statements.

3. I am currently employed by the Department of Homeland Security, U.S. Customs and Border Protection ("CBP") as a Supervisory Auditor in the Office of Finance, Financial Management Division. In this capacity, I have been establishing the protocols and performing reviews to verify eligibility, including the review of financial information and qualifying expenditures for amounts distributed, of affected domestic producers under the Continued Dumping and Subsidy Offset Act program.

4. Prior to transferring to the Financial Management Division, I served as the Director of Field Oversight in the Regulatory Audit Division. I worked for the Regulatory Audit Division for 18 years and in my capacity as the Director of Field Oversight for around 4 years. In that capacity, I was responsible for the actions of approximately 150 auditors and for overseeing approximately 200 audits of different types annually. The types of audits I oversaw included financial audits, performance audits, fraud audits, user fee audits, and other forms of audits.

5. As the Director of Field Oversight, I oversaw the user fee audit of Continental Airlines ("Continental") performed by Mr. Frank Andreu ("auditor"), a contract member of my staff, on May 10-14, 2004, for the period covering January 1, 2002, through December 31, 2003. This user fee audit was conducted for CBP and the



PENGAD 800-631-6989 EXHIBIT 11 5/18/07 nbr

U.S. Department of Agriculture-APHIS ("APHIS") regarding several fees. Although the audit covered many types of fees, my declaration will be limited in scope to that portion of the audit covering the immigration and APHIS international air passenger user fees (collectively referred to as "user fee").

6. For this Continental user fee audit, as was typically the case, our office worked with Continental Airlines months prior to the on-site review to select flights that were representative of Continental's typical flight pattern as to passenger volume, port of entry, and overall number of flights. Consistent with prior practice, at least one flight was selected for each quarter. On March 22, 2004, our office sent an engagement letter to Continental indicating what documents our office expected to be available for the review, including the tickets from the selected flights previously discussed with Continental.

7. For this user fee audit, as was generally the case, our office utilized a sampling methodology whereby we would select a fixed number of Continental's flights and review all the qualifying tickets of the selected flights for evidence of user fee collection. [A "qualifying ticket" is one for which user fee collection would have been required.]

8. To my knowledge, this is the same methodology previously used by the auditors in the other audits at issue in this case. In addition, until Continental filed its original complaint to recover the user fee liability resulting from this audit, I was never aware that Continental had any concerns or raised any objections about the user fee audit methodology outlined herein.

9. There were at least two purposes for the sampling methodology utilized in the Continental user fee audit: (1) to ensure that Continental remitted to the Government a user fee for every ticket for which there was evidence that Continental had collected such user fee; and (2) to assess a liability if there were any qualifying tickets for which Continental failed to demonstrate that a user fee was collected.

10. During the audit, if the auditor identified a qualifying ticket that failed to evidence collection of the user fee, the ticket would be considered a "potential error." The auditor would then provide Continental with the opportunity to present evidence that Continental had collected the user fee for the "potential error" ticket. This typically was accomplished either by demonstrating that the user fee had been collected in some other way (e.g., in the miscellaneous tax portion of the ticket) or that no user fee was owed for that ticket (e.g., it was an exchanged ticket where the user fee was already paid for that passenger's travel on the original ticket issued). If Continental provided evidence of user fee collection for a "potential error" ticket, the auditor would then ensure that the collected user fee was properly remitted to the Government. If there was evidence that the collected user fee was properly remitted to the Government, the "potential error" ticket was removed from the potential error list and was treated as having had the user fee properly collected and remitted.

11. If Continental failed to present evidence that the user fee was collected for a "potential error" ticket, the ticket would then be considered to represent an "error." In addition, if Continental failed to demonstrate that a user fee that had been collected for a ticket was remitted to the Government, this too would be considered an "error."

12. All errors of a certain type (e.g., those errors for fees collected but not remitted and those errors for which no evidence of collection was presented) were then extrapolated across Continental's qualifying tickets from the selected flights to arrive at a finding of liability. Specifically, the "error rate" was calculated by taking the total number of a given type of errors during the review period and dividing it by the number of qualifying tickets in the selected flights that had been reviewed. Our office would then take the error rate for each quarter and multiply it by Continental's total user fee remittances from that quarter to arrive at the liability finding due for that quarter. We arrived at a total liability finding by adding together the amounts due for each quarter of the review.

