**PREPARED TESTIMONY FOR DEFENDANT OF BARBARA BLESSING**
**AMERICAN AIRLINES, INC. v. UNITED STATES, 04-1736C (JUDGE BRADEN)**

Q. Are you employed?

A. Yes.

Q. Where?

A. Immigration and Customs Enforcement, which goes by ICE, I-C-E.

Q. And what is your current position at ICE?

A I am the director of a new unit within the Office of Financial Management, which we are calling Planning and Special Projects. We do strategic planning for the Office of Financial Management, as well as audit liaison work, such as responding to audits by the General Accounting Office or the Office of the Inspector General.

Q. When did you begin working for the Government?

A. In June 1987, I believe. I joined the Department of Agriculture as a regional director in the Women, Infants and Children program.

Q. How long have you been with ICE?

A. Since about 1988. I started as a director of resource management at what was then called the Immigration and Naturalization Service, or INS, which was a component of the Department of Justice, and has now been transferred into ICE, within the Department of Homeland Security.

Q. What other positions have you held there?

A. From 1988 until the end of 1999, I held a series of jobs in the INS Office of Financial Management in Dallas, Texas. I became the director of the Administrative Center in that office in about 1994 or 1995. From approximately April 2000 to late 2003, I served as the director of the Compliance Division in the Office of Financial Management. In late 2003 and into 2004, while I was still the director of Compliance, I was also detailed to serve on a transition team, to assist in the process as the INS was discontinued, and INS staff were assigned to ICE and to Customs and Border Protection, or CBP. A few of us from INS, APHIS, and the former Customs agency conducted orientations and helped to integrate the new people into the Department of Homeland Security.

During that transition, in approximately May or June of 2004, I was made the acting national finance director for ICE, while a new management structure was being set up. I was traveling back and forth between Washington, D.C., and Dallas at that time. I declined an offer

to become the permanent ICE national finance director, and in 2005, I returned to Dallas to become director of Financial Operations for ICE. I oversaw the ICE Debt Collection Center in Burlington, Vermont, as well as the Dallas Finance Center and operations in the field at at the six agencies to which ICE provides financial services. I recently made the transition from that position to my current Planning and Special Projects position in ICE.

Q. In which of those jobs, if any, did you have any role in immigration inspection user fee audits?

A. As director of Compliance, from 2000 to roughly 2004, I was in charge of the audits.

Q. Did you have any role in airline user fee audits in any of your other positions?

A. No.

Q. Were you involved in the immigration user fee audit of American Airlines that was performed in the latter part of 2000 and covered the period from 1998 to 2000?

A. Yes.

Q. The next immigration user fee audit of American Airlines covered the period from July 2000 to December 2001. Were you also involved in that audit?

A. Yes.

Q. The next immigration user fee audit of American Airlines was conducted in 2003 and covered from January 2002 through December 2002. Were you involved in that audit?

A. I would need to check to be certain, but I recall that I was present at American for at least a part of a day.

Q. The next audit of American Airlines covered the period from January 2003 through June 2004. It was conducted subsequent to June 2004. Were you involved in that audit?

A. Not to my recollection.

Q. Have you been involved in any user fee audits that were conducted after 2004?

A. No.

Q. Can you explain your role in the immigration user fee audits of American Airlines?

A. In audits of all airlines, I managed the overall program: supporting and monitoring the staff, reviewing the work papers, and providing on-site support as necessary.

Q. Did you have any role in designing the immigration user fee audit procedures?

A. No. The audit process was designed prior to my tenure with the carrier program.

Q. Could you generally describe what happened in the audits you were involved with?

A. For the three audits that I supervised, the procedure was generally the same. The auditor, Eugene Schulman, would work with American Airlines ahead of time to select a group of flights that reflected American's typical international flight schedules. He would then request and review ticket documentation from specific flights within that group. Tickets that did not show payment of the immigration user fee were flagged as "potential errors." If American could show through other documentation that the fee was paid to INS, or that the passenger was exempt from the fee, that ticket would be stricken from the list of potential errors.

When no other documentation was produced to show either payment of the fee, or an exemption, a potential error stayed on the list, as an "error." Next, an "error rate" was calculated by dividing the number of errors by the number of qualifying tickets that had been reviewed in the sample. This error rate was then multiplied by the entire population of qualifying tickets for the audit period. That result, assuming the error rate was not zero, determined the additional liability.

Q. Did American Airlines ever object to that methodology during the time you were involved in the audits?

A. With one specific exception, no. The only exception was in the audit covering 2002, in which American urged us to "stratify" our sample of flights statistically, because one flight from the Dominican Republic had an unusually high number of errors, and we agreed to do so.

Other than that, I attended several meetings during these reviews, both on the telephone and in person, with American Airlines representatives, including Monty Hobbs and his predecessor, John Parente, but American never questioned its liability for uncollected and unremitted immigration user fees at that time. Also, American participated in the INS User Fee Advisory Board, which met regularly to discuss user fee issues, but it never objected to the audit methodology at any Advisory Board meeting during my tenure.

Q. When did you become aware that American Airlines was challenging the Government's immigration user fee assessments?

A. I remember hearing it second or third hand after I had left the Compliance program, probably in late 2004.

Q. Do you believe the Government was negatively affected because American Airlines didn't advise the Government earlier of the claims it is now pursuing?

A. Yes. Had American raised this issue in the past, we would have looked again at the audit methodology. And we would have sought legal and regulatory actions.

Q. Why?

A. In short, the Government provided the immigration inspection service to American's passengers, and if the user fee was not being collected, American was asking the Government to do the inspection for free. If American Airlines is saying it didn't follow the law, and it didn't collect this money when arriving with a covered passenger, then it is expecting us to provide that service for free.

Q. Suppose American or another airline had come to you during an audit and said, "We have found specific evidence on this ticket that we did not collect the immigration user fee from this particular passenger." In your opinion, while you were involved in the audits, did the airline owe the user fee to the Government in that situation, or not?

A. I would have sought a legal opinion, if that issue had come up.

Q. You had no opinion during the time you were involved in the audits?

A. Not that I recall.

Q. What specifically, if anything, do you think the INS would have done differently, had it known earlier about American's position as to its liability?

A. We would have looked at the entire context of the audit methodology, and the entire context of the immigration user fee itself. We would have made recommendations for change. We would have sought carrier input. We would have brought the issue before the International Air Transport Association. And we would have brought it before the INS User Fee Advisory Group that I previously mentioned. We also would have sought a definitive and affirmative audit of each carrier, that went from A to Z and provided a final and complete audit liability.

Q. Do you believe American Airlines intentionally misled the Government in connection with the immigration user fee audits or assessments?

A. I can't make an assumption about what American knew or didn't know. In my dealings with American, it certainly gave no indication that it took the position it is taking now.

Q. Defendant has no further questions for this witness.