IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMERICAN AIRLINES, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 04-1736<br>Judge Susan G. Braden |

**PLAINTIFF'S POST-HEARING BRIEF ON THE GOVERNMENT'S AFFIRMATIVE DEFENSES AND DAMAGES**

Pursuant to the Court's request at the May 31, 2007 hearing, Plaintiff American Airlines, Inc. ("AA") respectfully submits this brief on (1) the Government's affirmative defenses and (2) whether AA can collect as damages interest and penalties it paid to the Government.

## I. THE GOVERNMENT'S AFFIRMATIVE DEFENSES MUST FAIL[1]

### A. The Government Has Not Established the Elements of Equitable Estoppel

In order to succeed on its equitable estoppel defense, the Government must prove that:

> (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Boeing Co. v. United States*, 75 Fed. Cl. 34, 48 (2007) (citing *Hercules Inc. v. United States*, 49 Fed. Cl. 80, 88 (2001) and *Emeco Industries, Inc. v. United States*, 485 F.2d 652, (Ct. Cl. 1973)).[2] The Government has failed to prove nearly all of these elements.

[1] The Government has withdrawn its affirmative defenses of "accord and satisfaction" and "laches," as its counsel stated at the May 31, 2007 hearing. Accordingly, the only affirmative defenses to be adjudicated are "equitable estoppel" and "waiver." *See* Def.'s Am. Answer (Doc. No. 59) at ¶¶ 98-101.

[2] The in banc Federal Circuit has expressed the elements of equitable estoppel as:

(footnote continued on next page)

**1. The Government has Failed to Prove that AA "Knew the Facts" While the Government was Ignorant of those Facts**

Here, the "facts" are that AA intended to pursue a claim against the Government for the return of the uncollected user fees AA was forced to pay during the audits. The Government learned of that fact no later than October 2003, when AA wrote to the agencies requesting a return of such fees. *See* Gov't Response to AA's Proposed Findings of Uncontroverted Fact (Doc. No. 20) ("Gov't Findings") ¶¶ 74, 76; *American Airlines, Inc. v. United States*, 68 Fed. Cl. 723, 727 (2005). But the Government has offered no evidence whatsoever that before October 2003 AA knew that it intended to pursue a claim against the Government. Indeed, when asked, the Government's only three witnesses could not even say that AA knew it had a possible claim before that time, let alone that it intended to pursue it. Shea Depo. (Doc. No. 64) at 64:9-65:9; Robinson Depo. (Doc. No. 66) at 45:22-46:6; Blessing Depo. (Doc. No. 65) at 100:8-12.

**2. The Government has Failed to Prove that AA Mislead the Government or Engaged in Any Conduct Intended to be Acted on by the Government or that the Government Reasonably Believed Was so Intended**

The only conduct alleged by the Government to support its defense is AA's purported "acquiescence" in the user fee audit process and its "remaining silent" about its possible claims against the Government. *See* Gov't Interrogatory Responses (Exh. 1 hereto) at 4-5. This alleged conduct cannot support the Government's defense.

---

(footnote continued from previous page)

> [1] The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. [2] The other relies upon that communication. [3] And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992). Although numbered and organized differently, these elements are similar to the elements set forth by this Court in *Boeing*.

First, this conduct fails as a matter of law to support an equitable estoppel defense to an illegal exaction claim. Although AA and the Government may have worked cooperatively through the audit process, AA had no choice about whether it was audited and no choice about whether the Government would assess any liabilities. Robinson Depo. at 22:17-23:2; Shea Depo. at 17:3-17. It has long been held that funds illegally exacted by the Government may be recovered, regardless of whether the plaintiff previously raised any protest and regardless of any course of conduct between the parties. *See, e.g.*, *Swift & Co. v. United States*, 111 U.S. 22, 29 (1884) (*citing Ogden v. Maxwell*, 18 F. Cas. 613 (S.D.N.Y. Cir. Ct. 1855) for the proposition "that illegal fees exacted by a collector, though sanctioned by a long-continued usage and practice in the office, under a mistaken construction of the statute, even when paid without protest, might be recovered back, on the ground that the payment was compulsory and not voluntary"). This principal is also embodied in the current tax law, under which a party may file a "claim for refund" (and if needed, a tax refund suit) years after an IRS audit has closed, without ever having raised an objection previously, much less during the audit itself. *See* 26 U.S.C. § 6511(a); Internal Revenue Manual § 34.5.2.2.1 (2004) ("Even after signing the waiver [accepting the deficiency asserted by the IRS in an audit] and paying the tax, the taxpayer may still contest the [liability] by filing a claim for refund"). As stated in the Treasury Regulations:

> At the conclusion of an office or field examination [*i.e.*, an audit], the taxpayer is given an opportunity to agree with the findings of the examiner. . . . If the taxpayer does agree with the proposed changes, the examiner will invite the taxpayer to execute [a waiver] . . . . [T]he taxpayer who has given a waiver may still claim a refund of any part of the deficiency assessed against, and paid by, the taxpayer or any part of the tax originally assessed and paid by the taxpayer. The taxpayer's acceptance of an agreed overassessment does not prevent the taxpayer from filing a claim and bringing a suit for an additional sum . . . .
>
> Treas. Reg. § 601.105(b)(4).

