# In the United States Court of Federal Claims

No. 04-1736T
Filed July 31, 2007
**TO BE PUBLISHED**

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | * | Affirmative Defenses, RCFC 8(c); |
| Plaintiff, | * | Agricultural Quarantine Inspection User Fee Statute, 21 U.S.C. § 136(a); |
| v. | * | Debt Collection Improvement Act, 31 U.S.C. § 3717; |
| THE UNITED STATES, | * | Equitable Estoppel; |
| Defendant | * | Federal Claims Collection Standards, 31 C.F.R. § 901.9(d); |
| | * | Illegal Exaction; |
| | * | Immigration User Fee Statute, 8 U.S.C. § 1356, *et seq.*; |
| | * | Interest; |
| | * | Penalties; |
| | * | Waiver; |
| | * | 8 U.S.C. § 1356(f)(3); |
| | * | 8 C.F.R. § 286.5(b). |

**Adam P. Feinberg**, Miller & Chevalier Chartered, Washington, D.C., counsel for Plaintiff.

**Kyle Eric Chadwick**, United States Department of Justice, Washington, D.C., counsel for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN, *Judge.***

On December 6, 2004, American Airlines, Inc. ("Plaintiff") filed a Complaint to recover $2,627,974.12 in uncollected user fees imposed by the United States ("Government"), pursuant to the Immigration User Fee Statute, 8 U.S.C. § 1356, *et seq.*, and the Agricultural Quarantine Inspection ("AQI") User Fee Statute, 21 U.S.C. § 136(a). *See* Complaint ("Compl.") ¶¶ 1-87.[1] On November 30, 2005, the United States Court of Federal Claims granted summary judgment in favor of Plaintiff on the issue of liability, holding that the Government did not have authority under either statute at issue to impose liability on Plaintiff for the payment of uncollected user fees. *See Am.*

[1] Prior to filing this action, Plaintiff voluntarily paid the Government the total amount claimed. *See Am. Airlines* v. *United States*, 68 Fed. Cl. 723, 726-27 (*"Am. Airlines I"*).

*Airlines I*, 68 Fed. Cl. at 734.[2] The court must now determine the viability of the Government's affirmative defenses and any amounts due to Plaintiff, including whether interest and penalties paid to the Government can be recovered as a matter of law.

## I. FACTUAL BACKGROUND.[3]

In 1986, Congress enacted the Immigration User Fee Statute, 8 U.S.C. § 1356, that requires an entity issuing tickets to passengers traveling into the United States aboard commercial vessels or commercial aircraft to collect and remit a $7.00 "user" fee. *See Am. Airlines I*, 68 Fed. Cl. at 724 (citing 8 U.S.C. § 1356 (f)(1), (d), (k)). This statute further requires that, if a ticket is issued in a foreign country and the fee has not been collected by the ticket issuer, the entity providing the transportation is obligated to collect the fee from the passenger at the point of departure from the United States. *Id*. at 724-25.

In 1990, Congress enacted Section 2509 of the Food, Agriculture, Conservation, and Trade Act of 1990, 21 U.S.C. § 136(a), authorizing the Secretary of Agriculture to impose a fee to cover the cost of agricultural quarantine and inspection services. *See Am. Airlines I*, 68 Fed. Cl. at 725-26 (citing 21 U.S.C. § 136(a)). Pursuant thereto, the Secretary issued regulations to establish an "Agricultural Quarantine Inspection User Fee," to be paid by passengers, but collection was imposed only on entities issuing international airline tickets or airline carriers, similar to the Immigration User Fee Program. *Id*. at 726 (citing 7 C.F.R. § 354.3(f) (2005)). The AQI User Fee is used by the Department of Agriculture's Animal and Plant Health Inspection Service ("APHIS") to pay for quarantine and inspection activities and has ranged from $1.45 per individual per ticket, to $3.10 per individual per ticket. *Id*.

In 1998, the Government began to conduct audits of Plaintiff's compliance with the Immigration User Fee Statute and AQI User Fee Statute. *Id.* As a result of audits conducted by the Government for the period of September 2000 to August 2004, Plaintiff voluntarily paid $2,627,974.12 for alleged uncollected user fees. *Id*. at 726-27.

After the Immigration User Fee audit for the period of January 1, 2002 to December 31, 2002, Plaintiff voluntarily paid $651,881 to the United States, on September 26, 2003, for alleged

---

[2] On July 12, 2007, a similar case was decided by Judge Margolis of the United States Court of Federal Claims. *See Cont'l Airlines* v. *United States*, No. 06-432C, 2007 WL 2049072, at *2 (Fed. Cl. July 12, 2007) (agreeing with *Am. Airlines I's* analysis of virtually identical issues and holding that both statutes' plain language demonstrates "that the Government is not authorized to require payment of user fees that were not collected" as a matter of law).

[3] Facts recited herein were derived from: *Am. Airlines I*, 68 Fed. Cl. 723 (2005); the April 8, 2005 Declaration of Monty Hobbs ("Hobbs Decl."); Exhibit 3 to the May 18, 2007 Deposition of Daune Robinson ("R. Ex. 3"); and Exhibit 2 to Plaintiff's Post Trial Brief on the Government's Affirmative Defenses and Damages ("Pl. P-H. Bf. Ex. 2").

uncollected user fees, as part of the $2,627,974.12 total. *See* Hobbs Decl. ¶¶ 30, 37. This amount included $12,010 in interest and $36,031 in penalties for late payment of the 2002 Immigration User Fees, pursuant to the Debt Collection Improvement Act, 31 U.S.C. § 3717 (2006). *See* Hobbs Decl. ¶ 36; *see also* R. Ex. 3 (July 17, 2003 letter assessing payment due for uncollected 2002 Immigration User Fees); Pl. P-H. Bf. Ex. 2 (Sept. 12, 2003 "First Delinquent Notice" assessing interest and penalties for non-payment of the July 17, 2003 assessment).[4]