13. When Continental failed to produce evidence that a user fee was collected for a qualifying ticket, the auditor would accept Continental's statement that no such user fee was collected and would not verify Continental's assertion. Thus, if Continental had collected the user fee but failed to disclose such a user fee collection for whatever reason (e.g., poor accounting), the auditor would not have known about it.

14. A goal of the audit was to ensure that a liability was assessed and a payment was received for those qualifying tickets for which Continental should have collected a user fee. Once Continental agreed to make payment, CBP viewed this payment as an admission of liability; and, therefore, at the time of the audit, there was no need for the auditor to verify whether Continental's statement concerning non-collection was accurate. Because of this mutual understanding between Continental and CBP, it did not occur to CBP that Continental would later contest its user fee liability.

15. Had a timely challenge to the audit methodology been made by Continental, CBP could have, and almost certainly would have, taken earlier actions to clarify that it is lawful to require Continental (as well as all international air carriers) to remit international air passenger fees that it did not collect. In addition, short of performing a complete financial audit as detailed below, CBP could have heightened its internal control review of Continental to pinpoint potential problem areas. This type of audit would have been very similar to the types of audits performed by my office to verify importer compliance.

16. In order to demonstrate that Continental actually failed to collect and/or to remit a user fee for each qualifying ticket from each of the audits at issue in this case, an auditor would have needed to perform an extensive financial audit, which would involve obtaining copies of all trial balance activities, general ledger accounts and entries, and financial statements for the time periods at issue. Noting the activity from the trial balances, the auditor would then have to review each unexplained entry in the

general ledger accounts and determine whether that entry might contain a user fee. Given that Continental will have multiple general ledger accounts and each account likely would contain multiple entries that are unexplained, a financial audit of this nature would be extremely costly (for both Continental and the Government) and take at least one year to complete.

17. To my knowledge, at no time during this user fee audit or at any time thereafter did Continental ever present to my staff any information about passengers who refused to pay the immigration user fee, as required by 8 C.F.R. § 286.4(c), such as the passenger's full name, complete address, nationality, passport number, and alien file number. As far as I am aware, Continental has never presented to the Immigration and Naturalization Service nor to CBP such information about passengers allegedly refusing to pay the fee.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 16th day of March 2007.

Daune Robinson 3/16/07

# DUANE I. ROBINSON DEPOSITION
# EXHIBIT 12

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1736C |
| v. | ) | (Judge Braden) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF DAUNE ROBINSON

I, Daune Robinson, hereby declare as follows:

1. I am over the age of 18 years and competent to testify to the following facts, of which I have personal knowledge.

2. I have a Bachelor's degree in Accounting from San Diego State University, and over the last 18 years have worked as an auditor, a computer audit specialist, an assistant field director, a field director, and a field oversight director. Through each of these positions, I have gained extensive experience performing financial audits, which involve the review of trial balance activity, general ledger accounts and entries, and financial statements.

3. I am currently employed by the Department of Homeland Security, U.S. Customs and Border Protection ("CBP") as the Director of Field Oversight in the Regulatory Audit Division. In this capacity, I am responsible for the actions of approximately 150 auditors and for overseeing approximately 200 audits, of different types, annually. The types of audits I oversee include financial audits, performance audits, fraud audits, user fee audits, and other forms of audits. I have worked for the Regulatory Audit Division for 18 years, and in my capacity as the Director of Field Oversight for 4 years.

4. In my capacity as the Director of Field Oversight, I supervised the user fee audit of American Airlines ("American") performed for CBP and U.S. Department of Agriculture-APHIS ("APHIS") by two members of my staff, Mr. Eugene Schulman and Ms. Yea Browning (collectively "auditor"), on August 23-27, 2004, for the period covering January 1, 2003, through June 30, 2004. Our office utilized a sampling methodology for this audit, whereby we selected a fixed number of American's tickets for review and extrapolated the number of errors from the reviewed sample to the total number of qualifying tickets on all of American's flights. This is generally the same methodology previously used by the auditors in the Immigration and Naturalization Service audits and the APHIS audits at issue in this case.

PENGAD 800-631-6989
EXHIBIT
12
5/18/07

5. There were at least two purposes for the sampling methodology utilized in the American audit: (1) to ensure that American remitted to the Government an immigration and agriculture user fee ("user fee") for every sampled ticket for which there was evidence that American collected such user fee; and (2) to determine whether there were any sampled tickets for which there was no evidence that a user fee was collected.