Second, silence is usually an insufficient basis for an equitable estoppel defense unless a

party acted in bad faith (which is not alleged here). *See Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1573 (Fed. Cir. 1987), *overruled on other grounds by A.C. Aukerman*, 960 F.2d 1020. The typical example of silence as the proper basis for the defense is when a party threatened to sue, but then took no action for a long period of time, thereby lulling the other side into thinking it would not sue. *See, e.g., A.C. Aukerman*, 960 F.2d at 1042; *see also Meyers v. Asics Corp.*, 974 F.2d 1304, 1309 (Fed. Cir. 1992) ("The defendants have not shown that Meyers threatened immediate and vigorous enforcement of his patents and then by silence lulled them into the belief that he did not intend to enforce his patents."). AA did not engaged in this pattern of conduct. It never threatened to sue before October 2003. Shea Depo. at 65:10-15; Robinson Depo. at 46:7-12; Blessing Depo. at 102:14-21. AA first asserted its claim against the Government in letters it sent to the agencies in October 2003, and it filed its complaint in this case shortly after the Government responded to those letters in August 2004. Gov't Findings ¶¶ 75, 77; *American Airlines*, 68 Fed. Cl. at 727. Moreover, there is no evidence that AA intentionally tried to mislead the Government into believing that it would not assert its claim. Shea Depo. at 66:2-5; Robinson Depo. at 48:11-15. This is not surprising given that there is no evidence that AA even knew it had a viable claim before October 2003.

Third, the evidence is clear that no action or inaction by either party was intended to foreclose the ability of either party to subsequently challenge a user fee audit assessment (so long as it was challenged within six years), and that the Government in fact repeatedly "reopen[ed] an audit period that [it] had previously closed" in order to sometimes increase and sometimes decrease the audit liability. Blessing Depo. at 131:14-132:17; *see also* Robinson Depo. at 29:12-17; Robinson Depo. Exh. 4 at 3 ("the review will cover the period from January 1, 2003 through June 30, 2004. However, CBP retains the right to review and assess liability . . . for a period of

the past six years"); Blessing Depo. Exh. 1 at Exh. A at 4 (page marked "26").

### 3. The Government has Failed to Prove that it Relied on AA's Conduct to its Injury

To borrow again from the patent context, a classic example of meeting these elements is where an infringer – after being lulled into thinking that a patent holder will not sue – constructs a new plant solely to build a product that infringes on the patent and would therefore be rendered useless by a successful patent infringement suit. *See A.C. Aukerman*, 960 F.2d at 1043. In this case, the Government cannot point to any affirmative action (like paying to construct a useless plant) that caused it injury. Instead, the Government claims injury because of actions is did *not* take. That is, the Government asserts that had it known of AA's claims sooner, it would have changed the way it conducted its audits of AA, would have increased the amount of the user fees to account for uncollected fees, and would have sought legislative and/or regulatory changes to make clear that it was entitled to assess liability for uncollected user fees. *See* Gov't Interrogatory Responses (Exh. 1 hereto) at 4-5.

These alleged injuries cannot support an equitable estoppel defense because the Government has failed to prove both that it would have taken these actions at all and that AA's conduct caused it not to. Despite knowing of AA's claims for more than three and a half years (*i.e.*, since October 2003), there is no evidence that the Government has changed anything about the way it audits AA (or any other airlines). To the contrary, the only evidence is that the Government has not changed anything about its audit methodology. Shea Depo. at 68:9-69:3; Robinson Depo. at 51:4-53:1. Thus, it is not surprising that the Government's audit report issued in February 2005 – after AA filed suit and more than a year after AA's October 2003 letters – looks like the prior reports. *Compare* Robinson Depo. Exhs. 2 and 3.

Similarly, there is no evidence that – after learning of AA's claims in October 2003 – the

Government increased the amount of the user fees because of shortfalls due to non-collections. Shea Depo. at 68:3-8. Likewise, there is no evidence of a legislative or regulatory change since October 2003. Further, there is no evidence that such changes are anywhere on the horizon. One Government witness claimed that APHIS began working internally on possible new rulemaking and on possible legislative changes, but those efforts did not even begin until 2007 and nothing yet has been made public. Shea Depo. at 66:6-19, *id*. at 67:11-68:2. Whether such changes ever materialize is completely unknown. Aside from this, there is no evidence that the Government has even started the process to modify the Immigration User Fee Statutes or Regulations.