## II. PROCEDURAL HISTORY.

On October 10, 2003, Plaintiff requested that APHIS refund all amounts paid, pursuant to the AQI User Fee audits, contesting the Government's authority to require that Plaintiff pay uncollected user fees. *See Am. Airlines I*, 68 Fed. Cl. at 727. On August 11, 2004, Plaintiff's request was denied. *Id.* On October 13, 2003, Plaintiff also requested that the Department of Homeland Security refund all amounts that Plaintiff paid for uncollected user fees, pursuant to the Immigration User Fee Statute. *Id.* On August 5, 2004, Plaintiff's request was denied. *Id.*

On December 6, 2004, Plaintiff filed a Complaint in the United States Court of Federal Claims challenging the Government's authority to require payment of uncollected Immigration User Fees and AQI User Fees. *See* Compl. ¶¶ 1-87.[5] On November 30, 2005, the court granted summary judgment for Plaintiff regarding liability, determining that the Government did not have authority under either statute at issue to impose liability on Plaintiff for the payment of uncollected user fees. *See Am. Airlines I*, 68 Fed. Cl. at 734.[6]

---

[4] The Government assessed interest and penalties from the date it believed the uncollected user fees should have been originally remitted to the Government, until the date of notice. *See* Pl. P-H. Bf. Ex. 2.

[5] The Complaint alleged four counts: 1) the Government illegally exacted sums by compelling Plaintiff to pay Immigration User Fees that it was unable to collect; 2) the Government illegally exacted sums by compelling Plaintiff to pay AQI User Fees that it was unable to collect; 3) the Government effected an unconstitutional taking of Plaintiff's private property for public use, without just compensation by compelling Plaintiff to pay uncollected Immigration User Fees; and 4) the Government effected an unconstitutional taking of Plaintiff's private property for public use, without just compensation by compelling Plaintiff to pay uncollected AQI User Fees. *See* Compl. ¶¶ 74-87.

[6] The court held that the Immigration User Fee Statute only required that airline carriers "*collect* user fees . . . and remit *collected* fees," and that no language "imposes liability on commercial airlines to pay user fees that [were] not collected." *Am. Airlines I*, 68 Fed. Cl. at 731 (citing 8 U.S.C. § 1356(f)(1)) (emphasis in original). Also, the Government "anticipated less than a 100% collection rate," and required "carriers to provide the Government with information about any passenger refusing to pay the fee." *Id.* This required notification demonstrated that the statute did not "include the imposition of any liability on the carriers to pay uncollected fees." *Id.*

On December 19, 2005, the court convened a telephone status conference to discuss how to proceed with any affirmative defenses and discovery. On December 22, 2005, the Government filed an Answer to the December 6, 2004 Complaint, asserting the affirmative defenses of: accord and satisfaction; equitable estoppel; laches; and waiver. *See* Answer ¶¶ 90-93.

On March 6, 2006, the court convened a telephone status conference, at which time the Government requested additional discovery and inquired into certification for interlocutory appeal to the United States Court of Appeals for the Federal Circuit. On March 29, 2006, the Government filed a Motion to Amend the November 30, 2005 Memorandum Opinion and Order ("Gov't Mot. Int. App.") and requested certification for interlocutory appeal, pursuant to 28 U.S.C. §1292(d)(2). *See* Gov't Mot. Int. App. at 1 (citing 28 U.S.C. § 1292(d)(2) (2006) (setting forth a three-part test to determine whether a question may be certified for interlocutory appeal, *i.e.*, whether: "a controlling question of law" is presented; that question is one "with respect to which there is substantial ground for difference of opinion;" and "an immediate appeal from that order may materially advance the ultimate termination of the litigation.")). The Government asserted that, in addition to a controlling question of law, there was "substantial ground for [a] difference of opinion," *i.e.*, interpretation of the Immigration User Fee Statute and the AQI User Fee Regulations. *Id.* at 1-2. The Government also argued that an interlocutory appeal regarding liability would render the damages phase moot, potentially saving the parties and the court time and resources. *Id.* at 6. In addition, the Government argued that an interlocutory appeal would "clear up" legal uncertainty for "other commercial airlines operating international flights into the United States," as well as "Congress and the affected agencies, which rely upon the user fees to fund the immigration and agricultural quarantine inspections."[7] Gov't Int. App. Reply at 3.

On April 11, 2006, Plaintiff filed a Response ("Pl. Int. App. Resp."), conceding that the first prong of the § 1292(d)(2) test was met, but arguing that an interlocutory appeal would not materially advance the ultimate termination of the litigation, because only minimal discovery was required and determining the recovery due was not "protracted or expensive litigation." Pl. Int. App. Resp. at 1-8.

On June 21, 2006, the court issued a Memorandum Opinion and Order denying the Government's Motion. *See Am. Airlines* v. *United States*, 71 Fed. Cl. 744, 747 (2006) ("*Am. Airlines II*"). Therein, the court determined that certification was not appropriate, because, although interpretation of the statute and regulations was a controlling question of law, there was no substantial ground for disagreement as to their interpretation, and interlocutory appeal would not materially advance entry of final judgment. *Id.* (citing 28 U.S.C. §1292(d)(2)).

---

Similarly, the court held that the AQI User Fee Statute only required that the airline carriers act "on behalf of" the Government. *Id*. at 732 (citing 21 U.S.C. § 136a(a)(3)). Therefore, "[t]he liability to pay this fee is imposed on the passenger, not upon commercial airlines that are required only to collect and to remit any fees collected." *Id*.

[7] On April 26, 2006, the Government filed a Reply ("Gov't Int. App. Reply").

On July 12, 2006, the court convened a telephone status conference, wherein the parties confirmed that there was no dispute regarding the amount that Plaintiff paid to the Government. *See* July 12, 2006 TR at 5. The only issue was whether this amount represented fees that were uncollected or included fees that were collected by Plaintiff, but mistakenly labeled uncollected. *Id.*

The Government counsel, however, took the position:

| | |
|---|---|
| GOVERNMENT COUNSEL: | We are entitled to find out *whether it is possible* that for instance fees could be collected and not end up in the proper account, and not be recorded properly. . . . We have a damages firm that we have just about retained, essentially are ready to retain, that *would like to examine the controls all the way through the process* to determine, on a sort of sampling basis -- *we're not talking about a criminal-style investigation, we're talking about an account investigation* -- to see what the controls are, exactly when things are collected, and whether we can, in fact, find any evidence of collection that– |
| THE COURT: | And how long will it take them to do this process? |
| GOVERNMENT COUNSEL: | It's a three- to six-month job. |
| | * * * |
| THE COURT: | All right. Here is what I'm going to do. I'm going to grant . . . the [G]overnment what they want. I'm going to give them three months to do it, and I'm going to order that they have to pay for [Plaintiff] outside expert, because I found that the statute was unlawful to begin with. To impose additional money on a company that shouldn't have had to go through this process and the internal costs to begin with it seems to me is over the hill. |

July 12, 2006 TR at 8-10 (emphasis added).