6. If the auditor identified a sampled ticket that failed to evidence collection of the user fee, the auditor would provide American with the opportunity to present evidence that American had collected such fee and remitted such fee to the Government. If American failed to present such evidence of collection and of remittance, such a sampled ticket represented an error that would be extrapolated across all of American's qualifying tickets and for which American would make payment.

7. If American failed to produce evidence that a user fee was collected for a sampled ticket, the auditor would accept American's statement that no such fee was collected. A goal of the audit was to ensure that payment was received for those tickets for which American should have collected a user fee. This was accomplished when American agreed to make payment based on its failure to present evidence of collection of the user fee. Thus, there was no need for the auditor to verify whether American's statement was accurate.

8. Even so, as a matter of fact, during this audit the auditor repeatedly asked to see American's general ledger trial balances so that the auditor could determine whether there were any user fees that American had collected but which were not entered into one of the user fee accounts. A complete review of the general ledger trial balances would have enabled the Government to verify American's statement that no user fee was collected for a sampled ticket. However, the American representatives refused to produce such general ledger trial balances.

9. In order to demonstrate that American failed to collect and/or to remit a user fee for each sampled ticket from each of the audits at issue in this case, an auditor would need to perform a financial audit, which involves obtaining copies of all trial balance activities, general ledger accounts and entries, and financial statements for the time periods at issue. Noting the activity from the trial balances, the auditor would have to review each unexplained entry in the general ledger accounts and determine whether that entry might contain a user fee. Given that American will have multiple general ledger accounts and each account likely will contain multiple entries that are unexplained, I would expect a financial audit of this nature to take at least six months to one year to complete.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 23rd day of March, 2006.

[signature] 3-23-06

Daune Robinson

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 29th day of March 2006, I caused the attached motion to be served by U.S. mail and electronic (PDF) courtesy copy upon:

Adam P. Feinberg
Miller & Chevalier
655 15th Street, N.W.
Suite 900, Metro Square
Washington, DC 20005-2701

____________________

# DUANE I. ROBINSON DEPOSITION
# EXHIBIT 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1736C |
| v. | ) | (Judge Braden) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

SECOND DECLARATION OF DAUNE ROBINSON

I, Daune Robinson, hereby declare as follows:

1. The American Airlines audit report covering the review period of January 1, 2003, through June 30, 2004, that my office issued on February 4, 2005 ("audit report"), stated, "Random Sample Review: We traced the collection of fees from a random sample of net qualifying ticket-lifts, manifests and passenger reports through the separate sales methods and to the general ledger (GL) liability account. Errors found during this process were: Immigration User Fee-3.5; Customs PPF-4.0; APHIS Passenger Fee-3.0." AA's Fact. App. at 42.

2. The audit report also indicated, "Reporting activity: To test reporting compliance, each sales channel was traced to associated sales reports and to the general ledger liability accounts." AA's Fact. App. at 43.

3. However, the only tickets for which the auditors on my staff traced the collection and the reporting of the user fees from the point of sale to the general ledger liability account were for those tickets that had evidence of user fee collection. That is, if the ticket had evidence that a user fee was collected, the auditor would review the sales report and general ledger liability account information to confirm that the user fee that had been collected at the time of ticket purchase ended up in the appropriate user fee account.

4. On the other hand, if the ticket did not have evidence that the user fees were collected, then the auditors would designate this ticket as a "potential error" and request that American provide evidence of user fee collection. For such a ticket, the auditors did not review any general ledger accounts to determine if the user fees had been deposited into an account. Instead, the auditors would request that American research its own collections to determine whether it had in fact collected the user fees for such ticket. If American failed to produce evidence that the user fees had been collected for the "potential error" ticket, then the "potential error" would be treated as a "confirmed error." It was these confirmed errors that were listed for each user fee (Immigration User Fee-3.5; Customs PPF-4.0; APHIS Passenger Fee-3.0) in the audit

PENGAD 800-631-6989
EXHIBIT
13
5/18/07

report. Moreover, if the ticket had no evidence of collection, then it was not tested for "reporting compliance."

5. Therefore, it is not true that "[i]f AA had been collecting user fees but not placing them in the proper general ledger accounts, the Government auditors would already know about it." Plaintiff's Brief at 6. The auditors only received information from American about its collections on tickets that failed to evidence user fee collection. Thus, even if American had collected the user fees subsequent to the time of ticketing, if American failed to disclose such a collection for whatever reason (e.g., poor accounting, inability to locate the location of the fees), then the auditors would not have known about it.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 18th day of April, 2006.

Daune Robinson