In sum, because the Government has not taken any of these actions in the more than three and a half years that have passed since it learned to AA's claims, the Government's assertion that AA's previous silence caused it not to take these actions must fail.

**B. The Government Has Not Established the Elements of Waiver**

"[F]or a waiver to be effective, it must be clearly established that there was 'an intentional relinquishment or abandonment of a known right or privilege.'" *Brookhart v. Janis*, 384 U.S. 1, 4 (1966) (*quoting Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). "[I]t is a well established rule of law that 'waivers of rights must be voluntary, knowing and intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" *Youngdale & Sons Constr. Co. Inc. v. United States*, 22 Cl. Ct. 345, 346-47 (1991) (*quoting Reliance Ins. Co. v. United States*, 20 Cl. Ct. 715, 723 (1990)); *see also Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1563 (Fed. Cir. 1990); *Melrose Assocs., L.P. v. United States*, 43 Fed. Cl. 124, 149 (1999).

The Government does not contend that AA made an express waiver of its right to sue to recover assessments for uncollected user fees. *See* Gov't Interrogatory Responses (Exh. 1 hereto) at 7. Instead, the Government claims AA made an implied or constructive waiver.

Specifically, the Government asserts that "[b]y its conduct during the planning and conduct of the user fee audits, and by remitting the amounts that the auditors determined were owed, AA accepted voluntarily, and without reservation or objection, the premise that it was liable for" uncollected user fees. *Id.*; *see also* Shea Depo. at 21:9-15 (entire basis of the Government's waiver defense is simply that AA "did not object and that they indeed paid"). The Government's waiver defense fails for a multitude of reasons, and many of the same ones discussed above.

First, the Government has failed to prove that AA even knew of its rights during the user fee audits. Presumably, the Government will argue that AA had constructive knowledge of its rights because "it had full knowledge of the user fee statues and regulations the entire time." *See* Gov't Interrogatory Responses (Exh. 1 hereto) at 7. However, the Government has not demonstrated that AA actually knew or should have known that the Government was not entitled to hold it liable for uncollected user fees. AA's failure to realize that fact sooner cannot be unreasonable in light of the Government's similar failure. In any event, the Government – which has the burden of proof – has certainly not proved that AA's lack of earlier recognition of its rights was unreasonable. Accordingly, the Government has failed to prove that AA's purported waiver was knowing and intelligent.

Second, the Government has not proved that AA engaged in any conduct that could possibly constitute a waiver. AA had no choice about whether it was audited or about whether the Government issued an assessment of liability. Robinson Depo. at 22:17-23:2; Shea Depo. at 17:3-17. In addition, if AA did not pay the assessments, the Government would assess additional penalties and interest against AA. *See, e.g.*, Robinson Depo. Exh. 2 at 2; Shea Depo. at 43:10-15; Gov't Findings ¶ 33. Under these circumstances, AA's cooperation with the Government auditors during the audits and payment of the assessments does not evidence an intent by AA to

relinquish all of its rights to later seek a refund of the amounts paid for uncollected user fees. Moreover, the Government clearly did not view AA's conduct as a waiver, because it reopened previously closed audit periods to either increase or decrease the audit assessments. Blessing Depo. at 131:14-132:17; Robinson Depo. at 29:12-17; Robinson Depo. Exh. 4 at 3; Blessing Depo. Exh. 1 at Exh. A at 4 (page marked "26").

Third, even assuming AA's conduct could constitute a waiver (which it cannot), the Government has failed to prove that such a waiver was voluntary. As described above, AA had no choice in the matter, and the law makes clear that AA does not have an affirmative obligation to immediately protest the Government's assessments in order to avoid a waiver. *See, e.g.*, *Swift & Co.*, 111 U.S. at 29.

Because the Government must prove each of these three points, but has failed on each one, the Government's waiver defense cannot succeed.