On August 1, 2006, a telephone status conference was convened, at which time the court was informed that Plaintiff retained the accounting firm of Deloitte & Touche to respond to data

requested by the Government's accounting expert, Navigant Consulting, Inc. Pursuant to the July 12, 2006 and August 4, 2006 telephone status conferences, the court issued a Scheduling Order, directing the parties to complete limited discovery by December 5, 2006.

On October 24, 2006, the court convened a telephone status conference, at which time the court learned of the Government's efforts to expand the scope of discovery concerning the amounts due to be refunded:

PLAINTIFF'S COUNSEL: The [G]overnment has propounded some discovery requests . . . *what they're trying to do is essentially find new errors. That is, they're looking at the same exact subject matter that they looked at in the audit* and when they looked at these issues in the audit, they did not find any errors or any problems and therefore, they didn't assess any liability against [Plaintiff], and now they want to go back and essentially redo that.

And in our view, that's totally outside the scope of this lawsuit. *All they're trying to do is find totally unrelated liability that they can use to offset the money that they essentially owed.*

THE COURT: Well, they've not filed any counterclaims in the case.

PLAINTIFF'S COUNSEL: Well, that's sort of our point. There's no counterclaims and there's no claim for an offset, and so we think they should not be allowed to search for completely new and unrelated errors in relation to the errors that were found in the previous audit.

* * *

GOVERNMENT COUNSEL: *What we're trying to do is do discovery into the claim of [Plaintiff] that it paid us more user fees than it collected.* And we're looking into the system to see well, what is the evidence of what it collected and what is the evidence of how that got translated into the payments to us?

So we're just following that chain. . . . In other words, we're not looking into did [Plaintiff] pay all its taxes in other respects? It's actually following the chain of how do we know what was collected and then how do we know that what was collected was paid? We're just following that accounting chain.

PLAINTIFF'S COUNSEL: *So what the [G]overnment is really trying to do is get a second bite at an unrelated apple.* They're trying to say well, we looked at that at the time and we didn't assess any liability for that particular aspect, but we want to go back and now do it again and see if maybe we can catch you this time.

And the reason we think that's improper is because, A, they've already looked at this specific issue and given [Plaintiff] a clean bill of health in the audit; and, B, and more importantly, it's totally unrelated to the assessments that we're talking about in this case. They could have issued a separate assessment under a separate finding in those audits, but they didn't do that.

October 24, 2006 TR at 7-13 (emphasis added).

On October 27, 2006, Plaintiff filed a Motion for a Protective Order ("Pl. Mot. Pr. Or.") to prohibit the Government from expanding discovery to "XT and ZZ allocations."[8] On November 13, 2006, the Government filed a Response. On November 17, 2006, Plaintiff filed a Reply. On November 17, 2006 and November 21, 2006, the court convened telephone status conferences.

---

[8] Commercial airlines collect a variety of taxes, fees, and charges ("TFCs") on behalf of the Government and airports that have been assigned a two-letter code by the International Air Transport Association. *See* Pl. Mot. Pr. Or. at 3. The AQI and Immigration User Fees at issue in this case are designated "XA" and "XY" respectively. *Id.* Every TFC is recorded in one of three boxes on the industry-standard ticket. *Id.* The "XT" codes are used when an airline collects more than three TFCs on one ticket. *Id.* The "ZZ" codes are used if the agent places any TFCs in a TFC box, but fails to enter a valid two-letter TFC code or if the TFC data exceed the limitations for the reporting format. *Id.* at 4 n.1. In order to discern whether tickets with "XT" and "ZZ" codes included the user fees at issue in this case, Plaintiff took a sample of such tickets, researched each ticket, and then labeled it with the proper "XA" or "XY" code. *Id.* at 3.

On November 30, 2006, the court issued a Memorandum Opinion Regarding Discovery and Evidentiary Damages Hearing Scheduling Order, granting Plaintiff's October 27, 2006 Motion for a Protective Order and allowing the Government to continue to conduct the *limited* discovery authorized by the August 1, 2006 Order, until the December 5, 2006 deadline. *See Am. Airlines* v. *United States*, 75 Fed. Cl. 237, 242 (2006) ("*Am. Airlines III*") (emphasis added). In addition, the court set a Scheduling Order for the evidentiary hearing. *Id.*

On February 1, 2007, Plaintiff filed a proposed Witness List. On February 15, 2007, the Government filed a Motion for Discovery, pursuant to the November 30, 2006 Order. On February 16, 2007, the Government filed a Motion for Leave to File Corrected Motion, which the court granted. On February 21, 2007, the court convened a telephone status conference, at which time the parties resolved the issues raised in the Government's February 16, 2007 Motion for Discovery.

On February 28, 2007, Plaintiff filed an Amended Complaint ("Am. Compl.") to withdraw Counts III and IV. *See* Am. Compl. ¶ 95. On March 14, 2007, the Government filed an Answer to the Amended Complaint. On March 15, 2007, the Government filed a Motion for Clarification concerning the expert fee award, which the court resolved during a March 26, 2007 telephone status conference.

On March 15, 2007, the Government filed a proposed Witness List. On April 17, 2007 and April 23, 2007, the court convened telephone status conferences, during which the parties informed the court that they jointly decided there was no need to proffer witnesses, but requested oral argument.