## II. AA IS ENTITLED TO RECOVER INTEREST AND PENALTIES IT ACTUALLY PAID IN CONNECTION WITH THE USER FEES AUDITS

In connection with the Immigration User Fee audit covering the period of January 1, 2002 through December 31, 2002, the Government assessed a liability of $603,840 against AA. Gov't Findings ¶ 32. This assessment was first communicated to AA in a letter (and attached audit report) dated July 17, 2003. *See* Robinson Depo. Exh. 3. On or about September 12, 2003, the Government issued a "First Delinquent Notice" for non-payment of the aforementioned assessment of July 17, 2003. *See* Letter dated Sept. 12, 2003 (Exh. 2 hereto); *see also* Gov't Findings ¶ 33. This Notice assessed interest in the amount of $12,010 and penalties in the amount of $36,031, pursuant to the Debt Collection Improvement Act, 31 U.S.C. § 3717. *Id.*; Gov't Findings ¶ 33. In assessing these amounts, the Government computed interest at the annual rate of 2% and penalties at the annual rate of 6%. *See* Letter dated Sept. 12, 2003 (Exh. 2

hereto); *see also* 31 U.S.C. § 3717; 67 Fed. Reg. 65187 (Oct. 23, 2002). The Government assessed interest and penalties from the date it believe the uncollected user fees should have originally been remitted to the Government (*i.e.*, a date before July 17, 2003), until the date of the Notice. *See* Letter dated Sept. 12, 2003 (Exh. 2 hereto). Including the interest and penalties, the Government claimed the total amount due was $651,881. *Id.*; Gov't Findings ¶ 33. On or about September 26, 2003, AA paid the $651,881 to the Government. Gov't Findings ¶ 34.

AA is entitled to recover the $12,010 in interest and $36,031 in penalties for three independent reasons. First, AA's payment of the interest and penalties was directly and proximately caused by the Government's illegal exaction of the underlying principal amount of $603,840. Accordingly, these amounts constitute actual damages caused by the Government's illegal exaction.

Second, the Government is liable to AA for the $12,010 in interest and the $36,031 in penalties, because they represent identifiable proceeds actually earned by the Government on a sum ($603,840) that was improperly exacted and that must be returned to AA. *See, e.g., United States v. $277,000 United States Currency*, 69 F.3d 1491 (9th Cir. 1995); *Larson v. United States*, 84 F. Supp. 2d 218 (D. Mass. 2000).

Third, the Government has illegally exacted the majority of the $12,010 in interest and all of the $36,031 in penalties by assessing such amounts in violation of 31 U.S.C. § 3717. That statute provides that interest on uncollected Government debts accrues "from the date . . . notice of the amount due is first mailed to the debtor." 31 U.S.C. § 3717(b)(2). The date of such notice in this instance was July 17, 2003. *See* Robinson Depo. Exh. 3; *see also* Gov't Findings ¶ 33. If properly calculated from July 17, 2003, through the date of the Notice, interest would have been

$1,912.16.[3] The remaining $10,097.84 of the $12,010 in interest assessed against AA accrued *before* July 17, 2003, and was therefore illegally exacted in violation of 31 U.S.C. § 3717.

In addition, the statute provides that penalties are due only if the debt is "more than 90 days past due." 31 U.S.C. § 3717(e)(2); *see also* 31 C.F.R. § 901.9(d). Because AA paid the entire amount on or about September 26, 2003 – within 90 days of the July 17, 2003 assessment – the Government illegally exacted the $36,031 in penalties in violation of 31 U.S.C. § 3717.

At the May 31, 2007 hearing, the Court inquired whether *United States Shoe Corp. v. United States*, 296 F.3d 1378 (Fed. Cir. 2002), would prohibit the award of interest and penalties. The answer is no, because that case is readily distinguishable from this one. *United States Shoe* addressed only the question of whether the plaintiff was entitled to prejudgment interest on amounts illegally exacted by the Government. Such prejudgment interest was neither paid by plaintiff to the United States, nor actually earned by the United States in some other fashion. Here, however, the interest and penalties were actually paid by AA and received by the Government. Thus, even though "the government is not generally liable for . . . interest prior to judgment," "to the extent that the government has profited from the use of the property, especially where it has (actually or constructively) earned interest on money, it must disgorge those earnings along with the property itself." *$277,000 United States Currency*, 69 F.3d at 1492. Here, the Government actually earned $12,010 in interest and $36,031 in penalties on the $603,840 it must return to AA. Accordingly, the $12,010 and $36,031 must be return too. Aside from that, to the extent that the interest and penalties themselves constitute illegal exactions in violation of 31 U.S.C. § 3717, the rationale in *United States Shoe* has no application.

---

[3] At 2% annually, the applicable daily interest rate is 0.00555556% (2% divided by 360 days). Because there are 57 days between July 17, 2003, and September 12, 2003, proper interest charges should have been 0.00555556% times 57 times $603,840, or $1,912.16.

Respectfully submitted,

/s/ Adam P. Feinberg
Adam P. Feinberg
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 626-6087
(202) 628-0858 (Facsimile)
Counsel for Plaintiff

*Of Counsel*:
David R. Hamill
ARENT FOX
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 857-8940
(202) 857-6395 (Facsimile)

Dated: June 15, 2007