On May 25, 2007, Plaintiff filed the May 23, 2007 Declaration of Monty Hobbs, former Manager of Revenue Accounting at American Airlines, and the Direct Testimony of David Williams, Principal in the Valuation Services Practice of Deloitte Financial Advisory Services ("Dt. Test. David Williams") and exhibits thereto ("W. Ex. 1-9"). On May 29, 2007, American Airlines filed: a May 15, 2007 Deposition of Barbara Blessing, Director of Planning and Special Projects at the Office of Financial Management within Immigration and Customs Enforcement, with exhibits thereto; the May 16, 2007 Deposition of Kevin Shea, Chief Operating Officer at APHIS, with exhibits thereto; and the May 18, 2007 Deposition of Daune Robinson, Senior Auditor at the Office of Finance within United States Customs and Border Protection, with exhibits thereto.

On May 30, 2007, the Government filed the Stipulated, Prepared Direct Testimony of Barbara Blessing, Kevin Shea, and Daune Robinson. On the same date, the parties filed a Joint Stipulation ("J. Stip.") agreeing that: the Direct Testimony of David Williams lists every error[9] from each of the user fee audits; the Direct Testimony of David Williams does not list any tickets that are

[9] An audit "error" is an instance in which the Government expected to collect a fee on a ticket, but no fee was collected and/or remitted. *See* Dt. Test. David Williams at 12.

not errors from one of the user fee audits; and all the information for each ticket in Exhibit 6 shown to David Williams is accurate. *See* J. Stip. at 2.

On May 31, 2007, the court held oral argument ("May 31, 2007 TR 1-41"). On June 4, 2007, Plaintiff filed a Second Amended Complaint ("Sec. Am. Compl."), asserting "Count III," to request recovery of $12,010 in interest and $36,031 in penalties that Plaintiff paid to the Government on September 26, 2003. *See* Sec. Am. Compl. ¶¶ 96-99. On June 15, 2007, the Government filed a First Post Trial Brief on Affirmative Defenses ("Gov't First P-H. Bf."). On the same day, Plaintiff filed a Post Trial Brief on the Government's Affirmative Defenses and Damages ("Pl. P-H. Bf.") and exhibits thereto ("Pl. P-H. Bf. Ex. 1-2"). On June 19, 2007, the Government filed an Answer to the Second Amended Complaint ("Sec. Am. Answer"), withdrawing the affirmative defenses of accord and satisfaction and laches. *See* Sec. Am. Answer ¶¶ 102-03. On June 22, 2007, the Government filed a Second Post Trial Brief on Damages ("Gov't Sec. P-H. Bf.").

## III. DISCUSSION.

### A. Jurisdiction.

Pursuant to the Tucker Act, 28 U.S.C. § 1491, the United States Court of Federal Claims has "jurisdiction over suits seeking the return of money improperly paid to, exacted or retained by the [G]overnment." *See New York Life Ins. Co.* v. *United States*, 118 F.3d 1553, 1556 (Fed. Cir. 1997) (holding the United States Court of Federal Claims had jurisdiction over plaintiff's claim because plaintiff asserted that the remittance was improperly paid in contravention of a statute); *see also* 28 U.S.C. § 1491(a)(1) (2006) (The United States Court of Federal Claims has jurisdiction to adjudicate claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States [.]"); *Aerolineas Argentinas* v. *United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996) ("The Tucker Act provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power."); *Eastport S.S. Corp.* v. *United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967) ("[T]he non-contractual claims we consider under Section 1491 can be divided into two somewhat overlapping classes – those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum . . .[.] In the first group (where money or property has been paid or taken), the claim must assert that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.").

Accordingly, the United States Court of Federal Claims has jurisdiction to adjudicate Plaintiff's claim for the return of money illegally exacted by the Government in contravention of the Immigration User Fee Statute, the AQI User Fee Statute, and the Debt Collection Improvement Act. *See* Sec. Am. Compl. ¶¶ 1-99.

**B. Affirmative Defenses.**

The Government asserts two affirmative defenses. First, the Government contends that Plaintiff is equitably estopped from recovering any uncollected user fees paid. Second, the Government argues that Plaintiff waived the right to deny liability for the uncollected user fees paid.

**1. Equitable Estoppel.**

The doctrine of equitable estoppel "is a judicial remedy by which a party may be precluded, by its own acts or omissions, from asserting a right to which it otherwise would have been entitled." *LaMirage, Inc.* v. *United States*, 44 Fed. Cl. 192, 200 (1999) (citing *Heckler* v. *Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 59 (1984)); *see also Stevens Mfg. Co.* v. *United States*, 8 F. Supp. 720, 724 (Ct. Cl. 1934) (holding the doctrine of equitable estoppel bars recovery where a claimant "acquiesced in the [underlying] transaction in such a manner as to change the relationship of the parties and make its repudiation of the proceedings contrary to equity and good conscience"). The elements of equitable estoppel are: 1) the party to be estopped must know the facts; 2) the party to be estopped must intend, or act in a manner that the other party has reason to believe it intends, for its conduct to be acted on; 3) the party asserting estoppel must be ignorant of the true facts; and 4) the party asserting estoppel must rely on the other party's conduct to its injury. *See Boeing Co.* v. *United States*, 75 Fed. Cl. 34, 48 (2007); *see also A.C. Aukerman Co.* v. *R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992) (The elements of equitable estoppel are: "1) The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. 2) The other relies upon that communication. 3) And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct." (citing D.B. Dobbs, HANDBOOK ON THE LAW OF REMEDIES § 2.3, at 42 (1973))).

**a. The Parties' Arguments.**

The Government asserts that the elements of equitable estoppel are satisfied in this case, because Plaintiff had full knowledge of and acquiesced to the "premise that instances in which [Plaintiff] *failed to document* the collection of a user fee would be deemed instances of non-remittance, and would be included in the statistical estimates of the 'error rates.'" Gov't First P-H. Bf. at 2 (emphasis in original); *see also* May 31, 2007 TR at 33-35. As the Government counsel explained at oral argument:

> So at some point, there appears to have been to us like sort of hiding the ball either intentionally or unintentionally that caused these agencies to act in ways to their detriment.

May 31, 2007 TR at 35.

The Government further argues that had it known at the time of the audits that Plaintiff would later claim that it was not legally liable for the uncollected user fees, the Government could have

taken alternate measures including: setting higher rates to include contingency for shortfalls; revising user fee regulations; seeking legislative changes to clarify the authority to require air carriers to remit user fee amounts that they failed to collect; performing additional reviews of Plaintiff's internal controls; demanding fuller explanations for incidents of non-collection; and/or expressly qualifying the audits results. *See* Gov't First P-H. Bf. at 2-3; *see also* May 31, 2007 TR at 33-35.

Plaintiff counters that the Government failed to establish the elements of equitable estoppel. *See* Pl. P-H. Bf. at 1-6. First, Plaintiff asserts that the Government has offered no evidence to suggest that Plaintiff knew that it intended to pursue a claim prior to October 2003, and therefore, it did not "know the facts." *Id.* at 2.

Second, Plaintiff argues that the Government has failed to prove that Plaintiff engaged in any misleading conduct intended to be acted on by the Government or that the Government reasonably believed was so intended. *Id.* Plaintiff insists that it had no choice about whether it was audited and no choice about whether the Government would assess liability. *Id*. at 3. The fact that Plaintiff was silent and did not contest the Government's actions is no basis for equitable estoppel, unless a party has acted in bad faith, which is not established in this record. *Id*. at 3-4 (citing *Hottel Corp.* v. *Seaman Corp.*, 833 F.2d 1570, 1573-74 (Fed. Cir. 1987) ("Although there is precedent for applying equitable estoppel where there has been 'intentionally misleading silence,' some evidence must exist to show that the silence was sufficiently misleading to amount to bad faith." (citations omitted))). In addition, Plaintiff points to a long standing legal tradition that illegally exacted funds may be recovered, regardless of whether the plaintiff previously raised a protest. *See* Pl. P-H. Bf. at 3 (*citing Swift & Courtney & Beecher Co.* v. *United States*, 111 U.S. 22, 29 (1884) ("[I]llegal fees exacted by a collector, though sanctioned by a long-continued usage and practice in the office, under a mistaken construction of the statute, even when paid without protest, might be recovered back on the ground that the payment was compulsory and not voluntary.")). Similarly, a claim for refund may be made without raising an objection. *See* Pl. P-H. Bf. at 3 (citing 26 U.S.C. § 6511(a) (2006) (A claim for refund may be filed "within 3 years from the time the return was filed."); 26 C.F.R. § 601.105(b)(4) ("[T]he taxpayer who has given a waiver may still claim a refund of any part of the deficiency assessed against, and paid by, the taxpayer, or any part of the tax originally assessed and paid by the taxpayer. The taxpayer's acceptance of an agreed overassessment does not prevent the taxpayer from filling a claim and bringing suit for an additional sum.")).

Third, Plaintiff argues that the Government has failed to prove that it relied on Plaintiff's conduct to its detriment. *See* Pl. P-H. Bf. at 5-6. The Government merely cites a laundry list of possible actions that it may have taken, but does not identify any affirmative conduct by Plaintiff that caused the Government injury. *Id*. at 6.

**b. The Court's Resolution.**

The Government has not shown that Plaintiff either "knew the facts" or intended to mislead the Government in any way. Although Plaintiff may have been on constructive notice of the relevant statute and regulations, there is no evidence in the record that Plaintiff "knew" it was not legally

liable for the uncollected user fees, anticipated future litigation, or misled the Government regarding Plaintiff's litigation intentions. Similarly, Plaintiff's acquiescence to the Government's audit and collection process does not evidence an intention to mislead the Government, only obedience to the Government's rules. Because the Government cannot establish the first two elements of equitable estoppel, the court need not determine whether the Government was ignorant of the true facts and/or relied on Plaintiff's conduct to its injury. *See Boeing*, 75 Fed. Cl. at 48; *see also A.C. Aukerman*, 960 F.2d at 1041. For these reasons, the court has determined that the Government has failed to establish the affirmative defense of equitable estoppel in this case. *Id.*

**2. Waiver.**

For a waiver to be effective, "it must be clearly established that there was 'an intentional relinquishment or abandonment of a known right or privilege.'" *See Brookhart* v. *Janis*, 384 U.S. 1, 4 (1966) (quoting *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938)). The waiver must be a "voluntary, knowing and intelligent act[] done with sufficient awareness of the relevant circumstances and likely consequences." *Youngdale & Sons Constr. Co.* v. *United States*, 22 Cl. Ct. 345, 346-47 (1991) (citations omitted); *see also Seaboard Lumber Co.* v. *United States*, 903 F.2d 1560, 1563 (Fed. Cir. 1990) ("Waiver requires only that the party waiving such right do so 'voluntarily' and 'knowingly' based on the facts of the case." (citations omitted)). A waiver need not be express, but may be inferred from a pattern of conduct. *See Ling-Temco-Vought, Inc.* v. *United States*, 475 F.2d 630, 637 (Ct. Cl. 1973); *see also Seaboard Lumber*, 903 F.2d at 1563 ("Waiver can be either express or implied." (citations omitted)).

**a. The Parties' Arguments.**

The Government argues that Plaintiff waived the right to contest liability for uncollected user fees, when it voluntarily participated in the audits and remitted the assessed amounts without objection over a period of years. *See* Gov't First P-H. Bf. at 4; *see also* May 31, 2007 TR at 31-32 (GOVERNMENT COUNSEL: "[T]he voluntariness is in the cooperation and the consultation with the [G]overnment that went on to develop these audits and the working side-by-side through them."). The Government further argues that Plaintiff had full knowledge of the applicable user fee statutes and regulations throughout the process and thus "knowingly, voluntarily, and repeatedly forswore the illegal exaction theories it advances now." *See* Gov't First P-H. Bf. at 4-5. As the Government counsel explained during oral argument:

> Knowing just means essentially with knowledge or to be charged with knowledge of something. And the fact is that these statutes and regulations haven't changed in any material respect throughout this period. So whatever American's claim is now, someone either knew or should have known at the time that the argument could be raised.

May 31, 2007 TR at 32-33.

Plaintiff counters that the Government has not established that it made a knowing, intelligent, and voluntary waiver of the right to contest liability for the uncollected user fees. *See* Pl. P-H. Bf. at 6-8. Plaintiff argues that the Government failed to prove that Plaintiff knew that the Government was not entitled to hold it liable for uncollected user fees. *Id*. at 7. In addition, Plaintiff had no choice about whether it was audited or whether the Government issued an assessment of liability. *Id*. Moreover, Plaintiff notes that if it did not pay the assessment, the Government simply would have assessed additional interest and penalties. *Id*. Plaintiff concludes that cooperation with the Government during the audits and payment of the assessments do not evidence an intent to relinquish the right to later seek a refund for the amounts paid for uncollected user fees. *Id*. at 7-8.

**b. The Court's Resolution.**

Although Plaintiff was on constructive notice of the relevant statute and regulations, this does not equate to knowledge that it was not liable for the uncollected user fees. Moreover, Plaintiff would have faced additional penalties if it had contested liability and refused to participate in the audits and/or pay the assessed amounts. Under these circumstances, Plaintiff made a rational and responsible business decision to cooperate with the Government, and did not relinquish any legal rights by doing so. *See Brookhart,* 384 U.S. at 4. Accordingly, the court has determined that the Government failed to establish the affirmative defense of waiver in this case.

**C. The Amounts Due Plaintiff.**

**1. Refund Of The Illegal Exaction.**

Count I requests a refund of $1,394,225 for the illegal exaction of uncollected Immigration User Fees. *See* Sec. Am. Compl. ¶ 21 (Prayer for Relief). Count II, requests a refund of $1,195,138 for the illegal exaction of uncollected AQI User Fees. *Id.* In support, Plaintiff relies on the Direct Testimony of David Williams of Deloitte & Touche and supporting exhibits.[10] *See* May 31, 2007 TR at 5. Exhibit 6 lists all of the "errors" from each audit at issue along with: type of audit; time period; number of errors; reference number; flight number; flight date; ticket number; codes used; missing ticket status; passenger name; and amount assessed due to each error. *See* W. Ex. 6. The following is a summary of the information represented therein:

[10] Plaintiff submitted nine exhibits with the Direct Testimony of David Williams. Plaintiff also submitted the May 23, 2007 Declaration of Monty Hobbs explaining the similarity between the original process that Plaintiff undertook to calculate uncollected user fees and Deloitte & Touche's process. *See* May 31, 2007 TR at 16-17.

| Type | Errors | Ref. # | Period of Audit | Fees Assessed |
|---|---|---|---|---|
| AQI | 5.000 | 1-5 | July 1, 1996 to June 30, 1998 | $ 150,572 |
| AQI | 8.000 | 6-13 | July 1, 1998 to June 30, 2000 | $ 299,107 |
| IUF | 4.000 | 14-17 | July 1, 1998 to June 30, 2000 | $ 397,844 |
| AQI | 7.000 | 18-24 | October 1, 2000 to December 31, 2001 | $ 345,937 |
| IUF | 1.000 | 25 | July 1, 2000 to December 31, 2001 | $ 160,878 |
| AQI | 12.000 | 26-37 | January 1, 2002 to December 31, 2002 | $ 298,298 |
| IUF | 20.142 | 38-58 | January 1, 2002 to December 31, 2002 | $ 603,840 |
| IUF | 3.500 | 59-62 | January 1, 2003 to June 30, 2004 | $ 270,274 |
| AQI | 3.000 | 63-65 | January 1, 2003 to June 30, 2004 | $ 101,224 |
| TOTAL | | | | $2,627,974 |

As demonstrated in Exhibit 6, the total amount assessed against Plaintiff for uncollected user fees was $2,627,974. *Id.* Mr. Williams, however, identified one type of ticket where the user fee was collected (Reference No. 59), in the amount of $38,611. *Id.* at 2; *see also* Dt. Test. David Williams at 13. Subtracting that amount, the total uncollected user fees paid by Plaintiff was $2,589,363. *See* Dt. Test. David Williams at 13.[11]

Accordingly, the court has determined that Plaintiff is owed $2,589,363 for the principal amount illegally exacted by the Government in connection with the Immigration User Fee and AQI User Fee audits.

---

[11] In the May 30, 2007 Joint Stipulation, the parties agreed that: the Direct Testimony of David Williams lists every error from each of the user fee audits and does not list any tickets that are not errors from one of the user fee audits; and all the information for each ticket in Exhibit 6 is accurate. *See* J. Stip. at 2. Therefore, at oral argument, the Government's counsel conceded:

> It is correct that we're not here to dispute any of the facts, the historical facts or numbers that [Plaintiff's counsel] has talked about with respect to damages. And we recognize that given what the Court has already ruled about how the damages should be calculated that at least with respect to the princip[al] amount, that is, what [Plaintiff's counsel] has characterized as the uncollected user fees of the audit assessments, that that is how the number would come out under the way the Court has told us to do the math.

May 31, 2007 TR at 24-25.

The court notes, however, that it did not direct how the damages should be calculated, but denied the Government's request for discovery to find new and unrelated "errors" to offset the refunds due Plaintiff. *See Am. Airlines III*, 75 Fed. Cl. at 237.

### 2. Refund Of Interest, But Not Penalties.

#### a. The Parties' Arguments Regarding Interest and Penalties.

A remaining issue is whether Plaintiff can recover $12,010 in interest and $36,031 in penalties paid on Immigration User Fees for 2002. *See* Sec. Am. Compl. ¶¶ 96-99; *see also* May 31, 2007 TR at 18.

The Government argues that interest is not automatically available on an illegally exacted amount and no statute authorizes an award of interest in this case. *See* Gov't Sec. P-H. Bf. at 2 (citing *U.S. Shoe Corp.* v. *United States*, 296 F.3d 1378, 1381 (Fed. Cir. 2002) (holding that prejudgment interest was not due on illegal exaction of unconstitutional tax, because "[i]nterest may only be recovered in a suit against the government if there has been a clear and express waiver of sovereign immunity by contract or statute, or if interest is part of compensation required by the Constitution" (citing *Library of Cong.* v. *Shaw*, 478 U.S. 310, 311 (1986)))).

Plaintiff counters that *Shoe* is inapplicable, because the plaintiff in that case sought prejudgment interest on an illegally exacted amount that never accrued. *See* Pl. P-H. Bf. at 10; *see also* May 31, 2007 TR at 20-22. In this case, however, interest and penalties accrued and were exacted from Plaintiff. *See* Pl. P-H Bf. at 10. Accordingly, Plaintiff argues that, in this case, the Government's illegal exaction of the underlying principal proximately caused actual damages to Plaintiff in the form of interest and penalties. *Id.* at 9; *see also* May 31, 2007 TR at 18-19. In the alternative, Plaintiff argues that the interest and penalties represent identifiable proceeds actually earned by the Government on the principal illegally exacted from Plaintiff. *See* Pl. P-H. Bf. at 9-10; *see also* May 31, 2007 TR at 19. As such, the Government was unjustly enriched. *See* Pl. P-H. Bf. at 9-10 (citing *United States* v. *$277,000 U.S. Currency*, 69 F.3d 1491, 1492 (9th Cir. 1995) (holding that the Government was required to disgorge any interest actually or constructively earned on the seized property)).

The Government replies that the cases cited by Plaintiff involve interest that the Government earned by investing an illegally exacted amount, while this case involves interest and penalties that the Government lawfully assessed against Plaintiff for late payment. *See* Gov't Sec. P-H. Bf. at 1-2 (citing 8 C.F.R. § 286.5(b)(2)[12]); *see also* May 31, 2007 TR at 27. The Government insists that these

---

[12] 8 C.F.R. § 286.5(b) provides, in relevant part:

> (b)(1) Fee remittances shall be sent to the Immigration and Naturalization Service, at a designated Treasury depository, for receipt no later than 31 days after the close of the calendar quarter in which the fees are collected, except the fourth quarter payment for fees collected shall be made on the date that is 10 days before the end of the U.S. Government's fiscal year, and the first quarter payment shall include any collections made in the preceding quarter that were not remitted with the previous

were "garden variety" interest and penalties that Plaintiff could have avoided had it paid the assessed amount on time. *See* Gov't Sec. P-H. Bf. at 2.

**b. The Court's Resolution.**

This case is distinct from those where a plaintiff requests that the court award interest on an illegally exacted sum. *See Shaw,* 478 U.S. at 310 (holding that plaintiff could not recover unearned interest on an illegally exacted sum, because sovereign immunity bars the award of interest against the Government absent a contractual, statutory, or Constitutional grant); *see also U.S. Shoe*, 296 F.3d at 1378 (holding that no prejudgment interest was due plaintiff on illegal exaction of an unconstitutional tax without a statute expressly providing for interest). It is also distinct from cases where a plaintiff seeks to recover interest that the Government earned by investing an illegally exacted principal. *See, e.g., $277,000 U.S. Currency*, 69 F.3d at 1493 (holding that interest actually or constructively earned while seized funds were held by the Government was not interest, but rather, the "profit from wrongly seized property," and thus the Government was liable for the interest the funds would have earned);[13] *but see Larson* v. *United States*, 274 F.3d 643, 647-48 (1st Cir. 2001) (holding that sovereign immunity precludes the recovery of interest against the Government no matter how it is classified).[14] Here, Plaintiff is seeking to recover an amount that the Government

---

> payment. The fourth quarter payment shall include collections for the months of July and August. The fiscal year referenced is the U.S. Government's fiscal year which begins on October 1 and ends on September 30.
>
> (2) Late payments will be subject to interest, penalty, and handling charges as provided in the Debt Collection Act of 1982 (31 U.S.C. 3717). Refunds by a remitter of fees collected in conjunction with unused tickets or documents for transportation shall be netted against the next subsequent remittance.

8 C.F.R. § 286.5.

[13] *Accord United States* v. *$515,060.42 U.S. Currency*, 152 F.3d 491, 504 (6th Cir. 1998) ("While sovereign immunity customarily precludes the Government's liability for interest prior to a judgment (citation omitted) . . . to the extent that the Government has actually or constructively earned interest on seized funds, it must disgorge those earnings along with the property itself when the time arrives for a return of the seized *res* to its owner.").

[14] *Accord United States* v. *$30,006.25 U.S. Currency*, 236 F.3d 610, 613 (10th Cir. 2000) (holding that pursuant to the "no-interest rule," the United States is immune from an interest award, absent express congressional consent to the award of interest separate from a general waiver of immunity to suit); *United States* v. *$7,990.00 U.S. Currency*, 170 F.3d 843, 844 (8th Cir. 1999) (holding that prejudgment interest may not be awarded against the United States absent an express waiver of sovereign immunity and the statute governing the return of the seized property makes no

assessed as interest and penalties on an underlying late payment, for which the court has since found that Plaintiff is not liable.

**i. Interest.**

Interest is imposed, in this and other contexts, to reimburse the Government for the time value of money and loss of use of amounts not paid when they are due. *See Motion Picture Ass'n of Am., Inc.* v. *Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992) ("[I]nterest compensates for the time value of money, and thus is often necessary for full compensation." (citations omitted)); *see also Vick* v. *Phinney*, 414 F.2d 444, 448 (5th Cir. 1969) ("Interest, in tax cases as in others, is merely compensatory; it is not a penalty." (citations omitted)). In this case, the Government was never owed the uncollected user fees, and therefore did not experience any loss on account of the late payment. *Cf. Shriners Hosps. for Crippled Children* v. *United States*, 862 F.2d 1561, 1564 (Fed. Cir. 1988) (Interest due on estate's late payment of estate tax was refundable when retroactive change in tax law allowed estate to recover the taxes paid and reform the will for all purposes so that "it was as if no tax had ever been due."). As compensation, rather than a penalty, the interest in this case is sufficiently related to the principal for the court to hold that the entire amount was illegally exacted. *See Phillips* v. *Washington Legal Found.*, 524 U.S. 156, 165 (1998) (holding that the "interest follows principal" rule is "firmly embedded in the common law of the various States."). Therefore, the Government must refund the $12,010 that Plaintiff paid as interest on the 2002 Immigration User Fees.

**ii. Penalties.**

The Government imposes penalties, in this and other contexts, as an incentive for parties to make timely payments. *See, e.g., Nev. Tax Comm'n* v. *Saveway Super Serv. Stations, Inc.*, 668 P.2d 291, 295 (Nev. 1983) ("The purpose of a penalty provision for the late payment of a tax is to encourage the timely payment of the tax and to punish those who do not pay on time. (citation omitted). The assessment of interest, however, has no punitive element, and is nonpejorative; the taxpayer must pay interest on late payment for the same reason the state must pay interest on overpayments."). Accordingly, the penalties in this case, were imposed as a punitive measure for late payment, and are owed regardless of the legality of the underlying exaction. Although this may seem unfair, sovereign immunity bars a plaintiff from being able to recover damages in excess of the amount illegally exacted. *See $277,000 U.S. Currency*, 69 F.3d at 1498 ("[T]here is no element . . . of forcing the [G]overnment to pay for the *damage* it has done, only that it must disgorge benefits that it has actually and calculably received from an asset that it has been improperly holding." (emphasis added)). Moreover, at the time the penalties were imposed and Plaintiff paid

---

mention of prejudgment interest); *Ikelionwu* v. *United States*, 150 F.3d 233, 239 (2d Cir. 1998) ("Absent express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award." (citation omitted)).

them, both parties believed that the Government was owed the underlying uncollected user fees. Accordingly, Plaintiff had no valid reason for delay of payment, and must pay the penalty required.

Nevertheless, Plaintiff asserts that the Government violated the Debt Collection Improvement Act, 31 U.S.C. § 3717, in *calculating* the penalties assessed in this case, because penalties are due only if the debt is "more than 90 days past due." *See* Pl. P-H. Bf. at 10 (citing 31 U.S.C. § 3717(e)(2) ("[The Government] shall assess on a claim owed by a person . . . a penalty charge of not more than 6 percent a year for failure to pay a part of a debt more than 90 days past due."); Federal Claims Collection Standards, 31 C.F.R. § 901.9(d) ("Unless otherwise established in a contract, repayment agreement, or by statute, agencies shall charge a penalty, pursuant to 31 U.S.C. 3717(e)(2), not to exceed six percent a year on the amount due on a debt that is delinquent for more than 90 days.")); *see also* May 31, 2007 TR at 22-24. Plaintiff argues that the payment at issue was not "past due" until a notice was mailed on July 17, 2003. *See* Pl. P-H. Bf. at 9-10 (citing 31 U.S.C. § 3717(b) ( "Interest . . . accrues from the date . . . on which notice is mailed[.]")); *see also* May 31, 2007 TR at 23-24. Accordingly, Plaintiff concludes that the September 26, 2003 payment was not more than 90 days "past due," and therefore no penalties were ever owed. *See* Pl. P-H. Bf. at 10.

The Government contends that it correctly set the "past due" date at thirty-two days after the end of the quarter, approximately January 31, 2003. *See* Gov't Sec. P-H. Bf. at 2-3 (citing 8 U.S.C. § 1356(f)(3) ("The person who collects fees . . . shall remit those fees to the Attorney General at any time before the date that is thirty-one days after the close of the calendar quarter in which the fees are collected."); 8 C.F.R. § 286.5(b)(1) ("Fee remittances shall be sent to the Immigration and Naturalization Service . . . for receipt no later than [thirty-one] days after the close of the calendar quarter in which the fees are collected.")). Accordingly, the Government concludes that an independent notice of Plaintiff's continuing legal obligation was not required. *See* Gov't Sec. P-H. Bf. at 3-4 (citing *Cecile Indus., Inc.* v. *Cheney*, 995 F.2d 1052, 1055-56 (Fed. Cir. 1993) (holding offset provisions of Debt Collection Act do not limit the Government's common law offset rights)).

Section 901.9(d) of the Federal Claims Collection Standards provides that "agencies shall charge a penalty, pursuant to [the Debt Collection Improvement Act,] 31 U.S.C. 3717(e)(2) . . . on a debt that is delinquent for more than 90 days," and that "[t]his charge shall accrue from the *date of delinquency*." 31 C.F.R. § 901.9(d) (emphasis added); *cf. id*. § 901.9(b)(1) (providing that "*[i]nterest* shall accrue from the date of delinquency, *or as otherwise provided by law*" (emphasis added)). Accordingly, penalties accrue from the "date of delinquency," and not the "date that notice is first mailed" as is the case with interest, which is "otherwise provided for" in 31 U.S.C. § 3717(b). *Compare* 31 C.F.R. § 901.9(d) (providing that penalties accrue "from the date of delinquency") *with* 31 U.S.C. § 3717(b) ("*Interest* under subsection (a) of this section accrues from the date notice of the amount due is first mailed to the debtor at the most current address of the debtor available to the head of the executive or legislative agency." (emphasis added)). Because fees are due on "the date that is thirty-one days after the close of the calendar quarter in which the fees are collected," they are "past due" or "delinquent" thereafter. *See* 8 U.S.C. § 1356(f)(3); *see also* 8 C.F.R. § 286.5(b)(1). Accordingly, the Government's calculation of penalties, from 90 days past 31 days after the end of

the quarter until the September 12, 2003 Notice,[15] was correct, and Plaintiff is not due a refund for penalties paid on September 26, 2003. *See* 31 U.S.C. § 3717(e)(2) ("[The Government] shall assess on a claim owed by a person . . . a penalty charge of not more than 6 percent a year for failure to pay a part of a debt more than 90 days past due.").

## IV. CONCLUSION.

For the aforementioned reasons, the Clerk of the United States Court of Federal Claims is directed to enter judgment in favor of Plaintiff in the amount of $2,601,373 for uncollected Immigration User Fees, AQI User Fees, and interest illegally exacted by the Government.

**IT IS SO ORDERED.**

**s/Susan Braden**
**SUSAN G. BRADEN**
**Judge**

[15] The Government never gives the actual date on which penalties began to accrue, but states that the "date of delinquency" was 31 days after the end of the quarter, "at the latest, approximately January 31, 2003." Gov't Sec. P-H. Bf. at 5; *see also* Pl. P-H. Bf. Ex. 2. Accordingly, the court has determined that the accrual date was on or about April 30, 2003, several months before Plaintiff made the September 26, 2003 payment.